Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION, | Case No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |
| v. | |
| DOUG BURGUM, Secretary of the U.S. Department of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BOREN, Pacific Regional Director, Bureau of Ocean Energy Management, | **(Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c, 1801–1866; Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706)** |
| *Defendants*. | |

**INTRODUCTION**

1.    In this case, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation challenge the failure of Defendants the Secretary of the U.S. Department of the Interior, Bureau of Ocean Energy Management, and the Pacific Region Director of the Bureau of Ocean Energy Management (collectively, the "Bureau") to comply with the Outer Continental Shelf Lands Act (OSCLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, in managing offshore oil and gas activities at the Santa Ynez Unit in the Santa Barbara Channel. Specifically, the Bureau has failed, and is failing, to require Sable Offshore Corp. (Sable) to revise the Unit's development and production plans (DPPs), in violation of OCSLA, 43 U.S.C. § 1351(h)(3), its implementing regulations, 30 C.F.R. § 550.283(a), and the APA, 5 U.S.C. § 706(1), (2).

2.    Oil and gas production at the Santa Ynez Unit has been shut down since 2015, when an onshore pipeline used to transport oil from the Unit ruptured due to massive corrosion, spilling hundreds of thousands of gallons of oil into the coastal environment. The spill killed hundreds of birds and marine mammals, harmed shorelines and fish habitat, closed beaches and fisheries, and was the worst oil spill in California in decades.

3.    Even before the spill, oil and gas activities at the Santa Ynez Unit caused significant harm. The onshore facilities that processed oil and gas produced at the Unit were Santa Barbara County's largest source of greenhouse gas emissions, contributing 55 percent of its emissions. These facilities were also the County's largest source of other harmful air pollutants like volatile organic compounds, small particulate matter, and formaldehyde.

4.    Sable—the new owner of the offshore platforms in the Unit—wants to restart production and has informed its investors that it plans to do so in the second quarter of 2025. Without this Court's intervention, the Bureau will allow Sable to

restart production under woefully outdated DPPs that the Bureau's predecessor agency originally approved *in the 1970s and 1980s* and that have not been meaningfully revised since then.

5.     Sable's plan to restart production threatens California's coast with more oil spills, more toxic air pollution, and other harms. And while all offshore oil and gas drilling is dangerous, the age of the Santa Ynez Unit infrastructure heightens the inherent risks. Some of this infrastructure has been in place for nearly 50 years, well beyond its intended lifespan and the age scientists say significantly increases the risk of oil spills.

6.     OCSLA—the primary statute governing drilling in federal waters—contains several provisions that seek to minimize the harms from such activity and ensure offshore drilling is balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. § 1802(2).

7.     These provisions include non-discretionary mandates that the Bureau periodically review approved DPPs and require revisions to ensure that operations under such plans continue to comply with OCSLA, *id.* § 1351(h)(3), including that they do not cause undue "serious harm or damage to life (including fish and other aquatic life), … or to the marine, coastal or human environments," *id.* § 1351(h)(1)(D).

8.     The Bureau's regulations implementing OCSLA specify when oil companies must revise a DPP, including when operations would result in a significant increase in the volume of oil and gas production, an increase in air pollution that exceeds the amounts specified in an approved plan, or a significant increase in water pollution, among other circumstances. 30 C.F.R. § 550.283(a).

9.     These triggers are met here. Oil production has already exceeded the amount considered in the approved DPPs, and the Santa Ynez Unit has emitted significantly more air and water pollution than described in the approved DPPs.

New information also indicates that an oil spill from production activities at the Santa Ynez Unit could be substantially larger than that considered in the DPPs.

10.    OCSLA and its implementing regulations therefore mandate that the Bureau require Sable to revise the DPPs for the Santa Ynez Unit prior to Sable restarting production at the Santa Ynez Unit. Without revisions, Sable will operate under DPPs that do not reflect current science or the true scope of activities and emissions at the platforms. Without revisions, both the Bureau and the public will be left in the dark about the full scope of harms from restarting production at the Santa Ynez Unit and further environmental safeguards will go unaddressed.

11.    The Bureau's failure to require Sable to revise the Santa Ynez Unit DPPs threatens the marine environment and coastal communities with more oil spills and toxic pollution, and it violates the Bureau's legal obligations.

12.    Accordingly, Plaintiffs request an order from the Court declaring that the Bureau is violating OCSLA, its implementing regulations, and the APA; an order requiring the Bureau to come into compliance with OCSLA, its implementing regulations, and the APA; and an order prohibiting the Bureau from authorizing new oil and gas activities at the Santa Ynez Unit unless and until the Bureau complies with OCSLA, its implementing regulations, and the APA.

**JURISDICTION AND VENUE**

13.    The Court has jurisdiction over this matter under the citizen suit provision of OCSLA, 43 U.S.C. § 1349(a)(1), (b)(1), and under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 701–706, and 43 U.S.C. § 1349(a)(1).

14.    Venue is proper in this Court under 43 U.S.C. § 1349(b)(1) because some Defendants reside in this District and it is "the judicial district of the State nearest the place where the cause of action arose." Venue is also proper in this

Court under 28 U.S.C. § 1391(e) because some Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

15.    Plaintiffs provided notice of their intent to file this suit by letter to Defendants dated September 26, 2024. Defendants have not taken action to remedy their continuing violations by the date of this filing. Therefore, an actual controversy exists between the parties under 28 U.S.C. § 2201.

