**LATHAM & WATKINS LLP**
Daniel P. Brunton (Bar No. 218615)
Email: daniel.brunton@lw.com
12670 High Bluff Drive
San Diego, CA 92130
Tel.: (858) 523-5400
Fax: (858) 523-5450

Michael G. Romey (Bar No. 137993)
Email: michael.romey@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Janice M. Schneider (*Pro Hac Vice Pending*)
Email: janice.schneider@lw.com
Devin M. O'Connor (*Pro Hac Vice Pending*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Proposed Intervenor-Defendant Sable Offshore Corp.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DOUG BURGUM, Secretary of the U.S. Department of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BOREN, Pacific Regional Director, Bureau of Ocean Energy Management,<br><br>        *Defendants*. | CASE NO. 2:25-cv-02840-MWC-MAA<br><br>**SABLE OFFSHORE CORP.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE**<br><br><u>Hearing</u><br>Date: June 20, 2025<br>Time: 1:30 PM<br>Judge: Hon. Michelle Williams Court<br>Courtroom: 6A |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................1

II. BACKGROUND ..................................................................................2

    A. BOEM's Discretion for Periodic DPP Review ...............................2

    B. The Santa Ynez Unit Is Subject to an Approved DPP.......................4

    C. As Owner and Operator of the Santa Ynez Unit Assets, Sable Has Significant Protectable Interests at Stake in This Case ......................................................................................6

III. ARGUMENT ......................................................................................8

    A. Sable Is Entitled to Intervention as a Matter of Right.......................8

        1. Sable's Intervention Motion Is Timely....................................9

        2. Sable Has Significant Protectable Interests Related to the Subject of This Action ...................................................10

        3. Sable's Ability to Protect Its Interests Would Be Impaired by a Decision in Plaintiffs' Favor...........................11

        4. Existing Parties Will Not Adequately Represent Sable's Interests ......................................................................12

    B. Alternatively, This Court Should Grant Permissive Intervention ......................................................................................15

    C. Sable Should Be Permitted to File Its Answer or Other Responsive Pleading By the Same Deadline as Federal Defendants......................................................................................15

IV. CONCLUSION....................................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*,
    No. 14-cv-09603, 2015 WL 12745805 (C.D. Cal. Mar. 25, 2015) ....................16

*Arakaki v. Cayetano*,
    324 F.3d 1078 (9th Cir. 2003) ........................................................................13

*Beckman Indus., Inc. v. Int'l. Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992) ..........................................................................16

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
    647 F.3d 893 (9th Cir. 2011) ...............................................................9, 12, 13, 14

*Ctr. for Biological Diversity v. Haaland*,
    No. 2:24-CV-05459-MWC-MAA, 2024 WL 5339157 (C.D. Cal.
    Dec. 3, 2024).......................................................................1, 9, 11, 12, 14

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
    No. 10-cv-0254, 2010 WL 5139101 (S.D. Ala. Dec. 9, 2010)..........................14

*Env't Def. Ctr. v. Bureau of Safety & Env't Enf't*,
    No. 2:14-cv-09281, 2015 WL 12734012 (C.D. Cal. Apr. 2, 2015) .............11, 12

*Friends of the Earth v. Haaland*,
    No. 21-cv-2317, 2021 WL 5865386 (D.D.C. Dec. 11, 2021).............................8

*Int'l Fur Trade Fed'n v. City & Cnty. of San Francisco*,
    No. 20-cv-00242, 2020 WL 6931066 (N.D. Cal. Apr. 17, 2020) ......................16

*Montana Wildlife Fed'n v. Haaland*,
    No. 20-35793, 2022 WL 42794 (9th Cir. Jan. 5, 2022).....................................13

*Sequoia ForestKeeper v. Price*,
    No. 1:16-cv-0759, 2017 WL 56655 (E.D. Cal. Jan. 5, 2017)............................14

*Sequoia ForestKeeper v. Watson*,
    No. 1:16-cv-1865, 2017 WL 4310257 (E.D. Cal. Sept. 28, 2017)
    ..................................................................................9, 10, 11, 14

*Sierra Club v. EPA,*
   995 F.2d 1478 (9th Cir. 1993) ....................................................................8

*Sw. Ctr. For Biological Diversity v. Berg,*
   268 F.3d 810 (9th Cir. 2001) .........................................................9, 11, 14

*Thompson v. Thompson,*
   No. 2:18-cv-04269, 2018 WL 6133659 (C.D. Cal. July 31, 2018) ...................16

*Trbovich v. United Mine Workers of Am.,*
   404 U.S. 528 (1972) ....................................................................................13

*W. Watersheds Project v. Haaland,*
   22 F.4th 828 (9th Cir. 2022) .......................................................................13

*Wilderness Society v. U.S. Forest Service,*
   630 F.3d 1173 (9th Cir. 2011) (en banc) ..............................8, 9, 10, 12

