Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DOUG BURGUM, et al., <br><br> *Defendants*, <br><br> and <br><br> SABLE OFFSHORE CORP., <br><br> *Intervenor-Defendant*. | Case No. 2:25-cv-02840-MWC-MAA <br><br> **DECLARATION OF KRISTEN MONSELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SABLE OFFSHORE CORP.'S MOTION TO DISMISS** |

I, Kristen Monsell, declare as follows:

1. I am counsel for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation in this case. I submit this declaration in support of Plaintiffs' Opposition to Sable Offshore Corp.'s Motion to Dismiss.

2. Attached as Exhibit 1 is a true and correct copy of the notice of intent to sue that Plaintiffs sent in writing under oath on September 26, 2024, to Defendants Secretary of the Interior, the Bureau of Ocean Energy Management, and the Pacific Regional Director of the Bureau of Ocean Energy Management, as well as to the Governor of California.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 22, 2025

/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorney for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

# Exhibit 1

Center for Biological Diversity and Wishtoyo Foundation
September 2024 60-Day Notice of Intent to Sue



CENTER for BIOLOGICAL DIVERSITY                                                           Because life is good.

*Via Electronic and Certified Mail*

September 26, 2024

Secretary Haaland                                   Douglas Boren, Pacific Region Director
U.S. Department of the Interior                     Bureau of Ocean Energy Management
1849 C Street, NW                                   760 Paseo Camarillo, Suite 102
Washington, D.C. 20240                              Camarillo, CA 93010
exsec_exsec@ios.doi.gov                             douglas.boren@boem.gov

Elizabeth Klein, Director                           Gavin Newsom, Governor
Bureau of Ocean Energy Management                   State of California
1849 C Street, NW                                   c/o State Capitol, Ste. 1173
Washington, D.C. 20240                              Sacramento, CA 95814
elizabeth.klein@boem.gov                            governor@governor.ca.gov

**RE: Notice of Intent to Sue Over Failure to Require Revisions of Development and Production Plans Prior to Allowing a Restart of Drilling Operations at the Santa Ynez Unit on the Pacific Outer Continental Shelf**

Dear Secretary Haaland, Director Klein, and Pacific Region Director Boren:

On behalf of the Center for Biological Diversity and Wishtoyo Chumash Foundation, we are writing to inform the Bureau of Ocean Energy Management ("BOEM") that it must require Sable Offshore Corporation ("Sable") to revise the development and production plans for the Santa Ynez Unit ("SYU") in federal waters off California before allowing Sable to restart any oil and gas recovery operations at the SYU. If BOEM fails to do so, we will pursue litigation to resolve the matter. This letter is provided pursuant to the 60-day notice requirement of the citizen suit provision of the Outer Continental Shelf Lands Act ("OCSLA"), to the extent such notice is deemed necessary by a court. *See* 43 U.S.C. § 1349(a)(2)(A).

Offshore oil and gas drilling is inherently dirty and dangerous. It causes oil spills that kill a wide variety of wildlife, toxic air pollution that harms frontline communities, habitat destruction, and greenhouse gas pollution that exacerbates the climate crisis, among many other problems. And while all offshore oil and gas drilling is treacherous, the age of the infrastructure off California—some of which has been littering the Pacific Ocean for over half-a-century—heightens the numerous inherent risks. Indeed, one recent analysis indicates that restarting the onshore pipeline that serves the SYU platforms could result in a spill *once a year and a rupture once every four years*; another recent analysis by Sable indicates that a worst-case spill from this old pipeline

Arizona · California · Colorado · Florida · N. Carolina · New York · Oregon · Virginia · Washington, D.C. · La Paz, Mexico

BiologicalDiversity.org

Exhibit 1
Page 1

could be *over 1.7 million gallons*.[1] As such, BOEM must immediately begin phasing out this treacherous activity on the Pacific Outer Continental Shelf ("OCS") and all other regions.

Yet, rather than doing so, BOEM appears poised to allow oil and gas drilling to resume at the SYU under plans originally approved in the *1970s and 1980s* despite a host of information demonstrating that those plans are woefully outdated and need to be updated. Indeed, resuming drilling operations at the SYU would substantially increase oil production, air pollution, and water pollution, among other factors triggering the requirements for revised plans.

