Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological
Diversity and Wishtoyo Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 2:25-cv-02840-MWC-MAA |
| *Plaintiffs*, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DOUG BURGUM, et al., | |
| *Defendants*, | Hearing Date: May 15, 2026 |
| and | Hearing Time: 1:30 p.m. |
| SABLE OFFSHORE CORP., | Judge: Hon. Michelle Williams Court |
| *Intervenor-Defendant*. | Location: Courtroom 6A |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on May 15, 2026, at 1:30 p.m., or as soon thereafter as they may be heard, Plaintiffs Center for Biological Diversity and

Wishtoyo Foundation will move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. The hearing will take place before the Honorable Michelle Williams Court in Courtroom 6A at the U.S. District Court for the Central District of California, located at 350 West First Street in Los Angeles, California, 90012. Plaintiffs move for summary judgment because "there is no genuine dispute as to any material fact," and Plaintiffs "are entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).[1]

Plaintiffs seek an order declaring that Federal Defendants the Secretary of the Interior, the Bureau of Ocean Energy Management, and the Pacific Regional Director of the Bureau of Ocean Energy Management violated the Outer Continental Shelf Lands Act and its implementing regulations in issuing a decision concluding that Sable Offshore Corp. need not revise the oil and gas development and production plan for Platform Harmony in the Santa Ynez Unit. Plaintiffs also seek an order requiring that Federal Defendants require revision or supplemental of the plan or, alternatively, an order that Federal Defendants conduct a new review that considers relevant information that Federal Defendants ignored in their decisionmaking.

Plaintiffs' Motion is based on the points and authorities set forth below, the attached declarations and exhibits, and the administrative record lodged with the Court. A proposed order accompanies this Motion.

---

[1] Pursuant to the Court's Scheduling Order of September 29, 2025, Plaintiffs have not submitted a separate statement of uncontroverted or undisputed material facts. *See* Scheduling Order 3, Dkt. No. 43.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY BACKGROUND...............................................................................2

FACTUAL BACKGROUND ...................................................................................4

PLAINTIFFS HAVE STANDING...........................................................................7

STANDARD AND SCOPE OF REVIEW ...............................................................7

ARGUMENT ..........................................................................................................9

    I.      BOEM Must Require Revision of a DPP That No Longer Meets
the Substantive Requirements of OCSLA ..............................................9

    II.    An Updated Plan is Required Because Restarting the Santa
Ynez Unit Will Significantly Increase the Unit's Volume of
Production and Extend its Lifespan .....................................................11

    III.   New Information Regarding the Santa Ynez Unit's Air
Emissions Indicates the DPP Must Be Revised ..................................16

    IV.   BOEM Failed to Consider How Restarting Production Will
Increase the Amount of Wastes Discharged .......................................19

    V.    BOEM Failed to Consider the Discrepancies in the Worst Case
Discharge Scenarios and the Heightened Risk of Another Oil
Spill......................................................................................................21

REMEDY..............................................................................................................24

CONCLUSION .....................................................................................................24

i

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Probert,*
  412 F. Supp. 3d 1188 (D. Mont. 2019)................................................................23

*Ctr. for Biological Diversity v. Zinke,*
  900 F.3d 1053 (9th Cir. 2018) ........................................................................9

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
  36 F.4th 850 (9th Cir. 2022) .........................................................................2

*Friends of the Earth v. Laidlaw Env't Servs.,*
  528 U.S. 167 (2000)................................................................................7

*Healthy Gulf v. U.S. Dep't of Interior,*
  152 F.4th 180 (D.C. Cir. 2025).....................................................................2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).......................................................................... 8, 15, 23

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ........................................................................8

*Native Village of Point Hope v. Jewell,*
  740 F.3d 489 (9th Cir. 2014) .................................................................. 14, 15

*Sec'y of the Interior v. California,*
  464 U.S. 312 (1984)................................................................................2

*W. Watersheds Proj. v. Kraayenbrink,*
  632 F.3d 472 (9th Cir. 2011) ........................................................................8

*Waterkeeper All. v. EPA,*
  140 F.4th 1193 (9th Cir. 2025) .............................................................. passim

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................8
43 U.S.C. §§ 1331–1365b...............................................................................2
43 U.S.C. § 1332(3) ....................................................................................2
43 U.S.C. § 1334(a)(1)..................................................................................4
43 U.S.C. § 1334(a)(2)..................................................................................4

