ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

SHANNON BOYLAN, Trial Attorney
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
shannon.boylan@usdoj.gov
(202) 598-9584

*Counsel for Federal Defendants*

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>DOUG BURGUM, Secretary of the Interior, *et al.*<br><br>　　　　　Defendants.<br><br>　　And<br><br>SABLE OFFSHORE CORP.<br><br>　　　　　Intervenor-Defendant. | Case No. 2:25-cv-02840-MWC-MAA<br><br>**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: May 15, 2026<br>Hearing Time: 1:30 p.m.<br>Judge: Hon. Michelle Williams Court<br>Location: Courtroom 6A |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 15, at 1:30 p.m., or as soon thereafter as the matter may be heard, Federal Defendants, by and through their undersigned counsel, will and hereby do move the Court for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56. The hearing will be held in front of the Honorable Michelle Williams Court in Courtroom 6A of the above-entitled Court, located at 350

West First Street in Los Angeles, CA.

Federal Defendants respectfully request that the Court grant summary judgment in their favor and deny Plaintiffs' motion for summary judgment. Federal Defendants' cross-motion is made and based upon the accompanying Memorandum of Points and Authorities and the administrative record filed in this action. Pursuant to this Court's Scheduling Order, Dkt. No. 43, Federals Defendants have not submitted a separate statement of uncontroverted or undisputed material facts. A proposed order accompanies this Cross-Motion.

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

STATUTORY BACKGROUND ............................................................................. 2

FACTUAL BACKGROUND .................................................................................. 4

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ............................................................................................................ 7

    I.     Plaintiffs Wrongly Assert That Periodic Reviews Must Evaluate All of OCSLA's Substantive Requirements ................................................. 7

    II.    Plaintiffs' Volume of Production Arguments Fail ....................................10

    III.   Plaintiffs' Air Emissions Arguments Fail ................................................15

    IV.   Plaintiffs' Waste Discharge Arguments Fail .............................................19

    V.    Plaintiffs' Worst Case Discharge Scenario Arguments Fail .....................22

CONCLUSION .......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Wilderness League v. Jewell*,
   788 F.3d 1212 (9th Cir. 2015) ........................................................................23

*All. for the Wild Rockies v. Probert*,
   412 F. Supp. 3d 1188 (D. Mont. 2019) ...........................................................6

*Ctr. for Biological Diversity v. Haaland*,
   No. 222CV06996CASKSX, 2023 WL 3007920 (C.D. Cal. Apr. 17, 2023) ..............7, 8

*Fed. Power Comm'n v. Idaho Power Co.*,
   344 U.S. 17 (1952) ...........................................................................................10

*Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) .......................................................................................6, 9

*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024) ..........................................................................................9

*Healthy Gulf v. U.S. Dep't of the Interior*,
   152 F.4th 180 (D.C. Cir. 2025) ........................................................................3

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................................6

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................6

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) ............................................................................6

*Native Village of Point Hope v. Jewell*,
   740 F.3d 489 (9th Cir. 2014) ..........................................................................14

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................................7

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ............................................................................7

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................................10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
   605 U.S. 168 (2025) ..........................................................................................9

ii

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
435 U.S. 519 (1978) ....................................................................................... 10

*W. Watersheds Proj. v. Kraayenbrink,*
632 F.3d 472 (9th Cir. 2011) ............................................................................ 6

*Waterkeeper Alliance v. EPA,*
140 F.4th 1193 (9th Cir. 2025) ......................................................................... 9

*Yang v. California Dep't of Soc. Servs.,*
183 F.3d 953 (9th Cir. 1999) ............................................................................ 8

**Statutes**

43 U.S.C. § 1332(3) .............................................................................................. 2

43 U.S.C. § 1340 .................................................................................................. 3

43 U.S.C. § 1348 .................................................................................................. 3

43 U.S.C. § 1351 .................................................................................................. 3

43 U.S.C. § 1351(c)(5) ................................................................................... 10, 11

43 U.S.C. § 1351(h)(1) ......................................................................................... 9

43 U.S.C. § 1351(h)(3) ............................................................................ 1, 3, 7, 8

43 U.S.C. §§ 1331–1356b ..................................................................................... 2

43 USC § 1337(b)(2) .......................................................................................... 14

5 U.S.C. § 558(c) ................................................................................................ 19

**Regulations**

30 C.F.R. § 254.26(d)(1) .................................................................................... 23

30 C.F.R. § 254.47 ............................................................................................. 22

30 C.F.R. § 550.1155 .......................................................................................... 13

30 C.F.R. § 550.243(c)(1) ........................................................................ 10, 11, 12

30 C.F.R. § 550.248(a) ............................................................................. 8, 20, 21

30 C.F.R. § 550.249(a) ....................................................................................... 16

30 C.F.R. § 550.283 ................................................................................ 7, 8, 12, 21

30 C.F.R. § 550.283 ........................................................................................... 14

30 C.F.R. § 550.283(a) ......................................................................................... 3

30 C.F.R. § 550.283(a)(3) ...................................................................................... 10, 11, 12

30 C.F.R. § 550.283(a)(4) .............................................................................................. 15, 18

30 C.F.R. § 550.283(a)(5) .................................................................................................... 19

30 C.F.R. § 550.284 ............................................................................................................. 15

30 C.F.R. §§ 550.248–550.250 ........................................................................................ 8, 20

30 C.F.R. Part 250 ........................................................................................................... 24, 25

30 C.F.R. Part 254 ................................................................................................................ 23

30 C.F.R. Part 550 .................................................................................................................. 3

30 CFR § 250 ........................................................................................................................ 13

30 CFR § 250.1004 ......................................................................................................... 24, 25

30 CFR § 250.880 ................................................................................................................... 5

40 C.F.R. § 122.6 .................................................................................................................. 19

# INTRODUCTION

This case challenges not an approval of new offshore oil and gas development plan, but a routine periodic review of a long-approved Development and Production Plan ("DPP") for the Santa Ynez Unit. Plaintiffs ask the Court to transform that limited review—required by statute to focus on *changes in available information*—into a wholesale reassessment of decades of agency decisions made in relation to the Santa Ynez Unit ("SYU") under the Outer Continental Shelf Lands Act ("OCSLA"), the National Environmental Policy Act ("NEPA"), and a host of applicable regulations. Neither OCSLA's text nor settled administrative law permits that type of backdoor expansion of the applicable laws and regulations.

