Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological
Diversity and Wishtoyo Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUG BURGUM, et al.,<br><br>*Defendants*,<br><br>and<br><br>SABLE OFFSHORE CORP.,<br><br>*Intervenor-Defendant*. | Case No. 2:25-cv-02840-MWC-MAA<br><br>**PLAINTIFFS' OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUGMENT**<br><br>Hearing Date: May 15, 2026<br>Hearing Time: 1:30 p.m.<br>Judge: Hon. Michelle Williams Court<br>Location: Courtroom 6A |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ...............................................................................................1

ARGUMENT .....................................................................................................2

I.     BOEM Must Review All Available Information and Require Revision of a DPP to Ensure the Plan Provides for Protection of the Environment...........................................................2

II.    BOEM's Failure to Require Revision of the DPP Was Arbitrary and Capricious. ..................................................................7

    A.    Increasing the Volume of Production at Santa Ynez Unit Triggers DPP Revision................................................8

    B.    BOEM's Failure to Consider How Restarting the Santa Ynez Unit Would Increase Air Emissions Was Arbitrary and Capricious. ..................................................13

    C.    BOEM's Failure to Consider How Restarting the Santa Ynez Unit Will Increase Waste Discharges Was Arbitrary and Capricious. ..................................................15

    D.    BOEM's Failure to Consider Highly Relevant Information About the Heightened Risk of Oil Spills Was Arbitrary and Capricious. ......................................18

    E.    Plaintiffs' Claim Should Succeed Regardless of Whether the Court Considers Their Exhibits...........................20

III.   Plaintiffs' Notice Was Sufficient. .......................................................20

IV.    The Court Should Compel BOEM to Comply With OCSLA...................................................................................22

CONCLUSION................................................................................................24

CERTIFICATE OF COMPLIANCE..................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Offshore Specialty Fabricators, Inc.*,
  663 F.3d 759 (5th Cir. 2011) ................................................................................22

*Burke v. Comm'r of Social Security Admin.*,
  704 F. Supp. 3d 989 (D. Ariz. 2023) ......................................................................4

*Cal. Pub. Utils. Comm'n v. FERC*,
  879 F.3d 966 (9th Cir. 2018) ................................................................................18

*Cascadia Wildlands v. Scott Timber Co.*,
  105 F.4th 1144 (9th Cir. 2024) ....................................................................... 21, 22

*Ctr. for Biological Diversity v. Haaland*,
  No. 2:22-cv-06996-CAS-KSx,
  2023 WL 3007920 (C.D. Cal. Apr. 17, 2023) ....................................................6, 22

*Duncan v. Walker*,
  533 U.S. 167 (2001).................................................................................................4

*Env't Def. Ctr. v. BOEM*,
  36 F.4th 850 (9th Cir. 2022) .................................................................................16

*Fed. Power Comm'n v. Idaho Power Co.*,
  344 U.S. 17 (1952).................................................................................................23

*Fed. Power Comm'n v. Transcont'l Gas Pipe Line Corp.*,
  423 U.S. 326 (1976)...............................................................................................24

*Flaherty v. Pritzker*,
  17 F. Supp. 3d 52 (D.D.C.  2014).........................................................................23

*Friends of the Inyo v. U.S. Forest Serv.*,
  103 F.4th 543 (9th Cir. 2024) .................................................................................8

*Healthy Gulf v. U.S. Dep't of Interior*,
  152 F.4th 180 (D.C. Cir. 2025).................................................................................3

*Hodgers-Durgin v. De La Vina*,
  199 F.3d 1037 (9th Cir. 1999) ...................................................................17

*Humane Soc'y of the United States v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ..................................................................20

*Kaweah Delta Health Care Dist. v. Becerra*,
  123 F.4th 939 (9th Cir. 2024) .....................................................................4

*League of Cal. Cities v. FCC*,
  118 F.4th 995 (9th Cir. 2024) .................................................................9, 10

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024)....................................................................................6

*Lopez-Venegas v. Beers*,
  No. LA CV13-03972-JAK (PLAX),
  2013 WL 12474081 (C.D. Cal. Dec. 27, 2013).......................................17

*Mountain Cmtys. for Fire Safety v. Elliott*,
  25 F.4th 667 (9th Cir. 2022) .......................................................................8

*Nat. Res. Def. Council v. EPA*,
  31 F.4th 1203 (9th Cir. 2022) .................................................................7, 13

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
  236 F.3d 985 (9th Cir. 2000) ....................................................................21

*Nw. Env't Advocates v. EPA*,
  745 F. Supp. 3d 1150 (D. Or. 2024) .........................................................22

*ONRC Action v. Columbia Plywood, Inc.*,
  286 F.3d 1137 (9th Cir. 2002) ..................................................................21

*Pac. Nw. Generating Co-op v. Bonneville Power Admin.*,
  596 F.3d 1065 (9th Cir. 2020) ....................................................................6

*SEC v. McCarthy*,
  322 F.3d 650 (9th Cir. 2003) ......................................................................9

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) .........................................................................6

iii

*United States v. Approx. 64,695 lbs. of Shark Fins*,
   520 F.3d 976 (9th Cir. 2008) ........................................................................9

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978)....................................................................................23

*W. Watersheds Proj. v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) .......................................................................20

*Waterkeeper All. v. EPA*,
   140 F.4th 1193 (9th Cir. 2025) .............................................................. 6, 7, 17

*Weyerhauser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018).........................................................................................5

*Wildearth Guardians v. Bucknall*,
   756 F. Supp. 3d 1017 (D. Mont. 2024)..........................................................7

