ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

SHANNON BOYLAN, Trial Attorney
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
shannon.boylan@usdoj.gov
(202) 598-9584

# THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*<br><br>      Plaintiffs,<br>   v.<br><br>DOUG BURGUM, Secretary of the Interior, *et al.*<br><br>      Defendants.<br><br>   And<br><br>SABLE OFFSHORE CORP.<br><br>      Intervenor-Defendant. | Case No. 2:25-cv-02840-MWC-MAA<br><br>**REPLY IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: May 15, 2026<br>Hearing Time: 1:30 p.m.<br>Judge: Hon. Michelle Williams Court<br>Location: Courtroom 6A |

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................1

    I.    Plaintiffs Continue to Misconstrue the Limited Scope of Periodic Review ...............................................................................................................1

    II.    Plaintiffs' "Volume of Production" Argument Fail .....................................3

    III.    Plaintiffs' Air Emissions Argument Fails .....................................................5

    IV.    Plaintiffs' Waste Discharge Claims Fail .......................................................6

    V.    Plaintiffs' Spill Risk Arguments Fail ............................................................8

    VI.    Plaintiffs' Request for Relief Is Improper ...................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Balt. Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*,
462 U.S. 87 (1983) ....................................................................................................3

*Cascadia Wildlands v. United States Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025)...................................................................................4

*Ctr. for Biological Diversity v. Haaland*,
No. 222CV06996CASKSX, 2023 WL 3007920 (C.D. Cal. Apr. 17, 2023) ........2, 3, 11

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ...............................................................................................4, 5

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ..................................................................................................6

*Oceana, Inc. v. Coggins*,
No. 19-CV-03809-LHK, 2021 WL 1788516 (N.D. Cal. May 5, 2021) ......................11

*San Luis & Delta-Mendota Water Auth. v. United States*,
672 F.3d 676 (9th Cir. 2012)....................................................................................6

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) ..................................................................................................3

**Statutes**

43 U.S.C. § 1332(3) ..........................................................................................................8

43 U.S.C. § 1351(c) ..........................................................................................................1

43 U.S.C. § 1351(c)(5).......................................................................................................4

43 U.S.C. § 1351(h) ..........................................................................................................1

43 U.S.C. § 1351(h)(1).......................................................................................................2

43 U.S.C. § 1351(h)(3).................................................................................................1, 11

5 U.S.C. § 701(a)(2)...........................................................................................................3

5 U.S.C. § 706(2)(A)........................................................................................................11

**Regulations**

30 C.F.R. § 250.410(b) ......................................................................................................7

30 C.F.R. § 550.243(c)(1) ................................................................................4

30 C.F.R. § 550.243(h) ...................................................................................9

30 C.F.R. § 550.248 ........................................................................................8

30 C.F.R. § 550.283(a) ................................................................................2, 8

30 C.F.R. § 550.283(a)(3) ...........................................................................3, 5

30 C.F.R. § 550.283(a)(4) ........................................................................5, 6, 7

30 C.F.R. §254.47 ...........................................................................................9

30 CFR Part 254 ..............................................................................................9

**Other Authorities**

70 Fed. Reg. 51,478 (Aug. 30, 2005) ...........................................................11

76 Fed. Reg. 64,432 (Oct. 18, 2011) ..............................................................8

91 Fed. Reg. 13,063 (Mar. 18, 2026) .........................................................7, 8

**INTRODUCTION**

Plaintiffs' opposition confirms that their challenge rests on a misreading of the Outer Continental Shelf Lands Act ("OCSLA") and its implementing regulations. Rather than engage with the limited function of periodic review of a Development and Production Plan ("DPP"), Plaintiffs attempt to recast that process as a vehicle for revisiting decades of agency decisionmaking and imposing new, extra-textual obligations on the Bureau of Ocean Energy Management ("BOEM"). The statute does not support that approach.

OCSLA's periodic review provision requires BOEM to determine whether newly available information or changed circumstances require revision of an approved DPP to meet the requirements of 43 U.S.C. § 1351(h). It does not require the agency to reassess every substantive requirement applicable to initial plan approval. The administrative record demonstrates that BOEM evaluated updated information concerning production, air emissions, waste discharges, and spill risk and reasonably concluded that no revision was necessary. Because BOEM applied the correct legal standard and reasonably exercised its technical expertise and judgment, the Court should deny Plaintiffs' motion and grant summary judgment to Federal Defendants.

