UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:25-cv-02840-MWC-MAA                    Date: May 14, 2026

Title:    Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

Present:  The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:
                N/A                                          N/A

**Proceedings:    (IN CHAMBERS) ORDER *SUA SPONTE* DISMISSING COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION AND DENYING AS MOOT ALL PENDING MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE EXTRA-RECORD EVIDENCE (DKTS. [51], [57], [58], [59], [60])**

Before the Court are the parties' cross-motions for summary judgment ("cross-motions"), Dkts. # 51, 57, 59, and Defendants' and Intervenor-Defendant Sable Offshore Corporation's ("Sable") concurrent Motions to Strike Plaintiff's Extra Record Evidence, Dkts. # 58 & 60.  All motions are fully briefed.  Plaintiffs Center for Biological Diversity ("Center") and Wishtoyo Foundation ("Wishtoyo") (collectively, "Plaintiffs") attached standing declarations to their pending Motion for Summary Judgment.  *See* Dkts. # 51-1–6.  Upon a thorough review of Plaintiffs' standing declarations, the Court finds that it lacks subject-matter jurisdiction over this case.  Accordingly, the Court **DISMISSES** Plaintiffs' First Amended Complaint (Dkt. # 12) **WITH LEAVE TO AMEND** and **DENIES AS MOOT** all pending Motions for Summary Judgment (Dkts. # 51, 57, 59) and Motions to Strike Extra-Record Evidence (Dkts. # 58 & 60).  The May 15, 2026 hearing is **VACATED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


Case No.  2:25-cv-02840-MWC-MAA                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*


### I.     Factual Background[1]

This case concerns the offshore oil and gas activities at the Santa Ynez Unit ("SYU" or "Unit" in the Santa Barbara Channel.  *See* Dkt. # 12 ("*FAC*") ¶ 1.  In 2015, oil and gas production at the SYU shut down after an onshore pipeline used to transport oil from the Unit ruptured, spilling hundreds of thousands of gallons of oil into the coastal environment. *FAC* ¶ 2; Dkt. # 30 ("*Defs.' Answer*") ¶ 2.  On April 30, 2025, the Bureau of Ocean Energy Management ("BOEM"), which is housed within the U.S. Department of Interior, issued a decision ("April 2025 Decision") determining that Sable was not required to revise the development and production plan ("DPP") for Platform Harmony—the first platform in the Santa Ynez Unit that Sable now intends to restart.  *FAC* ¶ 10; *Defs.' Answer* ¶ 10.  Plaintiffs now challenge that decision.  *See generally FAC*.

### A.     Brief History of the Santa Ynez Unit ("SYU")

There are currently thirty (30) active oil and gas leases on the Pacific Outer Continental Shelf ("OCS"), which are largely organized into units.  *FAC* ¶ 49; *Defs.' Answer* ¶ 49.  The Santa Ynez Unit consists of sixteen (16) leases and is comprised of three (3) separate offshore production platforms: Platform Harmony, Platform Heritage, and Platform Hondo.  *FAC* ¶¶ 49–50; *Defs.' Answer* ¶ 49–50.  Platform Harmony—the platform at issue in this case—was installed in June 1989.  *FAC* ¶ 50; *Defs.' Answer* ¶ 50. The predecessor to BOEM approved the DPP plan for drilling from Platform Harmony in 1985, based on a plan originally submitted in 1982.  *FAC* ¶ 51; *Defs.' Answer* ¶ 51; BOEM_AR_000018136–40.  In 1987, Exxon estimated "that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels (MB) of crude oil and 600 to 700 billion standard cubic feet (GSCF) of natural gas.  Recovery of these reserves will take place over a period of approximately 25 to 35 years." BOEM_AR_000018150; *see also id.* at 18738 (same estimates in 1982).  The 1982 and 1987 plans estimated that "containment design features will be extremely effective in dealing with most spills that might occur at the onshore facilities," and that the "spills are typically small (less than 5 barrels) and are usually caused by a failure of valves and other equipment located within the containment area of the facilities."  *Id.* at 19068 (1982 plan), 18418 (1987 update).  Regarding fugitive emission controls, the plans detailed that "design

---

[1] The Court derives the facts of this case from both the First Amended Complaint (Dkt. # 12) and Defendants' Answer, as well as the relevant parts of the administrative record ("AR") that Defendants lodged with the Court, *see* Dkts. # 49 & 50.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

features that have been incorporated [ ] minimize fugitive emissions and assist in the implementation of a control program[.]"  *Id.* at 18413, 19071 ("Hydrocarbon pumps will be equipped with dual mechanical seals to minimize potential fugitive emissions.  A preventative maintenance plan and operator attention will be used to minimize fugitive emissions.").

In 1992, the agency approved a supplemental plan to allow the installation of topsides, such as "the surface deck of a platform, which includes all drilling equipment," onto Platform Harmony.  *FAC* ¶ 52; *Defs.' Answer* ¶ 52; BOEM_AR_000018017–23.  In 2014, BOEM approved another DPP amendment to allow the replacement of two existing power cables from the onshore Las Flores Canyon processing facilities to Platform Harmony and the installation of a power cable from Platform Harmony to Platform Heritage.  *FAC* ¶ 52; *Defs.' Answer* ¶ 52; BOEM_AR_000017615–17.

The SYU's three platforms have produced over 500 million barrels of oil and 963 billion cubic feet of natural gas since their installations.  BOEM_AR_000000523–25.  Before it shut down in 2015, the Unit contributed to over half of Santa Barbara County's total greenhouse gas emissions, leaking reactive organic compounds and hydrogen sulfide emissions.  *See id.* at 233 (2014 EPA website snapshot showing that the Santa Ynez Unit emitted 309,712 metric tons of $CO_2e$ out of Santa Barbara County's total reported emissions of 564,428 metric tons of $CO_2e$), 412 (Santa Barbara County Air Pollution Control District's "Final Reporting Form for Breakdowns" for the Hondo Platform showing 2.64 lbs of $H_2S$ excess emissions).  Until 2024, the ExxonMobil Corporation ("Exxon") owned and operated all three platforms at the Santa Ynez Unit and produced oil from the Unit for decades.  *FAC* ¶ 57; *Defs.' Answer* ¶ 57.  Exxon sold the Unit to Sable, which now owns and operates Platform Harmony.  *FAC* ¶ 57; *Defs.' Answer* ¶ 57; BOEM_AR_000000069.