## PARTIES

### Plaintiffs

16.    Plaintiff Center for Biological Diversity (the Center) is a national conservation organization and California nonprofit corporation that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 79,000 members worldwide, including thousands in California. The Center brings this action on behalf of its members.

17.    The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and fish are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the California coastal environment from offshore oil and gas drilling activity.

18.    The Center's members regularly visit California beaches, including in Santa Barbara and Goleta, and the waters near the offshore platforms in the Santa Ynez Unit, for vocational and recreational activities such as swimming, surfing, kayaking, hiking, fishing, camping, viewing and studying wildlife, and photography. Plaintiffs' members derive recreational, spiritual, professional,

scientific, educational, and aesthetic benefits from their activities in these areas. Plaintiffs' members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

19.     Plaintiff Wishtoyo Foundation (Wishtoyo) is a Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties. Wishtoyo's mission is to preserve, protect, and restore Chumash culture, the culture of indigenous peoples, and the environment all peoples depend upon. The organization uses education, outreach, cultural programs, scientific study, restoration projects, advocacy, and legal action to attain this mission. Chumash tribes, bands, and clans have a long history of interaction with the marine waters of the Pacific Ocean and the Santa Barbara Channel, from Morro Bay to Malibu and out to and around the Channel Islands. Chumash peoples rely upon these lands and waters and their natural cultural resources to support and maintain Chumash traditional practices, ways of life, and ancestral connections. Wishtoyo's members use these lands and waters for ceremonial purposes; to connect with and celebrate their ancestors and cultural heritage; to gather natural cultural resources; and for educational purposes, recreational use, wildlife viewing, scientific study, and environmental monitoring. Wishtoyo's members intend to continue these uses as permitted.

20.     Since time immemorial, marine, and terrestrial species have played an important role in the culture and lifeways of Chumash maritime tribes, bands, and clans. Wishtoyo's Chumash members continue to have a strong cultural and spiritual interest in the protection of species. Wishtoyo's Chumash members navigate on tomols (Chumash plank canoes) and by other means through the Santa Barbara Channel, where encountering marine species is essential to their connection with their ancestors, providing them with a spiritual echo through time and a connection to the planet as they traverse between the Channel Islands (the

origin of the Chumash Peoples) and the mainland. The existence and abundance of species and habitat are also critical to the maintenance of Wishtoyo's Chumash members' cultural practices, lifeways, and ceremony. Wishtoyo brings this action on behalf of its members.

21.    Offshore oil and gas drilling activities degrade these habitats and threaten wildlife and the coastal environment. It also threatens Wishtoyo's Chumash members' ability to continue their traditional, educational, recreational, and environmental practices, ways of life, and ancestral connections. For example, offshore drilling activities increase air pollution that is harmful to public health and discharges wastewater that contaminates the ocean with pollutants that are toxic to marine species. It also requires the shipment of equipment to oil platforms, thereby increasing port and ship traffic, which in turn increases ocean noise and the risk of ship strikes of whales and other marine life.

22.    Offshore oil and gas activities also cause oil spills. Oil spills have a wide array of lethal and sublethal impacts on marine species, both immediate and long term. Direct impacts to wildlife from exposure to oil can include behavioral alteration, disease, suppressed growth, and death. Oil can also harm wildlife through reduction of key prey species. Oil destroys the water proofing and insulating properties of feathers and fur of birds and mammals, respectively, compromising their buoyancy and ability to thermoregulate. Oil spills can also lead to closures of beaches and recreational and commercial fisheries, causing widespread economic harm. Additionally, oil spills can harm cultural practices, as was the case with the 2015 spill from an onshore pipeline used to transport oil produced at the Santa Ynez Unit. The spill prevented Chumash people from participating in their annual tomol voyage across the Santa Barbara Channel to Limu, Chumash homeland in the Channel Islands, and their tomol village visits up and down the coast.

23.     The risk of oil spills is especially heightened at the Santa Ynez Unit, where drilling has occurred from platforms and pipelines installed between approximately 35–50 years ago. For example, the environmental impact statement for the onshore pipelines connected to the Santa Ynez Unit completed in 1985 determined that the probability of a spill more than doubles as the pipelines age from 20 to 40 years.

24.     Continued oil and gas drilling at the Santa Ynez Unit would increase the greenhouse gas emissions driving climate change. Scientists have determined that each barrel of federal California oil left in the ground would equate to roughly half a barrel reduction in net oil consumption, with associated reductions in greenhouse gas emissions.

25.     Offshore oil and gas drilling at the Santa Ynez Unit degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of Santa Barbara beaches, shorelines, and the surrounding waters where offshore drilling occurs at the Santa Ynez Unit. It harms water quality and wildlife that they study, fish for, and observe and decreases their ability to view species that are impacted by offshore drilling activities or abandon the area because of these activities.