**STATUTES**

5 U.S.C. § 551(8) ........................................................................................10

43 U.S.C.
   § 1351(a) ...............................................................................................2, 11
   § 1351(h)(3) ...............................................................................................3

**REGULATIONS**

30 C.F.R.
   § 550.201(a) .........................................................................................2, 11
   § 550.241 ...................................................................................................3
   § 550.283 ...................................................................................................3
   § 550.284 ...................................................................................................5
   § 550.284(a) ...............................................................................................3
   § 550.284(b) ...............................................................................................3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

CASE NO. 2:25-cv-02840-MWC-MAA
SABLE'S MEMORANDUM IN SUPPPORT OF
MOTION TO INTERVENE

# RULES

Fed. R. Civ. P.

24.................................................................................................................12
24(a)(2) .......................................................................................................14
24(b)(1)(B)...................................................................................................15
24(b)(3) .......................................................................................................15
24(c) ...........................................................................................................15

L.R. 7-3 ..............................................................................................................1

# OTHER AUTHORITIES

39 Fed. Reg. 16,910 (May 10, 1974) ........................................................................4

## I.    INTRODUCTION

Proposed Intervenor-Defendant Sable Offshore Corp. ("Sable") is an independent oil and gas company headquartered in Houston, Texas.  Sable owns three offshore oil and gas platforms and associated facilities in the Santa Ynez Unit, located in federal waters north of Santa Barbara, California.  Sable is authorized to operate the Santa Ynez Unit pursuant to the approved Development and Production Plans ("DPP"), including the Harmony Platform DPP that Plaintiffs challenge here, alleging violations of the Outer Continental Shelf Lands Act ("OCSLA") and the Administrative Procedure Act ("APA").  The Santa Ynez Unit operated for decades pursuant to the approved DPPs, which have been reviewed and revised in the ordinary course.

This case is the second lawsuit Plaintiffs have filed in this Court seeking to prevent oil and gas production at the Santa Ynez Unit.  For the same reasons as the Court granted Sable's motion to intervene in a related case,[1] Sable respectfully requests that the Court grant its motion to intervene as of right as a defendant in the instant case, because Sable meets the requirements of Federal Rule of Civil Procedure 24(a)(2), and to align its responsive pleading deadline with that of the federal government.  This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on April 3, April 4, April 22, and April 24, 2025.  The Plaintiffs do not oppose Sable's intervention and do not oppose Sable's request to align its responsive pleading with that of the federal government.  The Federal Defendants take no position on Sable's intervention and Sable's request to align its Answer or other responsive pleading deadline.

---

[1] *Ctr. for Biological Diversity v. Haaland*, No. 2:24-CV-05459-MWC-MAA, 2024 WL 5339157, at *1 (C.D. Cal. Dec. 3, 2024).  The Court determined these two cases are "related" because they "[a]rise from the same or closely related transactions, happenings or events."  Order, Dkt. No. 10.

The requested intervention is timely as Sable files this motion to intervene only 41 days after Plaintiffs filed their Original Complaint and only one day after Plaintiffs filed their Amended Complaint.  Sable entered into a purchase and sale agreement for the Santa Ynez Unit assets in 2022 and has committed close to $1 billion to date associated with the purchase, repair, maintenance, and upgrades of these assets.  As the leaseholder, owner, and operator of the Santa Ynez Unit assets, Sable has significant property, economic, and contractual interests in this action—including Sable's rights to conduct oil and gas activities under its approved DPP—which would be impaired if Plaintiffs prevail and which can only be protected through Sable's intervention in this action.  Finally, Sable's unique, private interests in the Santa Ynez Unit assets are not adequately represented by the Federal Defendants in this action.  Under Ninth Circuit precedent, Sable as an oil-and-gas lessee and private owner of the facilities plainly meets the requirements to intervene as of right in a lawsuit that challenges its ability to operate its assets.  Alternatively, the Court should grant Sable permissive intervention under Federal Rule of Civil Procedure 24(b) because Sable also satisfies those requirements.

If the Court grants Sable's Motion to Intervene, Sable respectfully requests that the Court permit Sable to file its Answer or other responsive pleading pursuant to Federal Rule of Civil Procedure 24(c) by the same deadline as Federal Defendants in this case or three days after intervention is granted, whichever is later.

## II.    BACKGROUND

### A.    BOEM's Discretion for Periodic DPP Review

Before an operator may "[c]onduct any development and production activities on a lease or unit in any [Outer Continental Shelf] area other than the Western Gulf of Mexico," they must submit, and BOEM must approve, a DPP.  30 C.F.R. § 550.201(a); *see* 43 U.S.C. § 1351(a).  A DPP includes a description,

1  discussion of the objectives, and tentative schedule of the development and

2  production activities proposed to be undertaken, the location and water depth of

3  each of the proposed wells and production facilities, a description of the drilling

4  unit and associated equipment used to conduct the proposed development drilling

5  activities, and description of the production platforms, satellite structures, subsea

6  wellheads and manifolds, lease term pipelines, production facilities, umbilicals,

7  and other facilities used to conduct the proposed development and production

8  activities.  30 C.F.R. § 550.241.