BOEM's failure to require revision or supplementation of the SYU development and production plans would violate BOEM's legal obligations under OCSLA, and threaten people, wildlife, and our ocean with yet more oil spills, toxic pollution, and climate chaos. We therefore urge BOEM to require Sable to update the SYU development and production plans before it can start any drilling activity at the SYU.

**LEGAL BACKGROUND**

OCSLA prescribes a framework under which the Secretary of the Interior ("Secretary") may lease areas of the OCS for purposes of exploring and developing the oil and gas deposits of the OCS's submerged lands.[2] Specifically, there are

> four distinct statutory stages to developing an offshore oil well: (1) formulation of a 5-year leasing plan by the [Secretary]; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS.[3]

The agency must comply with NEPA and other environmental laws at each stage of the process.[4]

At the fourth stage of the process, OCSLA requires lessees to submit development and production plans ("DPPs") to the Secretary.[5] The DPP must include a description of the specific work to be performed, all facilities and operations located on the OCS, the environmental safeguards that will be implemented and how those safeguards will be implemented, an expected rate of development and production and a time schedule for performance, among other requirements.[6]

OCSLA's implementing regulations further define the requisite contents of a DPP. In particular,

---

[1] *See* County of Santa Barbara, Administrative Draft of Draft EIR for Plains Pipeline Replacement Project (March 2022) at 5.6-79; Sable Offshore Corp., Pacific Pipeline Company Integrated Contingency Plan Las Flores Canyon Core Plan (Apr. 2024) at 14-4.
[2] 43 U.S.C. § 1331, *et seq*.
[3] *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).
[4] *E.g.*, *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).
[5] 43 U.S.C. § 1351(a); *Sec'y of the Interior*, 464 U.S. at 337.
[6] 43 U.S.C. § 1351(c).

DPPs must also include detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities; how such wastes will be disposed of; the frequency, duration and amount of emissions of VOCs and other pollutants that will be generated by development and production activities; and mitigation measures designed to avoid or minimize the take of protected species if there is reason to believe that protected species may be incidentally taken by planned activities, among other information.[7]

In addition, OCSLA vests the Secretary with the authority to require oil and gas companies to obtain a permit prior to engaging in drilling activities under an approved DPP. OCSLA's implementing regulations require an oil company to obtain approval of an application for a permit to drill ("APDs") prior to conducting any drilling activities under an approved DPP.[8] The regulations specify that the activities proposed in an APD "must conform to the activities described in detail" in an approved DPP.[9] The regulations also provide for approval of drilling activities via approval of an application for a permit to modify ("APM") when a company intends to revise its drilling plan.[10]

OCSLA also mandates that the Secretary review DPPs.[11] The reviews "shall be based on changes in available information and other onshore or offshore conditions" that impact development and production.[12] The statute specifies that if such review indicates that the DPP should be revised to ensure the plan complies with OCSLA, the Secretary must require such revision.[13]

OCSLA regulations require revision of DPPs when a company proposes to, *inter alia*, "[c]hange the type of production or significantly increase the volume of production;" increase the emissions of various air pollutants to a degree that exceeds the amount specified in the approved plan; or "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged."[14] The regulations also require a company to supplement a DPP when it proposes to conduct activities that require approval of a license or permit which is not described in the approved DPP.[15]

Finally, OCSLA gives the Secretary the authority to order the suspension of all development and production activities "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life) … or to the marine, coastal, or human environment" among other reasons.[16]

---

[7] 30 C.F.R. §§ 550.241–.262.
[8] 30 C.F.R. § 550.281(a).
[9] *Id*. § 550.281(b).
[10] *Id*. § 250.465(a).
[11] 43 U.S.C. § 1351(h)(3).
[12] *Id.* OCSLA regulations also review of DPPs and state that "[t]he frequency and extent of [such] review[s] will be based on the significance of any changes in available information and onshore or offshore conditions affecting, or affected by, the activities in [an] approved . . . DPP." 30 C.F.R. § 550.284(a).
[13] 43 U.S.C. § 1351(h)(3).
[14] 30 C.F.R. § 550.283(a).
[15] *Id*. § 550.283(b).
[16] 43 U.S.C. § 1334(a)(1); *see also* 30 C.F.R. § 250.172 (OCSLA regulations authorizing suspensions of operations for the same reason).