43 U.S.C. § 1349 .................................................................................................8

43 U.S.C. § 1349(a)(1) ................................................................................8, 24

43 U.S.C. § 1351(a) ...........................................................................................2

43 U.S.C. § 1351(c) ...........................................................................................3

43 U.S.C. § 1351(c)(2) ....................................................................... 7, 10, 15

43 U.S.C. § 1351(c)(3) ............................................................................. 10, 16

43 U.S.C. § 1351(c)(5) ................................................................ 10, 11, 12, 14

43 U.S.C. § 1351(c)(6) .....................................................................................10

43 U.S.C. § 1351(h)(1) .....................................................................................10

43 U.S.C. § 1351(h)(3) .......................................................................... passim

43 U.S.C. §§ 1801–1866 ...................................................................................2


**Regulations**

30 C.F.R. § 250.101 ...........................................................................................2

30 C.F.R. § 250.180 ...........................................................................................2

30 C.F.R. § 250.400 ...........................................................................................2

30 C.F.R. § 250.410 ...........................................................................................2

30 C.F.R. § 250.465 ...........................................................................................2

30 C.F.R. § 250.601 .........................................................................................20

30 C.F.R. § 254.26(a).......................................................................................21

30 C.F.R. § 254.26(d).......................................................................................21

30 C.F.R. § 254.26(e).......................................................................................21

30 C.F.R. § 550.101 ...........................................................................................2

30 C.F.R. § 550.105 .........................................................................................17

30 C.F.R. § 550.201 ...........................................................................................2

30 C.F.R. §§ 550.241–.262 ...............................................................................3

30 C.F.R. § 550.241(b) ....................................................................................15

30 C.F.R. § 550.243(a)......................................................................................24

30 C.F.R. § 550.243(f)......................................................................................24

30 C.F.R. § 550.248 .........................................................................................19

30 C.F.R. § 550.248(a)......................................................................................19

30 C.F.R. § 550.248(a)–(b) ...............................................................................3

30 C.F.R. § 550.248(b) ...........................................................................................19

30 C.F.R. § 550.248(c) ...........................................................................................19

30 C.F.R. § 550.248(c)(1) .......................................................................................20

30 C.F.R. § 550.249(a) ...........................................................................................16

30 C.F.R. § 550.249(a)(1) ...................................................................................3, 16

30 C.F.R. § 550.249(a)(1)(iii) ................................................................................17

30 C.F.R. § 550.249(a)(2) ................................................................................ 16, 18

30 C.F.R. § 550.249(b) ...........................................................................................16

30 C.F.R. § 550.250 ................................................................................................21

30 C.F.R. § 550.254 ..................................................................................................3

30 C.F.R. § 550.283 ................................................................................................11

30 C.F.R. § 550.283(a) .............................................................................................3

30 C.F.R. § 550.283(a)(3) .......................................................................... 11, 12, 14

30 C.F.R. § 550.283(a)(4) .............................................................................. 11, 16

30 C.F.R. § 550.283(a)(5) .............................................................................. 19, 20

30 C.F.R. § 550.283(b) .............................................................................................4

30 C.F.R. § 556.200 ..................................................................................................2

30 C.F.R. § 556.308 ..................................................................................................2

30 C.F.R. § 556.901 ................................................................................................24

**INTRODUCTION**

Plaintiffs Center for Biological Diversity and the Wishtoyo Foundation challenge under the Outer Continental Shelf Lands Act (OCSLA) an unlawful determination by Federal Defendants the Bureau of Ocean Energy Management, et al. (collectively, BOEM) that Sable Offshore Corp. (Sable) need not revise the development and production plan for Platform Harmony in the Santa Ynez Unit.

OCSLA mandates that BOEM periodically review previously approved oil and gas development plans and requires such plans be revised when doing so is necessary to ensure continued compliance with OCSLA, including its directives that BOEM ensure offshore oil and gas activity is balanced with protecting the environment and does not cause undue harm. BOEM's own regulations require revisions of a plan when an operator proposes to change the type or volume of production or to increase pollution and waste. These triggers, among others, are met here. Before it shut down in 2015 following a massive oil spill, the Santa Ynez Unit had already produced more oil and gas, and emitted significantly more air and water pollution, than was anticipated in its existing development plan. And the Unit's infrastructure has outlived its anticipated lifespan and is beyond the age scientists say significantly increases the risk of spills.

BOEM's failure to require an updated development plan means that Sable will operate Platform Harmony under a plan first approved over 40 years ago that does not contemplate the risks posed by Sable's plan to restart offshore production or reflect the true scope of activities and emissions, threatening California's coast with toxic air pollution, more oil spills from aging infrastructure, and other harms inherent in offshore oil and gas drilling. In determining that Sable need not revise the development plan, BOEM failed to consider several highly relevant factors indicating that an updated plan is needed to ensure compliance with OCSLA. BOEM's decision is therefore arbitrary and capricious and in violation of OCSLA and its implementing regulations. Plaintiffs ask this Court to declare BOEM's

1

decision unlawful and order BOEM to require Sable to revise or supplement the development plan.

**STATUTORY BACKGROUND**

Congress enacted OCSLA to govern the development of offshore oil and gas resources, "while recognizing the crucial need to balance resource development with the protection of the human, marine, and coastal environments." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 864 (9th Cir. 2022) (citing 43 U.S.C. § 1332(3)). The statute makes "clear that offshore leasing must not proceed without due regard for the communities and environments it affects." *Healthy Gulf v. U.S. Dep't of Interior*, 152 F.4th 180, 192 (D.C. Cir. 2025).

OSCLA prescribes a four-stage framework under which the Secretary of the Interior, through BOEM,[2] may lease areas of the outer continental shelf for purposes of exploring and developing the oil and gas deposits of those submerged lands. 43 U.S.C. §§ 1331–1365b, 1801–1866. Those stages are "(1) formulation of a five year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). "Each stage" of the process "involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the [outer continental shelf]." *Id.*

At the fourth stage, before oil and gas production can begin, OCSLA requires lessees to submit development and production plans (DPP) to BOEM. 43 U.S.C. § 1351(a). These plans must include a description of "the specific work to

---

[2] The Secretary has delegated its OCSLA responsibilities to two bureaus within the Department of the Interior. BOEM is responsible for issuing five-year leasing programs, holding lease sales, and approving exploration and development plans. 30 C.F.R. §§ 550.101, 556.200, 550.201, 556.308. The Bureau of Safety and Environmental Enforcement (BSEE) is responsible for enacting and enforcing safety and environmental standards, issuing lease extensions, and approving drilling permits. *Id.* §§ 250.101, 250.180, 250.400, 250.410, 250.465.

be performed …; all facilities and operations located on the outer Continental Shelf…; the environmental safeguards to be implemented … and how such safeguards [will] be implemented …; an expected rate of development and production and a time schedule for performance," among other requirements. *Id.* § 1351(c).

BOEM's regulations implementing OCSLA specify additional required contents of a DPP. 30 C.F.R. §§ 550.241–.262. DPPs must include detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities and how such wastes will be disposed of, *id.* § 550.248(a)–(b); the frequency, duration, and amount of emissions of volatile organic compounds (VOCs) and other pollutants that will be generated by development and production activities, *id.* § 550.249(a)(1); and "mitigation measures designed to avoid or minimize" the take of protected species "[i]f there is reason to believe that protected species may be incidentally taken by planned activities," *id.* § 550.254, among other information.

OCSLA mandates that BOEM periodically review approved DPPs. 43 U.S.C. § 1351(h)(3). The "review shall be based upon changes in available information and other onshore or offshore conditions" that impact development and production. *Id.* The statute specifies that if such review "indicates that the plan should be revised to meet the requirements of" OCSLA, BOEM "shall require such revision." *Id.*

BOEM's OCSLA regulations require revision of DPPs when a company proposes to "[c]hange the type of production or significantly increase the volume of production …; [i]ncrease the emissions of [various] air pollutant[s]" to a degree that exceeds the amount specified in the approved plan; or "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged," among other triggers. 30 C.F.R. § 550.283(a). The regulations also require a company to supplement a DPP when it proposes to conduct activities "that require approval of

a license or permit which is not described in" the approved DPP. *Id.* § 550.283(b).

Finally, OCSLA gives BOEM the authority to order the suspension of all development and production activities "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life) … or to the marine, coastal, or human environment," among other reasons. 43 U.S.C. § 1334(a)(1). It also allows BOEM to cancel a lease under certain circumstances, including when the agency determines that "continued activity [under] such lease would probably cause serious harm or damage to life … or to the … environment;" that "the threat of [such] harm or damage will not … decrease to an acceptable extent within a reasonable period of time;" and the benefits of cancelling the lease outweigh the benefits of continuing it. *Id.* § 1334(a)(2).