Congress designed to provide for reviews and decisions at key stages in oil and gas production: (1) the development of a program of oil and gas lease sales, (2) holding a lease sale, (3) approval of explorations, and (4) approval of development and production plans. This case centers on the last stage of development and production under an approved plan. Periodic reviews of DPPs under 43 U.S.C. § 1351(h)(3) serve a narrow purpose: to determine whether newly available information or changed conditions indicate that a previously approved plan should be revised based on a set of defined regulatory triggers. These reviews are not vehicles for relitigating compliance with every substantive provision of OCSLA or speculating about hypothetical future operations that have not yet been proposed to BOEM.

Plaintiffs nonetheless advance a sweeping theory under which virtually any regulatory update, historical incident, or extra-record document could compel revision of an approved DPP. Plaintiffs' arguments fail to account for the extensive and continuing monitoring and enforcement efforts over offshore oil and gas development by the Bureau of Safety and Environmental Enforcement ("BSEE") and other regulatory agencies. Plaintiffs' theory would upset the balance of OCSLA and the Department of the Interior's regulations, collapse the distinction between new plan submissions and

periodic reviews, and force perpetual re-approval of settled plans—an outcome that is inconsistent with the United States' interests on the Outer Continental Shelf ("OCS") and that Congress did not intend and no court has endorsed.

The administrative record confirms that BOEM conducted precisely the review OCSLA requires. Against the backdrop of exhaustive prior environmental analyses, historical reports, and existing environmental permits, BOEM examined newly available information concerning oil and gas production volumes, air emissions, waste discharges, and spill risk. It reasonably concluded that no proposed changes or new information triggered revision under the administered regulations. Plaintiffs' disagreement with that conclusion does not convert a lawful exercise of agency discretion into arbitrary and capricious action.

Finally, the relief Plaintiffs seek underscores the fatal flaw in their case. They ask the Court to order BOEM to require revision or supplementation of the DPP—precisely the type of intrusion into agency discretion that courts have repeatedly foreclosed. Even if Plaintiffs could identify some procedural defect, the Court lacks authority to dictate how BOEM must conduct its review or what substantive outcome it must reach. Because BOEM followed the statute, applied duly promulgated regulations implementing OCSLA, and reasonably explained its conclusions, Plaintiffs' claims fail. The Court should grant Defendants' motion and deny Plaintiffs' request for relief.

**STATUTORY BACKGROUND**

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356b, establishes the framework for oil and gas development on the Outer Continental Shelf ("OCS"). OCSLA directs the Secretary of the Interior to manage offshore resources to balance energy development with environmental protection, and to do so through a regulatory process that includes planning, operational approvals, and environmental review. *See* 43 U.S.C. § 1332(3).

The Secretary has delegated responsibilities under OCSLA to multiple agencies within the Department of the Interior, including the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"). Each agency plays a distinct role in regulating offshore operations, environmental review, and operational safety.

BOEM is responsible for leasing, resource evaluation, environmental analysis, and approval of exploration plans and DPPs for offshore oil and gas facilities. *See* 43 U.S.C. § 1340; 30 C.F.R. Part 550, Subpart B. A DPP governs the general scope and nature of development and production activities, including anticipated production volumes, facility design, and environmental impacts. *See* 43 U.S.C. § 1351. The DPP requirement functions as part of OCSLA's "pyramidic" four-stage framework designed to ensure orderly offshore development: (1) formulation of a five-year leasing plan, (2) lease sales, (3) exploration, and (4) development and production. *See Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 187 (D.C. Cir. 2025).

Once approved, a DPP remains in effect unless and until the operator proposes a change that triggers revision under BOEM's regulations. BOEM regulations identify specific circumstances requiring a revised DPP, including proposals to significantly increase production, emissions, waste discharges, or other operational parameters. *See* 30 C.F.R. § 550.283(a). BOEM also periodically reviews DPPs based on the significance of any "changes in available information and other onshore or offshore conditions affecting or impacted by" the activities authorized under the approved plan. 43 U.S.C. § 1351(h)(3).

BSEE is responsible for operational safety, inspection, enforcement, approval of well drilling and maintenance, and spill preparedness for offshore facilities. *See* 43 U.S.C. § 1348; 30 C.F.R. Parts 250, 254. The BSEE-administered regulations govern platform integrity, pipeline maintenance, and monitoring, inspection, and enforcement regimes.

**FACTUAL BACKGROUND**

Initially constructed between 1976 and 1989, the Santa Ynez unit ("SYU") consists of three offshore platforms – Hondo, Heritage, and Harmony – and a commensurate amount of pipelines, power cables and other facilities necessary to support offshore mineral exploration over 16 composite mineral leases. First Am. Compl. ¶¶ 4, 50, Dkt. No. 12 ("FAC"). For the majority of the SYU's lifetime, it was owned and operated by the ExxonMobile Corporation ("Exxon") and its affiliates until it was purchased by Sable in 2024.

Under 30 § C.F.R. 550.201, the SYU is subject to a DPP which was drafted and submitted to BOEM by its operator. The first DPP for the SYU—at that point referred to as a Plan of Operations by the predecessor agency Minerals Management Service—was submitted by Exxon in 1971 and envisioned the construction of platform Hondo alone. AR_Folder 02F_22987. The DPP has since undergone several changes over the lifetime of the unit in response to damages, renovations, and expansions. These alterations have included the installation of new or expanded pipelines, the replacement or upgrading of electrical infrastructure, and the addition of fluid treatment and storage facilities. *See* AR_Folder 02F_18705, AR_Folder 02F_19660.

The 1987 supplemental DPP called for the construction of platforms Heritage and Harmony, as well as a fourth platform, Heather, which was never constructed. AR_Folder 02F_18149. Revisions in 1997 allowed for the creation of a seven-mile-long pipeline from platform Heritage to Harmony in lieu of a pipeline from the platform to the shore. AR_Folder 02F_17965. The final DPP revision under Exxon took place in 2014 to replace power cables serving platforms Harmony and Heritage. AR_Folder 02F_17632. Following the Refugio offshore pipeline spill in May of 2015, Exxon suspended operations at the SYU. AR_Folder 01_69. Record title ownership of the SYU was eventually transferred to Sable in May of 2024 following its sale by Exxon. AR_Folder 01_69.