**Statutes**

15 U.S.C. § 2625(k) ........................................................................................12

16 U.S.C. § 1536(a)(2)......................................................................................12

43 U.S.C. § 1332(3) .....................................................................................3, 16

43 U.S.C. § 1349(a)(1)................................................................................. 22, 24

43 U.S.C. § 1351(c) .........................................................................................16

43 U.S.C. § 1351(h) ..........................................................................................2

43 U.S.C. § 1351(h)(1)............................................................................ 2, 3, 4, 5, 7

43 U.S.C. § 1351(h)(1)(A)..................................................................................3

43 U.S.C. § 1351(h)(1)(D) ..................................................................................3

43 U.S.C. § 1351(h)(3)......................................................... 2, 3, 4, 5, 7, 14, 19, 20

43 U.S.C. § 1531(h)(3).......................................................................................4

**Regulations**

30 C.F.R § 550.241 ................................................................................................16

30 C.F.R. § 250.410(b) ..........................................................................................16

30 C.F.R. § 550.243(h) ............................................................................................9

30 C.F.R. § 550.248 ...............................................................................................17

30 C.F.R. § 550.249 ...............................................................................................14

30 C.F.R. § 550.249(a)(2) ................................................................................ 13, 14

30 C.F.R. § 550.280(a).............................................................................................16

30 C.F.R. § 550.281(b) ..........................................................................................16

30 C.F.R. § 550.283 .............................................................................................2, 4

30 C.F.R. § 550.283(a)...........................................................................................12

30 C.F.R. § 550.283(a)(3)............................................................................... 8, 9, 10

30 C.F.R. § 550.283(a)(4)............................................................................... 13, 14

30 C.F.R. § 550.283(a)(5)........................................................................................15

30 C.F.R. § 550.284 ......................................................................................... 11, 14

30 C.F.R. § 550.284(a)....................................................................................... 12, 16

30 C.F.R. § 550.284(b) .............................................................................................5

30 C.F.R. §§ 550.283–.284 .......................................................................................5

40 C.F.R. § 702.33 .................................................................................................12

50 C.F.R. § 402.14(d) .............................................................................................12

**Federal Register Notices**

70 Fed. Reg. 51,478 (Aug. 30, 2005)........................................................................12

85 Fed. Reg. 34,912 (June 5, 2020).........................................................................15

91 Fed. Reg. 13,063 (Mar. 18, 2026).......................................................................16

**INTRODUCTION**

This case arises from an unprecedented effort to restart offshore drilling following a disastrous oil spill. The spill, which resulted in thousands of gallons of crude oil entering one of the most ecologically productive areas of the West coast, shut down operations at the Santa Ynez Unit for more than 10 years.[1] Federal Defendants, Bureau of Ocean Energy Management et al. (collectively, BOEM), unlawfully determined the Unit's development and production plan (DPP) requires no revision before drilling restarts. BOEM's decision allows operations to resume using long-dormant infrastructure, under a plan that has not been meaningfully revised in over 40 years. Moreover, this outdated plan does not account for operations beyond the Unit's anticipated lifespan, or the fact that oil will flow through corroded pipelines in quantities far surpassing the estimates BOEM evaluated.

The Outer Continental Shelf Lands Act (OCSLA) expressly requires BOEM to revise a DPP if available information indicates the plan is outdated, does not account for the anticipated scope of activities, or lacks adequate environmental safeguards. But here, rather than conducting a thorough evaluation of available information, BOEM ignored factors directly relevant to its inquiry, including information indicating how Sable's plans to resurrect this oil project will significantly increase the volume of production, intensify air and water pollution, and magnify the risks of an oil spill.

In trying to defend this arbitrary decision, BOEM argues that it cannot evaluate such information unless an oil company formally proposes changes. The

---

[1] On March 16, 2026, Intervenor-Defendant Sable Offshore Corp. (Sable) announced that it had resumed production at the Santa Ynez Unit on March 14, 2026, including transporting oil through the failed pipeline system. Sable Offshore Corp., Current Report (Form 8-K) (Mar. 16, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/00018314812600 0030/socc-20260313.htm.

plain language of OCSLA, however, makes clear that BOEM, not an oil company, is firmly in the driver's seat in determining whether a DPP needs to be revised. Moreover, contrary to BOEM's characterization, Plaintiffs complaints do not involve some "hypothetical future" project," BOEM Mem. Supp. Summ. J. 1, Dkt. No. 57 [hereinafter BOEM MSJ], but what the agency itself has described as its evaluation of the "phased return-to-production of the [Santa Ynez Unit] beginning with Platform Harmony." AR_Folder 01_000000069. BOEM and Sable fail in their additional attempts to strip teeth from OCSLA's substantive mandate to revise a DPP. OCSLA is clear that BOEM's review must evaluate changes in available information to ensure the DPP comports with the standards of 43 U.S.C. § 1351(h). But BOEM failed to do, despite BOEM and Sable's numerous post-hoc attempts to convince the Court otherwise. Sable's effort to relitigate issues regarding the adequacy of Plaintiffs' notice letter likewise fails.

Try as they might, BOEM and Sable simply cannot escape the fact that the agency ignored information directly relevant to the safety of offshore operations at the Santa Ynez Unit and the extent of harm to the marine environment from such activities. This information indicates a revision is necessary to ensure compliance with OCSLA's substantive mandates.

## ARGUMENT

### I.    BOEM Must Review All Available Information and Require Revision of a DPP to Ensure the Plan Provides for Protection of the Environment

OCSLA requires periodic review and revision of a DPP to ensure the DPP continues to satisfy the statute's substantive mandates, including protection of the "human, marine, [and] coastal environment." 43 U.S.C. § 1351(h)(1), (3). BOEM erroneously argues that revision is only required when the operator proposes changes to one of the eight enumerated factors of 30 C.F.R. § 550.283, and that periodic reviews pursuant to section 1351(h)(3) are committed to agency discretion. *See* BOEM MSJ 3, 7–9. These arguments are inconsistent with

2

OCSLA's plain language and fundamental principles of judicial review. Sable's desire for a restricted review process would eliminate any substantive evaluation of new information relevant to ensuring adequate protection of the environment. *See* Sable Mem. Supp. Summ. J. 7–8, Dkt. No. 59-1 [hereinafter Sable MSJ].

Under 43 U.S.C. § 1351(h)(3), BOEM

> shall, from time to time, review each plan approved under this section. Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan. If the review indicates that the plan should be revised to meet the requirements of this subsection, [BOEM] shall require such revision.

In requiring revision "to meet the requirements of this subsection," the statute refers to section 1351, subsection (h). Subsection (h) mandates "modification of a plan if . . . the lessee has failed to make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment." 43 U.S.C. § 1351(h)(1). It further requires BOEM to disprove a plan if "the lessee fails to demonstrate that he can comply with the requirements of this subchapter or other applicable Federal law," or if "implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life) . . . or to the marine, coastal or human environments." *Id*. § 1351(h)(1)(A), (D).

Thus, a DPP must be revised if BOEM determines, based upon its review of available information, that the DPP does not adequately protect the environment. This subsection is consistent with one of the overriding purposes of OCSLA: ensuring that "offshore leasing must not proceed without due regard for the communities and environments it affects." *Healthy Gulf v. U.S. Dep't of Interior*, 152 F.4th 180, 193 (D.C. Cir. 2025); *see also* 43 U.S.C. § 1332(3) (declaring that

3

offshore oil development is "subject to environmental safeguards").