**ARGUMENT**

**I.      Plaintiffs Continue to Misconstrue the Limited Scope of Periodic Review**

Plaintiffs' opposition brief abandons the central premise of their opening brief. There, Plaintiffs argued that BOEM was required during periodic review of a DPP to reassess compliance with the full suite of substantive requirements under OCSLA, including those applicable to initial DPP approval under 43 U.S.C. § 1351(c). *See* Pls.' Mot. for Summ. Jgmt. ("Pls.' Mot."), Dkt. No. 51 at 10. In their opposition, however, Plaintiffs concede that, in line with the statutory text of § 1351(h)(3), the DPP need only be revised when necessary "to meet the requirements of *this subsection*"—namely subsection (h). 43 U.S.C. § 1351(h)(3) (emphasis added); *see* Pls.' Opp'n, Dkt. No. 63,

at 3.

That concession is dispositive. By properly grounding their argument in § 1351(h)(3), Plaintiffs admit that DPP periodic reviews are not an avenue for reassessing compliance with *all* of "OCSLA's substantive requirements." And subsection (h) does not incorporate the full set of requirements applicable to initial DPP approval. Instead, it establishes a narrower inquiry focused on whether newly available information or changed circumstances warrant revision under the standards set forth in that subsection. And the Secretary, who is afforded "discretion as to the *manner* in which [he] may conduct a review of DPPs, along with any ultimate conclusion that *revision* of a plan is necessary," *Ctr. for Biological Diversity v. Haaland*, No. 222CV06996CASKSX, 2023 WL 3007920, at *8 (C.D. Cal. Apr. 17, 2023), properly exercised that discretion by duly promulgating regulations prescribing specific circumstances under which a revised DPP is required. *See* 30 C.F.R. § 550.283(a).

Plaintiffs are correct that BOEM's authority during periodic review is not mechanically limited to the specific triggers listed in 30 C.F.R. § 550.283(a). As Federal Defendants explained, OCSLA provides the Secretary broader authority to require modification where necessary to ensure safe operations and environmental protection. *See* 43 U.S.C. § 1351(h)(1); Fed. Defs.' Cross-Mot. ("Cross-Mot.") at 8-9. BOEM has exercised that authority in the past, including by requiring revisions to incorporate the results of Endangered Species Act consultation, BOEM_AR_Folder 02F_23144, and it likewise considered issues beyond the enumerated regulatory triggers in the review at issue here. *See* BOEM_AR_Folder 01_36 (review of Oil Spill Response Plan). But that does not advance Plaintiffs' claims. The regulatory criteria in § 550.283(a) identify the principal circumstances in which revision is required,[1] while the Secretary retains a measure of flexibility to require revision in other situations. That residual authority is

---

[1] Indeed, these regulatory triggers outline the types of changed circumstances that would most likely impact safety and environmental protection concerns (e.g., significantly increasing the volume of production or increasing air emissions or waste discharges).

2

discretionary, not mandatory.[2] *See Ctr. for Biological Diversity v. Haaland*, 2023 WL 3007920, at *8; Cross-Mot. at 8-9. Plaintiffs, therefore, must show that BOEM acted arbitrarily or capriciously in declining to require revision outside those triggers. They have not done so. As explained below and in Federal Defendants' Cross-Motion, BOEM evaluated the relevant criteria and reasonably concluded that revision is not required. *See* BOEM_AR_Folder 01_69–79.

**II.     Plaintiffs' "Volume of Production" Argument Fails**

Plaintiffs' interpretation of "volume of production" in 30 C.F.R. § 550.283(a)(3) as referring exclusively to cumulative lifetime output is not compelled by the text and is inconsistent with the statutory and regulatory context. In common parlance, "volume" often refers to the level or intensity of activity over a given period—such as daily or annual production (*e.g.*, volume of traffic or volume of calls)—rather than the total amount produced over the life of a project. A reasonable reader could therefore understand "volume of production" to encompass the rate or level of production activity, which is also the measure most directly tied to environmental impacts such as emissions, discharges, and operational risk, *i.e.*, the very considerations implicated by § 1351(h).[3] Because the term "volume" is inherently time-dependent, its meaning turns on context, and nothing in the regulation specifies that BOEM must evaluate cumulative lifetime production for purposes of determining if a revision is necessary. 30 C.F.R. §

[2] Plaintiffs incorrectly state that BOEM suggested its review and decision is "committed to agency discretion by law." Pls.' Opp'n at 5-6. That phrase comes from the § 701 of the Administrative Procedure Act ("APA") which precludes judicial review of an "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Federal Defendants are not suggesting that judicial review is unavailable in this case, but rather that courts must be at their "most deferential" under standard principles of APA review when an agency makes the kind of predictive, technical, or scientific judgments that BOEM made here. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 182 (2025) (citing *Balt. Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983)).