B.      Standing Declarations

On April 2, 2025, Plaintiffs initiated this action, Dkt. # 1, and on May 12, 2025, Plaintiffs filed their First Amended Complaint ("FAC"), Dkt. # 12.  Plaintiffs are two nonprofit organizations: the Center for Biological Diversity ("Center"), which "advocates for the protection of threatened and endangered species and their habitats," and the Wishtoyo Foundation ("Wishtoyo"), which is a "Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


Case No.   2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*


Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties." *FAC* ¶¶ 16, 19.  Attached to Plaintiffs' pending Motion for Summary Judgment are five (5) declarations, filed in an effort to demonstrate that they have Article III standing to bring this case.  *See* Decl. of Mikyoko Sakashita, Dkt. # 51-1 ("*Sakashita Decl.*"); Decl. of Brady Bradshaw, Dkt. # 51-2 ("*Bradshaw Decl.*"); Decl. of Blake Kopcho, Dkt. # 51-3 ("*Kopcho Decl.*"); Decl. of Mati Waiya, Dkt. # 51-4 ("*Waiya Decl.*"); Decl. of Tevin Schmitt, Dkt. # 51-5 ("*Schmitt Decl.*").  The Court summarizes each declaration in turn.

### i.    *Miyoko Sakashita Declaration*

Miyoko Sakashita is the director of the Center's Oceans Program, which "works to protect imperiled species and their habitats impacted by offshore oil and gas development, to protect public health, and to attain clean water, a safe climate, and a healthy web of life." *Sakashita Decl.* ¶¶ 2–3.  "The Center has over 93,000 members, including thousands of members . . . who live near and recreate in waters affected by offshore oil and gas drilling in the Santa Barbara Channel." *Id.* ¶ 4.  The Center has a history of petitioning the federal government, filing rulemaking petitions to the U.S. Department of Interior, commenting on proposed agency actions involving offshore oil and gas drilling, and filing lawsuits in various courts. *See id.* ¶¶ 5–7.

Sakashita attests that this case falls within the Center's organizational mission. *Id.* ¶ 8.  "Center members' interests in species, habitats, and water and air quality are injured by the continued reliance on an outdated plan that fails to address or mitigate the myriad problems inherent in restarting production at the Unit[.]" *Id.*  Sakashita attests that "[a]chieving the Center's mission and protecting [its] members' interests depend in large part on the federal government's proper compliance with the law, including the Outer Continental Shelf Lands Act, and its directive that BOEM balance offshore oil and gas development with protecting the marine and human environment." *Id.* ¶ 9.  Sakashita affirms that "BOEM's decision harms the aesthetic, recreational, spiritual, informational, and procedural interests of the Center's members" and that these "harms would likely be reduced and remedied if the Center prevailed in this lawsuit." *Id.* ¶ 10.

### ii.   *Brady Bradshaw Declaration*

Brady Bradshaw is the Center's Senior Oceans Campaigner. *Bradshaw Decl.* ¶ 2. He lives in Santa Cruz, California, and frequently visits Santa Barbara "for work and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


Case No.  2:25-cv-02840-MWC-MAA                      Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

---

personal recreation." *Id.* ¶ 3.  He visited the area four times in 2025, and has walked the beach and swam in the Channel Islands. *Id.*  He "plan[s] to return before April 2026, [to] visit West Beach and Refugio State Beach, and swim in the Santa Barbara Channel." *Id.* Bradshaw also enjoys skateboarding and biking along the coast in Santa Barbara and freediving off the coast, which is "central" to his spirituality. *Id.* ¶¶ 5–6.  Indeed, the "ocean is an important part of [his] spiritual practice." *Id.* ¶ 9.

Bradshaw has "closely followed and opposed efforts to resume offshore oil and gas drilling in the Santa Barbara Channel at the Santa Ynez Unit," including BOEM's decision not to update Platform Harmony. *Id.* ¶ 10.  Bradshaw affirms that he is "aware of the immense habitat destruction and animal deaths that resulted from the tens of thousands of gallons of oil that spilled onto Refugio Beach in 2015," and is "deeply concerned that if production resumes in the [SYU], another oil spill will occur[.]" *Id.*  Bradshaw declares that oil production at the SYU "causes noise pollution, water pollution, vessel strikes, and other impacts that harm the animals [he] love[s] to see and the coastal areas [he] love[s] to explore." *Id.* ¶ 11.  Bradshaw fears that "[t]he impacts from production and the risk of a spill are elevated as the platforms and other [SYU] infrastructure have outlived their expected lifespans and the Unit's produced more oil and gas than what was anticipated under the old, original plans." *Id.* ¶ 12.  "If production resumes," Bradshaw declares that he "believe[s] it is only a matter of when—and not if—an oil spill happens." *Id.*  He basis this belief off SYU's 2015 rupture and his knowledge that "the pipelines, platforms and other associated infrastructure are past their intended lifespans and are at higher risk of leaks and spills with each passing day." *Id.*  He confirms that he "would not enjoy diving in the Santa Barbara Channel as much if production restarts, because there will be an increased risk of an oil spill while [he is] in the water." *Id.*

Bradshaw also attests that he has asthma and "breathing in the harmful air pollution associated with oil processing facilities would harm [his] health." *Id.* ¶ 13.  Bradshaw fears being "exposed to pollutants that reach the water from a spill or oil production operations," and that when he has "seen oil sheens on the water in the past," he "will not get into the water[.]" *Id.* ¶ 15.  Bradshaw is "deeply worried about the irreparable harm that could result from restarting oil production in the [SYU] using decades-old, corroded pipelines and platforms under outdated plans[.]" *Id.* ¶ 16.  He concludes that "[a]n order that the Bureau must require an updated development plan for Platform Harmony will help alleviate these harms." *Id.* ¶ 17.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

### iii.     *Blake Kopcho Declaration*

Blake Kopcho has been an "active member and supporter" of the Center since 2015. *Kopcho Decl.* ¶ 2.  That same year, he joined the Center as a staff member; he left this position in 2019.  *See id.*  Kopcho affirms that he has lived in Santa Barbara since 2020, and that he loves to "surf, scuba dive, sail, and spend other time in and around the ocean," and that his "quality of life depends on the quality of its waters."  *Id.* ¶¶ 4; *see also id.* ¶¶ 6–13 (chronicling his history of surfing, spending time on the beaches, freediving, camping, hiking, sailing, scuba diving, swimming, and paddle boarding in the Santa Barbara Channel).  Kopcho worries about the possibility of oil spills.  *See id.* ¶¶ 4, 14.  He worries that "another oil spill could happen any time," and attests that "another oil spill seems inevitable" in light of the 2015 spill.  *Id.* ¶ 14.  Kopcho also attests that "[r]estart of these oil operations under outdated plans would cause [him] irreparable harm from the air pollution, water pollution, and risk of another oil spill that would bring."  *Id.* ¶ 15.  On a kayaking trip in May 2024, Kopcho "encountered a population of sea otters who live[d] . . . very close to the [SYU] platforms and onshore and offshore pipelines," and he fears that "a large spill would be devastating to this population."  *Id.* ¶ 16.