26.     For example, one Center member who lives in Santa Barbara regularly recreates in and near beaches in southern California, including in coastal areas and waters near offshore oil platforms in the Santa Ynez Unit. He regularly surfs in places like Rincon and Sands Beach near Santa Barbara, Naples on the Gaviota Coast, Jalama Beach near Point Conception, and Oxnard Shores and Silver Strand in Ventura. He goes as often as possible, generally twice a week. He also hikes, sails, and scuba dives on and around the Channel Islands. While on these trips he enjoys looking for and enjoying wildlife in the area, including sea otters, fur seals, blue whales, humpback whales, black abalone, and other animals. He derives aesthetic, emotional, and physical benefits from these activities that are

essential to his well-being. Noise pollution, water pollution, vessel strikes, oil spills, and other impacts from oil and gas drilling activities at the Santa Ynez Unit disturb and harm the animals he is interested in seeing and make it less likely he can see these animals in the future. Oil spills from drilling activity at platforms Hondo, Harmony, and Heritage—which close beaches or ocean waters—impede his ability to enjoy recreational activities.

27.    Defendants' management and authorization of offshore drilling activities at the Santa Ynez Unit without requiring revision of the plans governing such operations means Defendants are failing to adequately protect California's ocean and already imperiled wildlife, exposing them and the coastal environment to increased risk of harm. Such risks include, but are not limited to, increased risk of death and injury to humpback whales, fin whales, and other animals from ship strikes; increased noise pollution; and increased risk of oil spills, which could have devastating environmental and economic consequences on a variety of marine life.

28.    The above-described aesthetic, recreational, professional, spiritual, and other interests have been, are being, and will continue to be adversely affected and irreparably injured by the Bureau's authorization and management of offshore oil and gas drilling activity at the Santa Ynez Unit without complying with OCSLA or the APA.

29.    Plaintiffs are also suffering procedural and informational injuries resulting from the Bureau's failure to require revision of the DPPs for the Santa Ynez Unit. The procedural requirements in OCSLA were designed to promote public participation and information. By not requiring revisions to the Santa Ynez Unit DPPs, the Bureau is, for example, depriving Plaintiffs' members of opportunities for public comment on those revisions and the environmental impacts of restarting offshore drilling activities at the Santa Ynez Unit.

30.    Plaintiffs' members have no adequate remedy at law and the requested relief is proper. Relief in this case would ensure the Bureau's authorization and

management of offshore drilling activity at the Santa Ynez Unit complies with relevant law, including OCSLA's requirements that sufficient environmental safeguards are in place and offshore drilling does not cause undue harm. The requested relief could result in additional mitigation and oversight of offshore drilling that would better protect the ocean and imperiled wildlife and alleviate the recreational, aesthetic, spiritual, and other injuries of Plaintiffs' members. The requested relief could also result in additional information and procedures that would allow Plaintiffs' members to actively participate in decisionmaking regarding the management and oversight of offshore drilling at the Santa Ynez Unit that would alleviate the informational and procedural injuries of Plaintiffs' members. An order declaring Defendants in violation of the law, an order requiring the Bureau to comply with the law, and an order prohibiting Defendants from authorizing additional activities at the Santa Ynez Unit unless and until Defendants comply with OCSLA and/or the APA would redress the injuries of Plaintiffs' members.

## Defendants

31.    Defendant Doug Bergum is the Secretary of the U.S. Department of the Interior and is sued in his official capacity. The Interior Department is responsible for managing and overseeing the development of oil and gas resources on the outer continental shelf in accordance with OCSLA. Secretary Bergum is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Interior Department and its Bureaus comply with all applicable laws and regulations, including OCSLA and the APA.

32.    Defendant Bureau of Ocean Energy Management (BOEM) is a federal agency within the U.S. Department of the Interior. BOEM is charged with managing the development of offshore resources, including oil exploration, development, and production in federal waters.

33.    Defendant Douglas Boren is the Pacific Regional Director of BOEM and is sued in his official capacity. Mr. Boren has responsibility for implementing and fulfilling BOEM's duties under OCSLA and the APA.

## STATUTORY BACKGROUND

### Outer Continental Shelf Lands Act

34.    OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf (OCS) for purposes of exploring and developing the oil and gas deposits of the OCS's submerged lands. 43 U.S.C. §§ 1331–1356b. The OCS generally begins three miles from shore—the outer boundary of state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

35.    There are four separate stages to developing an offshore oil well:

> (1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS.

*Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984), *superseded by statute on other grounds*, Coastal Zone Act Reauthorization Amendments of 1990, Pub. L. No. 101-508, 104 Stat. 1388-307.

36.    At the fourth stage, prior to the development of a well, OCSLA requires lessees to submit a DPP to the Secretary. 43 U.S.C. § 1351(a); *Sec'y of the Interior*, 464 U.S. at 340.

37.    The DPP must include a description of:

> (1) the specific work to be performed; (2) … all facilities and operations located on the [OCS] … directly related to the proposed development …; (3) the environmental safeguards to be implemented … and how such safeguards are to be implemented; (4) all safety standards to be met and how such standards are to be met; (5) an expected rate of development and production and a time schedule for

performance; and (6) such other relevant information as the Secretary may by regulation require.

43 U.S.C. § 1351(c).

38.    OCSLA's implementing regulations further define the requisite contents of a DPP. In particular, the plan must also include detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities; how such wastes will be disposed of; the frequency, duration and amount of emissions of volatile organic compounds (VOCs) and other pollutants that will be generated by development and production activities; and mitigation measures designed to avoid or minimize the take of protected species if there is reason to believe that protected species may be incidentally taken by planned development and production activities, among other information. 30 C.F.R. §§ 550.241–.262.