9      The OCSLA statute requires the Secretary of the Interior to, "from time to

10  time," review each approved DPP "based upon changes in available information

11  and other onshore or offshore conditions affecting or impacted by development and

12  production pursuant to such plan."  43 U.S.C. § 1351(h)(3).  "If the review

13  indicates that the plan should be revised to meet the requirements of this

14  subsection, the Secretary shall require such revision."  *Id.*  Likewise, BOEM's

15  OCSLA implementing regulations provide that the agency "will periodically

16  review the activities" conducted under an approved DPP and "may require" the

17  operator to submit updated information on its activities.  30 C.F.R. § 550.284(a).

18  "The frequency and extent of this review will be based on the significance of any

19  changes in available information and onshore or offshore conditions affecting, or

20  affected by, the activities in" the DPP.  *Id.*  The regulations provide BOEM

21  considerable discretion, explaining that the agency "*may require* you [the operator]

22  to revise your approved . . . DPP . . . based on this review."  *Id.* § 550.284(b)

23  (emphasis added).[2]

24

25

26

27  ─────────────
   [2] The regulations also provide when *lessees or operators* must revise or
   supplement their DPPs.  *See* 30 C.F.R. § 550.283.

28

**B.   The Santa Ynez Unit Is Subject to an Approved DPP**

The prior Santa Ynez Unit owner and operator, then Exxon Company—U.S.A, prepared a plan of operations governing the unit in November 1970. Declaration of Steven P. Rusch in Support of Motion to Intervene ("Rusch Decl.") ¶ 9.  The Department of the Interior's United States Geological Survey conducted technical and environmental analysis of this plan, which resulted in a final environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA") in May 1974.  *Id*.; *see* 39 Fed. Reg. 16,910 (May 10, 1974).  The Secretary of the Interior approved this initial plan of development in August 1974. Rusch Decl. ¶ 9.[3]

In 1982, Exxon Company, U.S.A. prepared a DPP for the Santa Ynez Unit, building upon the approved initial plan of development.  This DPP, as it has been revised, amended, and supplemented over the years, are the plans the Plaintiffs describe as "the DPPs," including "the DPP for Platform Harmony," in their First Amended Complaint filed on May 12, 2025, Dkt. No. 12 ("Amend. Compl.").  *See* Amend. Compl. ¶¶ 51, 88-106.  In addition to the existing Hondo platform, the 1982 DPP described the future development of the Santa Ynez Unit, including two to four conventional platforms in Outer Continental Shelf waters, interconnecting oil and gas gathering pipelines, power cables, and water lines, and other facilities, including in Los Flores Canyon.  Rusch Decl. ¶ 10.  Following environmental review, the U.S. Minerals Management Service ("MMS", the predecessor agency to BOEM) approved the Santa Ynez Unit DPP in 1985.  *Id*. ¶ 11.

The Santa Ynez Unit DPP has been revised, supplemented, and updated several times since then, as needed.  In June 1985, Exxon Company, U.S.A. updated the DPP, calling for three or four additional platforms in the Santa Ynez

---

[3] This initial plan covered the development of the Hondo oil field by a single platform, an oil and a gas pipeline to carry production to shore, and other facilities. Rusch Decl. ¶ 9.

1  Unit and two crude oil treatment and storage options. *Id.* In September 1985,

2  MMS approved the DPP option for transporting oil by pipeline to facilities onshore

3  in Las Flores Canyon and in State waters. *Id.* In September 1987, Exxon

4  Company, U.S.A. revised the DPP once more to provide for the installation of

5  platforms Harmony and Heritage, as well as another platform that was never built

6  (Heather), in the Santa Ynez Unit with associated subsea pipelines to facilities in

7  Las Flores Canyon. *Id.* ¶ 12. MMS approved the DPP revisions, with conditions,

8  in April 1988. *Id.* In June 1992, Exxon Company, U.S.A. submitted a request to

9  MMS to install the topsides onto the previously installed Platform Harmony and

10  Heritage jackets, which was approved in August 1992. *Id.* ¶ 13.

11      In August 1997, Exxon Company, U.S.A. submitted a DPP revision

12  proposing to install a gas pipeline from Platform Heritage to Platform Harmony in-

13  lieu-of a pipeline to shore, topside modifications, and a steel catenary riser on

14  Platform Harmony. *Id.* ¶ 14. MMS approved the revisions in December 1997. *Id.*

15  In May 2014, ExxonMobil submitted a request to BOEM to revise the DPP to

16  replace existing power cables serving platforms Harmony and Heritage, which was

17  approved in October 2014. *Id.* ¶ 15. Numerous environmental reviews, as

18  appropriate, and extensive mitigation requirements currently in place support

19  development and operation of the Santa Ynez Unit. *See id.* ¶¶ 9-15. The DPP was

20  also recently revised in 2024 following a Biological and Conference Opinion,

21  dated February 27, 2024, prepared by the National Marine Fisheries Service

22  ("NMFS") for BOEM and the Bureau of Safety and Environmental Enforcement.