Each of these statutory provisions and requirements helps to ensure Congress's goal in OCSLA that, *inter alia*, "environmental safeguards" are in place and helps to "balance orderly energy resource development with protection of the human, marine, and coastal environments."[17]

The Secretary has delegated its authority under OCSLA to BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE"). BOEM is responsible for managing and approving DPPs. BSEE is responsible for enforcing safety and environmental regulations, and reviewing, approving, and compiling conditions for APDs and APMs.

**FACTUAL BACKGROUND**

There are currently 30 active oil and gas leases on the Pacific OCS from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The SYU is in the Santa Barbara Channel and consists of 16 leases: Leases OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0326, 0329, 0461, 0194, 0195. The federal government issued the leases between 1968 and 1982.[18]

There are three offshore production platforms at the SYU: Platform Harmony, Platform Heritage, and Platform Hondo. Platform Harmony was installed in June 1989, Platform Heritage was installed in October 1989, and Platform Hondo was installed in June 1976.[19] Production began from these platforms between April 1981 and December 1993.[20]

BOEM's predecessor agency originally approved the DPP for drilling at the SYU from Platform Hondo in 1974 based on a plan submitted in 1971.[21] The agency subsequently approved an updated DPP for drilling from Platforms Harmony in Heritage in 1985, and again in 1988, based on an updated plan submitted in 1987.[22] In 1992, it approved a supplemental plan to allow the installation of the topsides onto the previously installed Platforms Harmony and Heritage.[23] And in 2014, BOEM approved another DPP amendment to allow the replacement of two existing power cables from the Las Flores Canyon facilities to Platform Harmony, the installation of a

---

[17] 43 U.S.C. §§ 1332(3), 1802(2)(B).
[18] *E.g.*, BOEM, Pacific OCS Region Map, https://www.boem.gov/sites/default/files/documents/newsroom/2024_05_24%20BSEE_BOEM%20POCSR%20Facilities%20Map.pdf (updated May 2024).
[19] *Id.*
[20] *Id.*
[21] *See* Secretary's Decision on the Plan of Development Santa Ynez Unit, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/1974-Hondo-POD-approval.pdf.
[22] Letter from Minerals Management Service to ExxonMobil Re: Santa Ynez Unit Revised Development and Production Plan, Apr. 4, 1998, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/1988-04-Hondo-DPP-Rev-Approval.pdf; Exxon Company, Development and Production Plan (Cumulative Updates) Santa Ynez Unit Development, Sept. 1987, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/9C2---1987-09-Platforms-Harmony-Heritage-Hondo---Santa-Ynez-Unit-Cumulative-Updates.pdf
[23] Letter to ExxonMobil from Minerals Management Service Re: Santa Ynez Unit Topside Installation, Platforms Harmony and Heritage, Aug. 28, 1992, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/1992-08-Harmony-DPP-Supp-Approval.pdf.

power cable from Platform Harmony to Platform Heritage, and supporting electrical and communication equipment on both platforms.[24]

Until recently, the ExxonMobil Corporation ("Exxon") owned and operated all three platforms and produced oil from the SYU for decades until the 2015 oil spill from the Plains All American Pipeline, which ruptured and spilled what is now believed to be up to 460,000 gallons of oil on the Santa Barbara Coast.[25] Sable Offshore Corporation is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.[26]

Sable recently told its investors that it "affirms that initial restart of production from Sable's [SYU] is expected in fourth quarter 2024."[27] BOEM cannot allow that to happen without requiring revision of the DPPs for the SYU.

**BOEM MUST REQUIRE REVISION OR SUPPLEMENTATION OF THE SYU DPPs PRIOR TO SYU RESTART AND FAILURE TO DO SO WOULD VIOLATE OCSLA**

OCSLA and its implementing regulations mandate that BOEM require Sable to revise or supplement the DPPs for the SYU prior to restarting any drilling operations at the SYU. Failure to do so would violate the agency's clear legal obligations and put our coastal environment at greater risk from this dangerous offshore drilling project.