## FACTUAL BACKGROUND

The Santa Ynez Unit is located in the Santa Barbara Channel and consists of 16 oil and gas leases, three offshore production platforms (Platform Harmony, Platform Heritage, and Platform Hondo), and associated infrastructure. BOEM Answer ¶¶ 49–50, Dkt. No. 30 (admitting these facts). Platform Hondo was installed in June 1976, Platform Harmony in June 1989, and Platform Heritage in October 1989. *Id.* ¶ 50 (admitting these facts). Production began from these platforms between April 1981 and December 1993. *Id.* (admitting this fact).

In 1974, BOEM's predecessor agency approved the initial DPP for the Santa Ynez Unit for drilling from Platform Hondo. AR_Folder 02F_000019726. Since then, the DPP has been revised and supplemented several times to reflect the installation of new infrastructure, including the following:

- In 1985 and 1988, the agency approved revisions to the DPP for the Santa Ynez Unit, providing for the installation of three platforms and associated subsea pipelines. AR_Folder 02F_18566–68, 18136–37.
- In 1992, the agency approved a supplement to the DPP to allow the installation of topsides (i.e., the surface deck of a platform, which includes

4

all drilling equipment) onto Platforms Harmony and Heritage. AR_Folder
02F_000018017–19.

- In 2014, BOEM approved another revision to allow the replacement of two
  power cables from the onshore Las Flores Canyon processing facilities to
  Platform Harmony and the installation of a power cable from Platform
  Harmony to Platform Heritage to support electrical and communication
  equipment on both platforms. AR_ Folder 02F_000017615–17.

- In December 2024, BOEM issued a memorandum indicating that it was
  requiring all oil companies operating on the Pacific Outer Continental Shelf
  to update their DPPs to account for terms and conditions of a February 2024
  biological opinion issued by the National Marine Fisheries Service to
  ensure that oil and gas vessel operators report any collisions with marine
  mammals and sea turtles to the National Marine Fisheries Service. AR_
  Folder 02F_000023144. Sable revised its DPP accordingly by filling out the
  required form. *See* AR_ Folder 02F_000023147.

The 1987 Santa Ynez Unit DPP (approved in 1988) was the last version of the
DPP to address the extent of production activities. It estimates recovery of the oil
and gas reserves in the Unit "will take place over a period of approximately 25 to
35 years." AR_Folder 02F_000018150; *see also* AR_ Folder 02F_000018738
(1982 DPP (approved in 1985) estimating same). It also "estimates that primary
recovery by the proposed development will amount to approximately 300 to 400
million barrels … of crude oil and 600 to 700 billion standard cubic feet … of
natural gas." AR_Folder 02F_000018150; *see also* AR_Folder 02F_000018738
(1982 DPP estimating same). The 1982 and 1987 DPPs claim that containment
measures for the onshore facilities associated with the Santa Ynez Unit "will be
extremely effective in dealing with most spills" and that such spills "are typically
small (less than 5 barrels)" or 210 gallons. AR_Folder 02F_000019068, 18418.

Those plans also state that the facilities will "minimize fugitive emissions" from pollutants such as VOCs. AR_Folder 02F_000019071, 18413.

The three platforms of the Santa Ynez Unit have produced over 500 million barrels of oil and 963 billion cubic feet of natural gas since their installment. AR_ AR_Folder 01_ 000000523–25. Before it shut down in 2015, the Santa Ynez Unit was Santa Barbara's largest facility source of greenhouse emissions, contributing 55 percent of the county's total greenhouse gas emissions. *See* AR_Folder 01_000000233. It also leaked reactive organic compounds and hydrogen sulfide emissions. AR_Folder 01_000000412.

Sable is now the owner and operator of Platforms Harmony, Heritage, and Hondo, and lessee on all the 16 oil and gas leases in the Santa Ynez Unit. *See* AR_Folder 01_000000069. The change of ownership follows a May 20, 2015, oil spill from an onshore pipeline (now owned by Sable) that transported oil drilled at the Unit. AR_Folder 01_000000069, 73. The spill shut down oil and gas drilling operations at the Santa Ynez Unit, and Sable has indicated it intends to resume production in 2025. AR_Folder 01_000000069.

Federal officials estimate that the 2015 spill constituted 2,934 barrels, or 123,228 gallons, AR_Folder 02G_000025896, while a recent expert analysis indicates that the spill was as high as 10,750 barrels, or 451,500 gallons, AR_ Folder 01_000000487. The prior operator of the Santa Ynez Unit, ExxonMobil (Exxon), previously estimated that a future worst case scenario spill from offshore operations could total over 577,700 barrels, or over 24 million gallons. AR_Folder 2F_000023104–05.

Exxon also indicated it anticipated needing to use acid well stimulation treatments to both restart and continue production at the Unit. AR_Folder 01_000000234–36. Acidizing results in the discharge of a high volume of toxic and carcinogenic chemicals into the ocean. AR_Folder 01_000000101–03.

Weeks after Plaintiffs filed this lawsuit challenging BOEM's failure to review and require revision of the DPP for the Santa Ynez Unit, BOEM issued a decision memorializing (1) its review of the DPP for Platform Harmony and (2) its determination that the plan need not be revised. AR_Folder 01_000000069–79. BOEM stated that its review resulted in a finding that "[n]o additional revisions of the DPP for Platform Harmony are needed at this time." AR_Folder 01_000000071. BOEM also noted that it would conduct a review of the plans for Platforms Hondo and Heritage after BSEE completes pre-production inspections. AR_Folder 01_000000070.[3] Following BOEM's determination, Plaintiffs filed an amended complaint challenging the agency's arbitrary decision that a revision was not needed. Dkt. No. 12.

## PLAINTIFFS HAVE STANDING

Plaintiffs have standing to bring this case. Plaintiffs' members have suffered concrete and particularized injuries fairly traceable to BOEM's action that will likely be redressed by a favorable decision. *See Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000); Declarations of Miyoko Sakashita, Brady Bradshaw, Blake Kopcho, Mati Waiya, Tevin Schmitt, Attach. 1–5.