4

Starting in November of 2024, BOEM began the periodic review of the SYU DPP to determine if revisions were necessary. AR_Folder 01_70. BOEM based its review on information that had become available and events that had transpired since the last DPP revision in 2014. AR_Folder 01_70. Materials reviewed include the Programmatic EIS for Oil and Gas Decommissioning activities off the Pacific Coast, Environmental Impact Reports for the Rincon Decommissioning project, and reporting and studies on the Refugio Oil spill. AR_Folder 01_70. BOEM also incorporated data about well stimulation treatments, historical data on well venting and flaring, worst case discharge scenario analyses, and planning and review documents that had been drafted in other regions in 2023 and 2024. AR_Folder 01_71.

At the time of the periodic review, Sable began conducting leasehold operations on the Santa Ynez Unit (as of December 9, 2024). BSEE was in the process of conducting pre-production inspections of all production safety systems on Santa Ynez Unit platforms that began on February 24, 2025, as required by 30 CFR § 250.880, beginning with Platform Harmony. AR_Folder 01_76.

During the Platform Harmony periodic review, BOEM requested confirmation from BSEE that Platform Harmony and supporting infrastructure were being maintained in accordance with BSEE-administered regulations. BSEE completed its review and provided its results to BOEM on February 27, 2025. *See* AR_Folder 04_26836-45. The contents of this letter were considered during the Platform Harmony periodic review. AR_Folder 01_76.

Additionally, on March 11, 2025, BSEE notified BOEM of the final stages of survey inspections for Platform Harmony. AR_Folder 04_26822-24. The survey inspections involved work to allow testing of surface and subsurface safety, as well as thermal sensors. AR_Folder 04_26823. On April 3, 2025, the survey inspections were completed with 100% of the safety systems on Platform Harmony successfully tested. AR_Folder 04_26818. As such, BSEE confirmed that Sable has complied with BSEE-

administered regulatory requirements. Having reviewed each of the above documents and received confirmation from BSEE, BOEM ultimately determined in April of 2025 that no revisions were required for the existing DPP. AR_Folder 01_79.

Plaintiffs challenged this determination in May of 2025, amending an earlier complaint filed in September of 2024, arguing that BOEM was required to revise the existing DPP in light of the age of the infrastructure and other asserted conditions surrounding the SYU, and seeking a prohibition on extraction activities until the DPP had been revised. FAC ¶ 109.

## STANDARD OF REVIEW

The standard of review under the Administrative Procedure Act ("APA") governs review of claims under OCSLA's citizen suit provision. *See W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). Such review is highly deferential. *The Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th Cir. 2008). Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, courts are at their "most deferential" when reviewing an agency's predictive scientific judgments within its area of special expertise. *Balt. Gas & Elec. Co.*, 462 U.S. at 103. Finally, the scope of review under OCSLA is limited to the administrative record unless an extra-record exception applies. *See, e.g., All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1197 (D. Mont. 2019) (finding that citizen suit claims under the ESA "are subject to the same records limitations as other APA cases").[1]

---

[1] It is Federal Defendants' position that the Court's review must be limited to the administrative record, unless Plaintiffs satisfy the criteria for inclusion of extra-record

**ARGUMENT**

## I.    Plaintiffs Wrongly Assert That Periodic Reviews Must Evaluate All of OCSLA's Substantive Requirements

Plaintiffs' threshold argument asks the Court to transform the BOEM's periodic reviews of DPPs under 43 U.S.C. § 1351(h)(3) into wholesale reevaluations of compliance with all of OCSLA and its implementing regulations' substantive requirements. *See* Pls.' Mot. for Summ. J. 9–11, Dkt. No. 51 ("Pls.' Br.") ("If BOEM's review reveals that a DPP no longer meets OCSLA's substantive requirements, revision is also required."). Consistent with that theory, Plaintiffs devote substantial portions of their brief to alleged noncompliance with provisions of OCSLA other than subsection 1351(h). *See, e.g.*, Pls.' Br. 10, 15 (discussing § 1351(c)).

No court has ever endorsed that approach. To the contrary, another court in this District has recognized that "OCSLA affords discretion as to the *manner* in which [the Secretary] may conduct a review of DPPs, along with any ultimate conclusion that *revision* of a plan is necessary." *Ctr. for Biological Diversity v. Haaland*, No. 222CV06996CASKSX, 2023 WL 3007920, at *8 (C.D. Cal. Apr. 17, 2023). And it is black-letter law that where an agency is required to act but "the manner of its action is left to the agency's discretion, a court … has no power to specify what the action must be." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004),

Here, the Secretary exercised that discretion through notice-and-comment rulemaking by prescribing specific circumstances under which a revised or supplemental DPP is required. 30 C.F.R. § 550.283. That regulation identifies seven such circumstances for a required revision—while also authorizing the Regional Supervisor to specify additional ones—triggered only when an operator proposes defined changes to approved operations. For example, a revised DPP is required if a lessee proposes to

---

evidence. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (stating criteria for extra-record evidence). Federal Defendants will address the impropriety of Plaintiffs' reliance on extra-record documents in its forthcoming Motion to Strike Extra Record Evidence pursuant to the Court's Scheduling Order, Dkt. No. 54.

change "the type of drilling rig," *id*. § 550.283(a)(1), or to "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged," *id*. § 550.283(a)(5). Similarly, a lessee must submit supplemental plans if it seeks to conduct activities requiring permits "not described in" the approved DPP. *Id*. § 550.283(b).

Plaintiffs nonetheless ask the Court to render § 550.283 superfluous by requiring revision whenever any provision of OCSLA—or any regulation implementing it—might arguably be implicated. *See, e.g.*, Pls.' Br. 16–21 (invoking 30 C.F.R. §§ 550.248– 550.250). Plaintiffs' approach would thus have the bizarre result of requiring a revised DPP to, for example, reformat information from a narrative to tabular presentation. *See infra* Section IV (rebutting Plaintiffs' invocation of 30 C.F.R. § 550.248(a)–(c)). And the consequence of such an unexpected construction of 43 U.S.C. § 1351(h)(3) would be to discourage the Department of the Interior from updating its regulations, as any update could require the submission of revised DPPs from *every* lessee.