Sable argues that only 43 U.S.C. § 1351(h)(3) itself is relevant to periodic reviews—and thus BOEM can ignore the environmental considerations in section 1351(h)(1) when determining whether a revision is needed. Sable MSJ 7–8. But such a reading is illogical and incorrect, as it would render the reference to "meet[ ] the requirements of the subsection" completely extraneous, in violation of basic notions of statutory interpretation. *See Burke v. Comm'r of Social Security Admin.*, 704 F. Supp. 3d 989, 994 (D. Ariz. 2023) (rejecting a statutory interpretation that would "render[] the phrase 'under this subsection' superfluous" because courts "must 'give effect, if possible, to every clause and word of a statute.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Interpreting OCSLA as mandating revisions to a DPP when the DPP no longer meets the substantive requirements of the statute would not require revisions for minor issues like "reformat[ing] information from a narrative to tabular presentation." *Contra* BOEM MSJ 8. Rather, it would ensure that DPPs are updated when necessary to comply with the specific substantive factors Congress articulated in 43 U.S.C. § 1351(h)(1). Had Congress intended such factors to only apply when BOEM approves a DPP in the first instance, it would not have required review and revision of previously approved plans.

Such a reading of the statute would not render 30 C.F.R. § 550.283 "superfluous." *Contra* BOEM MSJ 8. OCSLA itself makes clear that the triggers in this regulation are not the sole basis for revision. *See* 43 U.S.C. § 1531(h)(3). And both BOEM and the Court must give effect to the statute's plain meaning. *See Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 948 (9th Cir. 2024) (holding agency policy unlawful because it violated the plain language of a statute).

Instead, the affirmative triggers for DPP revision listed in 30 C.F.R. § 550.283 should be viewed as the types of information (changes in volume of

4

production, increase of amount of liquid or solid waste, etc.) that are relevant in evaluating whether an operator is able to provide for adequate protection of the environment or whether a revision is required, 43 U.S.C. § 1351(h)(3); *see also* 30 C.F.R. § 550.284(b) (stating that BOEM may require revisions as a result of periodic review of "changes in available information and onshore or offshore conditions affecting, or affected by" development activities, without limiting required revisions to the factors outlined in section 550.283(a)).[2]

Nor would BOEM be required to conduct "continuous" reviews of DPPs. *Contra* Sable MSJ 9. Plaintiffs do not contend that every new piece of available information mandates review. Instead, where BOEM has found review of a particular DPP warranted (as it did here), it must evaluate changes in available information that is directly relevant to onshore and offshore conditions affecting the environment. *See* 43 U.S.C. § 1351(h)(3). Otherwise, BOEM has no way of knowing whether the DPP needs to be revised to meet the requirements of the subsection. *See id.* § 1351(h)(1), (3).

BOEM's suggestion that its review and decision whether to require revision of the DPP is committed to agency discretion by law, BOEM MSJ 7, likewise falls flat. Agency actions are presumptively reviewable and committed to discretion only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhauser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citation omitted). Here, the statute mandates a review of "changes in available information and . . . conditions affecting or impacted by development and production," and it requires revision if a DPP does not meet the substantive requirements of the subsection. 43 U.S.C. § 1351(h)(3); *see also* 30 C.F.R. §§ 550.283–.284. It is well within a reviewing court's capabilities to evaluate

---

[2] BOEM's "Periodic Review Tracker" references numerous DPP requirements outside of those in 30 C.F.R. §§ 550.283–.284. AR_Folder 01_000000033.

whether an agency has reviewed available information and evaluated if that information comports with substantive statutory requirements. *See, e.g.*, *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 402 (2024) ("[M]any statutory cases call upon courts to interpret the mass of technical detail that is the ordinary diet of the law." (citation modified)).

*Center for Biological Diversity v. Haaland* does not point otherwise. *Contra* BOEM MSJ 7 (citation omitted). In that case, the plaintiff challenged BOEM's failure to review a DPP, and the agency argued "that the review of DPPs under OCSLA is neither a discrete nor mandatory duty." No. 2:22-cv-06996-CAS-KSx, 2023 WL 3007920, at *7 (C.D. Cal. Apr. 17, 2023). The reviewability of BOEM's ultimate determination regarding DPP revisions was not before the court. Where the reviewability of an agency's decision was at issue, courts have regularly held that even where a statute grants an agency broad discretion, that agency's actions are reviewable when guided by meaningful standards found in the statute's framework or regulations, as is the case here. *See, e.g.*, *Pac. Nw. Generating Co-op v. Bonneville Power Admin.*, 596 F.3d 1065, 1077 (9th Cir. 2020) (holding the court could "review whether an action is 'consistent with sound business principles'" and noting that the Ninth Circuit has held it can review agency decisions involving "whether a particular act was 'feasible' or 'just and reasonable'" (citations omitted)); *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 754–55, 757–58 (9th Cir. 2021) (finding guidance in regulations as a whole despite apparent agency discretion).

Despite Defendants' objections, and notwithstanding the difference between the statutory directives of the Clean Water Act and OCSLA, *Waterkeeper Alliance v. EPA*, 140 F.4th 1193 (9th Cir. 2025), *does* provide valuable guidance on the DPP review process. As laid out in Plaintiffs' opening summary judgment brief, the Clean Water Act requires effluent limitation guidelines to "carry out the objective" of the Act, and the Ninth Circuit interpreted the statute's mandate to

6

revise the guidelines "if appropriate" as requiring consideration of "surrounding statutory provisions." *Id.* at 1215–16. OSCLA's review process similarly mandates revision when the DPP does not comport with the statutory provisions of subsection 1351(h), 43 U.S.C. § 1351(h)(3), as explained above. And Sable is wrong that OCSLA "provides BOEM with far more discretion" for revising a DPP than the Clean Water Act. *Contra* Sable MSJ 9. The review provisions of the Clean Water Act give the agency *more* discretion than OCSLA, not less, in determining whether revision is necessary. *Contrast Waterkeeper*, 140 F.4th at 1202, 1207 (citing Clean Water Act provisions that require revision of guidelines "if appropriate") *with* 43 U.S.C. § 1351(h)(3) ("If the review indicates that the plan should be revised to meet the requirements of this subsection, the Secretary shall require such revision.").