[3] From an operational standpoint, the rate of production (e.g., barrels per day or month) is frequently emphasized over the total volume of production because it directly dictates economic viability, reservoir management, and technical performance. While total volume is necessary for calculating remaining reserves, the rate of flow determines how fast the oil can be sold, the efficiency of the well, and the lifespan of the field.

550.283(a)(3). Rather, the statutory and regulatory context underscores BOEM's interpretation. *See* 43 U.S.C. § 1351(c)(5) (requiring a DPP to include "an expected rate of development and production"); 30 C.F.R. § 550.243(c)(1) (requiring "estimates of the average and peak rates of production").

At a minimum, if after exhausting its tools of construction the court finds that the phrase is ambiguous, BOEM's interpretation is reasonable and entitled to deference. *See Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 897 (9th Cir. 2025) (citing *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). It clearly implicates BOEM's "substantive expertise," *id*. at 898, and, contrary to Plaintiffs' assertion, it is not a "*post hoc* rationalizatio[n] advanced to defend past agency action against attack," *id*. at 900 (citation omitted); *contra* Pls.' Opp'n at 10. BOEM's Periodic Review Tracker explicitly refers to the volume of production in terms of rate. *See* BOEM_AR_Folder 01_35 (describing production rates and noting that "monthly production for SYU last reported volumes in June 2015" equating to an "average rate of 870,000 barrels of oil per month before being shut-in").

Plaintiffs next argue that "during the Santa Ynez Unit's last 15 years of operation, it was producing oil and gas at significantly higher rates than the DPP had predicted." Pls. Opp'n at 10 (citing to BOEM_AR_Folder 02E_17612). The referenced figure shows a comparison of the actual production rate (in barrels of oil per day ("BOPD")) versus the forecasted production rate in the DPP. *Id*. at 11. While it is true that actual rates sometimes exceeded forecasted rates, BOEM explained that "production forecasting is a complex process and cannot guarantee 100% accuracy." BOEM_AR_Folder 01_35. More importantly, Plaintiffs fail to grasp the relevant point. The 1987 DPP forecasted base oil production rates of 90,000 BOPD for the entire Unit, while providing for flexibility to increase total unit oil production to 125,000 BOPD. BOEM_AR_Folder 02F_18206. This maximum volume of production was never exceeded. *See* BOEM_AR_Folder 02E_17612 (peak oil production was reached in October 1995 at

approximately 105,000 BOPD across the Unit). Rather, as BOEM explained in the Periodic Review Tracker, "production has declined predictably with a 12-month average rate of 870,000 barrels of oil per month before being shut-in due to the 2015 Refugio Beach Oil Spill. The last reported monthly oil rates are within capacity of the onshore treatment facility." *Id*. This is important because the peak production rate is the most relevant consideration in terms of operational capacity[4] and environmental impacts.[5] In short, because Sable has not proposed to increase the volume of production beyond the peak rate authorized in the DPP (nor are they ever likely to because the overall rate of production will typically never exceed the initial peak), BOEM's decision not to require revision of the DPP was reasonable.

## III.    Plaintiffs' Air Emissions Argument Fails

Plaintiffs mischaracterize the record in arguing that BOEM did not consider whether restarting operations would increase air emissions "to an amount that exceeds the amount specified" in the DPP. Pls.' Opp'n at 13 (citing 30 C.F.R. § 550.283(a)(4)). Rather, as explained in the decision, BOEM analyzed the Environmental Assessments accompanying the DPP for the three SYU platforms. BOEM_AR_Folder 01_77-78. The air emissions analysis in those assessments "showed that peak annual emissions for the unit would occur in 1992 and 2000, depending on the field development option." BOEM_AR_Folder 01_78. BOEM then explained that "[r]eported data shows that flaring activity reached its' peak during January 1994 . . . [which] roughly corresponds with the expected peak in air emissions during 1992." BOEM_AR_Folder 01_78. As explained in Section II, *supra*, the peak rate (either of emissions or volume of production) is the most relevant metric in determining whether there will be an increase of emissions that exceed the amount specified or contemplated in the approved DPP.