Kopcho affirms that "[a]nother oil spill from the [SYU] would prevent [him] from engaging in activities that are so meaningful to [him]—including swimming, diving, surfing, and boating—for a long time," and would "be devastating for the entire community."  *Id.* ¶ 18.  Kopcho believes that the "restart of these operations also will impact air and water quality where [he] live[s] and recreate[s]."  *Id.* ¶ 19.  Kopcho fears that the greenhouse gas emissions from the SYU will "worsen[] the effects of climate change," and that "the very real risk of another catastrophic oil spill exist[s] as long as there are active oil leases in the [SYU][.]"  *Id.* ¶ 21.  Kopcho declares that BOEM's April 2025 Decision puts his "health, safety, and well-being at risk," and that a "court order requiring an updated plan would protect [his] health, values, and interests."  *Id.*

### iv.     *Mati Waiya Declaration*

Mati Waiya is a "Chumash Ceremonial Elder from the Chumash Mishkanaka Clan" and "elected Chairman of the Coastal Band of the Chumash Nation."  *Waiya Decl.* ¶ 2. Waiya founded the Wishtoyo Foundation in 1997 and has "served as the Executive Director of Wishtoyo since founding it."  *Id.* ¶ 3.  The nonprofit organization has "over 200 sustaining members" and is headquartered in Malibu and Ventura.  *Id.* ¶ 4.  Its "mission is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                    Date: May 14, 2026

Title:    Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

to protect and preserve Chumash culture, the culture of all indigenous peoples, and the natural resources upon which all people depend." *Id.* ¶ 5. Wishtoyo has a long history of "working to protect and restore the Santa Barbara Channel, Pacific Ocean, and our beaches and shores," including by bringing numerous Clean Water Act cases in Los Angeles and Ventura counties, advocating "in state and federal forums for adequate protections to prevent future oil spills," publishing white papers, and providing programs and annual coastal cleanup days. *Id.* ¶ 6. Waiya declares that the "Pacific Ocean and marine animals are an integral part of Chumash culture." *Id.* ¶ 7. "Numerous Chumash ceremonial practices rely on the presence of . . . dolphins, whales, sea lions," and other aquatic animals, with dolphins in particular being "particularly revered in Chumash culture[.]" *Id.*

Waiya affirms that BOEM's "refusal to revise the [DPP] for Platform Harmony in the [SYU] has direct, severe implications for Wishtoyo's members[.]" *Id.* ¶ 8. Waiya recounts that the 2015 Refugio oil spill devastated the coastal environment and killed hundreds of marine animals, "including dozens and dozens of dolphins." *Id.* When the ocean and shorelines were contaminated, Waiya represents that "we could not gather coastal resources for food, cultural practices, or ceremonies for an extended time," and that the oil spill prevented the Chumash people "from holding [their] annual tomol voyage across the Santa Barbara Channel to Limu[.]" *Id.*

Waiya believes that "another devastating spill is more likely because the Bureau is refusing to require revisions of outdated development plans before allowing offshore oil drilling operations to resume." *Id.* ¶ 9. Waiya attests that offshore drilling from "these old, decaying oil rigs increases the risk of spills with each passing day," and that the outdated plans "increase[] the risks of spills and leaks, habitat degradation, and pollution—reducing or even eliminating our traditional food sources, sacred areas, and exercise of ocean-based cultural practices." *Id.* ¶¶ 9–11. Waiya also represents that "by not requiring revisions of the outdated plans, the Bureau has cut out the opportunity for meaningful consultation with tribal nations or communities on a draft updated plan, compounding historical patterns of marginalization and exclusion from decisions affecting our ancestral home." *Id.* ¶ 12. Finally, Waiya declares that revising the DPP plans for Platform Harmony "would benefit Chumash people and Wishtoyo's members by better protecting the Pacific, marine species, and cultural resources," and that BOEM's decision "means that marine ecosystems will suffer, and Chumash people could lose access to culturally important plants, animals, and places[.]" *Id.* ¶ 13.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

        *v.*      *Tevin Schmitt Declaration*

Tevin Schmitt has been a member of Wishtoyo since the summer of 2014.  *Schmitt Decl.* ¶ 2.  He has been the "Watershed Scientist" for Wishtoyo since January 2019.  *See id.* ¶ 3.  In 2015, Schmitt was studying "invertebrate population ecology" at California State University ("CSU") Channel Islands.  *Id.* ¶ 4.  At the time of the 2015 oil spill at Refugio State Beach, Schmitt was visiting El Capitan State Beach, "about three miles south of the spill location, when oil started to wash up on the beach."  *Id.*  He attests that he felt "immense pain and anger . . . watching the ecosystems [he is] most passionate about covered with crude oil."  *Id.*

Since graduating from CSU Channel Islands, Schmitt has "been an avid birder" and "member of the Ventura Audubon Society," where he "regularly volunteer[s] for their events and lead[s] educational hikes to teach others about local ecology and bird identification."  *Id.* ¶ 6.  He attests that he "plan[s] to continue leading field trips for the Ventura Audubon Society," but is "concerned that restarting offshore oil drilling at the [SYU] will cause additional impacts to it and other places, particularly since the [BOEM] decided revisions of the development plans for drilling operations at the Unit are not needed."  *Id.* ¶ 7.

As the Watershed Scientist for Wishtoyo, Schmitt "collect[s] water quality data nearly monthly from the Santa Clara River Estuary and train[s] [Wishtoyo's] interns on bird identification, estuarine ecology, and sandy beach ecology."  *Id.* ¶ 8.  Schmitt states that "[a]ny future threats to the Santa Clara River estuary would have a significant impact on [his] enjoyment of this sensitive habitat and [his] ability to perform [his] duties as Watershed Scientist."  *Id.*  Further, Schmitt declares that Wishtoyo hosts a "bio blitz[]," which supports a "statewide initiative to collect biodiversity data along California's coastline."  *Id.*  The "bio blitz" takes place at beaches near Santa Barbara and involves volunteers and Wishtoyo staff and members using a phone application to "collect biodiversity data at various beaches and coastal ecosystems in the Chumash homelands."  *Id.*  Schmitt states that the 2015 oil spill affected all of these beaches and harmed his professional and personal interests.  *Id.* ¶ 9.  Schmitt therefore believes that the "outdated development plans for Platform Harmony invite[s] problems and risks that could be avoided or mitigated if BOEM required revised plans."  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                              Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

Schmitt affirms that his "interests and values are stake not only from another catastrophic oil spill, but also smaller leaks and other issues that destroy habitat, damage cultural resources, and cause water, air, visual, and noise pollution." *Id.* Schmitt believes that "BOEM's failure to require an updated development plan for Platform Harmony also deprives [him] of the ability to comment on the draft updated plan . . . as well as the risks that the plan must address and what mitigation measures the plan should include if approved by BOEM." *Id.* Finally, Schmitt states he is "concerned that BOEM avoided requiring updates to the development plans for Platform Harmony by ignoring relevant considerations," and that "BOEM's decision increases the probability of another oil spill, either along the Gaviota Coast, or within one of the coastal watersheds that support sensitive species and their habitats[.]" *Id.* ¶ 11. Schmitt concludes that a favorable decision for Plaintiffs "would help protect [his] interests, passions, volunteer efforts," and "would ensure that the development plans for Platform Harmony will be revised, following a robust public process that ensures" public input. *Id.* ¶ 13.