39.    OCSLA requires the Secretary to reject a DPP if, *inter alia*:

the lessee fails to demonstrate that he can comply with the requirements of [OCSLA] or other applicable Federal law …; [or] if the Secretary determines, because of … exceptional resource values in the marine or coastal environment, or other exceptional circumstances, that (i) implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life), to property, … or to the marine, coastal or human environments, (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time, and (iii) the advantages of disapproving the plan outweigh the advantages of development and production.

43 U.S.C. § 1351(h)(1).

40.    OCSLA vests the Secretary with the authority to require oil and gas companies to obtain a permit prior to engaging in drilling activities under an approved DPP. OCSLA's implementing regulations require an oil company to obtain approval of an application for permit to drill (also known as an APD) prior to conducting any drilling activities under an approved DPP. 30 C.F.R. § 550.281(a). The regulations specify that the activities proposed in an application

Complaint for Declaratory and Other Relief                                                    11

1    for permit to drill "must conform to the activities described in detail" in an

2    approved DPP. *Id*. § 550.281(b). The regulations also provide for approval of

3    drilling activities via approval of an application for permit to modify (also known

4    as an APM) when a company intends to revise its drilling plan. *Id*. § 250.465(a).

5         41.    OCSLA mandates that the Secretary review DPPs. 43 U.S.C.

6    § 1351(h)(3). The reviews "shall be based upon changes in available information

7    and other onshore or offshore conditions affecting or impacted by development and

8    production." *Id.*; *see also* 30 C.F.R. § 550.284(a) (OCSLA implementing

9    regulations mandating review of approved DPPs by the Bureau's Regional

10   Supervisors). If such review indicates that the DPP should be revised to ensure the

11   plan complies with OCSLA, the Secretary must require such revision. 43 U.S.C.

12   § 1351(h)(3).

13        42.    OCSLA specifies that the Bureau must approve revised DPPs in

14   accordance with the procedures for approving them in the first instance. *Id.*

15   § 1351(i).

16        43.    OCSLA regulations specifically require revision of DPPs when a

17   company proposes to, *inter alia*, "[c]hange the type of production or significantly

18   increase the volume of production or storage capacity; [i]ncrease the emissions of

19   [certain] air pollutant[s] … to an amount that exceeds the amount specified in [the]

20   approved [plan]; … [s]ignificantly increase the amount of solid or liquid wastes to

21   be handled or discharged;" or "[c]hange the location of [its] onshore support base

22   either from one State to another or to a new base or a base requiring expansion." 30

23   C.F.R. § 550.283(a). The regulations also require a company to supplement a DPP

24   when it "propose[s] to conduct activities … that require approval of a license or

25   permit which is not described in [the] approved [plan]." *Id.* § 550.283(b).

26        44.    Finally, OCSLA gives the Secretary the authority to order the

27   suspension of all development and production activities "if there is a threat of

28   serious, irreparable, or immediate harm or damage to life (including fish and other

aquatic life) … or to the marine, coastal, or human environment," among other reasons. 43 U.S.C. § 1334(a)(1)(B); *see also* 30 C.F.R. § 250.172(b) (OCSLA regulations authorizing suspensions of operations for the same reason).

45.     Each of these statutory provisions and requirements helps to ensure Congress's goal in OCSLA that, *inter alia*, "environmental safeguards" are in place and helps "to balance orderly energy resource development with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2)(B).

46.     The Secretary has delegated its authority under OCSLA to two bureaus within the Department of the Interior: BOEM and the Bureau of Safety and Environmental Enforcement (BSEE). BOEM is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf, including approving and managing DPPs. BSEE is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as approving applications for permits to drill a well and permits to modify.

**Administrative Procedure Act**

47.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

48.     Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

49.     Also under the APA, courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

# FACTUAL BACKGROUND

## Oil and Gas Drilling in the Santa Ynez Unit off California

50.    There are currently 30 active oil and gas leases on the Pacific OCS from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel and consists of 16 leases.

51.    There are three offshore production platforms at the Santa Ynez Unit: Platform Harmony, Platform Heritage, and Platform Hondo. Platform Hondo installed in June 1976, Platform Harmony was installed in June 1989, and Platform Heritage was installed in October 1989. Production began from these platforms between April 1981 and December 1993.

52.    The Bureau's predecessor agency approved the DPP for drilling at the Santa Ynez Unit from Platform Hondo in 1974 based on a plan submitted in 1971. The agency subsequently approved an updated plan for drilling from Platforms Harmony and Heritage in 1985, and again in 1988.

53.    In 1992, it approved a supplemental plan to allow the installation of topsides (i.e., the surface deck of a platform, which includes all drilling equipment) onto the previously installed Platforms Harmony and Heritage. And in 2014, the Bureau approved another DPP amendment to allow the replacement of two existing power cables from the onshore Las Flores Canyon processing facilities to Platform Harmony and the installation of a power cable from Platform Harmony to Platform Heritage to support electrical and communication equipment on both platforms.

54.    None of these amendments addressed relevant new information or operational changes, including the risk of oil spills, the age of the Santa Ynez Unit's infrastructure, the extent or length of production, or the extent of air pollution emissions from oil and gas operations at the Santa Ynez Unit.