23  *Id.* ¶ 16. In accordance with 30 C.F.R. § 550.284, BOEM "conducted a periodic

24  review of [Sable's] approved DPP based on the Biological Opinion" and directed

25  Sable "to revise its Development and Production Plan  (DPP) to incorporate terms

26  and conditions arising from the abovementioned NMFS consultation, which

27  include new reporting requirements related to vessel use and the unlikely event of a

28

1   collision with marine wildlife." Rusch Decl. ¶ 16. Additional new requirements to

2   protect marine species, including marine mammals, are also incorporated into the

3   requirements of the Biological Opinion. *Id.* BOEM subsequently acknowledged

4   that Sable completed this revision to its DPP in December 2024. *Id.* & n.21.

5   　　　On April 30, 2025, BOEM completed a periodic review of the DPP for

6   Platform Harmony, which included a review of information relating to oil spills

7   and response, recent inspections, air emissions, water permitting, threatened and

8   endangered species, among other information. *Id.* ¶ 17. Based on this review,

9   BOEM found that no additional revisions to the DPP for Platform Harmony are

10  required at this time. *Id.* & n.22.

11  ### C.　As Owner and Operator of the Santa Ynez Unit Assets, Sable Has
12  ### 　　Significant Protectable Interests at Stake in This Case

13  　　　The Santa Ynez Unit consists of 16 leases issued by the federal government

14  between 1968 and 1982, including three offshore oil platforms located five to nine

15  miles offshore in federal waters north of Santa Barbara, California, as well as

16  related pipelines and 112 wells. Rusch Decl. ¶ 3. The leases in the Santa Ynez

17  Unit are subject to an active unitization agreement ("Unit Agreement") approved

18  by the federal government in 1970. *Id.* These Santa Ynez Unit assets were

19  previously owned by Exxon Mobil Corporation ("Exxon"). *Id.* Between 1981 and

20  2014, the Santa Ynez Unit produced over 671 million of barrels of oil. *Id.* ¶ 4. In

21  2014, the Santa Ynez Unit averaged production of about 29,000 barrels of oil per

22  day. *Id.*[4]

23

24

_____

25  [4] Oil and gas produced from various platforms, including those within the Santa
    Ynez Unit, were pumped onshore to the Las Flores Canyon facility in Santa
26  Barbara County and then eventually entered two onshore pipelines operated by
    Plains All American Pipeline, L.P. ("Plains"). *Id.* ¶ 5. One of the Plains pipelines
27  experienced a leak, and, as a result, oil and gas production in the Santa Ynez Unit
    was shut down in mid-2015 until those onshore pipeline repairs are complete. *Id.*

28

On November 1, 2022, Sable entered into a purchase and sale agreement with Exxon and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM") under which Sable agreed to acquire from EM the leases and other assets constituting the Santa Ynez Unit in federal waters offshore California, the associated onshore processing facilities and one-hundred percent of the equity interests of Pacific Pipeline Company, owner of the onshore pipelines (the "Purchase Agreement"). *Id.* ¶¶ 5, 18. On February 14, 2024, Sable consummated the Purchase Agreement. *Id.* That same day, Exxon assigned the 16 leases to Sable and on May 21, 2024, the BOEM approved all 16 assignments. *Id.* As such, Sable is the current leaseholder of the 16 leases governed by the DPP that Plaintiffs challenge in this action. *Id.* The onshore facilities included in the Purchase Agreement are not within BOEM's jurisdiction.[5] Since acquiring the assets, Sable has been diligently investing in and upgrading the facilities to facilitate a restart of operations under the already-approved DPP. *Id.* ¶¶ 19, 23.