OCSLA expressly requires the Secretary to periodically review approved DPPs, and to require revision of such plans if its review determines revision is necessary.[28] The circumstances triggering the requirement to revise such plans include a change in the type of production or a significant increase in the volume of production; an increase in the emissions of an air pollutant to a quantity that exceeds the amount specified in the approved plan; or a significant increase in the amount of solid or liquid wastes to be handled or discharged, among others.[29] OCSLA regulations also require a company to supplement a DPP when it proposes to conduct activities that require approval of a license or permit which is not described in the approved DPP.[30]

---

[24] Letter from ExxonMobil to BOEM Re: Santa Ynez Unit Offshore Power System Reliability-B Project Application, May 14, 2014, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/9A1---2014-05-Platform-Harmony-Heritage-Hondo---Santa-Ynez-Unit-Development---Production-Plan---Revision.pdf; Letter from BOEM to ExxonMobil, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/2014-10-Harmony-DPP-Rev-Approval.pdf.
[25] Rebuttal Declaration of Igor Mezić in Support of Renewed Motion for Class Certification and in Opposition to Plains' Motion to Strike, *Andrews v. Plains All American Pipeline*, Case No. 2:15-cv-04113-PSG-JEM, ECF No. 399 at ¶¶16–17, 24 (C.D. Cal. Dec. 4, 2017).
[26] *See, e.g.*, BOEM, Development and Production Plans – Pacific, https://www.boem.gov/regions/pacific-ocs-region/oil-gas/development-and-production-plans-pacific#Hondo.
[27] Sable Offshore Corp., Security and Exchange Commission Form 8-K, Aug. 30, 2024, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312524211470/d815702d8k htm.
[28] 43 U.S.C. § 1351(h)(3; *see also* 30 C.F.R. § 550.284.
[29] 30 C.F.R. § 550.283(a).
[30] *Id.* § 550.283(b).

5

Exhibit 1
Page 5

The Secretary has delegated this particular duty to BOEM.[31] But, on information and belief, BOEM has not required revision or supplementation of the DPPs for the platforms at the SYU related to the restart of operations. This is despite the fact that the original approved DPPs *are decades old*, and subsequent narrow DPP amendments did not consider or account for a host of highly relevant new information and operational changes.

For example, BOEM's must require revision of the DPPs is triggered because the SYU platforms have been offline for nearly a decade, and restarting drilling activity would significantly increase the degree and composition of air emissions, significantly increase the amount and composition of wastewater, and significantly increase the volume of production. Indeed, the DPPs and associated environmental analysis estimated recovery of the oil and gas reserves in the SYU "will take place over a period of approximately 25 to 35 years."[32] As first production from the Unit began in 1981, production should have ceased by 2016 at the latest. Moreover, the DPPs also stated that Exxon "estimates that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels … of crude oil and 600 to 700 billion standard cubic feet … of natural gas."[33] However, BSEE reports that Exxon has already produced over 507.4 million barrels of oil and over 963.1 billion cubic feet of gas from the three platforms in the SYU —well beyond what they anticipated in the DPPs.[34] And in 2010, ExxonMobil drilled "what was, at the time, the world's longest extended-reach well from an existing offshore fixed platform drilling rig, increasing the company's ability to produce more" oil.[35] This means that the overall level of production—and associated volume of air and water pollution—would be significantly larger and more harmful than provided for in the DPPs.

BOEM's duty to require revision of the DPPs is also triggered because drilling activities at the SYU will emit air pollution in a quantity that exceeds the amount specified in the approved plans. The DPP for Platform Hondo states, for example, that vapor recovery systems would "Vapor recovery systems on all crude oil storage tanks and crude processing vessels *to essentially eliminate volatile organic compound (VOC) emissions*."[36] However, when it was operational, Las Flores Canyon—the processing facility for oil drilling from the SYU—was Santa Barbara County's largest source of VOC emissions.[37]

The DPPs also say that the SYU facilities will include design features to "minimize fugitive emissions."[38] But fugitive emissions are occurring at the SYU facilities; indeed, these leaks are a

---

[31] *See id*. § 550.284.
[32] *See, e.g.*, Exxon Company, Development and Production Plan Santa Ynez Unit Development, Oct. 1982 at I-2, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/9C4---1982-10-Platforms-Harmony-Heritage-Hondo---Santa-Ynez-Unit---Development---Production-Plan.pdf.
[33] *Id*.; Exxon Company, Development and Production Plan (Cumulative Updates) Santa Ynez Unit Development, Sept. 1987 at I -2, https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/DPPs/9A3----1987-09-Platforms-Harmony-Heritage-Hondo---Santa-Ynez-Unit-Cumulative-Updates.pdf.
[34] BSEE, Sable Offshore Corp.: Platforms Operated by Sable Offshore Corp., https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-ocs-platforms/exxonmobil.
[35] Santa Ynez Unit (SYU) Exxon Mobil, https://www.syu.exxonmobil.com/history (accessed September 21, 2024).
[36] Exxon 1982 DPP, MOU at 6.
[37] California Air Resources Board, Air Quality Mapping Tool, 2014.
[38] Exxon 1987 DPP at IX-39.