## STANDARD AND SCOPE OF REVIEW

This Court has ruled that Plaintiffs' claim arises under the citizen suit provision of OCSLA. Order Denying Sable Mot. to Dismiss 7–9, Dkt. No. 39. This provision allows lawsuits "to compel compliance with [OCSLA] against any person, including the United States, and any other government instrumentality or

---

[3] There is no discrete DPP for "for Platform Harmony" as BOEM's review suggests. *See* AR_Folder 02F (containing the DPP originally approved in 1974, all revisions and supplements, and plans that preceded OCSLA's DPP requirement). Rather, all platforms and facilities in the Santa Ynez Unit are governed by a single DPP that has been revised and supplemented over time. *See* Sable Mem. Supp. Mot. to Dismiss 9, Dkt. No. 31-1; *see also* 43 U.S.C. § 1351(c)(2) (requiring DPPs to describe "*all* facilities and operations." (emphasis added)).

7

agency … for any alleged violation of any provision of [OCSLA,]" its implementing regulations, "or of the terms of any permit or lease issued by" BOEM. 43 U.S.C. § 1349(a)(1).

OCSLA does not contain an independent standard of review for citizen suits challenging BOEM's decisionmaking. *See id.* § 1349. As such, courts apply the standard of review of section 706 of the Administrative Procedure Act (APA). *See W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (explaining that because the Endangered Species Act's citizen suit provision "contains no internal standard of review, section 706 of the [APA] governs" the standard of review (citation omitted)). However, because Plaintiffs' claim arises under OCSLA, the scope of review is not limited to an administrative record. *See id.* at 497 (holding the court "may consider evidence outside the administrative record" in evaluating a claim arising under the Endangered Species Act's citizen suit).

Under the APA's standard of review, a court evaluates whether an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In doing so, the court must "engage in a substantial inquiry, a thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 959 (9th Cir. 2005) (cleaned up). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citation omitted). "Even when an agency is acting within its area of expertise," the court "need not defer to the agency when

8

the agency's decision is without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted).

## ARGUMENT

BOEM's decision that the DPP need not be revised fails to consider several factors showing that the outdated plan must be amended to ensure activities under the plan will comply with OCSLA. The agency acknowledged the existence of new information about the Santa Ynez Unit but missed the big picture: that after a disastrous oil spill, a new operator has purchased the long-dormant Santa Ynez Unit with plans to restart production, drill new wells, workover old ones, and extract fossil fuels years into the future. These proposed activities will result in a higher volume of production over a longer period of time than the existing DPP contemplates. They will also generate more air and water pollution and will heighten the risk of oil spills from the Unit's aging, corrosion-prone infrastructure. BOEM failed to grapple with this relevant information, as the agency's own regulations require. BOEM also failed to consider any information about Sable's actual plans for restarting and operating the Unit, even though Sable's corporate filings contain specific details—such as estimates of reserves, a map of over 100 new drilling opportunities, and a post-restart production timeline. BOEM's decision not to require revision of the DPP is therefore arbitrary and capricious.

## I.    BOEM Must Require Revision of a DPP That No Longer Meets the Substantive Requirements of OCSLA

BOEM's decision whether to require revision of a DPP hinges on the degree to which the agency's review "indicates" that the plan no longer conforms to OCSLA's substantive requirements. *See* 43 U.S.C. § 1351(h)(3); *cf. Waterkeeper All. v. EPA*, 140 F.4th 1193, 1216 (9th Cir. 2025). In an analogous case brought under the Clean Water Act, the Ninth Circuit recently held that an agency's decision whether it is "appropriate" to revise effluent limitation guidelines following a periodic review must be based on the "surrounding statutory

provisions," and "must turn, at least to an extent, on the degree to which that [guideline] fails to conform to the substantive requirements" of the statute. *Waterkeeper All.*, 140 F.4th at 1216. Thus, it "would presumptively be appropriate" to revise an "outdated" guideline that deviates from the statute's substantive commands. *Id.* To that end, the "focus" of the agency's periodic review must be to identify whether each guideline is "outdated, in the sense that it does not conform with the Act's substantive requirements" for the guideline. *Id.* at 1217.

Similarly here, OCSLA's "substantive requirements" and section 1351(h)(3)'s "surrounding statutory provisions" make clear that DPPs are comprehensive, living documents that must evolve throughout the life of a drilling project. OCSLA expressly directs BOEM to periodically review approved DPPs "based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan." 43 U.S.C. § 1351(h)(3). The "focus" of BOEM's periodic review is to determine whether new or changed information "indicates that the plan should be revised to meet the requirements" of OCSLA, such as its requirement that the plan contain adequate provisions "for safe operations" and "for protection of the human, marine, [and] coastal environment." *Id.* § 1351(h)(1), (3).

These requirements also include, *inter alia*, that a DPP contain "a description of all facilities and operations" proposed by the operator, "the environmental safeguards to be implemented," "an expected rate of development and production and a time schedule for performance," and "such other relevant information" as required by regulation. *Id.* § 1351(c)(2), (3), (5), (6). Finally, OCSLA contains a strong directive that revision of DPPs is mandatory: if BOEM's review indicates that the plan should be revised to meet OCSLA's requirements, BOEM "*shall* require such revision." *Id.* § 1351(h)(3) (emphasis added); *contra Waterkeeper All.,* 140 F.4th at 1216–17 (statute's requirement to revise "if appropriate" gives agency limited discretion to decline revision).

To this end, BOEM has adopted a list of project changes that affirmatively trigger an operator's duty to revise or supplement a DPP. *See* 30 C.F.R. § 550.283. For example, any significant increase in the volume of production, or an increase in air pollution that exceeds the levels specified in an approved DPP, requires revision. 30 C.F.R. § 550.283(a)(3), (4). But OCSLA makes clear that these are not the sole bases for revision. 43 U.S.C. § 1351(h)(3). If BOEM's review reveals that a DPP no longer meets OCSLA's substantive requirements, revision is also required. *Id.*; *cf. Waterkeeper All.*, 140 F.4th at 1216.

Here, BOEM failed to "offer a reasoned justification for declining to" require revision of the DPP for Platform Harmony "that is consistent with the APA and [OCSLA]." *Waterkeeper All.*, 140 F.4th at 1217. Indeed, the "changes in available information and other onshore or offshore conditions" plainly necessitate a revision to the Santa Ynez Unit DPP to ensure activities under the plan "meet the requirements" of OCSLA. 43 U.S.C. § 1351(h)(3).

## II. An Updated Plan is Required Because Restarting the Santa Ynez Unit Will Significantly Increase the Unit's Volume of Production and Extend its Lifespan

BOEM's decision not to require revision of the DPP was arbitrary and capricious because "available information," 43 U.S.C. § 1351(h)(3), demonstrates that restarting the Santa Ynez Unit will "significantly increase the volume of production" of the Unit compared to the volume estimated in the DPP and will prolong production well beyond what the DPP contemplates. 30 C.F.R. § 550.283(a)(3); *see also* 43 U.S.C. § 1351(c)(5) (requiring DPPs to "set forth … an expected rate of development and production and a time schedule for performance").