That, of course, is not the law. Instead, OCSLA directs that periodic reviews be "*based upon* changes in available information and other . . . conditions," 43 U.S.C. § 1351(h)(3) (emphasis added), without prescribing "the *manner*" in which such reviews must be conducted, *Ctr. for Biological Diversity v. Haaland*, 2023 WL 3007920, at *8. The statutory provision provides only that revision may be required when the "review indicates that the plan *should* be revised to meet the requirements of this subsection." 43 U.S.C. § 1351(h)(3) (emphasis added). This court has previously held that it "affords discretion as to . . . any ultimate conclusion that *revision* of a plan is necessary." *Ctr. for Biological Diversity v. Haaland*, 2023 WL 3007920, at *8; *see also Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 958 (9th Cir. 1999) (use of "should" reflects a precatory, not mandatory, directive).

Entrusting the review to the Secretary's discretion accords with settled administrative law. In limiting the review to the "requirements of this subsection," § 1351(h)(3) focuses the review on predictive judgments within the Secretary's

expertise. *See, e.g.*, 43 U.S.C. § 1351(h)(1) (requiring judgments about whether the plan "make[s] adequate provision . . . for safe operations" or involves "exceptional circumstances."). When an agency makes precisely those kinds of predictive, technical, or scientific judgments, courts must be at their "most deferential." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 182 (2025) (citing *Balt. Gas & Elec. Co.*., 462 U.S. at 103).

Plaintiffs' repeated reliance on *Waterkeeper Alliance v. EPA*, 140 F.4th 1193 (9th Cir. 2025), only underscores the weakness of their statutory argument. *Waterkeeper* construed the term "appropriate" in a different statute—the Clean Water Act—and emphasized that the term's meaning was "quintessentially 'context dependent.'" *Id*. at 1216 (quoting *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024)). Plaintiffs cite no authority suggesting that the term "indicates" in § 1351(h)(3) carries similar context-dependent elasticity, nor do they explain how the review can be expanded beyond subsection (h) without disregarding the statute's plain text.

Here, there can be no dispute that Defendants complied with the requirements of § 1351(h)(3). Before approving the DPP, the Secretary undertook an exhaustive review of OCSLA's requirements through, *inter alia*, a 2,000-page Environmental Impact Statement. *See* AR_Folder 02C_14698–16736. And prior to authorizing a corrosion-protection platform maintenance project for Platform Harmony, BOEM undertook another 300-page environmental assessment. AR_Folder 02C_16794–17111. The DPP had also recently been revised in November 2024 to incorporate terms and conditions from a 2024 Biological Opinion. AR_Folder 01_71.

Against that backdrop, BOEM conducted the challenged periodic review by examining newly available information across numerous reports, documents, and datasets to determine whether further revision was warranted. AR_Folder 01_69–79. BOEM explained—on a document-by-document basis—why no additional revision was

required. AR_Folder 01_33–38. Plaintiffs do not identify any statutory requirement that BOEM failed to consider, only requirements they wish BOEM had reconsidered anew.

Finally, even if Plaintiffs could identify some deficiency in BOEM's review—which they cannot—the relief they seek is categorically unavailable. Plaintiffs ask the Court to "order BOEM to require a revision to or supplementation of the DPP." Pls.' Br. 24. But courts may not "impose upon the agency [their] own notion of which procedures are 'best.'" *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978). Nor may they intrude "into the domain which Congress has set aside exclusively for the administrative agency." Id. at 545 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). At most, "the function of the reviewing court ends when an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Ordering BOEM to mandate a revised or supplemental DPP would exceed the Court's Article III authority.

## II.    Plaintiffs' Volume of Production Arguments Fail

The BOEM-administered regulations require a lessee to revise its DPP only when it *proposes* to "change the type of production or significantly increase the volume of production or storage capacity." 30 C.F.R. § 550.283(a)(3). Plaintiffs attempt to stretch this provision far beyond its text, arguing that BOEM was required to mandate a revised DPP based on (1) alleged increases in cumulative lifetime production, (2) speculative future drilling, and (3) the fact that the Santa Ynez Unit ("SYU") has continued producing beyond the lifespan forecasted decades ago. None of these arguments has merit.

In conducting its periodic review, BOEM examined whether changes in available information indicated a need to revise the DPP due to changes in production volume. BOEM reasonably focused on production rates, because both OCSLA and its implementing regulations consistently define "production" in terms of rates over time, not cumulative lifetime output. *See* 43 U.S.C. § 1351(c)(5), 30 C.F.R. § 550.243(c)(1).

The original DPP included production forecasts expressed as daily rates of oil and gas production. *See* AR_Folder 02F_18206; AR_Folder 02F_18561. The 1987 DPP forecasted base oil production rates of 90,000 barrels of oil per day ("BOPD") for the entire Unit, while providing for flexibility to increase total unit oil production to 125,000 BOPD. AR_Folder 02F_18206. BOEM compared those projections to historical production data reported by the operator and stored in the internal BOEM database, the Technical Information Management System ("TIMS"). That data shows that peak oil production was reached in October 1995 at approximately 105,000 BOPD across the Unit —well within the range anticipated by the DPP. AR_Folder 02E_17612. The last reported 12-month average rate for the entire Unit was 29,000 BOPD before being shut-in due to the 2015 Refugio Beach Oil Spill. *Id*. This rate is far below both historical peaks and the DPP's forecasted maximums.[2] Therefore, BOEM reasonably concluded that the DPP need not be revised because there will be no "significant[] increase [in] the volume of production." 30 C.F.R. § 550.283(a)(3). Based on this information, BOEM reasonably concluded that resumption of production would not constitute a "significant[] increase [in] the volume of production" within the meaning of § 550.283(a)(3).

Plaintiffs do not meaningfully dispute these facts. Instead, they argue that BOEM was obligated to require a revised DPP because total *cumulative* production over the life of the Unit has exceeded the quantities estimated in the DPP. That argument misreads the regulation and the statute. Nothing in OCSLA or the regulations suggests that "the volume of production" in § 550.283(a)(3) refers to the total cumulative amount of oil and gas extracted over decades of operation. To the contrary, OCSLA requires a DPP to include the "expected *rate* of development and production." 43 U.S.C. § 1351(c)(5)

---

[2] Oil production in the Santa Ynez Unit has declined predictably over time as resources were produced. In general, as oil is extracted, the pressure in the underground reservoir decreases, making it more difficult to recover the remaining oil. Decline rates vary by field, and decline can be slowed by technological developments, but the overall rate of production will typically never exceed the initial peak, which was reached at the SYU in October 1995. AR_Folder 02E_17612.