Here, as discussed below and in Plaintiffs' motion for summary judgement, available information shows that revision of the DPP is needed to ensure "safe operations on the lease area or for protection of the human, marine, or coastal environment," as required by OCSLA. 43 U.S.C. § 1351(h)(1).

## II. BOEM's Failure to Require Revision of the DPP Was Arbitrary and Capricious.

When considering whether agency decisionmaking is arbitrary and capricious, "[i]t is fundamental that the agency must have 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022) (citation omitted). "Whether an agency has overlooked an important aspect of the problem turns on what the relevant substantive statute makes important." *Wildearth Guardians v. Bucknall*, 756 F. Supp. 3d 1017, 1032 (D. Mont. 2024) (citation modified); *accord Waterkeeper*, 140 F.4th at 1214–16. Plaintiffs' opening summary judgment brief established that BOEM's decision ignored critical new information that OCSLA and BOEM's regulations make important: namely, how

Sable's plans to resurrect this long-dormant, post-failure oil project will significantly increase the volume of production, intensify air and water pollution, and magnify the risks of oil spills. Pls.' Mot. Summ. J. 11–24, Dkt. No. 51 [hereinafter Pls.' MSJ]. BOEM's review of the DPP, and its failure to require revision to reflect changes in available information, was arbitrary and capricious.

### A. Increasing the Volume of Production at Santa Ynez Unit Triggers DPP Revision.

Plaintiffs' opening summary judgment brief established that BOEM's DPP review failed to consider the following: that restarting the Santa Ynez Unit will significantly increase the Unit's volume of production compared to the volume estimated in the DPP, Pls.' MSJ 11–13; that Sable plans to expand production by drilling new wells and working over old ones, *id.* at 13; and that restarting the Unit will prolong production well beyond the lifespan considered in the DPP, *id.* BOEM's primary excuse for not considering this information is that 30 C.F.R. § 550.283(a)(3)—which requires revision if an operator will "significantly increase the volume of production"—does not mean what it says and instead requires revision for an increase in the *rate* of production. BOEM MSJ 10–11; Sable MSJ 10–11. This is contrary to the plain language of the regulation and an impermissible *post hoc* rationalization of the agency's arbitrary decisionmaking.

Where a regulation "is unambiguous and there is only one reasonable construction . . . , then [a court has] no business deferring to any other reading." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022) (citation modified). This is "because deferring to an agency's interpretation of its own regulation creates a systematic judicial bias in favor of the federal government, the most powerful of parties, and against everyone else." *Id*. (citation modified). Courts interpret regulations "according to the same rules as statutes, applying traditional rules of construction." *Friends of the Inyo v. U.S. Forest Serv.*,

103 F.4th 543, 553 (9th Cir. 2024) (citation omitted). "[T]he starting point of [the] analysis must begin with the language of the regulation." *Id.* (citation omitted).

Here, the plain language of the regulation is unambiguous: an operator that proposes to "significantly increase the *volume of production*" must revise their DPP. 30 C.F.R. § 550.283(a)(3) (emphasis added). Sable argues that this is a "technical issue" that lies within BOEM's expertise, Sable MSJ 11 (citation omitted), but any layperson with a basic mathematical education understands that volume and rate are distinct concepts, with volume representing the total quantity of a liquid (e.g. gallons of oil) and rate representing a ratio (e.g., gallons of oil produced per day). "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates" the "inten[tion] to convey a different meaning for those words." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (citations omitted). Moreover, BOEM's regulations do not use these terms interchangeably. *See id.* For example, a blowout scenario included in a DPP must give both the "estimated flow rate" of a blowout and the "total volume" of oil that would spill. 30 C.F.R. § 550.243(h). Had BOEM intended to require DPP revision for an increase in the *rate* of production, it would have used that precise language in its regulation. *See United States v. Approx. 64,695 lbs. of Shark Fins*, 520 F.3d 976, 983 (9th Cir. 2008) ("Where an agency includes language in one section of the regulation and omits it in another, it is reasonable to presume that the agency acted intentionally in forgoing the language." (citation omitted)). Instead, the agency chose to use "volume of production." This language is clear and unambiguous, and BOEM's efforts to conflate volume with rate must fail.

Even if some ambiguity exists in the regulation, BOEM's interpretation is not entitled to any deference. Courts may only defer to an agency's interpretation of an ambiguous regulation "if it is reasonable, is based on the agency's substantive expertise, reflects the agency's fair and considered judgment, and represents the agency's authoritative or official position." *League of Cal. Cities v.*

*FCC*, 118 F.4th 995, 1013 (9th Cir. 2024) (citation modified). "To reflect the fair and considered judgment of the agency, the regulatory interpretation cannot be a convenient litigating position or a *post hoc* rationalization." *Id.* (citation modified). Here, BOEM's argument that "volume of production" actually means "rate of production" is unreasonable and plainly a *post hoc* rationalization for the agency's failure to consider available information demonstrating that the Santa Ynez Unit has already far exceeded the total production estimated in the DPP, and that the volume of production will surge if Sable restarts the Unit—particularly if it drills new wells and reworks old ones. Nor could BOEM's interpretation reflect the agency's "authoritative or official position," *see id.*, given its clear conflict with the plain language of the agency's own "duly promulgated regulations," *contra* BOEM MSJ 2.

Even assuming for the sake of argument that "volume of production" in 30 C.F.R. § 550.283(a)(3) means "rate of production" as BOEM and Sable assert, the agency's review of the DPP was still fatally flawed. During the Santa Ynez Unit's last 15 years of operation, it was producing oil and gas at significantly higher rates than the DPP had predicted. *See* Fig. 1, *infra*; AR_Folder 02E_000017612. Moreover, the DPP's production rate predictions stop in 2020, which Exxon believed would be the final year of operation. AR_Folder 02E_000017612; AR_Folder 02F_000018195, 18206.[3]

---

[3] It is also irrelevant that the Unit never reached its predicted maximum production rate, *contra* BOEM MSJ 11, given that the Unit has exceeded the predicted volume of production. And even if the lifespan of the Santa Ynez Unit predicted in the DPP should be "extended" until 2031 as Sable proposes, Sable MSJ 12, Sable's investor materials predict sustained production through at least 2035, Monsell Decl., Ex. 2 at 13, Dkt. No. 51-8 (Mar. 2025 Investor Pres.), warranting a DPP revision.



*Figure 1.* BOEM's graph comparing actual production (green) to predicted production (blue). AR_Folder 02E_000017612.