---

[4] Indeed, the relevant regulatory trigger explicitly links production rates with storage capacity. *See* 30 C.F.R. § 550.283(a)(3) (requiring DPP revision when the operator proposes to "significantly increase the volume of production or storage capacity").

[5] *See* Cross-Mot. at 17 (explaining that "peak air emissions rates tend to coincide with peak production rates").

This is not a "post-hoc rationalization" but a matter of common sense and evident from the analysis in the decision. And even if BOEM's "rationale [is] not clearly articulated in the record, a court should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

Importantly, Sable has not proposed to increase air emissions above those specified in the DPP, which is the relevant trigger under 30 C.F.R. § 550.283(a)(4). While it is true that restarting production would increase emissions above the status quo at the time of the review (no production), that does not mean it will increase emissions to an amount that exceeds the amount specified in the DPP. And BOEM reasonably relied on current air quality standards and permitting decisions issued by the Santa Barbara County Air Pollution Control District ("APCD"), which is the entity responsible for ensuring compliance with applicable air quality standards. BOEM_AR_Folder 01_78. Based on this information, BOEM reasonably determined that emissions remain within the limits of the current APCD permit. BOEM_AR_Folder 01_78. Plaintiffs have not demonstrated otherwise.

## IV.    Plaintiffs' Waste Discharge Claims Fail

An operator must revise its DPP when it "propose[s] to . . . significantly increase the amount of solid or liquid wastes to be handled or discharged." 30 C.F.R. § 550.283(a)(4). BOEM reasonably determined that Sable made no such proposal and that no newly available information indicated any increase in waste discharges beyond levels previously approved and permitted.

As explained in Federal Defendant's Cross-Motion, BOEM evaluated waste discharges associated with the Santa Ynez Unit under the applicable National Pollutant Discharge Elimination System ("NPDES") permit: General Permit No. CAG280000, which governs offshore oil and gas exploration, development, and production operations

in Southern California. *See* BOEM_AR_Folder 02C_1673; BOEM_AR_Folder 01_78-79; Cross-Mot. at 19. Plaintiffs identify no evidence that Sable proposes to exceed the limits in this permit or in those reflected in the DPP. *See* BOEM_AR_Folder 02C_4349, 4349. Nor do they point to any newly available information demonstrating a change in discharge conditions that would undermine BOEM's analysis or require revision of the DPP. And nothing in OCSLA or the implementing regulations require BOEM to assume that an operator will violate existing permit conditions or to speculate about noncompliance.

Plaintiffs instead argue that BOEM must require revision based on speculative future activities, including the possibility that Sable may drill new wells. *See* Pls.' Opp'n at 16-17. But as Plaintiffs themselves acknowledge, an operator must include any such wells in its DPP before obtaining a permit to drill. *Id*. (citing 30 C.F.R. § 250.410(b)). That is precisely the point. If and when Sable proposes new wells, BSEE and BOEM will evaluate whether those activities conform to the existing DPP, and revision will be required if they do not. The regulations do not require BOEM to mandate revision in anticipation of hypothetical proposals that may never materialize. To the contrary, requiring revision based on mere speculation would impose unnecessary burdens on both the agency and the operator without advancing OCSLA's objectives.

Plaintiffs' argument regarding potential well stimulation treatments fails for the same reason. Pls.' Opp'n at 16. They point to an example where BOEM is considering a different oil company's proposal to supplement its DPP to use well stimulation treatments. *Id*. (citing 91 Fed. Reg. 13,063 (Mar. 18, 2026)). But their own example underscores that a DPP is revised when an operator actually proposes such activities—not before. *See* BOEM_AR_Folder 01_77 (explaining that "no revision to the DPP is required at this time because no [well simulation treatment] is taking place or proposed at this time."). In the example Plaintiffs cite, BOEM initiated additional environmental review only after the operator formally proposed to supplement its DPP to use well

7

stimulation treatments. *See* 91 Fed. Reg. 13,063. That approach is fully consistent with OCSLA's framework and does not "defeat[] OCSLA's purpose of 'orderly development, subject to environmental safeguards.'" Pls.' Opp'n at 16 (citing 43 U.S.C. § 1332(3)).