II.      Procedural History

On April 2, 2025, Plaintiffs initiated this action against BOEM, filing their original Complaint. Dkt. # 1. On April 30, 2025, BOEM issued a decision memorializing its review of the DPP for Platform Harmony,[2] and its determination that the DPP plan does not need revision. *See* BOEM_AR_000000069–79. The decision explained that from November 2024 until April 2025, BOEM "identified and reviewed the DPP for Platform Harmony," reviewing several reports and studies, including a consent decree in a similar case filed in this District. *See id.* at 70–71 (noting, in part, that BOEM reviewed the consent decree issued in *United States v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, No. 2:20-cv-02415 (C.D. Cal. 2020)). The memorandum assessed each report, study, and biological opinion, and explained why none of the studies required revision to the Platform Harmony DPP. *See id.* at 71–79. BOEM ultimately concluded that: (1) "No additional revisions to the DPP for Platform Harmony are needed at this time"; and (2) "Recent revisions to all DPPs in the BOEM Pacific Region, including for Platform Harmony, were required and completed in November 2024 to incorporate mandatory Terms and Conditions from the 2024 BiOp." *Id.* at 71, 79.

---

[2] BOEM limited its decision to only Platform Harmony, noting that it will "complete the review of the DPPs for two other platforms in the SYU, Heritage and Hondo, after BSEE pre-production safety inspections are completed." BOEM_AR_000000070.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


Case No.  2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*


On May 12, 2025, Plaintiffs filed their FAC.  Dkt. # 12.  On June 10, 2025, Sable intervened in this case, Dkt. # 28, and then moved to dismiss the FAC shortly thereafter, Dkt. # 31.  On September 10, 2025, the Court denied Sable's motion to dismiss.  *See generally* Dkt. # 39 ("*Sept. 10, 2025 Order*").  In resolving Sable's motion, the Court addressed the parties' dispute regarding which statute controls the present action: the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*, or alternatively, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq.  See Sept. 10, 2025 Order* at 7–9 (addressing the "Statute Controlling Plaintiffs' Cause of Action") (emphasis omitted).  The Court held, in pertinent part, that OCSLA controls this matter, stating:

> Beginning with the question as to whether the APA provides an avenue for relief separate from OCSLA, making the 60-day notice requirement inapplicable, the Court finds that OCSLA controls.  Plaintiffs' FAC indeed refers to BOEM's violation of or lack of compliance with OCSLA multiple times. . . . And since '[c]ourts must give effect, if possible, to every clause and word of a statute,' . . . the Court cannot overlook the plain language of OCSLA that 'all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of, the provisions of [OCSLA], or any regulation promulgated under this subchapter . . ., shall be undertaken in accordance with the procedures described in' OCSLA's citizen suit provision.  43 U.S.C. § 1349(a)(6).  The same is true of the text of the APA, which counsels that judicial review is available 'for final agency action for which there is no other adequate remedy in a court.'  5 U.S.C. § 704.  To adopt Plaintiffs' interpretation would require the Court to act as if there were no remedy available under the citizen suit provision of OCSLA, or as if Plaintiffs were not seeking to correct 'violations' of OCSLA, contrary to the plain language of the FAC. . . .
>
> . . . Plaintiffs provide no authority where a court interpreted a provision referring to 'all suits' challenging violations of or seeking enforcement of a statute as simultaneously allowing judicial review of the APA. . . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:  Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

> . . . With respect to Plaintiffs' argument that they are not
> bringing a suit under § 1349(a)(1) because they are not seeking
> a mandamus action, the Court likewise finds this reasoning
> unpersuasive.  As detailed above, the Court has little doubt that
> Plaintiffs' lawsuit challenges BOEM's decision and alleges
> violations of OCSLA. . . .

*Id.* at 8–9 (internal citations omitted).

III.   Legal Standard

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *Exxon Mobil Corp v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  As such, "[i]t is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Gila River. Indian Cmty. v. Schoubroek*, 145 F.4th 1058, 1070 (9th Cir. 2025) (same).  It is well-established that federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."  *Foster v. Chatman*, 578 U.S. 488, 496 (2016) (internal quotation marks and citation omitted); *Moe v. GEICO Indem. Co.*, 73 F.4th 757, 759 (9th Cir. 2023); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  It is also well-established that Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).  Thus, even where the defendant fails to raise or challenge a claim or Complaint for lack of standing, "federal courts have a duty to raise, sua sponte, questions of standing before addressing the merits" of any claim.  *Iten v. Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) ("[A] jurisdictional issue such as Article III standing may be raised *sua sponte* by the court at any time.") (citation omitted).

Article III of the Constitution limits the Court's authority to resolving "Cases" or "Controversies."  U.S. Const., art. III, § 2.  "The doctrine of standing, among others,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                     Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

implements this limit on [the Court's] authority." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (internal quotation marks and citation omitted).  The Supreme Court "has established that the irreducible constitutional minimum of standing contains three elements that a plaintiff must plead and—ultimately—prove." *Id.* (internal quotation marks and citation omitted).  "First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted).  "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted).  "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing the [three] elements of standing, and each element must be supported in the same way as any other manner on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  "[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element," and "can no longer rest on mere allegations but must set forth by affidavit or other admissible evidence specific facts as delineated in Federal Rule of Civil Procedure 56(e) as to the existence of such standing." *Jones*, 74 F.4th at 1058 (internal quotation marks and citations omitted).   "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citation omitted).

"And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (parenthetical in original) (citations omitted).  Indeed, the three elements of standing "do[] not change in either the declaratory judgment or permanent injunction context." *Chandler v. Cal. Dep't of Corr. and Rehab.*, No. 1:21-cv-01657-JLT-HBK, 2024 WL 2153890, at *10 (E.D. Cal. May 14, 2024) (citations omitted); *see also Haaland v. Brackeen*, 599 U.S. 255, 292–92 (2023) (analyzing standing for plaintiffs' requests for declaratory and injunctive relief); *California v. Texas*, 593 U.S. 659, 671–72 (2021) (analyzing standing where the plaintiffs sought injunctive relief and a declaratory

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                   Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

judgment); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 407–10 (2013) (analyzing standing for plaintiffs' requests for a declaratory judgment and permanent injunction); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1022 (9th Cir. 2023) (Article III standing requirement "is not relaxed in the declaratory judgment context.") (internal quotation marks and citation omitted).  Indeed, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement."  *California*, 593 U.S. at 672 (citation omitted).

IV.    Discussion

Though neither party has raised or challenged Plaintiffs' standing to sue, the Court has "an independent obligation to consider standing sua sponte."  *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1149 (9th Cir. 2024) (internal quotation marks and citation omitted); *see also Eng v. U.S. Env'tl Prot. Agency*, 172 F.4th 747, 749 n.1 (9th Cir. 2026) ("Although Eng's standing to sue has not been challenged, this court has an independent obligation to address *sua sponte* whether we have subject matter jurisdiction."); *Wilson v. Lynch*, 835 F.3d 1083, 1090 n.2 (9th Cir. 2016) ("Neither party challenged the district court's determination that Wilson had standing, but we have an independent obligation to examine jurisdictional issues such as standing sua sponte.") (cleaned up).