55.     In December 2024, the Bureau issued a memorandum indicating that it was requiring all oil companies operating on the Pacific OCS to update their DPPs to account for terms and conditions of a February 2024 biological opinion issued by the National Marine Fisheries Service under the Endangered Species Act. Those terms and conditions require the Bureau to ensure that oil and gas vessel operators on the Pacific OCS report any collisions with marine mammals and sea turtles to the National Marine Fisheries Service. On information and belief, the Bureau is not requiring any other revisions to the Santa Ynez Unit.

56.     Until 2024, the ExxonMobil Corporation (Exxon) owned and operated all three platforms and produced oil from the Santa Ynez Unit for decades. Exxon sold the Santa Ynez Unit after it was shut down for nearly ten years due to the 2015 oil spill from an onshore pipeline (now owned by Sable), which ruptured and spilled what is now believed to be up to 450,000 gallons of oil on the Santa Barbara Coast. Sable is now the listed owner and operator of platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

57.     Sable financed the purchase with a loan from Exxon.

58.     Sable notified investors that the risks of offshore oil and gas production at the Santa Ynez Unit are heightened because most of the equipment has been "shut-in," meaning operations have been halted, since 2015.

59.     Sable has also told investors that it plans to resume drilling operations at the Santa Ynez Unit in the second quarter of 2025.

60.     Sable plans to restart oil production, including transport, using the same onshore pipeline system that ruptured in 2015. It decided not to replace the original pipelines. Instead, Sable applied for a state waiver from certain pipeline safety requirements because cathodic protection systems that are otherwise required to prevent pipeline corrosion have limited effectiveness on these pipelines.

61.    Sable's restart efforts have been fraught with problems. For example, on September 26, 2024, the California Geologic Energy Management Division sent Sable a letter noting that Sable was not in compliance with California bonding requirements for one of its facilities that processes oil produced at the Santa Ynez Unit.

62.    Additionally, Sable has undertaken construction work on the Santa Ynez Unit pipeline system that ruptured in 2015, including installing valves, excavation work, vegetation removal, grading and widening roads, and other activities. On September 27, 2024, the California Coastal Commission issued a Notice of Violation to Sable for unpermitted development in the coastal zone. Subsequently, Sable continued development activities in the coastal zone, and on October 4, 2024, the Commission sent a letter of its intent to issue a cease-and-desist order if necessary to halt project work. On November 12, 2024, the Commission's Executive Director issued a Cease and Desist Order that cited safety and environmental risks of the unpermitted development activities and ordered Sable to stabilize and restore sites to prevent further damage to coastal resources. According to the Commission, instead of coming to an agreement, Sable moved its operations to offshore state waters to carry out additional activities and resumed anomaly repair work on the onshore pipelines in February 2025. The Commission issued another cease-and-desist order to Sable on February 18, 2025, to halt its unpermitted onshore and offshore developmental activities. Rather than comply with this directive, Sable sued the Commission, continued its work in the coastal zone, and informed investors that its "pipeline repair operations remain unaffected."

63.    Further, following an inspection, the Central Coast Regional Water Quality Board issued violation and non-compliance notices to Sable on December 13, 2024, for unauthorized waste discharge into Santa Barbara County waterways and directed Sable to seek permit coverage for its discharges.

64.     On December 17, 2024, the California Department of Fish and
Wildlife also issued a notice to Sable of state Fish and Game Code violations
concerning its activities on the department's properties.

65.     On the federal side, in September 2024, BSEE issued two permits to
modify to Sable to perforate two of its wells at the Santa Ynez Unit, the primary
purpose of which is to "[e]nhance [p]roduction." Perforating the wells that have
been shut down since 2015 is a necessary step toward restarting production at the
offshore oil and gas platforms in the Santa Ynez Unit. BSEE approved the permits
within four business days of receiving the permit applications.

**Harms of Offshore Oil and Gas Drilling**

66.     Oil and gas development and production activities in the Pacific,
including at the Santa Ynez Unit, have numerous harmful effects on coastal and
marine species in California.

67.     For example, oil and gas drilling exacerbates climate change, which is
already threatening many species with extinction and causing more intense storms,
droughts, and wildfires, among other harms.

68.     Oil and gas drilling also includes the discharge of drilling muds and
cuttings, produced wastewater, and well treatment and workover fluids. The
federal government permits platforms Harmony, Heritage, and Hondo to discharge
more than 33.76 million gallons of produced wastewater into the ocean each year.
These discharges can contain toxic chemicals like benzene (a known carcinogen),
heavy metals, and radioactive materials.

69.     Oil and gas activity off California has also entailed the use of well
stimulation treatments such as hydraulic fracturing (fracking) and acidizing. These
practices cause significantly worse impacts to the environment and public health
than conventional offshore oil and gas production. The harmful impacts from well
stimulation treatments include the discharge of toxic wastewater, emissions of
hazardous air pollutants, and increased risks of earthquakes and oil spills, among

other harms. Exxon previously used well stimulation treatments at the Santa Ynez Unit and has stated it would likely need to use well stimulation treatments to restart the platforms in the Santa Ynez Unit.