Since the close of the Purchase Agreement, Sable's geoscience and reservoir engineering management team has been evaluating reservoir development opportunities. *Id.* ¶ 24. Sable has identified over one hundred additional infill development and step-out opportunities across the leasehold. *Id.* ¶ 25. Sable estimates that over 1 billion barrels of oil are still recoverable from the Santa Ynez Unit, which represents nearly $10 billion in net contingent resources overall. *Id.* Since it acquired the Santa Ynez Unit assets, Sable has committed close to $1 billion associated with the purchase, repair, maintenance and upgrades of the assets. *Id.* ¶ 26. Under the Purchase Agreement, if Sable does not successfully

---

[5] Although not within federal jurisdiction or at issue in this lawsuit, Sable has also been working diligently to repair and upgrade the onshore pipelines. *Id.* ¶ 23. Sable became a party to and agreed to assume compliance with the requirements (including pipeline safety requirements) of the 2020 Consent Decree between Plains and Federal and State Governments that resolved all regulatory claims against Plains related to the pipeline leak incident and provides a path forward for restart of the offshore pipelines. *Id.*

1    restart the offshore facilities to achieve first production in a certain period prior to

2    2026,[6] Exxon has the option to take back the Santa Ynez Unit assets and rights at

3    no cost. *Id.* ¶ 27.

4    **III.    ARGUMENT**

5         **A.    Sable Is Entitled to Intervention as a Matter of Right**

6         Under Federal Rule of Civil Procedure 24(a)(2), "[o]n timely motion, the

7    court must permit anyone to intervene who . . . claims an interest relating to the

8    property or transaction that is the subject of the action, and is so situated that

9    disposing of the action may as a practical matter impair or impede the movant's

10   ability to protect its interest, unless existing parties adequately represent that

11   interest." In *Wilderness Society v. U.S. Forest Service*, the Ninth Circuit overruled

12   prior precedent and affirmed that intervention as of right shall be granted whenever

13   the elements of Rule 24(a)(2) are met in cases in defense of federal agency actions.

14   630 F.3d 1173, 1180 (9th Cir. 2011) (en banc).

15        In determining whether an applicant meets the requirements of Rule

16   24(a)(2), district courts in the Ninth Circuit apply a four-part test: "(1) the motion

17   must be timely; (2) the applicant must claim a 'significantly protectable' interest

18   relating to the property or transaction which is the subject of the action; (3) the

19   applicant must be so situated that the disposition of the action may as a practical

20   matter impair or impede its ability to protect that interest; and (4) the applicant's

21   interest must be inadequately represented by the parties to the action." *Id.* at 1177

22   (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)); *see also*

23   *Friends of the Earth v. Haaland,* No. 21-cv-2317, 2021 WL 5865386, at *4

24   (D.D.C. Dec. 11, 2021) (granting intervention to trade group of oil-and-gas

25

26   [6] Sable's publicly-available Form 10-K filing provides further detail on the Purchase Agreement timing requirements with respect to the restart of production. *See* Sable Offshore Corp. Form 10-K (Mar. 17, 2025),

27   https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/04be1d82-191a-4cb1-9923-de8348e660fa.pdf.

28

1    companies in lawsuit challenging offshore oil-and-gas leases under APA and

2    NEPA); *Sequoia ForestKeeper v. Watson*, No. 1:16-cv-1865, 2017 WL 4310257,

3    at *1-3 (E.D. Cal. Sept. 28, 2017) (applying four-part test and granting intervention

4    in an APA and NEPA case).  When deciding motions to intervene, courts must

5    apply "[a] liberal policy in favor of intervention," *Wilderness Soc'y*, 630 F.3d at

6    1179 (citation omitted), "guided primarily by practical considerations, not

7    technical distinctions," *Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810,

8    818 (9th Cir. 2001) (internal quotation marks and citation omitted).

9        In another case this Court has determined is "related" to this one, *see* Dkt.

10   No. 10, which also involves OCSLA and APA claims, the Court granted Sable

11   intervention as of right under circumstances extremely similar to this case.  *See*

12   *Ctr. for Biological Diversity*, 2024 WL 5339157, at *1.  The Court recognized that

13   Plaintiffs did not dispute that Sable's intervention motion was timely, that Sable

14   had a protectable legal interest in the subject of the action (*i.e.*, the extension of

15   time for Sable to resume operations under its leases), and that Sable was not

16   adequately represented by the Federal Defendants.  *Id.*  The Court declined

17   Plaintiffs' request to impose limitations on Sable's participation, recognizing that

18   "[a]lthough there is overlap between Sable and the Defendants' interests, the Court

19   recognizes that Sable's property, contractual, and overall financial interests will

20   likely differ at times from Defendants' governmental and public interests." *Id.*  For

21   the same reasons, the Court should grant Sable intervention as of right in the

22   instant case.

### 1.    Sable's Intervention Motion Is Timely

24       The "traditional features" of a timely intervention motion are that the motion

25   "was made at an early stage of the proceedings, the parties would not have suffered

26   prejudice from the grant of intervention at that early stage, and intervention would

27   not cause disruption or delay in the proceedings." *Citizens for Balanced Use v.*

28

*Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).  Sable is filing this motion approximately 41 days after Plaintiffs filed the Original Complaint on April 2, 2025, Dkt. No. 1, only one day after Plaintiffs filed the Amended Complaint on May 12, 2025, Dkt. No. 12, and before the deadline for Federal Defendants to file an answer or other responsive pleading.  Accordingly, the administrative record has not yet been served and no briefing has yet been scheduled in this case.  As a result, the parties in this case will not be prejudiced by Sable's intervention at this early stage.  *See, e.g.*, *Watson*, 2017 WL 4310257, at *2 (motion to intervene timely filed eight months after complaint and after initial scheduling conference).  Sable's motion to intervene in this case is therefore timely.