significant source of the SYU's VOC emissions. Exxon previously stated that it was unable to determine the cause of the leaks, but that they are likely "due to the high vibration, operating pressures and thermal expansion/contraction that occurs during start-ups & shutdowns of the equipment" and as such "it is relatively *next to impossible* to totally to prevent a recurrence" of these leaks.[39]

And the DPPs say nothing about greenhouse gas emissions. Before it shut down in 2015, the SYU was Santa Barbara County's largest facility source of greenhouse gas emissions.[40] It contributed 55 percent of Santa Barbara County's total emissions:[41]



The failure to properly account for greenhouse gas emissions in the DPPs is particularly glaring considering that these emissions come not only from processing the oil and earlier stages of the drilling process, but from consumption of the produced oil itself.[42] And records reveal that

---

[39] Santa Barbara County Air Quality Control District, Hondo Platform Breakdown Report 11,124 (Jan. 27, 2015).
[40] U.S. Environmental Protection Agency, 2014 Greenhouse Gas Emissions from Large Facilities, https://ghgdata.epa.gov/
[41] *Id.*
[42] Conversely, every barrel of federal oil left undeveloped would result in nearly half a barrel reduction in net oil consumption, with associated reductions in greenhouse gas emissions. *See, e.g.*, P. Erickson and M. Lazarus, How would phasing out US federal leases for fossil fuel extraction affect CO2 emissions and 2°C goals?, Stockholm Environment Institute, Working Paper No. 2016-2 (2016); P. Erickson and M. Lazarus, Impact of the Keystone XL Pipeline on Global Oil Markets and Greenhouse Gas Emissions, 4 Nature Climate Change 778 (2016); *see also* P. Erickson, Rebuttal: Oil Subsidies—More Material for Climate Change Than You Might Think (Nov. 2, 2017); United Nations Environment Programme, Emissions Gap Report 2019, at 25, 26,

Exxon knew at the time it submitted DPPs that its drilling activities produced greenhouse gas emissions which in turn would contribute to climate change.[43] Yet its DPPs are silent on greenhouse gas emissions.

BOEM must also require revision of the DPPs because new information indicates an oil spill could be substantially larger than described in the DPPs. For example, the DPPs claimed that containment measures for the onshore facilities associated with the SYU "will be extremely effective in dealing with most spills" and that such spills "are typically small (less than 5 barrels)" or 210 gallons.[44] However, the 2015 spill from the Plains All American Pipeline spilled significantly more oil than the amount contemplated by the SYU DPPs. Santa Barbara County recently described the spill as roughly 123,228 gallons,[45] but an expert report indicates that it could have been as high as 451,500 gallons.[46] And the County also recently acknowledged that the onshore pipeline serving the SYU platforms could spill once a year and a rupture once every four years. And a recent analysis by Sable indicates that a worst-case spill from this pipeline could be over 1.7 million gallons.[47]

And the risk of an oil spill also exists from offshore infrastructure, particularly given its old age and degraded state. According to scientists, aging poses risks of corrosion, erosion and fatigue stress to subsea pipelines.[48] Subsea pipeline corrosion appears to accelerate over time,[49] and can act synergistically with fatigue stress to increase the rate of crack propagation.[50] Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent.[51] One offshore pipeline study found that after 20 years the annual probability of pipeline failure increases rapidly, with values in the range of 0.1 to 1.0, which equates to a probability of failure

---

https://www.unep.org/resources/emissions-gap-report-2019; SEI, IISD, ODI, E3G, and UNEP, The Production Gap: The discrepancy between countries' planned fossil fuel production and global production levels consistent with limiting warming to 1.5°C or 2°C (2019), at 4, 14; P. Erickson and M. Lazarus, How limiting oil production could help California meet its climate goals, Stockholm Environment Institute Discussion Brief (2018), https://www.sei.org/wp-content/uploads/2018/03/sei-2018-db-california-oil2.pdf.