The Santa Ynez Unit's production volume was last addressed in the 1987 DPP (approved in 1988), which estimates that "primary recovery by the proposed development will amount to approximately 300 to 400 million barrels (MMB) of crude oil and 600 to 700 billion standard cubic feet (BSCF) of natural gas."

11

AR_Folder 02F_000018150; *see also* AR_Folder 02F_000018738 (1982 DPP estimating same). Yet BOEM's sister agency, BSEE, reports that Santa Ynez Unit production has already far exceeded these numbers: before production shutdown in 2015, Exxon had produced over 507.4 million barrels of oil and over 963.1 billion cubic feet of gas from the Unit. AR_Folder 01_000000523–25.

BOEM estimates that the Santa Ynez Unit has 190 million barrels of oil in remaining reserves. AR_Folder 01_000000035. Investor presentations that Sable filed with the Securities and Exchange Commission (SEC) in November 2024 and March 2025 provide a drastically higher estimate. *See* Nov. 2024 Investor Pres., Ex. 1 at 9; Mar. 2025 Investor Pres., Ex. 2 at 9.[4] Sable predicts that of the 1,207 million barrels of oil equivalent of net recoverable total resources of the Santa Ynez Unit, 646 million barrels of oil equivalent remain—including 557 million barrels of oil, 486 billion cubic feet of natural gas, and 7 million barrels of natural gas liquids. Nov. 2024 Investor Pres., Ex. 1 at 9, 14; Mar. 2025 Investor Pres., Ex. 2 at 9, 14; *see also* Sable Mem. in Supp. of Mot. to Intervene 7, Dkt. 14-1 ("Sable estimates that over 1 billion barrels of oil are still recoverable from the Santa Ynez Unit"). Either estimate represents a "significant[] increase" in the volume of production contemplated in the DPP and triggers the revision requirement. 30 C.F.R. § 550.283(a)(3); *see also* 43 U.S.C. § 1351(c)(5).

Additional "available information" underscores that the production volume and predicted lifespan of the Santa Ynez Unit far exceed what was contemplated in the DPP. There are 148 well slots on the Unit's platforms (60 on Harmony, 60 on Heritage, and 28 on Hondo). AR_Folder 01_000000523–25. Not all of those slots were in use at the time of shut-in: Exxon's 2015 annual plan of operations states that at the time the Santa Ynez Unit was shut-in, it had 111 total wells. AR_Folder 02A_000001157. Yet Sable's SEC materials indicate that the company could

---

[4] All exhibits cited herein are exhibits to the Declaration of Kristen Monsell, which is filed in support of and concurrently with this brief.

nearly double the number of existing wells drilled in the Santa Ynez Unit, and that "[f]or every platform, more opportunities exist than available donor wellbores … (i.e., slot-constrained)." Nov. 2024 Investor Pres., Ex. 1 at 7, 12; Mar. 2025 Investor Pres., Ex. 2 at 7, 12. Sable reports that it has identified more than 100 infill drilling and step-out opportunities, which all involve drilling new wells. Nov. 2024 Investor Pres., Ex. 1 at 7; Mar. 2025 Investor Pres., Ex. 2 at 7. It also plans workovers and electric submersible pump installation on existing wellbores, which would augment and prolong production. Nov. 2024 Investor Pres., Ex. 1 at 7; Mar. 2025 Investor Pres., Ex. 2 at 7.

In addition, the 1982 DPP (approved in 1985) predicted that recovery of the Santa Ynez Unit's reserves "will take place over a period of approximately 25 to 35 years," AR_Folder 02F_000018738, forecasting oil production continuing "until the year 2013" and gas production continuing "until 2016," AR_Folder 02F_000018808.[5] The 1987 DPP revised these figures, estimating that Harmony and Heritage would produce through 2020. AR_Folder 02F_000018195, 18206. Thus, the Santa Ynez Unit has already outlived the lifespan predicted in its DPP. Sable's SEC materials predict at least another decade of production, accomplished by restarting production, drilling new wells, and remediating existing wells. Mar. 2025 Investor Pres., Ex. 2 at 13, 7.

These "changes in available information" all "indicate[]" that the Santa Ynez Unit DPP should be revised because it no longer conforms to OCSLA's substantive requirement that such plans shall set forth the "expected rate of development and production and a time schedule for performance." *See* 43 U.S.C.

---

[5] The 1982 DPP discusses two options for storage and treatment of produced oil: "Option A," involving offshore storage and treatment; and "Option B," involving onshore storage and treatment. *See* AR_Folder 02F_000019657. Option B was the scenario ultimately approved and that the Santa Ynez Unit uses today. *See* AR_Folder 02F_000018124*;* AR_Folder 01_000000073. Accordingly, Plaintiffs cite the projections relevant to Option B.

§ 1351(h)(3), (c)(5); *Waterkeeper All.*, 140 F.4th at 1216. Yet BOEM did not even discuss the volume of production or lifecycle of the project in its decision. *See* AR_Folder 01_000000069–79.[6]

In a Periodic Review Tracker spreadsheet, BOEM also determined that there was no need to revise the DPP's production rates (i.e. production per day or month, rather than total volume) because "[p]roduction forecasting is a complex process and cannot guarantee 100% accuracy." AR_Folder 01_000000035. That spreadsheet further noted that at the time BOEM's predecessor approved the DPPs in the 1980s, the production forecasts "were based on the best available information obtained from exploratory wells and geologic interpretations" and that "[a]s additional data is obtained during field development, production forecasts would be assessed and updated, but there is no requirement to proactively provide a current production forecast to BOEM." *Id.* Yet this "additional data" already exists: Exxon's actual production from the Santa Ynez Unit has far exceeded the numbers anticipated in the 1980s, AR_Folder 01_000000523–25, and Sable anticipates producing hundreds of millions more barrels of oil in the future, Mar. 2025 Investor Pres., Ex. 2 at 13–14. And contrary to BOEM's assertions, the agency's own regulations require operators to proactively revise their DPPs if they intend to "significantly increase the volume of production," as is the case here. 30 C.F.R. § 550.283(a)(3).