(emphasis added). The applicable regulations likewise require estimates of "average and peak *rates* of production." 30 C.F.R. § 550.243(c)(1) (emphasis added).

Consistent with these provisions, the DPP itself presents production forecasts in rate-based terms. For example, the forecasted production graph in the DPP, Figure 3.2 (AR_Folder 02F_18561), is displayed in a rate per day – kBOPD (thousand barrels of oil per day) and MCFD (thousand cubic feet of gas per day). There is no comparable graph for the total lifetime cumulative production, underscoring that "volume of production" is understood—both by the agency and the regulated community—to mean production rates, not aggregate totals.

Plaintiffs' contrary interpretation would produce absurd results. Under their theory, any offshore facility that operates longer than originally forecast—even while producing at declining rates—would automatically require a revised DPP, regardless of whether its production profile remained within approved parameters. Nothing in 30 C.F.R. § 550.283 or OCSLA supports such an outcome, and Plaintiffs cite no authority adopting it.

Even assuming arguendo that cumulative production were relevant, Plaintiffs' argument still fails. The 1987 DPP "estimates that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels (MB) of crude oil and 600 to 700 billion standard cubic feet (GSCF) of natural gas." AR_Folder 02F_18150. That estimate expressly addressed production under a *primary* recovery scheme. *Id*. Primary recovery refers to the initial stage of extracting oil and gas from offshore reservoirs, relying on natural reservoir energy like gas expansion or water pressure, often using artificial lift (pumps), to bring hydrocarbons to the surface before significant pressure decline. The DPP also anticipated that additional recovery could occur through improved or *secondary* recovery methods. *See* AR_Folder 02F_18195 ("successful application of improved recovery techniques would extend the productive life beyond the dates given above"). Secondary recovery techniques—such as

waterflooding or gas injection—are widely used to extend field life and increase total recovery after primary production declines, and the DPP expressly contemplated such techniques. Accordingly, the fact that total cumulative production has exceeded the primary recovery estimate does not reflect any deviation from the approved plan, let alone a change requiring DPP revision.

Moreover, the regulations separately govern enhanced recovery operations and require additional approvals through mechanisms other than DPP revision, such as applications under 30 C.F.R. § 550.1155. Plaintiffs' effort to fold these distinct regulatory pathways into § 550.283(a)(3) ignores the structure of the regulatory scheme.

Plaintiffs next contend that a revised DPP is required because Sable has indicated, in extra-record SEC investor materials,[3] that it *could* nearly double the number of existing wells in the Unit. Pls.' Br. 12-13. That argument fails for at least two reasons. First, § 550.283(a) is explicitly triggered *only when a lessee proposes a change*. Sable has not proposed any new drilling activity to BOEM or BSEE, and Plaintiffs concede as much. Pls.' Br. 15 (noting that "Sable has not yet 'proposed' this development."). The regulation does not require BOEM to mandate a revised DPP based on speculative future possibilities or statements made outside the administrative process.

Second, Plaintiffs' argument improperly seeks to force BOEM to evaluate hypothetical future projects divorced from any concrete proposal. If and when Sable submits an application to drill new wells, BOEM and BSEE will evaluate whether the proposed activities are consistent with the existing DPP and whether a revision is required under § 550.283(a)(1) or separate authorizations are required under other applicable provisions.[4] Until then, Plaintiffs' claim is premature.

---

[3] The Court should disregard this extra-record evidence for the reasons set forth in Federal Defendants' forthcoming motion to strike.

[4] Each well would also need to be individually approved through BSEE's Applications for Permit to Drill (APD) or Application for Permit to Modify (APM) process under 30 CFR § 250 Subpart D. These regulations require that an operator receives written approval from the BSEE District Manager before drilling any well or to bypass or deepen a well. And a number of cross-checks are performed at the APD/APM stage to determine consistency with the approved DPP.

1    Finally, Plaintiffs argue that BOEM was required to mandate a revised DPP

2    because the SYU "has already outlived the lifespan predicted in its DPP." Pls.' Br. 13.

3    But nothing in OCSLA or the regulations imposes an expiration date on an approved

4    DPP or requires revision simply because production continues longer than initially

5    forecasted. Section 550.283 does not include longevity as a trigger for DPP revision, and

6    Plaintiffs identify no statutory provision to the contrary. Forecasted lifespans serve as

7    planning tools that inform facility design and initial development assumptions;[5] they do

8    not impose a legal cap on how long a unit may operate if it continues to meet applicable

9    regulatory requirements. Indeed, 43 USC § 1337(b)(2) specifically states that the lease

10   shall continue for "as long . . . as oil or gas is produced from the area in paying

11   quantities, or drilling or well reworking operations as approved by the Secretary are

12   conducted thereon."

13   Plaintiffs' reliance on *Native Village of Point Hope v. Jewell*, 740 F.3d 489 (9th

14   Cir. 2014), is misplaced. That case addressed deficiencies in a NEPA analysis, not

15   OCSLA's DPP revision requirements, and turned on NEPA's obligation to analyze

16   reasonably foreseeable environmental impacts. *Id*. at 503–05. This case does not arise

17   under NEPA, and Plaintiffs cannot import NEPA's analytical standards into OCSLA or

18   30 C.F.R. § 550.283 and nor should the Court allow it. In any event, BOEM here

19   considered both forecasted and historical production information and reasonably

20   concluded that no DPP revision was warranted.

21   In sum, each of Plaintiffs' volume-of-production theories attempts to sever

22   § 550.283(a) from its text and regulatory context. BOEM's DPP revision triggers are

23   proposal-based and forward-looking, focused on whether an operator seeks approval for

24   activities that would materially depart from the parameters analyzed in an approved plan.

25   Here, BOEM reasonably determined that production rates remain within historical and

26   forecasted levels, that no new drilling or facilities have been proposed, and that

27   _____

[5] For example, forecasted production rates can help determine the sizing of a pipeline, processing equipment, or the number of slots necessary for a platform to develop an oil

28   field.

14

continued operation beyond an estimated lifespan—standing alone—does not require revision of an otherwise compliant DPP. Plaintiffs' contrary approach would convert § 550.283 into a perpetual reopening mechanism untethered from any concrete proposal, undermining the staged structure of OCSLA and displacing the discretion Congress vested in the Secretary. The Court should reject that theory.