BOEM's review of this data acknowledged that production forecasts should be "assessed and updated" as "additional data is obtained during field development." AR_Folder 01_000000035. Yet BOEM wrongly concluded that "there is no requirement to proactively provide a current production forecast," *id.*, even though it has the authority to both request updated information from Sable and to require revision of the DPP. 30 C.F.R. § 550.284. The materials that Sable provided to the Securities and Exchange Commission and its investors predict that drilling as many as 102 new wells and reworking old wells will result in sustained daily production rates exceeding 50,000 barrels of oil equivalent per day. Monsell Decl., Ex. 1 at 7, 12, 13, Dkt. No. 51-7 (Nov. 2024 Investor Pres.), Ex. 2 at 7, 12, 13, Dkt. No. 51-8 (Mar. 2025 Investor Pres.). This would far exceed the DPP's predicted rate of about 10,000 barrels of oil per day for 2020. AR_Folder 02E_000017612. The purpose of BOEM's review was to consider the "phased

return-to-production of the [Santa Ynez Unit] properties beginning with Platform Harmony." AR_Folder 01_000000069. It had the ability to both request updated production predictions from Sable, 30 C.F.R. § 550.284(a), or to seek out information that Sable had otherwise publicly released.[4] *Contra* Sable MSJ 13. It chose not to.

Finally, it bears repeating that BOEM's decision whether to require DPP revision is not limited to the triggers listed in 30 C.F.R. § 550.283(a). *Contra* BOEM MSJ 14; Sable MSJ 12, 16. As BOEM's predecessor agency explained in adopting the rule, the agency "cannot anticipate, with complete certainty, the factors that would require a revision, and therefore must retain a certain degree of flexibility." 70 Fed. Reg. 51,478, 51,493 (Aug. 30, 2005). The need for flexibility in requiring revisions is critical because, as BOEM points out, DPPs do not have an "expiration date" and leases are extended for as long as they are producing. BOEM MSJ 14.[5] That the Unit is at the end of the lifespan anticipated in the DPP—regardless of the unforeseen 10-year hiatus in production—provides strong grounds to require revision to reflect Sable's plan for extending that lifespan. That the DPP acknowledged enhanced oil recovery methods could extend the productive life of the Unit, Sable MSJ 12 (citing AR_Folder 02F_000018195), is

---

[4] OCSLA does not define "available information," but the phrase naturally encompasses information that the agency could reasonably obtain. The Department of the Interior has interpreted similar language—which requires agencies to "use the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2)—to include "data available or which can be obtained," 50 C.F.R. § 402.14(d). The EPA has similarly interpreted a requirement that it consider "reasonably available information," 15 U.S.C. § 2625(k), to include "information that EPA possesses or can reasonably generate, obtain, and synthesize," 40 C.F.R. § 702.33.

[5] Indeed, the fact that BSEE repeatedly extended the Santa Ynez Unit's leases despite a lack of production underscores the highly unusual circumstances of this case that warrant DPP revision. *See* Second Supplemental and Amended Complaint ¶¶ 3–6, *Ctr. for Biological Diversity v. Burgum*, No. 2:24-cv-05459-MWC-MAA (C.D. Cal. Nov. 10, 2025), Dkt. No. 104.

12

all the more reason to require a revision now that the Unit is well beyond its peak production years, as both the past and current operators have indicated that ongoing production from the Unit may require well stimulation, Pls.' MSJ 20; AR_Folder 01_000000236.

### B.     BOEM's Failure to Consider How Restarting the Santa Ynez Unit Would Increase Air Emissions Was Arbitrary and Capricious.

BOEM's review of air emissions considered only two things: that the Santa Ynez Unit's flaring rates peaked in the 1990s, and that the Unit is covered by air permits. AR_Folder 01_000000077–78. It did not consider whether new operations would "[i]ncrease the emissions of [a] criteria air pollutant, VOC, or TSP to an amount that exceeds the amount specified" in the DPP. 30 C.F.R. §§ 550.283(a)(4), 550.249(a)(2). Its review of the DPP and decision not to require revision was therefore arbitrary and capricious.

BOEM contends it reviewed air emissions "holistically" but cites nothing in the record to support this. BOEM MSJ 17. Instead, it supplies impermissible *post hoc* rationalizations for its decision to review only flaring data. This includes the assertion—which appears nowhere in the record—that operations "cannot reasonably be expected to approach the production rates[,] and correspondingly, the emissions rates" of the past. *Id.* But BOEM could not possibly have used "flaring volumes to confirm that emissions remained below permitted and historically approved levels," *id.*, because, as the agency's review acknowledged, "the DPP . . . does not state any specific volume limits" for flaring, AR_Folder 01_000000077. "Courts do not accept . . . counsel's post-hoc rationalizations for agency action," and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Nat. Res. Def. Council v. EPA*, 31 F.4th at 1207 (citation modified). BOEM's *post hoc* position also lays bare the unreasonableness of its review. Historic flaring rates and production data speak only to the Santa Ynez Unit's past, even though the purpose of the DPP review was to consider its

13

future. *See* AR_Folder 01_000000069–70. BOEM failed to seek any information about Sable's vision for future development and production of these mothballed facilities to shed light on the composition and volume of their future emissions.

Sable argues that because it has not affirmatively *proposed* to increase emissions, the revision requirement under 30 C.F.R. § 550.283(a)(4) is not triggered. Sable MSJ 16. But there is a proposal before BOEM: the "phased return-to-production of the [Santa Ynez Unit] properties beginning with Platform Harmony." AR_Folder 01_000000069. It follows that the Unit's air pollution levels will change, whether or not Sable has expressly requested to increase its emissions. Sable's reading of the regulation would give operators undue power over the regulatory process and undermine a requirement that BOEM found so important that it is included *twice* in BOEM's regulations. *See* 30 C.F.R. §§ 550.249(a)(2), 550.283(a)(4). These regulations make clear that a DPP should accurately reflect a project's emissions rates and must be revised if actual rates exceed predictions. 30 C.F.R. §§ 550.249(a)(2), 550.283(a)(4). Sable's reading would replace an objective trigger for revision with a subjective judgment call by the operator. It is also contrary to BOEM's duty under OCSLA to independently review changes in available information to determine whether a DPP should be revised. 43 U.S.C. § 1351(h)(3); 30 C.F.R. § 550.284.