Finally, Plaintiffs contend that the DPP must be revised because its discharge information lacks the level of detail required for new plans under 30 C.F.R. § 550.248. Pls.' Opp'n at 17. But that regulation governs the contents of newly submitted DPPs and was promulgated long after approval of the Platform Harmony DPP. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011). It does not apply retroactively to periodic review of existing plans. In any event, BOEM considered the significance of any changes in available information and reviewed the very materials Plaintiffs dismiss as "wholly irrelevant." Pls.' Opp'n at 18 n.7. Those documents contain detailed information regarding waste discharges in the vicinity of Platform Harmony and provided BOEM with information equivalent to what would be included in a new DPP submission. *See* BOEM_AR_Folder 02C_14922; BOEM_AR_Folder 02C_15614–33; BOEM_AR_Folder 02C_4349; BOEM_AR_Folder 02C_346; BOEM_AR_Folder 02F_17805. BOEM reasonably compared that information against the applicable NPDES permit and found no basis to require revision of the DPP.

In short, BOEM appropriately focused its analysis on whether any proposed changes or new information indicated increased discharges. Finding none, it acted well within its discretion in concluding that revision was not required.

## V.    Plaintiffs' Spill Risk Arguments Fail

Plaintiffs' oil-spill arguments rest on a fundamental misunderstanding of both the regulatory framework governing offshore spill preparedness and the scope of BOEM's periodic review. As a threshold matter, oil spill analysis is not a trigger for DPP revision in 30 C.F.R. § 550.283(a), and Plaintiffs do not allege as much. Instead, they point to alleged discrepancies between a worst-case discharge ("WCD") scenario and Sable's Oil Spill Response Plan ("OSRP") and assert that BOEM failed to account for heightened

8

spill risk from aging infrastructure. Neither argument establishes that BOEM acted arbitrarily or that revision of the DPP was required.

To begin, Plaintiffs improperly conflate distinct regulatory regimes. A WCD is the maximum foreseeable daily flow of oil from the offshore facility from a rare event like a loss of well control or well blowout. *See e.g.*, 30 C.F.R. §254.47. WCDs are submitted as part of a DPP for blowouts during the drilling of a new well.[6] *See* 30 C.F.R. § 550.243(h). As part of its DPP review, BOEM reviewed the existing WCD, which has remained the same since it was first evaluated by BOEM and BSEE's predecessor agency (the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") in 2011. BOEM noted that "while no immediate action is required, BOEM may need to reevaluate the WCD for the blowout scenario based on reports of reservoir conditions submitted to BOEM after resumption of continuous production." BOEM_AR_Folder 01_75. An OSRP, on the other hand, is a comprehensive response plan to address an oil spill (whether from drilling or from other situations like a pipeline rupture). The OSRP documents how an operator would respond to the WCD scenario. BSEE, not BOEM, reviews and approves OSRPs. *See* 30 CFR Part 254; BOEM_AR_Folder 01_75. BOEM_AR_Folder 01_75. BOEM also confirmed that Sable has a compliant OSRP. *Id*.

Plaintiffs' claimed "discrepancy" between the 2011 WCD scenario and Sable's current OSRP is likewise misplaced. The 2011 WCD scenario evaluated a potential blowout associated with drilling a new well—an activity not currently proposed. *See* BOEM_AR_Folder 02F_23100 (describing drilling-based WCD scenario). By contrast, the current OSRP evaluates worst-case scenarios based on existing operations, including

---

[6] An operations' total WCD consists of three separate scenarios: 1) the uncontrolled wellbore WCD scenario ("blowout"), 2) the topside topple volume WCD scenario, and 3) the pipeline rupture WCD scenario. BOEM_AR_Folder 01_75. The total WCD volume for an operation equals the sum of the amount of oil spilled under each scenario. BOEM is responsible for verifying the WCD scenario for the "blowout" presented by an operator. *Id*. BOEM, in turn, provides this blowout scenario volume to BSEE. BSEE is responsible for verifying the pipeline and topside WCD scenarios submitted by an operator.

production from the highest-capacity well and potential pipeline releases. BOEM_AR_Folder 04_27293 (platform scenario based on highest-producing well); BOEM_AR_Folder 04_27330 (pipeline scenario based on current production conditions). These are not inconsistent estimates; they reflect different operational assumptions. BOEM expressly recognized that if drilling resumes, WCD scenarios would be revisited in coordination with BSEE. BOEM_AR_Folder 01_75; BOEM_AR_Folder 01_35. That reasonable, forward-looking approach is consistent with the regulatory scheme.