Plaintiffs are two nonprofit organizations.  *See FAC* ¶¶ 16 & 19; *cf. Sakashita Decl.* ¶ 2; *Waiya Decl.* ¶ 3.  "To have associational standing, each organization must show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit."  *Nat'l Fam. Farm Coal. v. U.S. Env'tl Prot. Agency*, 966 F.3d 893, 908 (9th Cir. 2020).  The Court does not dispute that Plaintiffs have satisfied the last two elements for associational standing—the standing declarations have adequately shown that the interests are germane to the Center and Wishtoyo, and neither Plaintiffs' claim nor requested remedies requires the participation of individual members.  *See id.*  However, the Court is skeptical that the individual members have satisfied the requisite injury and redressability prongs to demonstrate that they possess standing to prosecute their claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

A.      Plaintiffs' Procedural Injuries

Plaintiffs' Complaint and pending Motion for Summary Judgment bring two requests for relief.  First, Plaintiffs seek a declaration "that Defendants' decision that the DPP for Platform Harmony in the Santa Ynez Unit need not be revised is arbitrary, capricious, and not in accordance with OCSLA or its implementing regulations."  *FAC* at 30; *see also Pls.' MSJ* at 30 ("Plaintiffs request a declaration that BOEM's decision that the DPP for Platform Harmony in the [SYU] need not be revised is unlawful.").  Second, Plaintiffs ask the Court to Order BOEM "to require revision of the DPP for Platform Harmony in the [SYU]."  *FAC* at 30; *see also Pls.' MSJ* at 30 (asking for the Court to "order BOEM to require a revision to or supplementation of the DPP" or "to conduct a new review of the DPP").  Plaintiffs must demonstrate standing for each form of relief sought. *TransUnion*, 594 U.S. at 430–31.

Declaratory and injunctive relief are two forms of prospective relief and are usually analyzed "together because a plaintiff who has standing to seek injunctive relief also has standing to seek a declaratory judgment."  *Sterling v. Feek*, 150 F.4th 1235, 1245 (9th Cir. 2025).  "To establish standing for prospective relief, [Plaintiffs] must show there is a sufficient likelihood that [they] will again be wronged in a similar way" and "that the threat of injury is actual or imminent, not conjectural or hypothetical."  *Id.* at 1246 (internal quotation marks and citation omitted).  Where "the plaintiff was injured by an alleged violation that occurred in the past, he must demonstrate that he is realistically threatened by a repetition of the violation," though not necessarily "that the likelihood of repetition is high."  *Id.* (internal quotation marks and citation omitted).

"Further, a plaintiff seeking injunctive relief for a procedural injury is held to a less demanding standard."  *Id.* (internal quotation marks and citation omitted).  "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Id.* (internal quotation marks and citation omitted).  "A plaintiff establishes procedural standing by showing that he was accorded a procedural right to protect his interests, and that he has concrete interests that are threatened."  *Id.* (internal quotation marks and citation omitted); *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017) ("To establish a procedural injury in fact, a plaintiff must allege that (1) the agency violated certain procedural rules; (2) these rules protect a plaintiff's concrete

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.") (cleaned up).

At the outset, the Court is satisfied that Plaintiffs have demonstrated a prospective, albeit, somewhat tenuous, environmental injury in the possibility that Platform Harmony may result in a future oil spill.  *See Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) ("[A]n increased risk of harm can itself be injury in fact for standing and nothing necessitates a showing of existing environmental harm. . . . To require actual evidence of environmental harm, rather than an increased risk based on a violation of a statute, misunderstands the nature of environmental harm and would unduly limit the enforcement of statutory environmental protections.") (quotation marks and citation omitted); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) ("[R]equiring a plaintiff to demonstrate actual environmental harm in order to obtain standing would . . . compel the plaintiff to prove more to show standing than she would have to prove to succeed on the merits. . . . an increased risk of harm can itself be injury in fact sufficient for standing."). "Threatened environmental injury is by nature probabilistic" and Plaintiffs "need not prove to a scientific certainty" that restarting Platform Harmony will result in environmental damage.  *Ecological Rights*, 230 F.3d at 1151–52 (internal quotation marks and citation omitted); *see also Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002); *but see Andrews v. Plains All Am. Pipeline, L.P.*, No. CV 15-4113 PSG (JEMx), 2017 WL 10543401, at *15 (C.D. Cal. Aug. 25, 2017) ("Plaintiffs could conceivably argue that a safer pipeline would redress potential future injuries because it would decrease the likelihood of future spills . . . [h]owever, this is merely speculative").

At the same time, Plaintiffs have not shown a violation to a procedural injury in this case—at least not in the Plaintiffs' complaints regarding deprived notice and comment procedures.  *See, e.g.*, *Waiya Decl.* ¶ 11 ("[T]he Bureau has cut out the opportunity for meaningful consultation with tribal nations or communities on a draft updated plan, . . ."); *Schmitt Decl.* ¶ 9 ("BOEM's failure to require an updated plan for Platform Harmony also deprives me of the ability to comment on the draft updated plan, including whether BOEM should approve the plan, . . .").  None of Plaintiffs' standing declarations, nor Plaintiffs'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

pending motion for summary judgment,[3] demonstrate that OCSLA or its implementing regulations afford Plaintiffs a procedural right to the process of revising a DPP.  *See Sterling*, 150 F.4th at 1246 ("A plaintiff establishes procedural standing by showing that he was accorded a procedural right to protect his interests"); *Save Bull Trout v. Williams*, 51 F.4th 1101, 1106 (9th Cir. 2022) (a procedural injury "requires [plaintiffs] to show that the procedures in question are designed to protect some threatened concrete interest of theirs that is the ultimate basis of their standing."); *Haugrud*, 848 F.3d at 1232 (plaintiffs must show that the "agency violated certain procedural rules") (cleaned up).