70.    Oil and gas drilling activities also release harmful air pollutants like fine particulate matter and VOCs. VOCs emitted during drilling activities can include the "BTEX compounds"—benzene, toluene, ethyl benzene, and xylene—which are designated as hazardous air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term and long-term effects to the respiratory, nervous, and circulatory systems. Additionally, VOCs create ground-level ozone, or smog, which can contribute to asthma, premature death, stroke, heart attack, and low birth weight. Benzene is also a known carcinogen and has been detected in people living within a 10-mile radius of oil wells where fracking has occurred.

71.    The impacts also include noise pollution from vessel and air traffic, conductor installation and pile driving, and production operations on platforms. Noise pollution can interfere with important biological functions of marine mammals like feeding, mating, and rearing young.

72.    Vessel traffic from offshore oil and gas activity can also lead to vessel strikes of large whales and other marine animals. Vessel strikes can kill or injure large whales and other animals by causing blunt force trauma, resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or amputations.

73.    Oil spills are another impact of offshore drilling. Drilling off California has been accompanied by spills and other accidents since its early days, including a spill of more than 2,000 gallons from Platform Hogan in 1968 and the infamous 1969 spill from Platform A in the Santa Barbara Channel that spewed upwards of 4.2 million gallons of oil into the ocean.

74.     Other spills have occurred since. For example, in addition to the 2015 spill, in October 2021, an offshore pipeline connected to Platform Elly in federal waters off California spilled 25,000 gallons of oil into the ocean.

75.     Oil spills can have devastating impacts on a wide variety of wildlife. Oil spills have an array of lethal and sublethal impacts on marine species, both immediate and long-term. Direct impacts to wildlife from exposure to oil include behavioral alteration, suppressed growth, induced or inhibited enzyme systems, reduced immunity to disease and parasites, lesions, tainted flesh, and chronic mortality. Oil can also exert indirect effects on wildlife by reducing key prey species. Oil destroys the waterproofing and insulating properties of feathers and fur of birds and mammals, respectively, thereby compromising their buoyancy and ability to thermoregulate.

76.     Marine mammals can be exposed to oil externally by swimming in oil and internally by inhaling volatile compounds at the surface, swallowing oil, and consuming oil-contaminated prey. Exposure to toxic fumes from petroleum hydrocarbons during oil spills has been recently linked to mortality in cetaceans, even years after such incidents occur.

77.     Exposure to crude oil also adversely affects fish at all stages. Early-life stages of fish are particularly sensitive to the effects of toxic oil components such as polycyclic aromatic hydrocarbons, which can cause larval deformation and death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver, changes in heart and respiration rates, fin erosion, and reproductive impairment. Additionally, fish and sharks are at risk from lethal coating of their gills with oil and declines in and contamination of their food sources. Exposure to crude oil has also been linked to long-term population effects in fish. A study based on 25 years of research demonstrated that embryonic salmon and herring exposed to very low levels of crude oil can develop heart defects that impede their later survival.

78.     Official reports document that the 2015 oil spill killed at least 558 birds and 232 mammals, including 19 dolphins and more than 94 sea lions. A wide variety of nearshore fish species were impacted by the spill, including surfperch and grunion, which were spawning at the time of the spill. The actual number of birds killed is likely to be four times the number of birds recovered. The spill also impacted a variety of coastal habitats, including kelp wrack, feather boa kelp, surfgrass, and eelgrass. Humpback whales were seen swimming in the spilled oil. Scientists predict the ecological impacts of these spills will be felt for years to come.

79.     Oil spills not only harm wildlife, but public health, commercial fisheries, tourism, and recreation. For example, following the 2015 spill, the California Department of Fish and Wildlife closed 138 square miles of marine waters to fishing and shellfish harvesting, two State Parks were closed, and the Governor declared a state of emergency in Santa Barbara County.

80.     While oil spills occur wherever offshore drilling activities occur, the risk of spills is especially acute off California because of the age of the oil and gas infrastructure.

81.     For example, the pipeline that ruptured in 2015 was built in 1987. The 1985 environmental impact statement that the Bureau of Land Management and California State Lands Commission prepared for the construction and operation of the pipeline acknowledged that spills happen and determined that the risk of a spill would more than double as the pipeline aged from 20 to 40 years. Many of the offshore pipelines in the Santa Ynez Unit have reached 40 years of age.

82.     According to scientists, aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines. These impacts accelerate over time and can act synergistically to increase the rate of crack propagation. Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to

15 percent. One offshore pipeline study found that the annual probability of pipeline failure increases rapidly after 20 years, equating to a probability of failure of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found that accident incident rates, including spills, increased significantly with the age of infrastructure.

83.    A recent analysis of federal records found that from 1986 to July 2021, nearly 1400 oil and gas pipeline leaks, spills, and other significant incidents in California caused at least $1.2 billion in damages, as well as 230 injuries and 53 deaths.

84.    Older wells can also lead to oil spills or other accidents. For example, one study found that 30 percent of the offshore oil wells in the Gulf of Mexico experienced well casing damage in the first five years after drilling, and damage increased over time to 50 percent after 20 years. Another study determined about five percent of oil and gas wells leak immediately, 50 percent leak after 15 years, and 60 percent leak after 30 years.