2.    <u>Sable Has Significant Protectable Interests Related to the Subject of This Action</u>

Under Rule 24(a)(2), to determine whether a proposed intervenor has a "significantly protectable" interest in the subject of the action, "the operative inquiry [is] whether the 'interest is protectable under some law' and whether 'there is a relationship between the legally protected interest and the claims at issue.'" *Wilderness Soc'y*, 630 F.3d at 1180-81.  Sable has significant protectable property, economic and contractual interests that are related to the subject of this action. Plaintiffs challenge BOEM's determination that the DPP for Platform Harmony did not need to be revised for any reason other than to include terms and conditions from a recent biological opinion.  *See, e.g.*, Amend. Compl. ¶¶ 1, 111. Specifically, Plaintiffs request that this court "[o]rder Defendants to require revision of the DPP for Platform Harmony in the Santa Ynez Unit," and "[p]rohibit Defendants from authorizing new oil and gas drilling activity at the Santa Ynez Unit unless and until revision of the DPP is complete."  *Id.* at Request for Relief. The Santa Ynez Unit leases issued by the federal government are legally protectable "license[s]" under the APA.  5 U.S.C. § 551(8) ("'[L]icense' includes

the whole or a part of an agency permit, certificate, approval, registration . . . or other form of permission").  Without an approved DPP, Sable cannot engage in development and production pursuant to its oil and gas leases.  *See* 43 U.S.C. § 1351(a); 30 C.F.R. § 550.201(a).  Furthermore, since acquisition of the Santa Ynez Unit assets, Sable has been diligently investing in and upgrading the facilities, as appropriate, to facilitate a restart of production.  *See* Rusch Decl. ¶¶ 19-25.  To date, Sable has obligated close to $1 billion associated with the purchase, repair, maintenance and upgrades of the Santa Ynez Unit assets.  *Id.* ¶ 26.

Courts routinely find that Rule 24(a)(2) recognizes and protects interests of this nature.  *See, e.g.*, *Ctr. for Biological Diversity*, 2024 WL 5339157, at *1 (granting intervention in related case recognizing "Sable's property, contractual, and overall financial interests" in the Santa Ynez Unit); *Sw. Ctr. for Biological Diversity*, 268 F.3d at 820–21 (finding proposed intervenor had a protectable interest where lawsuit implicated "projects that are in the pipeline for design and mitigation . . . and approval" because "[c]ontract rights are traditionally protectable interests" (citation omitted)); *Env't Def. Ctr. v. Bureau of Safety & Env't Enf't*, No. 2:14-cv-09281, 2015 WL 12734012, at *3 (C.D. Cal. Apr. 2, 2015) (finding proposed intervenor Exxon's "personal financial interest" in the Santa Ynez Unit a significantly protectable interest because it "invested significant resources in obtaining" permits); *Watson*, 2017 WL 4310257, at *2 (holding proposed intervenor had protectable interest in APA action where intervenor possessed contracts to implement projects that were subject of litigation).  Sable has clearly cognizable, protectable interests relating to the challenged DPP in this case.

3.  Sable's Ability to Protect Its Interests Would Be Impaired by a Decision in Plaintiffs' Favor

Under the third element of the Rule 24(a)(2) inquiry, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an

1  action, he should, as a general rule, be entitled to intervene." *Citizens for Balanced*

2  *Use*, 647 F.3d at 898 (quoting Fed. R. Civ. P. 24, advisory committee note (1966

3  Amendment)).  A party is even entitled to intervene in an action that potentially

4  threatens its interests.  *See id*. at 900 ("intervention of right does not require an

5  absolute certainty that a party's interests will be impaired").  Among other things,

6  Plaintiffs ask this Court to: (1) declare that Defendants' decision that the DPP for

7  Platform Harmony in the Santa Ynez Unit need not be revised is arbitrary,

8  capricious, and not in accordance with OCSLA or its implementing regulations; (2)

9  order BOEM to require "revision of the DPP for Platform Harmony"; and (3)

10  "[p]rohibit Defendants from authorizing new oil and gas drilling activity at the

11  Santa Ynez Unit unless and until revision of the DPP is complete."  Amend.

12  Compl., Request for Relief.  Thus, an adverse ruling in this case could prevent

13  Sable from exercising its rights as lessee under an approved and valid DPP.  If the

14  relief Plaintiffs seek were granted, that would impair Sable's ability to protect its