[43] G. Supran, et al. 2022. Assessing ExxonMobil's global warming projections. Science Vol. 379, No. 6628, https://www.science.org/doi/10.1126/science.abk0063; Shannon Hall, Exxon Knew about Climate Change almost 40 years ago Scientific American, Oct. 26, 2015, https://www.scientificamerican.com/article/exxon-knew-about-climate-change-almost-40-years-ago/

[44] Exxon 1987 DPP at IX-44.

[45] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project at 5.6-10.

[46] Expert Report of Igor Mezic at ¶¶ 16–17, *Andrews v. Plains All American Pipeline*, Case 2:15-cv-4113.

[47] *See* Administrative Draft of Draft EIR for Plains Pipeline Replacement Project at 5.6-79; Pacific Pipeline Company Integrated Contingency Plan Las Flores Canyon Core Plan at 14-4.

[48] Petroleum Safety Authority Norway. 2006. Material Risk – Ageing offshore installations. Prepared by Det Norske Veritas on request from Petroleum Safety Authority Norway.

[49] Mohd, M.H. and J.K. Paik, Investigation of the corrosion progress characteristics offshore oil well tubes, 67 Corrosion Science 130-141 (2013).

[50] PSA Norway 2006.

[51] Mohd and J.K. Paik 2013; A. Igor, R.E. Melchers, Pitting corrosion in pipeline steel weld zones, 53:12 Corros. Sci. 4026–4032 (2011); R.E. Melchers, M. Ahammed, R. Jeffrey, G. Simundic, Statistical characterization of surfaces of corroded, 23 Mar. Struct. 274–287 (2010).

of 10 to 100 percent per year.[52]

Moreover, records from the federal government show that the platforms in the SYU had widespread corrosion and gas leaks requiring emergency responses before they were shutdown following the 2015 oil spill.[53] Federal officials who inspected Platform Hondo on May 1, 2015, found "numerous corrosion issues" and components out of compliance. Just three weeks before that, they also found corrosion, five failed gas detectors, and "leakage rates higher than the maximum allowable" on that platform's Well H-12U.[54] Platforms Hondo, Heritage, and Harmony had early-2015 gas leaks that required their crews to gather for safety reasons, including an incident on Platform Heritage at 10:29 a.m. on May 19.[55] Platform Hondo also had a gas leak on April 27, 2015, and Platform Harmony had one on March 29 of that year. A federal inspection of Harmony on Aug. 27, 2015, found "corrosion issues throughout the platform" and "electrical issues throughout the platform."[56] Exxon has a significant track record of state and federal violations and penalties, including 492 environmental violations racking up more than $2 billion in penalties since 2000.[57] Sable also has a troubling track record. Exxon and Sable have partnered in the past on Canadian projects. The safety record of Sable reveals incidents, including a massive shutdown for failure to report leaks and air quality tests and a worker safety incident caused by poor rig maintenance.[58] This increases the risk of spills and other accidents that should be properly accounted for in a revised DPP.

Finally, BOEM's duty to require revision of the DPPs is also triggered because the prior owner of the SYU leases—Exxon—indicated its intent to use well stimulation treatments to both restart and continue to develop oil at the SYU, which would change the types of water pollution discharges contemplated under the DPPs, as well as the quantity. Specifically, a company employee stated in a declaration in federal court that "ExxonMobil anticipates that it will require the use of certain acid well stimulation treatments at one or more wells."[59] The declaration further stated that "ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells, at SYU."[60] Many of the chemicals used in acidizing are F-graded hazardous chemicals—carcinogens, mutagens, reproductive toxins, developmental toxins, endocrine disruptors or high acute toxicity chemicals.[61] These acidizing

---

[52] Bea, R., C. Smith, B. Smith, J. Rosenmoeller, T. Beuker, and B. Brown. 2002. Real-time Reliability Assessment & Management of Marine Pipelines. 21st International Conference on Offshore Mechanics & Arctic Engineering. ASME.
[53] BSEE, Offshore Accident Reports, available at https://www.biologicaldiversity.org/campaigns/Refugio_oil_spill/pdfs/exxonmobile-offshore-accident-reports.pdf.
[54] *Id*.
[55] *Id*.
[56] *Id.*
[57] Violation Tracker, https://violationtracker.goodjobsfirst.org/prog.php?parent=exxon-mobil.
[58] Safety Online, $3 Billion Natural Gas Project Derailed by a Stop Work Order (Dec. 16, 1999); Prentiss, Mairin, ExxonMobil fined $40K after heavy chain fell within centimetres of worker (Aug. 14, 2019).
[59] Declaration of Ken Dowd, ECF No. 23-3 at ¶14, *Ctr. for Biological Diversity v.* BOEM, Case 2:16-cv-08473-PSG-FFM (C.D. Cal. Feb. 8, 2017).
[60] *Id.*
[61] Abdullah, Khadeeja, Timothy Malloy, Michael K. Stenstrom & I. H. (Mel) Suffet., Toxicity of acidization fluids used in California oil exploration, Toxicological & Environmental Chemistry (2016).