*Native Village of Point Hope v. Jewell* is instructive. 740 F.3d 489 (9th Cir. 2014). There, the Ninth Circuit held that BOEM acted arbitrarily by basing an

---

[6] In a separate "Periodic Review Tracker," BOEM noted that the 1987 DPP predicted the Unit would produce 300–400 million barrels over 25–35 years. AR_Folder 01_000000035. BOEM also noted its own estimate that the Unit has 190 million barrels in reserves. *Id.* The tracker concluded these numbers did not require revision. *Id.* There is no indication that BOEM considered either the Unit's actual production volume or the future production predicted by Sable, and its final decision contains no reference to the Unit's production volume or lifespan.

environmental analysis for a lease sale on an estimate of one billion barrels, which was "the lowest amount of oil that could be produced … from the smallest number of oil fields that could be developed." *Id.* at 499, 503–04. The court reasoned that "BOEM was fully aware from the very beginning that if one billion barrels could be economically produced, many more barrels could also be economically produced." *Id.* at 504. And while "BOEM had no choice but to make an estimate" given uncertainties before it, the agency was still required "to base its analysis on the full range of likely production." *Id.* at 505. Here, too, uncertainty is no excuse for BOEM's failure to consider the full volume of likely production from the Santa Ynez Unit, or its failure to require a revision in light of this information. The agency was fully aware from the beginning of its review process that production from the Santa Ynez Unit has already exceeded the DPP's estimates, and it was fully aware of Sable's plans to develop the Unit long into the future.

Additionally, BOEM "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, because nowhere in its review does BOEM consider the number of new wells that Sable may drill and the increase in production that new drilling would represent. OCSLA makes this information "important" by requiring that a DPP include "a description of all facilities and operations located on the outer Continental Shelf which are proposed by the lessee." 43 U.S.C. § 1351(c)(2); *see also* 30 C.F.R. § 550.241(b) (DPP must include the location and depth of each proposed well).  BOEM cannot excuse its failure to consider this information because Sable has not yet "proposed" this development. OCSLA requires BOEM to consider "available" information. 43 U.S.C. § 1351(h)(3). Publicly available materials filed with the SEC and used to cultivate investors was certainly "available" to BOEM during its review of the DPP. These materials include precise information that Sable has identified "102 total opportunities" for new drilling. *E.g.*, Nov. 2024 Investor Pres., Ex. 1 at 12, 7. The presentation even includes a map of these opportunities. *Id.* At the very least

BOEM should have considered these "changes in available information" in its
review. 43 U.S.C. § 1351(h)(3).

Indeed, aside from draft restart plans for the *onshore* pipelines and an oil
spill response plan, there is no information in the record that BOEM at all
considered Sable's overall plans for restarting production at the Santa Ynez Unit.

## III. New Information Regarding the Santa Ynez Unit's Air Emissions Indicates the DPP Must Be Revised

BOEM's decision not to require revision of the DPP is also arbitrary and
capricious because new information regarding the Unit's air pollution "indicates"
that the DPP no longer conforms to OCSLA's substantive requirements related to
air emissions. *See* 43 U.S.C. § 1351(h)(3); *Waterkeeper All.,* 140 F.4th at 1216.

DPPs must include "the environmental safeguards to be implemented on the
outer Continental Shelf and how such safeguards are to be implemented." 43
U.S.C. § 1351(c)(3). BOEM's regulations specify that DPPs must be accompanied
by tables showing the projected emissions from criteria air pollutants, VOCs, and
total suspended particulates generated by the operator's proposed activities. 30
C.F.R. § 550.249(a). This must include, "for each source on or associated with the
facility," a list of the projected peak hourly emissions, the total annual emissions,
the emissions "over the duration of the proposed development and production
activities," the frequency and duration of emissions, and the total of all these
emissions. *Id.* § 550.249(a)(1). The DPP must provide emission reduction
measures and the quantity of reductions to be achieved. *Id.* § 550.249(b). Any
increase in air pollution that "exceeds the amount specified" in a previously
approved DPP requires a revision. *Id.* §§ 550.249(a)(2), 550.283(a)(4).

To begin with, no iteration of the DPP contains the kinds of emissions data
and level of detail demanded by 30 C.F.R. § 550.249(a). This alone prompts a need
for revision because it demonstrates that the DPP is "outdated." *Waterkeeper
All.,* 140 F.4th at 1216.

And while a 1982 "Environmental Report (Production)" includes dozens of tables modeling emissions for various potential development and production scenarios, Exxon developed this report at the "conceptual stage," and included the caveat that "[s]pecific details concerning methods, processes, facilities, and equipment types, sizes, and capacities will not be determined until final design has been completed. Consequently, information contained in this document which relates to such detail will be subject to change based on continuing evaluation." AR_Folder 02C_000009936. Moreover, the 1982 DPP predicted that oil production would end after 2013, and gas production would end after 2016. AR_Folder 02F_000018808. Thus, to the extent that any of the emissions data from 1982 is still valid, the DPP would still need to be updated to reflect the emissions data "over the duration of the proposed development and production activities," which could extend well into the future. 30 C.F.R. § 550.249(a)(1)(iii).

Instead of determining which, if any, of the emissions levels from the 1982 report are applicable and assessing whether the Santa Ynez Unit's actual emissions of various pollutants are within the levels predicted in that report, BOEM arbitrarily looked only at flaring[7] rates. AR_Folder 01_000000077–78. The agency acknowledged that "the DPP recognizes the need for flaring but does not state any specific volume limits." AR_Folder 01_000000077. It then concluded that because Exxon's "Environmental Assessments" for the project assumed that peak air emissions would occur in 1992, and actual flaring peaked in 1994, which "roughly corresponds," "[f]laring is within the limits found within the Platform Harmony DPP approval." AR_Folder 01_000000078; *see also* AR_Folder 02E_000017609 (BOEM flaring data spreadsheet used to reach this conclusion).[8] Nothing in 30

---

[7] "*Flaring* means the burning of natural gas as it is released into the atmosphere." 30 C.F.R. § 550.105.

[8] BOEM's Periodic Review Tracker spreadsheet shows that its source for the "peak" air emissions data was Table 3.2-57 from Exxon's 1982 Environmental

C.F.R. § 550.249 allows the agency to simply eyeball flaring rates. The only reasonable reading of the regulation is that it demands a comparison of *actual* emissions rates with those predicted in the DPP for each listed pollutant. *See, e.g.*, *id.* § 550.249(a)(2) (discussing how if proposed activities "would result in an increase in the emissions … to an amount greater than the amount specified in [the] previously approved DPP … the revised emission rates for each source as well as the incremental change for each source" must be shown).