## III.    Plaintiffs' Air Emissions Arguments Fail

Plaintiffs next argue that BOEM acted arbitrarily and capriciously by declining to require a revised DPP based on alleged changes in air emissions at Platform Harmony. That argument mischaracterizes both the scope of BOEM's periodic review and the record evidence. Consistent with OCSLA and its implementing regulations, BOEM evaluated whether *newly available information* indicated a change in emissions that would trigger a DPP revision under 30 C.F.R. § 550.283(a)(4). It reasonably concluded that no such change had occurred.

Under 30 C.F.R. § 550.284, a periodic DPP review "will be based on the significance of any changes in available information and onshore or offshore conditions affecting, or affected by, the activities" in the approved DPP. Unlike the review of a newly submitted DPP under § 550.249, a periodic review does not reopen or re-evaluate the DPP in its entirety. Applying that standard here, BOEM reviewed the volume, duration, and type of air pollutants associated with Platform Harmony against newly available information from recent BOEM and BSEE NEPA reviews, as well as against current air quality standards and permitting decisions issued by the Santa Barbara County Air Pollution Control District ("APCD"). BOEM determined that there was no evidence of an increase in emissions of any criteria air pollutant—whether volatile organic compounds ("VOC"), reactive organic compounds ("ROC"), particulate matter ("PM"), or total suspended particulates ("TSP")—that exceeded the amounts specified or contemplated in the approved DPP. Emissions remained within the bounds of prior NEPA analyses and within the limits of the current APCD permit for Platform Harmony.

In the Pacific Region, BOEM does not issue air permits for offshore facilities. That authority rests with the local air pollution control district—in this case, the Santa Barbara County APCD—which is responsible for ensuring compliance with applicable air quality standards. BOEM reasonably relied on APCD's permitting determinations, which reflect the most current and detailed emissions information available for the facility, particularly where no changes in equipment or operations had been proposed.

As part of its review, BOEM verified that emissions associated with Platform Harmony remained below historically approved levels reflected in the original DPP, the 1975 Final Environmental Statement, and subsequent NEPA analyses, and that current operations remained within the limits authorized by APCD's valid air quality permit. Nothing in OCSLA or the regulations required BOEM to disregard the determinations of the competent permitting authority or to independently replicate APCD's permitting analysis during a periodic review.

Plaintiffs argue that the DPP must be revised because "no iteration of the DPP contains the kinds of emissions data and level of detail demanded by 30 C.F.R. § 550.249(a)." Pls.' Br. 16. But § 550.249 governs the contents of a *new* DPP submission, not the scope of a periodic review under § 550.284. Plaintiffs thus repeat the same legal error addressed in Section I: attempting to transform a periodic review into a wholesale reassessment of compliance with every substantive and procedural requirement applicable to an initial DPP.

Here, BOEM appropriately incorporated by reference the current APCD permit and emissions information, which represents the most detailed and up-to-date data available and reflects the absence of any proposed change in equipment or operations. Plaintiffs identify no authority requiring BOEM to retroactively reformat or supplement an approved DPP during a periodic review to match the contents required of a new DPP submission.

Plaintiffs next contend that BOEM arbitrarily limited its review to flaring emissions. That contention misstates the record. BOEM reviewed air emissions holistically, including flaring, in light of Platform Harmony's operational status and power configuration. Because the Santa Ynez Unit is partially powered by onshore electricity, flaring constitutes a disproportionate share of total emissions relative to facilities that rely entirely on onsite power generation. At the time of review, Platform Harmony was shut in, making flaring the primary source of emissions. BOEM therefore reasonably examined flaring volumes to confirm that emissions remained below permitted and historically approved levels.

Critically, BOEM also considered flaring data in historical context. As Plaintiffs themselves acknowledge, flaring at the Santa Ynez Unit peaked in the mid-1990s—specifically in 1994—when production rates across the Unit were at or near their historical maximum. AR_Folder 01_78; see also AR_Folder 02E_17609. That relationship is neither coincidental nor disputed: peak air emissions rates tend to coincide with peak production rates. Since that time, production rates at the Santa Ynez Unit have declined, and as explained in Section II, are unlikely ever to return to historical peak levels due to reservoir depletion and field maturity. Continued operations therefore cannot reasonably be expected to approach the production rates—and correspondingly, the emissions rates (which now are also capped by the APCD permit)—experienced during the Unit's historical peak.

BOEM reasonably accounted for this reality in determining that current and foreseeable emissions, including flaring, remain well below levels previously approved and analyzed in the DPP and associated NEPA documents. Plaintiffs offer no basis to conclude otherwise.

Finally, Plaintiffs argue that BOEM acted arbitrarily by failing to rely on APCD inspection reports regarding fugitive emissions. That argument fails as a matter of law and fact. As an initial matter, Plaintiffs rely on extra-record inspection materials that

were never presented to BOEM during the periodic review. The Court should disregard that evidence for the reasons set forth in Federal Defendants' forthcoming motion to strike. In any event, Plaintiffs' cited inspection report does not demonstrate any increase in emissions warranting a revised DPP.

The inspection report on which Plaintiffs rely classified the fugitive emissions event at Platform Harmony as *minor* and reflects that the leak was repaired within one day of identification. *See* Monsell Decl. Ex. 3 p. 4, Dkt. No. 51-9. The report therefore documents prompt corrective action, not ongoing or increased emissions. Plaintiffs offer no basis to treat a brief, resolved emissions event as probative of whether future production under the existing DPP will result in increased emissions.

More fundamentally, BOEM's periodic review properly focused on whether newly available information indicated a change in emissions *rates* or operating conditions that would exceed previously approved or permitted levels. A single, minor, promptly corrected fugitive emissions event does not alter that analysis and does not trigger any revision requirement under 30 C.F.R. § 550.283(a)(4).

In short, Plaintiffs' air emissions arguments fail for the same structural reasons as their production-volume claims. BOEM's obligation during a periodic DPP review is not to re-litigate historical emissions analyses or conduct a de novo permitting review, but to assess whether newly available information indicates a proposed or foreseeable increase in emissions that would exceed levels previously approved. BOEM reasonably determined that emissions—including flaring—remain well below historical and forecasted peak levels, that no changes in equipment or operations have been proposed, and that current operations remain within the limits of valid permits issued by the relevant air quality authority. Plaintiffs' attempt to force a DPP revision absent any increase in emissions rates or regulatory trigger finds no support in OCSLA or its implementing regulations and should be rejected.