Moreover, Sable's argument that 30 C.F.R. § 550.249 is inapplicable fails. Sable MSJ 13–14. While this regulation governs preparation of new DPPs, it contains relevant language specifically pertaining to "previously approved" DPPs—namely, that an existing DPP must show "revised emission rates" if a facility's actual emissions are "greater than the amount specified in [a] previously approved DPP." 30 C.F.R. § 550.249(a)(2). Plaintiffs therefore reasonably rely on this regulation to show both the type of air emissions information that must accompany a DPP and when such information must be revised. BOEM's review also cites this regulation. AR_Folder 01_000000037.

Finally, it is irrelevant that BOEM previously rejected a regulatory proposal to require review of each project's emissions every decade regardless of changes in operations. *Contra* Sable MSJ 14 (citing 85 Fed. Reg. 34,912 (June 5, 2020)). This case is not simply about "the mere passage of time." *Id.* (citing 85 Fed. Reg. at 34,920). Rather, there are major changes in operations at the Santa Ynez Unit, including a new operator with plans to restart production using aging infrastructure, drill new wells, and operate for many more years than considered in the DPP. As BOEM explained in the rulemaking Sable cites, "an update of the air emissions, and the associated analysis, must be provided only if a proposed plan revision would increase the amount of air emissions released." 85 Fed. Reg. at 34,926. Here, BOEM's cursory review of the DPP failed to consider either the Santa Ynez Unit's actual emissions or how the proposal to restart and expand production under a new operator will increase those emissions.

### C.   BOEM's Failure to Consider How Restarting the Santa Ynez Unit Will Increase Waste Discharges Was Arbitrary and Capricious.

As to waste discharges, BOEM's review of the DPP did nothing more than verify that the Santa Ynez Unit is covered by a National Pollutant Discharge Elimination System (NPDES) permit. AR_Folder 01_000000078–79. It did not consider whether or how resuscitating and prolonging operations at the Unit would "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged." 30 C.F.R. § 550.283(a)(5). Its review of the DPP and decision not to require revision was therefore arbitrary and capricious.

BOEM and Sable argue that revision is not required because there was neither a "proposal" to increase discharges, BOEM MSJ 19; Sable MSJ 18, nor any "newly available information" to indicate that waste discharges might increase, BOEM MSJ 19. This argument fails for the reasons discussed above. Sable has "proposed" to restart an aging facility. This proposal represents the Santa Ynez Unit entering a new phase of production that is likely to involve well workovers,

15

well stimulation treatments, and drilling new wells. *See*, *e.g.*, Pls.' MSJ 20 (quoting AR_Folder 01_000000236 ("ExxonMobil anticipates that it will require the use of certain acid well stimulation treatments at one or more wells" to restart production.)). All this information was available to BOEM through Sable's public investor materials or by requiring Sable to submit information about its activities in accordance with 30 C.F.R. § 550.284(a).

It is not "premature" to require revision of the DPP to account for the Unit's future operations, *contra* BOEM MSJ 22, because drilling activities and permits "must conform to the activities described" in the approved DPP. 30 C.F.R. § 550.281(b); *and see id.* § 550.280(a). Waiting for oil companies to submit a permit to drill before requiring a revision of a DPP would undermine the ultimate purpose of DPPs—they are intended as a comprehensive plan for addressing all impacts from offshore oil and gas activities. *See* 43 U.S.C. § 1351(c) (listing requirements for contents of a DPPs); 30 C.F.R § 550.241 (same). An operator must also include any well in their DPP before they can obtain a permit to drill it. 30 C.F.R. § 250.410(b).

Likewise, BOEM's suggestion that it is appropriate to wait until Sable specifically requests permission to use well stimulation treatments (such as fracking), BOEM MSJ 21–22, inverts the process set out in its regulations and defeats OCSLA's purpose of "*orderly* development, subject to environmental safeguards. 43 U.S.C. § 1332(3) (emphasis added). And while it is true that a court has prohibited Interior from issuing fracking permits until it complies with multiple environmental requirements, *Env't Def. Ctr. v. BOEM*, 36 F.4th 850, 882, 885, 886, 890–92 (9th Cir. 2022), BOEM is taking steps to lift the moratorium. Indeed, BOEM is currently considering another oil company's proposal to supplement its DPP in order to use fracking on wells from a platform in the Santa Barbara Channel. 91 Fed. Reg. 13,063 (Mar. 18, 2026).

Moreover, information about the Santa Ynez Unit's actual discharge levels prior to shut-in is also available to BOEM and highly germane to its review. *See* Monsell Decl., Ex. 4, Dkt. No. 52-1 (EPA 2014 Pollutant Loading Rep.). It is curious for Sable to argue that this report is "irrelevant" because it "simply provides what a prior lessee may have done," Sable MSJ 18, considering that Sable's entire theory of the case is that it is simply stepping into the shoes of that same prior operator. The immigration cases it cites—which denied the plaintiffs standing to maintain class actions to enjoin future civil rights violations because they could not demonstrate that they would face the same mistreatment again, *Lopez-Venegas v. Beers*, No. LA CV13-03972-JAK (PLAX), 2013 WL 12474081, at *1, *9 (C.D. Cal. Dec. 27, 2013); *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1038–39, 1044 (9th Cir. 1999)—are not remotely applicable or persuasive. The point here is that Platform Harmony's waste discharge history is directly related to the question of whether the DPP ought to be revised to reflect increased discharges.[6] The same is true of Sable's investor materials, which lay out its production plans with a notable degree of precision and detail. *E.g.*, Monsell Decl., Ex. 1 at 7, 12–13, Dkt. No. 51-7 (Nov. 2024 Investor Pres.) (demonstrating that Sable has identified "102 total opportunities," and laying out Sable's "Operational Plan"). The fact that BOEM did not consider this kind of information demonstrates that its review was arbitrary and capricious.

Finally, BOEM and Sable fail to identify any portion of the DPP that meaningfully rebuts Plaintiffs' point that the DPP's discharge information is outdated because it lacks the required level of detail on solid and liquid waste discharges. *See* 30 C.F.R. § 550.248; *see also Waterkeeper*, 140 F.4th at 1216.

---

[6] The fact that a more favorable report from 2025 exists, Sable MSJ 18–19, does not make the Unit's discharge history any less relevant. The Unit was shut down in 2025, so it makes sense for discharges to be within the NPDES limits. But because BOEM is considering a return to production, the pollution reports most relevant to its review are those generated prior to shut-in.