Nor do Plaintiffs establish that BOEM failed to consider spill risk more broadly. To the contrary, BOEM reviewed extensive information regarding infrastructure conditions, prior incidents, and ongoing regulatory oversight. See BOEM_AR_Folder 01_33 (review of Refugio spill information); BOEM_AR_Folder 04_27507 (BSEE inspection and testing summary). That review included confirmation that safety systems were inspected, tested, and found to be in compliance with applicable requirements. See BOEM_AR_Folder 04_26843 (100% of safety systems successfully tested). BOEM reasonably relied on BSEE's ongoing inspection, testing, and enforcement regime, which is specifically designed to address risks associated with offshore infrastructure.

At bottom, Plaintiffs' oil-spill arguments amount to a request that BOEM reanalyze spill-response planning and impose new requirements outside the established regulatory framework. But periodic review under OCSLA is not a vehicle for relitigating OSRP assumptions or second-guessing BSEE's technical determinations. Plaintiffs identify no new information demonstrating a change in spill risk that would require revision of the DPP under § 1351(h), nor do they show that BOEM abused any residual discretion to require revision outside the regulatory triggers. The agency's determination was neither arbitrary nor capricious.

**VI.    Plaintiffs' Request for Relief Is Improper**

Even if Plaintiffs could establish a deficiency in BOEM's periodic review—which they cannot—one of their requested remedies (ordering BOEM to require revision of the DPP) fails because it would require the Court to exercise discretion that is reserved to the Secretary. OCSLA provides that the Secretary "shall require" revision only if the agency determines, based on its discretionary review, that a plan "should be revised to meet the requirements of this subsection." 43 U.S.C. § 1351(h)(3). That determination necessarily involves the agency's technical judgment and evaluation of complex operational and environmental factors. Nothing in the statute mandates that BOEM reach any particular conclusion in conducting that review.

Indeed, as Plaintiffs themselves acknowledge, BOEM "must retain a certain degree of flexibility" in how it conducts periodic review. Pls.' Opp'n at 12 (citing 70 Fed. Reg. 51,478, 51,493 (Aug. 30, 2005)). That flexibility extends both to the scope of issues the agency considers and to its ultimate determination whether revision is warranted. As this Court has recognized, BOEM's periodic review decisions involve the exercise of agency judgment and are not subject to judicial compulsion as to outcome. *See Ctr. for Biological Diversity v. Haaland*, No. 2:22-cv-06996-CAS-KSx, 2023 WL 3007920, at *7 (C.D. Cal. Apr. 17, 2023).

If the Court finds that the BOEM's decision not to require revision of the DPP was arbitrary or capricious because BOEM, for example, failed to consider the appropriate factors or failed to adequately explain its decision, or the decision was otherwise not in accordance with OCSLA, then the "the normal course is to remand the matter to the agency for further consideration rather than dictating the agency's future actions." *Oceana, Inc. v. Coggins*, No. 19-CV-03809-LHK, 2021 WL 1788516, at *4 (N.D. Cal. May 5, 2021). The fact that the citizen suit provision allows the Court to "compel compliance" with OCSLA does not alter the scope of relief. *See* 43 U.S.C. § 1349(a)(1); 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside

agency, action, finding, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

Because Plaintiffs seek relief beyond what the Court may order, their requested remedy should be denied.

Dated: April 10, 2026          Respectfully submitted,

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Shannon Boylan*
SHANNON BOYLAN, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
E-mail: shannon.boylan@usdoj.gov
Tel: (202) 598-9584

*Attorneys for Federal Defendants*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Federal Defendants, certifies that this brief does not exceed 12 pages, in compliance with the page limit set by this Court's Standing Order, Section 6.c, dated April 15, 2025 (Dkt. No. 11).

Dated: April 10, 2026                    */s/ Shannon Boylan*
                                          Shannon Boylan