As the Court has previously held, this is an OCSLA citizen-suit—*not* an APA action.  *Sept. 10, 2025 Order* at 7–9.  While the APA may provide the arbitrary and capricious standard of review, the plain terms of OCSLA must control this litigation.  *See, e.g.*, *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 495–96 (9th Cir. 2011) ("Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review of the BLM's actions, . . ."), 497 ("[B]ecause the ESA provides a citizen suit remedy—the APA does not apply in such actions.").  OCSLA provides, in relevant part, that "[i]f approval of a development and production plan is not found to be a major Federal action," as defined under Sections 1351(e) and (f), then the statute affords sixty (60) days for the following procedures:  First, "the executive of any affected local government" must make available their "comments and recommendations . . . to the public upon request."  43 U.S.C. § 1351(g).  At that time, "any interested person may submit comments and recommendations."  *Id.*  Once the executive of an affected local government has compiled (1) their own comments and recommendations; and (2) comments and recommendations from "any interested person[s]," then the executive "must forward his recommendations to the Governor of his State."  *Id.*  At that time, the local government executive and "the Governor of any affected State" must submit their comments and recommendations jointly to the Secretary of Interior.  *See id.*

To the extent that Plaintiffs rely on a violation of Section 1351(g) to confer a procedural injury, *see, e.g.*, *Waiya Decl.* ¶ 11; *Schmitt Decl.* ¶ 9, there are several fatal

---

[3] When assessing whether Plaintiffs have satisfied standing at this stage of the litigation, the Court may not rely on the allegations contained in Plaintiffs' FAC.  *See Jones*, 74 F.4th at 1057–61 (holding that a district court may not assess standing allegations in a Complaint when *sua sponte* determining standing at summary judgment phase).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                          Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

flaws to pressing this theory.  First, Plaintiffs have not attested that they "request[ed]" to submit comments and recommendations to the executive of an affected local government in the first instance.  *See id.*  Second, Plaintiffs have not affirmed, declared, or otherwise argued, that revision to the SYU is not "major Federal action," as defined under 43 U.S.C. §§ 1351(e) and (f)—such that it falls within the scope of Section 1351(g)—thereby triggering local and state governments' obligations to accept comments and recommendations from the interested public.  Third, a plain and ordinary reading of Section 1351 as a whole indicates that the "approval of a development and production plan" cannot mean the revision of *an already-existing plan*.  *Cf. Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025) ("When interpreting a statute, we look first to its text. . . . We must generally give words their ordinary, contemporary, common meaning," and "[i]f the statutory text is plain and unambiguous, we must apply the statute according to its terms.") (cleaned up); *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) ("[W]e examine a statute as a whole" and "construe the statute in context to avoid superfluities . . . to give every word some operative effect.").  Section 1351(a)(1) indicates that this "plan" is defined as a *new* plan—one that prescribes that "the lessee shall submit a development and production plan . . . to the Secretary, for approval pursuant to this section."  *Id.* § 1351(a)(1).  But the crux of Plaintiffs' instant lawsuit is that BOEM failed to require revision to an already-existing DPP—Platform Harmony—not a new one.  *See generally Pls.' MSJ.*  Since Section 1351(g) speaks to the "approval" of a plan, and not revision to an old one, it logically cannot afford Plaintiffs a procedural right.  *Contra Williams*, 51 F.4th at 1106

Moreover, even if Section 1351(g) did apply to the revision of an existing DPP, and even if Plaintiffs were able to demonstrate a procedural injury, the injury would not be "fairly traceable" to the Secretary or to BOEM.  *Brown*, 600 U.S. at 561.  Instead, by OCSLA's plain terms, the procedural injury would be traced to "the executive of any affected local government" that failed to accept "comments and recommendations" from the "interested" public.  *See* 43 U.S.C. § 1351(g).  In other words, Plaintiffs cannot show that any procedural rights conferred by OCSLA were deprived or violated by the federal Defendants to this suit.  For all these reasons, Plaintiffs have failed to demonstrate that OCSLA conferred a "procedural right" upon them, let alone that any deprivation to this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

right was traceable to the federal Defendants in this case.[4]  The Court therefore declines to "relax[]" the "requirements of causation and redressability[.]"  *Williams*, 51 F.4th at 1106.

       B.       <u>Redressability</u>

       "The second and third standing elements—causation and redressability—are often flip sides of the same coin."  *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (internal quotation marks and citation omitted).  For instance, "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."  *Id.*  Redressability, on the other hand, "requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power."  *Haaland*, 599 U.S. at 294 (emphases in original) (citations omitted).

       "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award."  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020); *Day v. Henry*, 152 F.4th 961, 968 (9th Cir. 2025) ("Redressability is meant only to be a constitutional minimum, depending on the relief that federal courts are *capable* of granting.") (emphasis in original), *cert. pet. filed*, No. 25-788 (Jan. 6, 2026).  "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered."  *California*, 593 U.S. at 671; *Diamond Alt. Energy, LLC v. Env'tl Prot. Agency*, 606 U.S. 100, 120 (2025) ("Article III's redressability requirement serves to align injuries and remedies.").  "The primary goals of [the redressability] requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions."  *Diamond Alt.*, 606 U.S. at 120.  Further, "to show redressability, the plaintiff must simply show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury."  *Id.* at 121; *G.B. by and through G.P. v. U.S. Env'tl Prot. Agency*, 172 F.4th 1042, 1064 (9th Cir. 2026).  "The redressability inquiry" cannot "amount to a guess over whether a favorable decision will in fact ultimately bring about the plaintiff's broadest objective."  *G.B.*, 172 F.4th at 1064 (quoting *Gutierrez v. Saenz*, 606 U.S. 305, 318 (2025)); *Juliana*, 947 F.3d at 1170 ("Redress need not be guaranteed, but it must be more than merely speculative.").  Instead,

---

[4] To the extent that Plaintiffs also invoke a procedural injury to the deprivation of the process of revising a DPP, for the reasons stated below, this theory also fails.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

"[r]edressability is satisfied so long as the requested remedy would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mecinas v. Hobbes*, 30 F.4th 890, 900 (9th Cir. 2022) (citation omitted).

In analyzing redressability, the Court "assume[s]" that Plaintiffs have a "meritorious legal claim[][.]" *Juliana*, 947 F.3d at 1170.  Once more, Plaintiffs request two separate remedies: (1) "a declaration that BOEM's decision that the DPP for Platform Harmony in the [SYU] need not be revised is unlawful"; and (2) that the Court "order BOEM to require a revision to or supplementation of the DPP" or alternatively, to "order BOEM to conduct a new review of the DPP that properly considers the factors required by OCSLA." *Pls.' MSJ* at 30; *see also* Dkt. # 51-12 at 1–2 (Plaintiffs' Proposed Order of requested relief stating the same).  The Court takes issue with both forms of requested relief.

First, issuing a declaration that BOEM's April 2025 Decision was unlawful "alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries.  A declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action." *Juliana*, 947 F.3d at 1170; *see also Haaland*, 599 U.S. at 294 ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability."); *G.B.*, 172 F.4th at 1063 ("Even if the declaration they seek had the practical effect of discouraging the Government from discounting future costs and benefits of GHG regulations . . . it would not guarantee—or even increase the likelihood—that the Government will take some future action to mitigate climate pollution.").  The Court "cannot say that issuing the declaration Plaintiffs seek would cause a *predictable* chain of events ultimately mitigating their [declared] injuries." *G.B.*, 172 F.4th at 1063 (emphasis in original).  Indeed, Plaintiffs' own standing declarations fail to demonstrate how declaratory relief would likely redress their aesthetic, physical, or spiritual injuries.  Nor have Plaintiffs demonstrated what BOEM would likely do in response to a declaration.  This requested remedy is therefore deficient to show redress.