85.    Federal records show that the Santa Ynez Unit has already experienced problems. Before it shut down, federal inspectors on May 1, 2015, found "numerous corrosion issues" and components out of compliance on Platform Hondo. Inspectors also found corrosion at Platform Hondo on April 30, 2015, and, the week prior, found five failed gas detectors and "leakage rates higher than the maximum allowable" on that platform's Well H-12U. Platforms Harmony, Heritage, and Hondo had early-2015 gas leaks that required work crews to gather for safety reasons, including an incident on Platform Heritage the morning of May 19, 2015. Platform Hondo also had a gas leak on April 27, 2015, and Platform Harmony had one on March 29, 2015.

86.    More recent problems have also occurred. For example, during maintenance activities on October 24, 2024, there was a leak of hydraulic fluid

from an equipment line at Platform Harmony; and an electrical incident at Platform Hondo on November 19, 2024, resulted in an arch flash.

## The Bureau Must Require Revision of the Santa Ynez Unit Development and Production Plans

87.     OCSLA and its implementing regulations mandate that the Bureau require Sable to revise the DPPs for the Santa Ynez Unit prior to restarting any production. The Bureau's failure to do so would violate the agency's clear legal obligations and put our coastal environment at greater risk from this dangerous offshore drilling project.

88.     The circumstances specified in the Bureau's regulations that trigger the requirement to revise an approved DPP include a proposed change in the type of production or a significant increase in the volume of production; an increase in the emissions of an air pollutant to a quantity that exceeds the amount specified in the approved plan; or a significant increase in the amount of solid or liquid wastes to be handled or discharged, among others. 30 C.F.R. § 550.283(a). OCSLA regulations also require a company to supplement a DPP when it proposes to conduct activities that require approval of a license or permit that is not described in the approved plan. *Id*. § 550.283(b)

89.     On information and belief, the Bureau has not required revision or supplementation of the Santa Ynez Unit DPPs for any of these reasons. The Bureau has failed to do so even though the original approved DPPs are decades old and subsequent narrow DPP amendments did not consider or account for a host of highly relevant new information and operational changes.

90.     The requirement to revise the DPPs is triggered by several factors. For example, because the Santa Ynez Unit platforms have been offline for nearly a decade, restarting drilling activity would significantly increase the degree and composition of air emissions, the amount and composition of wastewater, and the volume of production.

Complaint for Declaratory and Other Relief                                          22

91.    The Santa Ynez Unit has already exceeded the level of production contemplated in the DPPs and associated environmental analyses. Those DPPs estimated extraction of the oil and gas reserves in the Santa Ynez Unit to "take place over a period of approximately 25 to 35 years." Production from the Unit began in 1981, so it should have ceased by 2016.

92.    Moreover, the DPPs also stated that Exxon "estimates that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels … of crude oil and 600 to 700 billion standard cubic feet … of natural gas." However, BSEE reports that Exxon already produced over 507.4 million barrels of oil and over 963.1 billion cubic feet of gas from the three platforms in the Santa Ynez Unit—well beyond what is considered in the DPPs.

93.    And in 2010, Exxon drilled what was then the longest extended-reach well from an existing offshore platform in the world. At the time, Exxon stated that it would increase the company's ability to produce more oil at the Santa Ynez Unit.

94.    The facts that the Santa Ynez Unit has outlived its expected production timeline, that Exxon already produced more oil than contemplated under the DPPs, and that Exxon used new technology to increase production all mean that the overall level of production is significantly larger and more harmful than considered in the DPPs. This triggers the Bureaus' duty to require revision of the Santa Ynez Unit DPPs.

95.    The Bureau's duty to require revision of the DPPs is also triggered because drilling activities at the Santa Ynez Unit will emit air pollution in a quantity that exceeds the amount specified in the approved plans. The DPP for Platform Hondo states, for example, that vapor recovery systems on all crude oil storage tanks and crude processing vessels would "essentially eliminate volatile organic compound (VOC) emissions." However, when it was operational, the processing facilities for the Santa Ynez Unit were Santa Barbara County's largest source of VOC emissions.

96.     The DPPs also state that the Santa Ynez Unit facilities will include design features to minimize fugitive emissions. But fugitive emissions have consistently occurred at Santa Ynez Unit facilities. These leaks are a significant source of the Unit's VOC emissions. Exxon previously stated that it was unable to determine the cause of the leaks but that they are likely "due to the high vibration, operating pressures and thermal expansion/contraction that occurs during start-ups & shutdowns of the equipment," and, as such, "it is relatively *next to impossible* to totally to prevent a recurrence" of these leaks.

97.     The DPPs are silent on the issue of greenhouse gas emissions. Before it shut down in 2015, the onshore processing facilities for the Santa Ynez Unit were Santa Barbara County's largest facility source of greenhouse gas emissions, contributing 55 percent of the County's total emissions. And greenhouse gas emissions come not only from processing the oil and gas and earlier stages of the drilling process, but from consumption of the produced oil itself.

98.     In other words, the amount of air pollution from oil and gas production at the Santa Ynez Unit is greater than that considered in the approved DPPs. This triggers the Bureau's duty to require revision of the DPPs.