15  significant financial interests in the Santa Ynez Unit.  *See supra* Section II.A.2;

16  Rusch Decl. ¶¶ 24-28.  Therefore, Sable would "suffer a practical impairment of its

17  interests as a result of [the action]" if Plaintiffs prevail.  *See Wilderness Soc'y*, 630

18  F.3d at 1180; *see also Env't Def. Ctr.*, 2015 WL 12734012, at *3 ("The relief

19  sought by Plaintiff would undoubtedly have a 'significant detrimental impact on

20  [Exxon's]' interests in its Santa Ynez Unit leases and permits." (alteration in

21  original).); *Ctr. for Biological Diversity*, 2024 WL 5339157, at *1.  Sable's

22  intervention in this action is thus necessary to protect its interests in the Santa Ynez

23  Unit.

24          4.      Existing Parties Will Not Adequately Represent Sable's

25                  Interests

26          To satisfy the fourth element of the Rule 24(a)(2) inquiry, "[t]he burden of

27  showing inadequacy of representation is 'minimal' and satisfied if the applicant

28

can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)); *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Indeed, the Ninth Circuit has held that even a trade group with "the same 'ultimate objective' of upholding the [government's] lease sales" for oil and gas cannot adequately represent the interests of an individual lessee. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 841–42 (9th Cir. 2022) (holder of oil-and-gas leases was entitled to intervene as of right in case challenging leases under NEPA and Federal Land Policy and Management Act; "[A]s a party with a legally protected interest in contract rights with the federal government, [the individual oil-and-gas lessee] would offer a necessary element to the proceeding that other parties would neglect." (citation omitted).); *see also Montana Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 WL 42794, at *1 (9th Cir. Jan. 5, 2022) (reversing district court's denial of leaseholder's motion to intervene in lawsuit challenging lease sale of 24,000 acres of intervenor's oil-and-gas lease, finding trade organization could not adequately represent leaseholder's interest).

In this case, Federal Defendants—BOEM and senior agency officials—do not share Sable's interests in this action. To determine adequacy of representation, courts in the Ninth Circuit consider the following: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). The public interest represented by government parties is not "identical to the individual parochial interest" of private parties by virtue of "both entities occupy[ing] the same posture in the litigation." *See id.* at 899 (citation omitted). Government agencies advance the

1   "broad public interest." *See Watson*, 2017 WL 4310257, at *3; *Sequoia*

2   *ForestKeeper v. Price*, No. 1:16-cv-0759, 2017 WL 56655, at *1 (E.D. Cal. Jan. 5,

3   2017).  In contrast, Sable's interest in this matter is centered on protecting its

4   property, contractual and overall financial interests relating to the Santa Ynez Unit

5   assets as this Court has previously recognized.  *See supra*, Section II.A.2; *Ctr. for*

6   *Biological Diversity*, 2024 WL 5339157, at *1 (related case recognizing that

7   "Sable's property, contractual, and overall financial interests [in the Santa Ynez

8   Unit] will likely differ at times from Defendants' governmental and public

9   interests").  Because Federal Defendants do not share Sable's unique interests in

10   this action, the existing Defendants may be incapable of and unwilling to make

11   arguments that advance and protect Sable's interests as a private party.  Even

12   where the Federal Defendants and Sable may share a common litigation posture,

13   they "do not have sufficiently congruent interests" to warrant a finding of adequate

14   representation.  *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823; *see also*

15   *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, No. 10-cv-0254, 2010 WL

16   5139101, at *3 (S.D. Ala. Dec. 9, 2010) (holding that oil and gas lessee meets

17   "minimal" requirement of showing inadequacy of representation because lessee

18   has "narrowly focused, direct and specific interest in [] controversy").

19       As the owner and operator of the Santa Ynez Unit, which are subject to the

20   DPP that Plaintiffs challenge in this case, Sable is uniquely positioned to provide

21   relevant information to the Court to address the merits and potential ramifications

22   of Plaintiffs' arguments and requested relief.  As such, Sable meets its "minimal"

23   burden of demonstrating that Federal Defendants' representation of Sable's

24   protectable interests may be inadequate, and Sable must be granted intervention.

25   *See Citizens for Balanced Use*, 647 F.3d at 898.

26       Therefore, Sable is entitled to intervene as of right in this action because it

27   meets all of the requirements of Rule 24(a)(2).

28

**B.**     **Alternatively, This Court Should Grant Permissive Intervention**

In the alternative, this Court should allow Sable to intervene because Sable meets all the requirements for permissive intervention under Rule 24(b).  Rule 24(b)(1)(B) provides that on timely motion, "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Courts also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  *Id.* at 24(b)(3).