chemicals can make up as much as 18 percent of the fluid used in these procedures.[62] Further, each acidization can use as much as hundreds of thousands of pounds of some chemicals.[63]

An evaluation of thousands of well stimulation treatments in the Gulf of Mexico revealed that each well treatment releases about 20,000 gallons of discharges including biocides, polymers and solvents into the ocean.[64] Discharges from well stimulations are likely to cause adverse marine ecosystem effects.[65] For example, a 2021 study identified that produced waters comingled with hydraulic fracturing chemicals had acute toxicity and thiol reactivity in some cases up to nine months after fracking.[66]

Indeed, because of the likely use of well stimulation treatments at the SYU, in addition to not allowing a restart until revised DPPs are approved, BOEM cannot allow a restart unless and until it completes: (1) an environmental impact statement under the National Environmental Policy Act ("NEPA"), (2) consultation under the Endangered Species Act ("ESA"), and (3) consistency review under the Coastal Zone Management Act ("CZMA") to comprehensively evaluate the impacts of well stimulation treatments on California's coastal environment, as required by the U.S. Court of Appeals Ninth Circuit Court of Appeals that prohibited BOEM and BSEE from allowing well stimulations on the Pacific OCS until it completes each of these critical analyses.[67]

**CONCLUSION**

For the foregoing reasons, BOEM must require revision of the DPPs for the SYU. Failure to do so would violate the agency's legal obligations, and the Center for Biological Diversity and Wishtoyo Chumash Foundation will pursue litigation to resolve the matter. Please contact me if you have any questions or would like to discuss this matter.

///
///

---

[62] *Id.*
[63] *Id.*
[64] Center for Biological Diversity, Toxic Waters: How Offshore Fracking Pollutes the Gulf of Mexico (July 2021) at 2, https://www.biologicaldiversity.org/campaigns/fracking/pdfs/Toxic-Waters-offshore-fracking-report-Center-for-Biological-Diversity.pdf.
[65] Zhong, C., Kwan, Y. H., Goss, G. G., Alessi, D. S., & Qian, P. Y., Hydraulic fracturing return fluids from offshore hydrocarbon extraction present new risks to marine ecosystems, 55 Environmental Science & Technology, 4199-4201 (2021).
[66] Aghababaei, M., Luek, J. L., Ziemkiewicz, P. F., & Mouser, P. J., Toxicity of hydraulic fracturing wastewater from black shale natural-gas wells influenced by well maturity and chemical additives. 23(4) Environmental Science: Processes & Impacts 621-632 (2021).
[67] *See Env't Defense Ctr. v. BOEM*, 36 F.4th 850, 890–92 (9th Cir. 2022) (upholding the district court's "injunctive relief … which enjoined [BOEM and BSEE] from approving any permits allowing well stimulation treatments offshore California until the agencies completed [ESA] consultation with the Fish and Wildlife Service and consistency review with California" under CZMA and ordering the district court "to amend its injunction to enjoin the agencies from approving well stimulation treatment permits until the agencies issue a complete [environmental impact statement]" under NEPA).

Sincerely,

*/s/ Kristen Monsell*
Kristen Monsell
Oceans Legal Director, Senior Attorney
Center for Biological Diversity
kmonsell@bioloigcaldiversity.org
510-844-7137

cc:   Kati Kovacs, Director
Bureau of Safety and Environmental Enforcement
kathryn.kovacs@bsee.gov

Cassidy Teufel, Deputy Director
Energy, Ocean Resources, & Federal Consistency
California Coastal Commission
Cassidy.Teufel@coastal.ca.gov

---

I hereby declare under penalty of perjury that, to the best of my knowledge and belief, the foregoing is true and correct.

Dated this 26th day of September 2024.

*/s/ Kristen Monsell*
Kristen Monsell
Center for Biological Diversity

11

Exhibit 1
Page 11