The fact that BOEM verified that the Santa Ynez Unit is covered by air permits issued by the Santa Barbara County Air Pollution Control District, AR_Folder 01_000000078, does not cure the defect in its logic. The agency did not use the contents of those permits to evaluate whether the DPP requires revisions. For example, the DPP states that the Santa Ynez Unit's offshore facilities will include design features to "minimize" fugitive emissions, and that leaks "will be controlled by a rigorous preventative maintenance plan and operator attention." AR_Folder 02F_000018300. Had BOEM reviewed the Air Pollution Control District's inspection reports, it would have found that fugitive emissions from the Santa Ynez Unit's platforms are a continuing concern. *See*, *e.g.*, 2023 Air Pollution Inspection Report, Ex. 3. In a 2015 inspection report that found major gas leaks, Exxon stated that it was unable to determine the cause of the leaks but that they are likely "due to the high vibration, operating pressures and thermal expansion/contraction that occurs during start-ups & shutdowns of the equipment," and, as such, "it is relatively next to impossible to totally to prevent a recurrence" of these leaks. AR_Folder 01_000000411, 412.

---

Report. AR_Folder 01_000000037. Notably, Table 3.2-57 was developed for expanded offshore storage and treatment, AR_Folder 02C_000010836, the option ultimately abandoned. *See* AR_Folder 02F_000018124.

18

## IV.    BOEM Failed to Consider How Restarting Production Will Increase the Amount of Wastes Discharged

BOEM's decision not to require revision of the DPP is also arbitrary and capricious because the agency's review looked only at whether the Santa Ynez Unit is covered by a water pollution permit and did not consider how past and future operations at the Santa Ynez Unit have or will exceed the limits of this permit. *See* AR_Folder 01_000000079.

As with air emissions, BOEM's regulations require that DPPs include detailed information related to solid and liquid waste discharges. For example, the DPP must be accompanied by "[a] table providing the name, brief description, projected quantity, and composition of solid and liquid wastes (such as spent drilling fluids, drill cuttings, trash, sanitary and domestic wastes, produced waters, and chemical product wastes) likely to be generated by [the] proposed development and production activities." 30 C.F.R. § 550.248(a). This must include a table showing projected ocean discharges, and a discussion of how the operator will comply with the applicable National Pollutant Discharge Elimination System (NPDES) permit. *Id.* § 550.248(b), (c). A DPP must be revised if the operator proposes to "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged." *Id.* § 550.283(a)(5).

Also as with air emissions, no iteration of the DPP contains a table with discharge data at the level of detail demanded by 30 C.F.R. § 550.248. This alone should prompt revision because it demonstrates that the DPP is "outdated." *Waterkeeper All.,* 140 F.4th at 1216.

BOEM concluded that no revision to the DPP was required because Platform Harmony is permitted under NPDES General Permit CAG280000, which establishes effluent limitations and other conditions on waste discharges. AR_Folder 01_000000079; AR_Folder 05_000028163. Yet BOEM failed to consider "available information" about whether the Santa Ynez Unit has actually

19

operated in compliance with this permit.[9] For example, the EPA's Pollutant Loading Report for Platform Harmony shows that in 2014, the Platform's last full year of operation, Harmony dumped 194,703 pounds of oil and grease into the water, even though its maximum allowable load was 48,851 pounds per year. EPA 2014 Pollutant Loading Rep., Ex. 4. Evidence that the Santa Ynez Unit has exceeded the limits of its NPDES permit should trigger DPP review under 30 C.F.R. § 550.283(a)(5), as this could indicate a significant increase in the amounts of waste to be discharged. *See also id.* § 550.248(c)(1) (requiring DPPs to include "[a] discussion of how [the operator] will comply with the provisions of the applicable general NPDES permit.").

Moreover, BOEM failed to consider available information indicating that restarting production at the Santa Ynez Unit could involve well stimulation treatments, which would change the types and quantity of water pollution discharges contemplated under the DPP. Specifically, Sable's investor materials indicate that Sable will do workovers of existing wellbores. Nov. 2024 Investor Pres., Ex. 1 at 7; Mar. 2025 Investor Pres., Ex. 2 at 7. Operators workover wells "for the purpose of maintaining or restoring the productivity of a well," and well acidization is a common type of workover. 30 C.F.R. § 250.601. When Exxon still owned the Santa Ynez Unit, it filed a declaration in federal court stating that "[i]n order to re-start production, ExxonMobil anticipates that it will require the use of certain acid well stimulation treatments at one or more wells." AR_Folder 01_000000236. The declaration further stated that "ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells, at [the Santa Ynez Unit]." *Id.*

---

[9] Indeed, BOEM's Office of Environment's review of the DPP was so cursory that it does not even include the correct operator name. *See* AR_Folder 05_000028163 (referring to DCOR, LLC).

Many of the chemicals used in acidizing are F-graded hazardous chemicals—carcinogens, mutagens, reproductive toxins, developmental toxins, endocrine disruptors or high acute toxicity chemicals. AR_Folder 01_000000094. These acidizing chemicals can make up as much as 18 percent of the fluid used in these procedures. *Id.* Further, each acidization can use hundreds or thousands of pounds of some chemicals. AR_Folder 01_000000197. An evaluation of thousands of well stimulation treatments in the Gulf of Mexico revealed that each well treatment releases over 20,000 gallons of discharges including biocides, polymers and solvents into the ocean. AR_Folder 01_000000886. Discharges from well stimulations are likely to cause adverse marine ecosystem effects. AR_Folder 01_000000903–04. For example, a 2021 study identified that produced waters comingled with hydraulic fracturing chemicals had acute toxicity in some cases up to nine months after fracking. AR_Folder 01_000000114.

**V.     BOEM Failed to Consider the Discrepancies in the Worst Case Discharge Scenarios and the Heightened Risk of Another Oil Spill**

BOEM's decision not to require revision of the DPP was also arbitrary and capricious because the agency overlooked discrepancies in operator estimates of how large a worst-case spill might be and other highly relevant information about the heightened risk of oil spills from the Unit's aging, corroded infrastructure.

DPPs must be accompanied by an oil spill response plan and worst case discharge scenario. 30 C.F.R. § 550.250. Worst case discharge scenarios must predict the volume of a worst case spill and include a discussion of how the company will "cope with" a spill of that volume. *Id.* § 254.26(a), (d). The scenario must "[e]nsure that the response equipment, materials, support vessels, and strategies listed are suitable" to address the spill. *Id.* § 254.26(e).