**IV.    Plaintiffs' Waste Discharge Arguments Fail**

Plaintiffs next contend that BOEM acted arbitrarily and capriciously by declining to require a revised DPP based on alleged changes in waste discharges at the Santa Ynez Unit. As with Plaintiffs' production and air emissions claims, this argument mischaracterizes the scope of BOEM's periodic review and ignores both the governing regulatory framework and the administrative record.

Under the BOEM-administered regulations, a revised DPP is required only if an operator *proposes* to "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged." 30 C.F.R. § 550.283(a)(5). BOEM reasonably determined that no such proposal had been made and that no newly available information indicated any increase in waste discharges beyond levels previously approved and permitted.

In conducting its periodic review, BOEM reviewed waste discharges associated with the Santa Ynez Unit under the applicable National Pollutant Discharge Elimination System ("NPDES") permit: General Permit No. CAG280000, which governs offshore oil and gas exploration, development, and production operations in Southern California. AR_Folder 02C_1673. That permit establishes effluent limitations, prohibitions, monitoring and reporting requirements, and other conditions applicable to production, well completion, well treatment, workover, and abandonment operations.

The permit was issued by the U.S. Environmental Protection Agency ("EPA") on December 20, 2013, and remains in effect pursuant to 40 C.F.R. § 122.6 and 5 U.S.C. § 558(c) pending issuance of a new permit. BOEM reviewed the permit and confirmed that no changes to discharge types or quantities had been submitted for review. Based on that review, BOEM reasonably determined that there was no basis to conclude that waste discharges would significantly increase so as to trigger a DPP revision under § 550.283(a)(5).

Plaintiffs assert that BOEM failed to consider whether past or future operations have exceeded, or will exceed, NPDES permit limits. Pls.' Br. 19. That argument misunderstands BOEM's role and misstates the law.

Compliance with NPDES permit limits is overseen by the permitting authority—here, the EPA—not BOEM. BOEM's NEPA analyses appropriately considered the environmental effects of operations conducted pursuant to existing regulatory approvals, including the NPDES permit. Nothing in OCSLA requires BOEM to speculate that an operator will violate permit conditions or to assume non-compliance with existing permits.

Moreover, BOEM's environmental analyses for the Santa Ynez Unit already provided a detailed discussion of cumulative water quality impacts offshore Southern California. AR_Folder 02G_24210. Plaintiffs identify no newly available information demonstrating a change in discharge conditions that would undermine those analyses or require a revised DPP.

Plaintiffs next argue that the DPP must be revised because "no iteration of the DPP contains a table with discharge data at the level of detail demanded by 30 C.F.R. § 550.248." Pls.' Br. 19. As with their air emissions argument, Plaintiffs incorrectly invoke a regulation governing the contents of a *new* DPP to challenge the adequacy of a periodic review.

Plaintiffs assert that the DPP must be accompanied by a *table* describing discharges and discussions of how the operator will comply with the applicable NPDES permit. Pls.' Br. 19 (citing 30 C.F.R. § 550.248(a)–(c)). But Plaintiffs never explain how the substantial existing information about discharge amounts and NPDES permit compliance accompanying the DPP fails to satisfy this requirement. *See, e.g.*, AR_Folder 02C_000014922, AR_Folder 02C_000015614, AR_Folder 02C_000004349, AR_Folder 02C_000004346, AR_Folder 02F_000017805, AR_Folder 02C_000015614–33. In any event, § 550.248 applies to the review of a newly submitted DPP, not to a periodic

review under § 550.284. Plaintiffs' effort to require BOEM to reformat or supplement an existing, approved DPP during a periodic review repeats the same legal error identified in Sections I and III, *supra*.[6]

Plaintiffs also fault BOEM for failing to consider an EPA 2014 Pollutant Loading Report summarizing self-reported NPDES discharge monitoring data. Pls.' Br. 19–20. That document is extra-record evidence that was never presented to BOEM during the periodic review and should be excluded for the reasons set forth in Federal Defendants' forthcoming motion to strike.

Even if considered, the report does not demonstrate any failure by BOEM. The EPA document is a program-level summary prepared for Clean Water Act oversight purposes and reviews historical operations that may include periods of shutdown or abnormal conditions. Such a report is not designed to predict future discharges and would not have expanded upon the informational requirements of the DPP or altered BOEM's determination that no significant increase in waste discharges had been proposed.

Finally, Plaintiffs argue that BOEM acted arbitrarily by failing to consider the possibility that restarting production could involve well stimulation treatments that would alter the type or quantity of waste discharges. Pls.' Br. 20–21. That argument fails for the same reason as Plaintiffs' speculative drilling claims discussed in Section II, *supra*.

BOEM does not, and cannot be reasonably expected to, evaluate hypothetical operations that have not been proposed. Under 30 C.F.R. § 550.283, desired changes in operations must be formally submitted for review before BOEM determines whether a

---

[6] Plaintiffs similarly carry the same legal error into a footnote in their brief, arguing that because §550.23 requires that new DPPs be accompanied by a list of permits needed from other federal, state, or local agencies and evidence of required bonding, the DPP should be revised. *See* Pls.' Br. 24, fn. 12.  But requiring a revised DPP every time a replacement permit is issued by another Federal, state or local agency or a new certificate of bonding is submitted to BOEM under a different regulation would be an absurd and pointless paperwork exercise.  Moreover, as noted above, BOEM did consider certain permits (e.g., the APCD and NPDES permits) and their relevancy to changes in new information or onshore or offshore conditions.

21

revised DPP is required. If Sable were to propose well stimulation activities—such as hydraulic fracturing—it would be required to submit that proposal to BOEM and BSEE, at which point BOEM would evaluate whether the existing DPP remains adequate or requires revision. Until then, Plaintiffs' argument is premature and provides no basis for relief. Moreover, existing environmental analyses for the DPP already analyzed the effects of acidizing or fracturing well treatments to improve production. *See, e.g.*, AR_Folder 02C_14966.

In short, Plaintiffs' waste discharge arguments fail for the same reasons as their production and air emissions claims. BOEM's review properly focused on whether newly available information or proposed operational changes indicated a significant increase in waste discharges beyond levels previously approved and permitted. Finding none—and reasonably relying on the continued applicability of the governing NPDES permit—BOEM acted well within its discretion in concluding that no revised DPP was required.