17

BOEM cites mostly irrelevant parts of the record, BOEM MSJ 20, while Sable cites to a single table from the 1980s listing the anticipated chemical components of wastewater discharge but not other kinds of solid and liquid wastes. Sable MSJ 18.[7]

### D.    BOEM's Failure to Consider Highly Relevant Information About the Heightened Risk of Oil Spills Was Arbitrary and Capricious.

BOEM points to nothing in the record to demonstrate that it considered the implications of the discrepancy between Exxon's 2011 worst case discharge scenario and the far lower numbers in Sable's Oil Spill Response Plan. BOEM MSJ 22–23. Instead, it offers a *post hoc* deflection that oil spill response is regulated by other agencies. *Id.* But this regulatory scheme has not previously prevented BOEM from independently considering this kind of information. For example, BOEM prepared a detailed "Periodic Review Analysis" of the Santa Ynez Unit DPP in response to Exxon's submission of the 2011 worst case discharge scenario that specifically considered "the difference between the oil spill numbers" found in a 1984 Environmental Impact Statement and Exxon's new numbers. AR_Folder 02F_000023100. Likewise, Sable's convoluted explanation for the worst-case-discharge discrepancy, Sable MSJ 21–22, merely underscores that BOEM itself offered no such explanation in its review of the DPP. *See Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 978 n.5 (9th Cir. 2018) (explaining

---

[7] BOEM cites to the following, most of which are wholly irrelevant: a table showing "Estimated Economic and Resource Data" from a lease sale unrelated to the Santa Ynez Unit (AR_Folder 02C_000014922); a discussion of water quality impacts resulting from a discrete project to replace power cables (AR_Folder 02F_000017805); a general discussion of water quality impacts from a 1975 Environmental Impact Statement on oil and gas development in the Santa Barbara Channel that is not specific to the Santa Ynez Unit (AR_Folder 02C_000015614–33); and a table of anticipated chemical components and trace elements in the Unit's wastewater (AR_Folder 02C_000004346, 49). BOEM MSJ 20. Sable also cites this last table and a duplicate version at AR_Folder 02F_000018305. Sable MSJ 18.

18

that an intervenor's arguments "could not sustain the orders on review, as they do not appear anywhere in those orders" because courts "can only uphold agency action on grounds articulated by the agency in its orders"). And contrary to BOEM's assertion that this is a collateral attack on the approval of Sable's oil spill response plan by BOEM's sister agency, BOEM MSJ 23, the issue here is BOEM's failure to address the discrepancy in two different worst case discharge scenarios, not whether another agency's approval of the plan was lawful.

The fact that the Santa Ynez Unit is subject to inspections does not make the heightened risk of oil spills associated with aging infrastructure any less relevant to BOEM's review of the DPP. *Contra* BOEM MSJ 24–25; Sable MSJ 22–23. Indeed, past inspections of the Unit demonstrate considerable problems. On February 1, 2015, a corroded component on one of the Unit's platforms broke, "releasing a mixture of rich glycol and sour gas. The event lasted 25 minutes and up to 50 [parts per million] of [hydrogen sulfide gas] was detected at 1 head and up to 12 [parts per million] at 2 additional heads." AR_Folder 01_000000283. A federal inspection of Platform Heritage on September 9, 2015, found "corrosion issues throughout the platform" and "electrical issues throughout the platform." AR_Folder 01_000000391. Federal officials who inspected Platform Hondo on May 1, 2015, found "numerous corrosion issues" and a "number of components out of compliance." AR_Folder 01_000000386. Just weeks before that, they also found corrosion, five failed gas detectors, and a "leakage rate higher than the maximum allowable" on one of the platform's wells. AR_Folder 01_000000385. All three Santa Ynez Unit platforms had early-2015 gas leaks that required their crews to gather for safety reasons, including an incident on Platform Harmony on March 29, Platform Hondo on April 27, and Platform Heritage on May 19. AR_Folder 01_000000247, 278, 394–95, 398. BOEM's duty is to consider whether changes in offshore conditions warrant revision of the DPP, 43 U.S.C. § 1351(h)(3), and as these incidents demonstrate, the changed conditions here

19

include the heightened pollution and safety risks resulting from the corrosion and deterioration that comes with the Santa Ynez Unit's age.

### E. Plaintiffs' Claim Should Succeed Regardless of Whether the Court Considers Their Exhibits.

As established in Plaintiffs' Opposition to BOEM and Sable's Motions to Strike, the scope of review here is not limited to an administrative record because Plaintiffs' claim arises under OCSLA. *See W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). Moreover, Plaintiffs' exhibits are necessary to determine whether the agency has considered all the relevant factors and adequately explained its decision. *See Humane Soc'y of the United States v. Locke*, 626 F.3d 1040, 1058 (9th Cir. 2010) (citation omitted). OCSLA tasks BOEM with considering "changes in available information," 43 U.S.C. § 1351(h)(3), and each exhibit was readily accessible to BOEM through government websites. But even without these exhibits, Plaintiffs' claim should still succeed because each argument is also supported by evidence in the record.

## III. Plaintiffs' Notice Was Sufficient.

This Court has already found Plaintiffs' notice of intent to sue sufficient. Order Denying Sable Mot. to Dismiss 9–12, Dkt. No. 39 [hereinafter Order on MTD]. Sable's effort to relitigate this issue, Sable MSJ 5–7, fails for the same reasons this Court denied its motion to dismiss.

Each claim in Plaintiffs' brief appears in its notice of intent to sue. For example, Plaintiffs' notice stated that BOEM must require revision of the DPP "because the [Santa Ynez Unit] platforms have been offline for nearly a decade, and restarting drilling activity would significantly increase the degree and composition of air emissions, significantly increase the amount and composition of wastewater, and significantly increase the volume of production." AR_Folder 01_000000087. The letter provided detailed information and references related to, *inter alia*, the Unit's production volume and lifespan, AR_Folder 01_000000087;

20

air pollution from the Unit, particularly VOC emissions, AR_Folder 01_000000087–88; the potential for well stimulation at the Unit, "which would change the types of water pollution discharges contemplated under the DPPs, as well as the quantity," AR_Folder 01_000000090–91; and the heightened risk of oil spills associated with the Unit's "old age and degraded state," AR_Folder 01_000000089–90.