Instead, the "crux of the plaintiffs' requested remedy is an injunction," *Juliana*, 947 F.3d at 1170—*i.e.*, ordering BOEM to "require Sable . . . to revise or supplement the [DPP] for the [SYU]" or to conduct a "new review" of the DPP. *See* Dkt. # 51-12 at 2.  Because this case is a citizen-suit under OCSLA, the statute must control. *See* 43 U.S.C. § 1349(a).  While it is true that "a district court is not limited to a plaintiff's proposal and instead may enter any injunction it deems appropriate, so long as the injunction is no more burdensome

CV-90 (03/15)                          Civil Minutes – General                          Page **19** of **25**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

to the defendant than necessary to provide complete relief to the plaintiffs," *Day*, 152 F.4th at 968 (internal quotation marks and citation omitted), the Court is also cognizant that "[i]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 488 (1996) (analyzing citizen suit provision of Resource Conservation and Recovery Act of 1976 ("RCRA")); *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1007 (9th Cir. 2010).

Here, Plaintiffs' remedy is found in the text of OCSLA's citizen-suit provision itself.  Again, the APA does not apply—the Court cannot provide for vacatur and remand.  Instead, Section 1349(a) of OCSLA prescribes that "any person having a valid interest which is or may be adversely affected may commence a civil action on his own behalf to *compel compliance* with this subchapter against any . . . agency . . . for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter[.]"  43 U.S.C. § 1349(a) (emphasis added).  Thus, "Congress did not intend for a private citizen" to seek anything more than that the Department of Interior comply with the terms of OCSLA.  *Cf. Meghrig*, 516 U.S. at 487–88 ("[W]here Congress has provided elaborate enforcement provisions for remedying the violation of a federal statute, as Congress has done with RCRA and CERCLA, it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under the statute.").  Such a remedy is unique compared to other environmental statutes' citizen-suit provisions, such as the Clean Water Act, 33 U.S.C. § 1365(a), or the Endangered Species Act, 16 U.S.C. § 1540(g)(4)—neither of which prescribes "compliance" with its terms.

Turning to the relevant text of the statute, OCSLA provides for the modification of a DPP in two instances, both found in Section 1351(h).  First, Section 1351(h)(1) states that "[t]he Secretary shall require modification of a plan *if he determines* that the lessee has failed to make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment, including compliance with the regulations prescribed by the Secretary pursuant to" section 1334.  43 U.S.C. § 1351(h)(1) (emphasis added).  Further down, Section 1351(h)(3) provides:

> The Secretary shall, from time to time, review each plan approved under this section.  Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

> production pursuant to such plan.  If the review indicates that
> the plan should be revised to meet the requirements of this
> subsection, the Secretary shall require such revision.

*Id.* § 1351(h)(3).

   "The use of the phrase 'from time to time,' suggests that [the Secretary of Interior] has discretion about when to revise such standards." *Waterkeeper All. v. U.S. Env'tl Prot. Agency*, 140 F.4th 1193, 1215 (9th Cir. 2025).  The issue here is that "OCSLA affords discretion as to the *manner* in which defendants may conduct a review of DPPs, along with any ultimate conclusion that *revision* of a plan is necessary[.]"  *Ctr. for Bio. Diversity v. Haaland*, No. 2:22-cv-06996-CAS-KSx, 2023 WL 3007920, at *8 (C.D. Cal. Apr. 17, 2023) (emphases in original).  True, "defendants clearly lack the discretion to entirely forego predicate reviews," and if that were the case, the Court could compel such compliance.  *See id.* at *9 (concluding that OCSLA creates a "discrete and mandatory duty" to review approved plans); 43 U.S.C. § 1349(a).  But that is not the case here.

   Plaintiffs ask the Court to order BOEM to require revision or conduct a new review of the DPP for Platform Harmony, but it appears that such a remedy is not contemplated by the plain terms of OCSLA.  Instead, OCSLA confers discretion on the Secretary of Interior to "require modification of a plan" only if "he determines" that the lessee failed to account for safe operations or the protection of the human, marine, or coastal environment.  43 U.S.C. § 1351(h)(1).  Compelling "compliance" does nothing to likely redress Plaintiffs' declared injuries, as this would essentially revert to the deference of the Secretary.  *Contra Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.") (emphasis added).  Similarly, Section 1351(h)(3) cannot afford relief either.   As the *Haaland* court explained, the only "non-discretionary obligation" required is that the Secretary "shall, from time to time" conduct reviews of "each plan approved under" OCSLA.  43 U.S.C. § 1351(h)(3).  There is no dispute that BOEM conducted such a review in its April 2025 Decision.  The Court is powerless to compel the Secretary to conduct another review, as Congress has afforded discretion about *when* to do so to the Secretary of Interior.  *See id.*; *Waterkeeper*, 140 F.4th at 1215.  Further, the statute only requires revision if the review indicates "that the plan should be revised to meet the requirements" of OCSLA.  43 U.S.C. § 1351(h)(3).  Revision is then left up to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-02840-MWC-MAA                              Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

Secretary's read of the plan, and what he believes should happen next. *See id.*; *see also Handel v. Edlow*, No. 1:25-cv-00584-HBK, 2026 WL 84339, at *4 (E.D. Cal. Jan. 12, 2026) ("[T]he statute's use of 'sense' and 'should' signals precatory legislative intent but does not compel a compulsory duty. Black's Law Dictionary defines 'should' as 'no more than an obligation of propriety or expediency, a moral obligation . . . It does not ordinarily express certainty as 'will' sometimes does.'") (citing *Black's Law Dictionary* 1379 (6th ed. 1990)). Indeed, "[c]ourts define 'should' as permissive not a mandatory term." *Handel*, 2026 WL 84339, at *4 (citations omitted). Thus, compelling compliance of OCSLA does not compel revision to the Plan.

Nor do the implementing regulations provide redress for Plaintiffs' claims. To begin, 30 C.F.R. § 550.283 starts: "*You* must revise your approved . . . DPP when *you* propose to . . ." 30 C.F.R. § 550.283(a) (emphases added). As defined by the regulations, the term "You" "means a lessee, operator, or other person who pays royalties under this subpart." 30 C.F.R. § 1206.51. Thus, this obligation is not conferred on the Secretary, nor BOEM at large, but rather upon the lessee and operator of the DPP (*i.e.*, Sable). Indeed, none of the implementing regulations can provide Plaintiffs with a remedy against Defendants, as they all impose obligations on the lessee or operator. *See, e.g.*, 30 C.F.R. §§ 550.241 ("*Your* DPP or DOCD must include the following . . .") (emphasis added), 550.249 ("The following air emissions information, as applicable, must accompany *your* DPP") (emphasis added), 550.250 ("The following information regarding potential spills of oil . . . and hazardous substances . . . must accompany *your* DPP") (emphasis added). True, the Court can "compel compliance" for "any alleged violation of . . . any regulation promulgated under" OCSLA, *see* 43 U.S.C. § 1349(a)(1), but the regulations impose duties and obligations on *Sable*. They do not contemplate, nor provide any authority for, issuing an Order on *BOEM* to order Sable to revise the DPP.