99.     The Bureau must also require revision of the DPPs because new information indicates an oil spill could be substantially larger than described in the DPPs. For example, the DPPs claimed that containment measures for the onshore facilities associated with the Santa Ynez Unit "will be extremely effective in dealing with most spills" and that such spills "are typically small (less than 5 barrels)" or 210 gallons. However, the 2015 spill spilled significantly more oil than the amount contemplated by the Santa Ynez Unit DPPs. Santa Barbara County recently described the spill as roughly 123,228 gallons, but an expert report indicates that it could have been as high as 451,500 gallons. And the County also recently acknowledged that the onshore pipeline serving the Santa Ynez Unit platforms could spill once a year and rupture once every four years. A recent

analysis by Sable indicates that a worst-case spill from this pipeline could be over 1.7 million gallons.

100.   The old age and degraded state of the Santa Ynez Unit infrastructure compounds the risk of an oil spill. According to scientists, aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines. Subsea pipeline corrosion accelerates over time and can act synergistically with fatigue stress to increase the rate of crack propagation. One offshore pipeline study found that the annual probability of pipeline failure increases rapidly after 20 years, with a probability of failure of 10 to 100 percent per year.

101.   Moreover, records from the federal government show that the platforms in the Santa Ynez Unit had widespread corrosion and gas leaks requiring emergency responses before they were shut down after the 2015 oil spill. And the Unit's new owner, Sable, has quickly amassed a track record of environmental citations in its short possession. This increases the risk of spills and other accidents that should be properly accounted for in a revised DPP.

102.   The Bureau's duty to require revision of the DPPs is also triggered because the prior owner of the SYU leases—Exxon—indicated its intent to use well stimulation treatments to both restart and continue to develop oil at the Santa Ynez Unit. An Exxon employee stated in a declaration that the company would use "certain acid well stimulation treatments at one or more wells." Many of the chemicals used for acid well stimulation are highly hazardous and include carcinogens, mutagens, reproductive toxins, developmental toxins, endocrine disruptors, or high acute toxicity chemicals. Each well stimulation treatment would release tens of thousands of gallons of discharges, including these chemicals, into the oceans, causing adverse ecosystem effects. For example, a 2021 study discovered that produced waters mixed with hydraulic fracturing chemicals had acute toxicity and thiol reactivity up to nine months after fracking in some cases.

103.   In other words, resuming oil and gas production at the Santa Ynez Unit would significantly change the types and quantity of water pollution discharges contemplated under the DPPs for the Santa Ynez Unit. This triggers the Bureau's duty to require revision of the DPPs.

104.   Additionally, Sable has told investors that it intends to build a new control center in Santa Maria. At the time of the 2015 oil spill, the onshore pipeline system's control room was in Texas. This triggers the Bureau's duty to require revision of the DPPs because the control base is changing from one state to another and/or to a new or expanded base.

105.   The Bureau has not required revision of the DPPs for the Santa Ynez Unit for any of these reasons.

**CLAIM FOR RELIEF**
**Failure to Require Revision of the Santa Ynez Unit DPPs**

106.   Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 105 of this Complaint.

107.   OCSLA mandates that the Bureau "shall, from time to time, review each plan approved under [section 1351 of OCSLA]" and require revisions to ensure DPPs meet the requirements of the statute. 43 U.S.C. § 1351(h)(3). The agency's regulations implementing OCSLA state that DPPs must be revised in certain circumstances, including when an operator "propose[s] to: [c]hange the type of production or significantly increase the volume of production;" "[i]ncrease the emissions of [certain] air pollutant[s] … to an amount that exceeds the amount specified in [the] approved [plan];" "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged;" or "[c]hange the location of your onshore support base either from one State to another or to a new base or a base requiring expansion;" among other situations. 30 C.F.R. § 550.283(a).

108.   On information and belief, the Bureau has failed to require revisions of the DPPs for the Santa Ynez Unit to address the fact that (1) the Unit has

outlived its expected production timeline; (2) more oil and gas has been and will be produced at the Unit than contemplated under the DPPs; (3) oil and gas production at the Unit has and will emit more air pollution than specified in the DPPs; (4) oil and gas production at the Unit will discharge significantly more water pollution than considered in the DPPs; (5) the infrastructure has outlived its intended lifespan; and (6) the risk of another oil spill from production at the Unit is heightened. It has also failed to require revisions for the changed location and construction of a new onshore control room or the restart of production after a nearly 10-year hiatus.

109.    The Bureau's failure to require revisions of the DPPs for the Santa Ynez Unit violates OCSLA, 43 U.S.C. § 1351, its implementing regulations, 30 C.F.R. §§ 550.283, 550.284, and/or constitutes "agency action unlawfully withheld or unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1). Alternatively, the Bureau's determination that the DPPs for the Santa Ynez Unit need not be revised for any reason other than to include the terms and conditions in a 2024 biological opinion (regarding reporting vessel collisions with marine mammals and sea turtles) constitutes an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and made "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that Defendants' failure to require revisions of the DPPs for the Santa Ynez Unit violates OCSLA, its implementing regulations, and/or the APA;

2.    Order Defendants to require revisions of the DPPs for the Santa Ynez Unit;

3.    Prohibit Defendants from authorizing new oil and gas drilling activity at the Santa Ynez Unit unless and until revision of the DPPs is complete;

4.      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

5.      Grant such other relief as the Court deems just and proper.

Respectfully submitted this 2nd day of April 2025,

/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150

*Attorneys for Plaintiffs*