Sable satisfies the standard for permissive intervention under Rule 24(b) for many of the same reasons that Sable is entitled to intervene as of right.  *First*, Sable's motion is timely.  *See supra*, Section III.A.1.  *Second*, Sable is moving to intervene in this case to address the same claims set forth by Plaintiffs and thus defend the Santa Ynez Unit DPP for Platform Harmony, which will necessarily involve common facts and legal issues with the main action.  *Third*, Sable's intervention at this early stage in the case will not "unduly delay or prejudice the adjudication of the original parties' rights" pursuant to Rule 24(b)(3) because Sable is prepared to participate in this case in accordance with the schedule that will be set by this Court.  Indeed, Sable's participation in this action as an intervenor will promote a fair and full adjudication of Plaintiffs' claims.

**C.**     **Sable Should Be Permitted to File Its Answer or Other Responsive Pleading By the Same Deadline as Federal Defendants**

Sable respectfully requests leave to file its Answer or other responsive pleading pursuant to Federal Rule of Civil Procedure 24(c) by the same deadline as Federal Defendants, or three days after intervention is granted, whichever is later.  Although a motion to intervene must typically "be accompanied by a pleading that sets out the claim or defense for which intervention is sought," Fed. R. Civ. P. 24(c), "the Ninth Circuit allows for courts to approve 'intervention motions

1  without a pleading where the court [is] otherwise apprised of the grounds for the

2  motion.'" *Thompson v. Thompson*, No. 2:18-cv-04269, 2018 WL 6133659, at *4

3  (C.D. Cal. July 31, 2018) (citing *Beckman Indus., Inc. v. Int'l. Ins. Co.*, 966 F.2d

4  470, 474 (9th Cir. 1992) (alteration in original)).  Furthermore, courts have

5  recognized that delaying an intervenor's responsive pleading is appropriate when

6  the defendant in a case is yet to file their own responsive pleading.  *See Am. Hotel*

7  *& Lodging Ass'n v. City of Los Angeles*, No. 14-cv-09603, 2015 WL 12745805, at

8  *9 (C.D. Cal. Mar. 25, 2015) (finding "it would not make sense for [intervenor] to

9  file a pleading at this stage of the litigation" when defendant "has yet to file a

10  responsive pleading"); *Int'l Fur Trade Fed'n v. City & Cnty. of San Francisco*, No.

11  20-cv-00242, 2020 WL 6931066, at *3 (N.D. Cal. Apr. 17, 2020) (allowing

12  intervenor to respond to complaint on "the same date defendants' response is

13  due").

14      Here, Sable's Motion informs the Court of the grounds that justify Sable's

15  intervention, including the basis for Sable's need to participate in this case, such

16  that the Court may appropriately evaluate Sable's proposed intervention without a

17  corresponding pleading in this APA-based case.  *See Beckman Indus.*, 966 F.2d at

18  474.  Deferral of the deadline for Sable's Answer or other responsive pleading to

19  align with Federal Defendants' deadline will further judicial economy by not

20  prematurely requiring such filing.  Because the deadline for Federal Defendants to

21  file their Answer or other responsive pleading has not yet passed, granting Sable's

22  request will not cause any delay in this case.

23  **IV.   CONCLUSION**

24      For the foregoing reasons, Sable respectfully requests that this Court grant

25  its motion to intervene as of right or, in the alternative, to grant permissive

26  intervention, and that Sable be permitted to file its responsive pleading under Rule

27  24(c) on the same date as Federal Defendants' deadline for responding to

28

1 | Plaintiffs' Amended Complaint or three days after interventions is granted,

2 | whichever is later.

3

4 | Dated:  May 13, 2025

Respectfully submitted,

5 | LATHAM & WATKINS LLP

6 | By: /s/ *Daniel P. Brunton*

7 | Daniel P. Brunton (Bar No. 218615)
Email: daniel.brunton@lw.com
12670 High Bluff Drive

8 | San Diego, CA 92130
Tel.: (858) 523-5400

9 | Fax: (858) 523-5450

10 | Michael G. Romey (Bar No. 137993)
Email: michael.romey@lw.com

11 | 355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560

12 | Tel.: (213) 485-1234
Fax: (213) 891-8763

13

14 | Janice M. Schneider
(*Pro Hac Vice Pending*)

15 | Email: janice.schneider@lw.com
Devin M. O'Connor

16 | (*Pro Hac Vice Pending*)
Email: devin.o'connor@lw.com

17 | 555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304

18 | Tel.: (202) 637-2200
Fax: (202) 637-2201

19 | *Attorneys for Proposed Intervenor-Defendant Sable Offshore Corp.*

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Intervenor-Defendant Sable Offshore Corp., certifies that this brief contains 4,891 words, which complies with the word limit of L.R. 11-6.1, and is 17 pages long, which complies with Section 6.c. of this Court's Civil Standing Order.


Dated:  May 13, 2025                    By: /s/ *Daniel P. Brunton*
                                            Daniel P. Brunton (Bar No. 218615)

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

18