Here, BOEM's decision states that a 2011 worst case discharge scenario "has remained the same since first evaluated by … a predecessor agency to BOEM[] in 2011." AR_Folder 01_000000075. That scenario predicted that "[a]

21

well could flow at a rate of 33,986 barrels of oil per day for up to 17 days …
resulting in a total discharge volume of up to 577,762 barrels." AR_Folder
02F_000023104; *see also* SYU 2025 EA, Ex. 5 at 7 (BOEM's May 2025
environmental assessment of the extension of the Santa Ynez Unit's leases also
using this figure). Yet Sable's oil spill response plan predicts a drastically lower
spill volume of just 2,430 barrels from a platform, AR_Folder 04_000027332, or
6,210 barrels from a pipeline, AR_Folder 04_000027294, based on the assumption
that the Unit is shut-in, AR_Folder 04_000027237, 27330. In other words, Sable's
plan does not demonstrate Sable's ability to "cope with" a spill of the magnitude
that could result from *active* production. *See also* AR_Folder 01_000000069
(acknowledging Sable's plans to return the Unit to production).[10]

  BOEM also failed to consider that the DPP should be revised to reflect the
heightened risk of a spill associated with the Santa Ynez Unit's aging and
deteriorating infrastructure. As discussed above, the Unit's infrastructure has
already outlived its intended production lifespan. Moreover, BSEE's February
2024 periodic review of the DPP found low cathodic protection[11] readings for all
three platforms, requiring Sable to "investigate … and increase the level of
protection." AR_Folder 04_000026839. This should have been a red flag for
BOEM that triggered revision of the DPP given that ineffective cathodic protection
of the onshore pipeline was a contributory cause of the 2015 oil spill. AR_Folder

---

[10] Sable's estimate of the worst case discharge for a pipeline also assumes the leak
would be detected and the pipeline shut down within 11 minutes. AR_Folder
04_000027294. Yet the 2015 spill belies this assumption: the Las Flores Pipeline
System was not shut down for approximately 35 minutes after the pipeline
ruptured, AR_Folder 02G_000025918–19, and spilled what is now believed to be
10,750 barrels into the ocean, AR_Folder 01_000000487, far more than that
predicted in Sable's oil spill response plan for the offshore pipeline.

[11] Cathodic protection is an electrochemical method of controlling corrosion of
metal surfaces. *See* AR_Folder 02G_000025930.

02G_000025907. Yet BOEM's review of the DPP did not address BSEE's findings of low cathodic protection. *See* AR_Folder 01_000000076.

BOEM dismissed the significance of the onshore pipeline's failed corrosion protection system because the pipeline is "outside BOEM … jurisdiction" and "[c]athodic protection requirements to mitigate corrosive events are required by the DPP." AR_Folder 01_000000073. Yet cathodic protection was also required for the ruptured onshore pipeline—it was simply not effective. AR_Folder 02G_000025930, 25896. The agency failed to glean the significance of two key pieces of evidence before it: first, that cathodic protection systems can fail with catastrophic consequences, *see* AR_Folder 02G_000025896; and second, that the cathodic protections for the Santa Ynez Unit platforms were low, AR_Folder 04_000026839. Thus, BOEM's explanation for not requiring a DPP revision runs counter to the evidence before it. *State Farm*, 463 U.S. at 43; *All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1195, 1204–05 (D. Mont. 2019) (holding the Forest Service's approval of a logging project was arbitrary and capricious where there was "discord between" what the agency anticipated—that road closures would limit environmental impacts—"and what is actually happening"—that such closures were "ineffective" at preventing illegal use).

Additionally, BSEE records show that the Unit's platforms had a history of widespread corrosion and gas leaks requiring emergency responses before the Unit was shut down following the 2015 oil spill. AR_Folder 01_000000243–399. Aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines and structures. AR_Folder 01_000000413–14, 420–25, 500. Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent. AR_Folder 01_000000500–01. One offshore pipeline study found that after 20 years the annual probability of pipeline failure increases rapidly, with values in the range of 0.1 to 1.0, which equates to a probability of failure of 10 to

100 percent per year. AR_Folder 01_000000515. All of these factors significantly increase the risk of an oil spill as the Santa Ynez Unit ages, yet BOEM failed to consider such risks in its decision.[12]

**REMEDY**

OCSLA authorizes this Court to "compel compliance" with the statute. 43 U.S.C. § 1349(a)(1). To that end, Plaintiffs request a declaration that BOEM's decision that the DPP for Platform Harmony in the Santa Ynez Unit need not be revised is unlawful. Plaintiffs further request that this Court order BOEM to require a revision to or supplementation of the DPP; or, alternatively, order BOEM to conduct a new review of the DPP that properly considers the factors required by OCSLA and its implementing regulations.

**CONCLUSION**

For the foregoing reasons, BOEM's decision that the DPP for Platform Harmony does not require revision is arbitrary, capricious, and not in accordance with OCSLA or its implementing regulations. BOEM's decision will unlawfully allow the restart of oil and gas production at the Santa Ynez Unit without a DPP reflecting the true scope of operations and risks. This Court should declare BOEM's decision unlawful, and order BOEM to require an updated plan, or conduct a new review of the DPP.

---

[12] BOEM's review failed to identify myriad other deficiencies in the DPP that should have also triggered revision. For example, a DPP must be accompanied by a list of all federal, state, and local permits needed "to carry out … proposed development and production activities." 30 C.F.R. § 550.243(a). No such list appears in the DPP, even though various federal, state, and local agencies are involved in oversight of the Santa Ynez Unit. AR_Folder 02G_000025248–57. BOEM's decision does not address this requirement. Likewise, the DPP must include evidence that the facilities will be "covered by an appropriate bond" guaranteeing compliance with the terms of a lease, including any supplemental financial assurances for decommissioning. 30 C.F.R. §§ 550.243(f), 556.901. BOEM's decision only considered oil spill financial responsibility and did not consider other requisite bonding. AR_Folder 01_000000070.

DATED:  December 12, 2025          /s/ *Kristen Monsell*
                                   Kristen Monsell (CA Bar No. 304793)
                                   Email: kmonsell@biologicaldiversity.org
                                   Emily Jeffers (CA Bar No. 274222)
                                   Email: ejeffers@biologicaldiversity.org
                                   CENTER FOR BIOLOGICAL DIVERSITY
                                   2100 Franklin St., Suite 375
                                   Oakland, CA 94612
                                   Phone: (510) 844-7137
                                   Facsimile: (510) 844-7150

                                   *Attorneys for Plaintiffs Center for Biological
                                   Diversity and Wishtoyo Foundation*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation, certifies that this brief does not exceed 25 pages, in compliance with the page limit set by this Court's Standing Order, Section 6.c, dated April 15, 2025 (Dkt. No. 11).


DATED: December 12, 2025          /s/ *Kristen Monsell*
                                  Kristen Monsell