## V.    Plaintiffs' Worst Case Discharge Scenario Arguments Fail

Plaintiffs' final challenge contends that BOEM acted arbitrarily by failing to require a revised DPP based on alleged deficiencies in worst-case discharge scenario analysis. Pls.' Br. 21–24. That argument misunderstands the regulatory framework governing offshore spill preparedness, conflates the roles of multiple federal agencies, and again seeks to impose requirements applicable to new or modified operations on a periodic DPP review.

Under OCSLA and its implementing regulations, worst-case discharge scenarios are calculated by facility operators as part of Oil Spill Response Plans ("OSRPs"), not specifically as part of a DPP periodic review. *See* 30 C.F.R. § 254.47. For oil production platforms, the worst-case discharge scenario is defined as the sum of: (1) the maximum capacity of all oil storage tanks and flow lines on the facility; (2) the volume of oil that could leak from connected pipelines, accounting for shutdown time and physical

conditions; and (3) the daily production volume from an uncontrolled blowout of the highest-capacity well, evaluated over a 30-day response period. *See* 30 C.F.R. § 254.26(d)(1).

The BSEE-administered regulations require operators to maintain the capability to respond to such worst-case scenarios, typically through membership in certified Oil Spill Removal Organizations. *See* 30 C.F.R. Part 254. These requirements apply independent of BOEM's periodic DPP review and ensure that spill preparedness reflects current operational conditions.

Critically, OSRPs are not subject to federal discretion and approval and are therefore not the proper vehicle for the type of challenge Plaintiffs attempt to raise here. *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1224–25 (9th Cir. 2015). Plaintiffs' effort to use the DPP periodic review process to relitigate spill-response planning is contrary to the regulatory structure Congress and the agencies have established, and case law in the Ninth Circuit.

Plaintiffs' argument also ignores the extensive interagency spill-response framework applicable to the Santa Ynez Unit. In the event of an oil spill, the U.S. Coast Guard serves as the lead federal response agency in the coastal zone and coordinates response activities through a Unified Command under the Incident Command System. The State of California, through the Office of Spill Prevention and Response, serves as the State on-scene coordinator and plays a significant role in wildlife protection and response operations.

Oil spill response exercises—whether agency-led or operator-led—are conducted using this Unified Command structure. BOEM reasonably relied on this comprehensive regulatory regime in determining that no DPP revision was required based on speculative spill scenarios. Plaintiffs identify no proposed operational changes that would alter the worst-case scenario calculation.

Plaintiffs next assert that BOEM ignored evidence of inadequate cathodic protection, increasing the risk of a worst-case discharge. Pls.' Br. 22–23. That claim rests on a fundamental mischaracterization of the record.

The materials that Plaintiffs cite regarding "low cathodic protection," Pls.' Br. 22, originate from the Pipeline and Hazardous Materials Safety Administration and relate to nearshore and onshore pipelines—facilities that are outside of BOEM's and BSEE's offshore regulatory jurisdiction. Offshore platform and pipeline infrastructure in the Santa Ynez Unit is regulated under 30 C.F.R. Part 250, Subpart J, which requires cathodic protection for offshore pipelines and assigns BSEE responsibility for evaluating its adequacy.

BSEE inspections and Level I surveys for the Santa Ynez Unit—including cathodic protection—were deemed compliant with applicable regulations. *See* AR_Folder 04_26839. Moreover, platform and infrastructure maintenance in the Santa Ynez Unit is ongoing. In 2021, BOEM prepared an Environmental Assessment evaluating ExxonMobil's proposal to install 21 Impressed Current Cathodic Protection ("ICCP") anode sleds at Platforms Hondo, Heritage, and Harmony. AR_Folder 02C_16794–17111. That EA analyzed potential environmental effects in detail and identified protective measures developed through agency consultation. Plaintiffs' suggestion that BOEM ignored cathodic protection issues is therefore unsupported by the record.

Plaintiffs further argue that BOEM should have mandated a DPP revision because the age of Santa Ynez Unit infrastructure increases the risk of a catastrophic spill. Pls.' Br. 23–24. But this argument ignores that, as with all offshore infrastructure, the SYU platforms and pipelines must meet rigorous regulatory standards that are reviewed by BSEE subject matter experts to remain in service, certifying their continued integrity. *See* 30 CFR § 250.1004.

In 2024 alone, BSEE inspected each of the three platforms in the Santa Ynez Unit four times. AR_Folder 04_26836. Individual segments of pipeline were also inspected several times throughout 2024. *Id.* Offshore pipelines are subject to comprehensive leak detection requirements, including real-time volume comparison systems with alarm functionality and sensitivity thresholds reviewed by BSEE engineers prior to installation. AR_Folder 02G_24563; *see also* 30 C.F.R. §250.1004. Pipelines also undergo regular third-party internal inspections to identify corrosion or damage, with mandatory repair or shut-in thresholds for wall loss, dents, or other structural concerns. AR_Folder 02G_24565. External inspections are conducted in alternating years using remotely operated vehicles and high-resolution sonar to assess pipeline integrity and environmental hazards. *Id.*

Platforms themselves are subject to annual structural inspections under 30 C.F.R. Part 250, Subpart I, including corrosion protection evaluations and reporting requirements. During site visits, BSEE inspectors visually inspect platforms, pipelines, and conductors and respond to any reported hazardous incidents. Plaintiffs' generalized concerns about aging infrastructure do not overcome this extensive, ongoing inspection and maintenance regime.

## CONCLUSION

BOEM conducted the DPP review that OCSLA requires, applied the duly promulgated regulations, and reasonably explained—based on the administrative record—why no revision to the Santa Ynez Unit DPP was warranted. Plaintiffs' effort to convert that limited review into a wholesale reassessment of long-settled agency decisions finds no support in the statute or the case law and would require the Court to intrude into matters committed to agency discretion. Because BOEM's decision was lawful, reasonable, and entitled to deference, the Court should deny Plaintiffs' motion and grant judgment in favor of Federal Defendants.

Dated: February 6, 2026

Respectfully submitted,

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Shannon Boylan*
SHANNON BOYLAN, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
E-mail: shannon.boylan@usdoj.gov
Tel: (202) 598-9584

*Attorneys for Federal Defendants*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Federal Defendants, certifies that this brief does not exceed 25 pages, in compliance with the page limit set by this Court's Standing Order, Section 6.c, dated April 15, 2025 (Dkt. No. 11).

Dated: February 6, 2026                    */s/ Shannon Boylan*
                                            Shannon Boylan