As Plaintiffs explained at the motion to dismiss stage, notice letters need only "provide sufficient information so that the notified parties could identify and attempt to abate the violation. To be sufficient, the notice does not have to list every specific aspect or detail of every alleged violation." *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1154 (9th Cir. 2024) (citation modified). Rather, a court must examine "the 'overall sufficiency' of the notice by 'examin[ing] both the notice itself and the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations.'" *Id.* at 1154–55 (alteration in original) (citation omitted). Plaintiffs' notice met these standards and BOEM has never argued that it did not understand the violations alleged in the notice. Moreover, the fact that BOEM took some action between receiving Plaintiffs' notice and Plaintiffs' filing their First Amended Complaint does not render their notice deficient. Order on MTD 11–12 (citing *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000)).

The cases Sable cites are unavailing. The notice in *ONRC Action v. Columbia Plywood, Inc.*, was inadequate because the "sole challenge raised in the notice" was that a permit renewal application was untimely, and the notice letter failed to raise two additional claims ultimately brought against the agency. 286 F.3d 1137, 1143, 1139 (9th Cir. 2002). The court in *Northwest Environmental Advocates v. EPA* held that "it is not Plaintiff's notice that is inadequate—it is Plaintiff's Motion for Summary Judgment," because the Plaintiff failed to identify specific violations during record review and discovery. 745 F. Supp. 3d 1150, 1177

(D. Or. 2024). And in *Brown v. Offshore Specialty Fabricators, Inc.*, "no plaintiff gave the required notice" before filing suit, and "deficient attempts at notice given by two former plaintiffs, neither attempt occurring before the original complaint was filed, [could not] anchor all of the plaintiffs' claims." 663 F.3d 759, 768–69 (5th Cir. 2011). In contrast to these cases, each claim that Plaintiff has briefed was also raised in its notice of intent to sue.

Finally, as Plaintiffs previously argued, citizen suit notice requirements are claims-processing rules. Pls.' Opp'n to Sable MTD 19 n.4, Dkt. No. 35 (citing *Cascadia Wildlands*, 105 F.4th at 1153). Even if Plaintiffs' detailed notice was somehow defective, this Court would retain jurisdiction because Plaintiffs have substantively complied with the procedural requirements of OCSLA. *Contra* Sable MSJ 5.

## IV.    The Court Should Compel BOEM to Comply With OCSLA.

When it seemed advantageous to them, both Sable and BOEM argued that Plaintiffs' claim arises under OCSLA's citizen suit provision. *See* Sable MTD 11–15, Dkt. No. 31-1; BOEM Response to Sable MTD 2–3, Dkt. No. 34. Yet now they argue that Plaintiffs are not entitled to the relief the citizen suit provision provides. BOEM MSJ 10; Sable MSJ 24–25. They cannot have it both ways. Plaintiffs' request for relief is entirely reasonable and within this Court's authority to "compel compliance" with OCSLA. 43 U.S.C. § 1349(a)(1).

As another court in this district has held, "the plain text, statutory scheme, and legislative history of OCSLA all support" a court's ability to compel BOEM's compliance with its statutory duties under OCSLA because "the plain text of the citizen-suit provision . . . appears to contemplate mandamus-type actions." *Ctr. for Biological Diversity*, 2023 WL 3007920, at *4–5. Here, Plaintiffs have asked the court to "compel compliance" by either ordering BOEM to require Sable to update the DPP or ordering BOEM to conduct a new review of the DPP that properly

considers the factors that OCSLA and its implementing regulations require. Pls. MSJ 24. Neither remedy intrudes on the agency's normal discretion as to the manner in which defendants may conduct a review of a DPP, its instructions to Sable on how to update the DPP, or its ultimate decision whether to approve any updates Sable makes as a result of a court order. Indeed, Plaintiffs' request "that this court order BOEM to require a revision to or supplementation of the DPP," Pls.' MSJ 24, protects BOEM's discretion to determine which kind of update is ultimately warranted based on the new information before it. *Contra* Sable MSJ 24–25.[8]

Neither of the cases BOEM cites provide persuasive grounds to limit the Court's mandamus-type powers. BOEM MSJ 10; Sable MSJ 24–25. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council* is inapplicable because its holding turns on the specific rulemaking procedures required by the Administrative Procedure Act (APA), which are not at issue here. 435 U.S. 519, 548 (1978). *Federal Power Commission v. Idaho Power Co.* found a court's order to issue a license with certain language stricken to be improper because it foreclosed the agency's ability to determine whether the altered license would meet other legal objectives. 344 U.S. 17, 20 (1952). Here, in contrast, the order Plaintiffs seek would not constrain BOEM's ability to carry out OCSLA's objectives because BOEM would retain discretion as to how the DPP should be updated and whether to ultimately approve the update.

The cases Sable cites are also unpersuasive. *Flaherty v. Pritzker* is an out-of-circuit case that merely recites the "typical" remedy available under the APA. 17 F. Supp. 3d 52, 57 (D.D.C.  2014). Here, Plaintiffs' claim arises out of OCSLA,

---

[8] Sable's argument that Plaintiffs did not plead a request for supplementation in their First Amended Complaint, Sable MSJ 24–25, is irrelevant because the FAC requested that this Court "[g]rant such other relief as the Court deems just and proper," First Am. Compl.  29, Dkt. No. 12.

23

which governs the remedy. Indeed, the other case Sable cites, *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, underscores that the statute providing for judicial review governs the remedy available. 423 U.S. 326, 331–32 (1976) (citation omitted). The statute at issue there authorized courts to "affirm, modify, or set aside" certain agency orders. *Id.* at 332 n.3. The remedy provided in OCSLA is far broader: courts may "compel compliance" with the law. 43 U.S.C. § 1349(a)(1). Moreover, the language Sable quotes pertains to a unique procedural provision with no analog in OCSLA. *Transcont'l Gas*, at 423 U.S. 332 n.3, 333–34 (citations omitted).

Finally, neither BOEM nor Sable challenge Plaintiffs' request for declaratory relief or for an order that BOEM conduct a new review of the DPP that properly considers the factors required by OCSLA and its implementing regulations. There is no need for further briefing on remedy. *Contra* Sable MSJ 25.

## CONCLUSION

The Court should deny BOEM and Sable's motions for summary judgment, grant Plaintiffs' motion for summary judgment, declare BOEM's decision that the DPP for Platform Harmony does not require revision is unlawful, and order BOEM to require an updated plan or conduct a new review of the DPP.

DATED: March 18, 2026

s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

24

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation certifies that this brief does not exceed 25 pages, in compliance with the page limit set by this Court's Standing Order, Section 6.c, dated April 15, 2025 (Dkt. No. 11).


DATED: March 18, 2026             s/ *Kristen Monsell*
                                  Kristen Monsell

25