At bottom, OCSLA only contemplates redress in the form of "compel[ling] compliance" with its provisions and implementing regulations. 43 U.S.C. § 1349(a)(1). The regulations do not apply to BOEM, and OCSLA's own provisions afford near-plenary discretion on the Secretary regarding when and how to revise a DPP. It is well-established that "[t]here is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (quotation marks and citation omitted); *see also Winsor v. Sequoia Benefits & Ins. Servs.*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                           Date: May 14, 2026

Title:    Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

*LLC*, 62 F.4th 517, 526 (9th Cir. 2023).  Moreover, because OCSLA does not provide an internal framework or guideline on how a DPP must be revised, any issuing injunction would likely exceed the power of an Article III court.  *Cf. Juliana*, 947 F.3d at 1171.  The Court would be required "to order, design, supervise, or implement the plaintiffs' requested remedial plans" on how BOEM should order Sable to revise the DPP for the SYU.  *See id.*; *see, e.g.*, *Lighthiser v. Trump*, No. CV 25-54-BU-DLC, 2025 WL 2930569, at *10 (D. Mont. Oct. 15, 2025) ("Granting Plaintiffs' injunction would require the Defendant agencies and—ultimately—this Court, to scrutinize every climate-related agency action . . . this Court would be required to monitor an untold number of federal agency actions to determine whether they contravene its injunction.  This is, quite simply, an unworkable request").

Finally, the Court finds that even if declaratory and injunctive relief under OCSLA would likely redress Plaintiffs' injuries, and even if OCSLA and its implementing regulations likely provided Plaintiffs with a remedy, the Court would *still* have to dismiss Plaintiffs' Complaint because their standing declarations provide only conclusory allegations of redress.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (disregarding "conclusory allegations" contained in standing affidavit on summary judgment posture).  Indeed, none of the standing declarations attest to *how* their requested forms of relief would likely redress their stated harms.  *See Sakashita Decl.* ¶ 10 ("These harms would likely be reduced and remedied if the Center prevailed in this lawsuit."); *Bradshaw Decl.* ¶ 17 ("An order that the Bureau must require an updated development plan for Platform Harmony will help alleviate these harms."); *Kopcho Decl.* ¶ 21 ("A court order requiring an updated plan would protect my health, values, and interests."); *Waiya Decl.* ¶ 13 ("Revising the outdated development plans for Platform Harmony would benefit Chumash people and Wishtoyo's members by better protecting the Pacific, marine species, and cultural resources."); *Schmitt Decl.* ¶ 13 ("A decision that supports the plaintiffs in this case would help protect my interests, . . . Relief from the court would ensure that the development plans for Platform Harmony will be revised, following a robust public process that ensures myself and other interested members of the public can provide input on BOEM's decision.").  None of the declarants have proffered either "a predictable chain of events that would likely result from judicial relief," *Diamond Alt.*, 606 U.S. at 121, let alone how injunctive or declaratory relief "would amount to a significant increase in the likelihood that" their injuries would be redressed.  *Mecinas*, 30 F.4th at 900.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:      Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

Accordingly, for all these reasons, the Court concludes that Plaintiffs' injuries are not redressable through a citizen-suit under OCSLA.  The Court has no alternative but to *sua sponte* **DISMISS** Plaintiffs' Complaint for lack of Article III standing.  Fed. R. Civ. P. 12(h)(3).  In light of this dismissal, all cross-motions for summary judgment (Dkts. # 51, 57, 59) and motions to strike (Dkts. # 58 & 60) are **DENIED AS MOOT**.

C.      Leave to Amend

Generally, Rule 15 requires that leave to amend "be freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2); *Jensen v. Brown*, 131 F.4th 677, 701 (9th Cir. 2025).  "This policy is to be applied with extreme liberality."  *Jensen*, 131 F.4th at 701 (cleaned up).  The Court considers various factors when determining whether to grant leave to amend, such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."  *G.B.*, 172 F.4th at 1065.  Not all factors are afforded "equal weight, however."  *Id.*  "If repleading would not help the plaintiff stave off dismissal, [the Court] consider[s] amendment futile."  *Id.*  This is particularly so where the "plaintiff fails to identify any new allegations that would cure the complaint's deficiencies[.]"  *Id.*

The Court is hesitant that amendment can cure Plaintiffs' standing deficiencies.  *Cf. id.* (affirming district court's denial of leave to amend due to Plaintiffs' "deep, fundamental flaws at odds with principles of Article III standing").  Though "the Court is skeptical that Plaintiffs can amend their allegations to demonstrate redressability," the Court affords Plaintiffs **one more chance** to amend their Complaint to address the standing issues discussed in this Order.  *G.B. v. U.S. Env'tl Prot. Agency*, No. CV 23-10345-MWF (AGRx), 2024 WL 3009302, at *5 (C.D. Cal. May 8, 2024).  This decision is further supported by the fact that the Court did not prompt Plaintiffs nor the parties of the standing defects in Plaintiffs' current citizen-suit prior to this decision.  Accordingly, the Court affords Plaintiffs another opportunity to cure the Complaint's deficiencies and demonstrate how their claims are redressable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-02840-MWC-MAA                                    Date: May 14, 2026

Title:     Center for Biological Diversity, *et al.* v. Doug Burgum, *et al.*

V.      Conclusion

For the foregoing reasons, the Court **ORDERS** as follows:

1. Plaintiffs' First Amended Complaint (Dkt. # 12) is *sua sponte* **DISMISSED** for lack of subject-matter jurisdiction. The Court **GRANTS** Plaintiffs leave to file an amended Complaint addressing the defects in standing identified in this Order.

2. Within **twenty-one (21) days**, Plaintiffs may file an amended Complaint or a notice of dismissal. Failure to timely file either document will result in dismissal of its case with prejudice pursuant to Federal Rule of Civil Procedure 41(b).[5]

3. Plaintiff's Motion for Summary Judgment (Dkt. # 51), Defendants' Motion to Strike Extra-Record Evidence (Dkt. # 58) and Motion for Summary Judgment (Dkt. # 57), and Intervenor-Defendant Sable Offshore Corporation's Motion to Strike Plaintiffs' Extra-Record Evidence (Dkt. # 60) and Motion for Summary Judgment (Dkt. # 59) are all **DENIED AS MOOT**.

4. The May 15, 2026 hearing is **VACATED**.

**IT IS SO ORDERED.**

                                                                                          :

**Initials of Preparer**   TJ

---

[5] *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1063–65 (9th Cir. 2004) (stating that a plaintiff's failure to take any action in response to a court's ultimatum to the plaintiff to either amend their complaint or indicate to the court that it will not do so "is properly met with the sanction of a Rule 41(b) dismissal.").

---