Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological
Diversity and Wishtoyo Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUG BURGUM, et al.,<br><br>*Defendants*,<br><br>and<br><br>SABLE OFFSHORE CORP.,<br><br>*Intervenor-Defendant*. | Case No. 2:25-cv-02840-MWC-MAA<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**<br><br>**(Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c, 1801–1866; Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706)** |

i

## INTRODUCTION

1.     In this case, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation challenge the failure of Defendants the Secretary of the U.S. Department of the Interior, Bureau of Ocean Energy Management, and the Pacific Region Director of the Bureau of Ocean Energy Management (collectively, BOEM) to comply with the Outer Continental Shelf Lands Act (OSCLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, and/or the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, in managing offshore oil and gas activities at the Santa Ynez Unit in the Santa Barbara Channel. Specifically, BOEM failed to consider significant changes in available information and unlawfully determined that Sable Offshore Corp. (Sable) need not revise the Unit's development and production plan (DPP), in violation of OCSLA, 43 U.S.C. § 1351(h)(3), its implementing regulations, 30 C.F.R. § 550.283(a), and/or the APA, 5 U.S.C. § 706(2).

2.     Oil and gas production at the Santa Ynez Unit was shut down in May 2015, when an onshore pipeline used to transport oil from the Unit ruptured at Refugio State Beach Park, releasing hundreds of thousands of gallons of heavy crude oil into the surrounding environment (the 2015 Refugio oil spill). Investigators determined the pipeline ruptured due to external corrosion of the pipeline wall. Investigators further concluded that the pipelines' cathodic protection system, which is designed to prevent corrosion, was ineffective.

3.     The spill destroyed thousands of acres of shoreline and near-shore ocean habitat and killed hundreds of birds and marine mammals. It also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties. The spill disrupted the lifeways and cultural practices of Plaintiffs' members, who witnessed the extensive devastation firsthand. It was the worst oil spill in California in decades.

4.      Even before the spill, oil and gas activities at the Santa Ynez Unit caused significant harm. The onshore facilities that processed oil and gas produced at the Unit were Santa Barbara County's largest facility source of greenhouse gas emissions, contributing 55 percent of its emissions. These facilities were also the County's largest source of other harmful air pollutants like volatile organic compounds, small particulate matter, and formaldehyde.

5.      Sable purchased the Santa Ynez Unit in 2024, restarted one of the Unit's three platforms in May 2025, resumed production from that platform in March 2026, and resumed production from a second platform in April 2026. The company is operating under a woefully outdated DPP prepared by the Unit's former owner in the 1970s and 1980s and that forecasts production ending by 2020.

6.      The resumption of production at the Santa Ynez Unit threatens California's coast with more oil spills, more toxic air pollution, and other harms. And while all offshore oil and gas drilling is dangerous, the age of the Santa Ynez Unit infrastructure heightens the inherent risks. Some of this infrastructure has been in place for nearly 50 years, well beyond its intended lifespan and the age scientists say significantly increases the risk of oil spills.

7.      OCSLA—the primary statute governing drilling in federal waters—contains several provisions that seek to minimize the harms from such activity and ensure offshore drilling is balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. § 1802(2).

8.      These provisions mandate that BOEM periodically review approved development plans and that its review must "be based on changes in available information and other onshore or offshore conditions affecting or impacted by" operations covered by the plan. *Id.* § 1351(h)(3). Additionally, BOEM must require a revised plan when its review indicates that revisions are necessary to ensure the plan continues to meet the substantive requirements of OCSLA. *Id.* For example,

2

BOEM must require modification of a plan that has "failed to make adequate provision . . . for safe operations on the lease area or for protection of the human, marine, or coastal environment." *Id.* § 1351(h)(1).

9. BOEM's regulations implementing OCSLA specify when oil companies must revise a development plan, including when they propose to significantly increase the volume of oil and gas production, increase air pollution that exceeds the amounts specified in an approved plan, or significantly increase water pollution, among other circumstances. 30 C.F.R. § 550.283(a). Additionally, companies must supplement their development plan if they intend to conduct activities that require approval of a license or permit not already described in the approved plan. *Id.* § 550.283(b).

10. These triggers are met here. Oil and gas production has already exceeded the volume considered in the approved DPP, and the Santa Ynez Unit has emitted significantly more air and water pollution than described in that DPP. New information also indicates that an oil spill from production activities at the Santa Ynez Unit could be substantially larger than that considered in the Unit's DPP.

11. Yet in April 2025, following Plaintiffs' notice of intent to sue BOEM over the agency's failure to require revisions of the Santa Ynez Unit DPP and the filing of this lawsuit, BOEM issued a decision determining that Sable was not required to revise the DPP prior to resuming production at the Santa Ynez Unit.

12. BOEM's decision fails to consider important changes in available information about the Unit's operations, including Sable's intention to significantly increase the volume of production, drill new wells, and operate the Unit's aging infrastructure for many more years than contemplated in the DPP. It also fails to consider whether Sable's production at the Unit would increase the risk of oil spills, or increase the amount of air pollution and water pollution beyond the levels described in the DPP. This information is highly relevant to whether the DPP ensures safe operations and environmental protections.

13.     BOEM's decision means that Sable is operating under a DPP developed decades ago that does not reflect current science or the true scope of activities, emissions, and discharges at the platforms. Without requiring an updated plan, and the public process such an update would entail, both the agency and the public will be left in the dark about the full scope of harms from restarting production at the Santa Ynez Unit, and the need for further environmental safeguards will go unaddressed.

14.     BOEM's failure to examine relevant information and failure to require Sable to revise the Santa Ynez Unit DPP threatens the marine environment and coastal communities with more oil spills and toxic pollution and is arbitrary and capricious.

15.     Accordingly, Plaintiffs request an order from the Court declaring that BOEM's decision not to require revision or supplementation of the DPP failed to consider all available information and is arbitrary, capricious, an abuse of discretion, and not in accordance with OCSLA and its implementing regulations. Plaintiffs also request an order compelling BOEM to come into compliance with OCSLA and its implementing regulations; or alternatively, setting aside BOEM's decision and remanding it to the agency for further analysis.

**JURISDICTION AND VENUE**

16.     The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. The Court also has jurisdiction over this matter under the citizen suit provision of OCSLA, 43 U.S.C. § 1349(a)(1), (b)(1).

17.     An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202; 5 U.S.C. §§ 701–706; and 43 U.S.C. § 1349(a)(1).

18.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because some Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.    Venue is also proper in this Court under 43 U.S.C. § 1349(b)(1) because some Defendants reside in this District and it is "the judicial district of the State nearest the place where the cause of action arose."

## PARTIES

## I.    Plaintiffs

20.    Plaintiff Center for Biological Diversity (the Center) is a national conservation organization and California nonprofit corporation that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 101,000 members worldwide, including thousands in California. The Center brings this action on behalf of its members.

21.    The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and fish are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the California coastal environment from offshore oil and gas drilling activity, and regularly comments on proposed agency actions involving offshore oil and gas drilling off California. For example, the Center recently submitted comments on proposed revisions to an approved DPP for an offshore drilling project in the Santa Barbara Channel. The Center also submitted comments on the draft environmental impact statement analyzing the potential impacts of the revisions.

22.    The Center's members regularly visit California beaches, including in Santa Barbara and Goleta, and the waters near the offshore platforms in the Santa Ynez Unit, for vocational and recreational activities such as swimming, surfing, kayaking, hiking, fishing, camping, viewing and studying wildlife, and photography. Plaintiffs' members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. Plaintiffs' members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

23.    Plaintiff Wishtoyo Foundation (Wishtoyo) is a Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties. Wishtoyo's mission is to preserve, protect, and restore Chumash culture, the culture of indigenous peoples, and the environment all peoples depend upon. The organization uses education, outreach, cultural programs, scientific study, restoration projects, advocacy, and legal action to attain this mission. In pursuit of this mission, Wishtoyo has been actively involved in protecting the California coastal environment from offshore oil and gas drilling activity, and regularly comments on proposed agency actions involving offshore oil and gas drilling off California. For example, Wishtoyo recently submitted comments on proposed revisions to an approved DPP for an offshore drilling project in the Santa Barbara Channel. Wishtoyo also submitted comments on the draft environmental impact statement analyzing the potential impacts of the revisions.

24.    Chumash tribes, bands, and clans have a long history of interaction with the marine waters of the Pacific Ocean and the Santa Barbara Channel, from Morro Bay to Malibu and out to and around the Channel Islands. Chumash peoples rely upon these lands and waters and their natural cultural resources to support and maintain Chumash traditional practices, ways of life, and ancestral connections. Wishtoyo's members use these lands and waters for ceremonial purposes; to

6

connect with and celebrate their ancestors and cultural heritage; to gather natural cultural resources; and for educational purposes, recreational use, wildlife viewing, scientific study, and environmental monitoring. Wishtoyo's members intend to continue these uses as permitted.

25. Since time immemorial, marine, and terrestrial species have played an important role in the culture and lifeways of Chumash maritime tribes, bands, and clans. Wishtoyo's Chumash members continue to have a strong cultural and spiritual interest in the protection of species. Wishtoyo's Chumash members navigate on tomols (Chumash plank canoes) and by other means through the Santa Barbara Channel, where encountering marine species is essential to their connection with their ancestors, providing them with a spiritual echo through time and a connection to the planet as they traverse between the Channel Islands (the origin of the Chumash Peoples) and the mainland. The existence and abundance of species and habitat are also critical to the maintenance of Wishtoyo's Chumash members' cultural practices, lifeways, and ceremony. Wishtoyo brings this action on behalf of its members.

26. Offshore oil and gas drilling activities degrade these habitats and threaten wildlife and the coastal environment. It also threatens Wishtoyo's Chumash members' ability to continue their traditional, educational, recreational, and environmental practices, ways of life, and ancestral connections. For example, offshore drilling activities increase air pollution that is harmful to public health and discharges wastewater that contaminates the ocean with pollutants that are toxic to marine species. It also requires the shipment of equipment to oil platforms, thereby increasing port and ship traffic, which in turn increases ocean noise and the risk of ship strikes of whales and other marine life.

27. Offshore oil and gas activities also cause oil spills. Oil spills have a wide array of lethal and sublethal impacts on marine species, both immediate and long term. Direct impacts to wildlife from exposure to oil can include behavioral

alteration, disease, suppressed growth, and death. Oil can also harm wildlife through reduction of key prey species. Oil destroys the water proofing and insulating properties of feathers and fur of birds and mammals, respectively, compromising their buoyancy and ability to thermoregulate. Oil spills can also lead to closures of beaches and recreational and commercial fisheries, causing widespread economic harm.

28.    Additionally, oil spills can harm cultural practices, as was the case with the 2015 Refugio oil spill. The spill prevented Chumash people from participating in their annual tomol voyage across the Santa Barbara Channel to Limu, Chumash homeland in the Channel Islands, and their tomol village visits up and down the coast.

29.    The risk of oil spills is especially heightened at the Santa Ynez Unit, where drilling has occurred from platforms and pipelines installed between approximately 35–50 years ago. For example, the environmental impact statement for the onshore pipelines connected to the Santa Ynez Unit completed in 1985 determined that the probability of a spill more than doubles as the pipelines age from 20 to 40 years.

30.    Continued oil and gas drilling at the Santa Ynez Unit will increase the greenhouse gas emissions driving climate change. Scientists have determined that each barrel of federal California oil left in the ground would equate to roughly half a barrel reduction in net oil consumption, with associated reductions in greenhouse gas emissions. Continued oil and gas drilling at the Santa Ynez Unit also increases other harmful air pollutants, such as small particulate matter that negatively affects human health in a variety of ways, including difficulty breathing and decreased lung function.

31.    Offshore oil and gas drilling at the Santa Ynez Unit degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of Santa Barbara beaches, shorelines, and the surrounding waters where

offshore drilling occurs at the Santa Ynez Unit. It harms their health and the water quality and wildlife that they study, fish for, and observe and decreases their ability to view species that are impacted by offshore drilling activities or abandon the area because of these activities.

32. For example, one Center member who lives in Santa Barbara regularly recreates in and near beaches in southern California, including in coastal areas and waters near offshore oil platforms in the Santa Ynez Unit. He regularly surfs in places like Rincon and Sands Beach near Santa Barbara, Naples on the Gaviota Coast, Jalama Beach near Point Conception, and Oxnard Shores and Silver Strand in Ventura. He goes as often as possible, daily if the waves are good. He also hikes, sails, and scuba dives on and around the Channel Islands. While on these trips he enjoys looking for and enjoying wildlife in the area, including sea otters, fur seals, blue whales, humpback whales, black abalone, and other animals. He derives aesthetic, emotional, and physical benefits from these activities that are essential to his well-being. Noise pollution, water pollution, vessel strikes, oil spills, and other impacts from oil and gas drilling activities at the Santa Ynez Unit disturb and harm the animals he is interested in seeing and make it less likely he can see these animals in the future. Oil spills from drilling activity at platforms Hondo, Harmony, and Heritage—which close beaches or ocean waters—impede his ability to enjoy recreational activities.

33. Another Center member regularly free dives in waters off California, including off Santa Barbara near the Santa Ynez Unit. Oil and gas production at the Santa Ynez Unit causes air pollution like particulate matter that degrades air quality and harms the health of his lungs.

34. OCSLA's procedures, such as the mandate that BOEM review previously approved development and production plans based on new information and that the agency require an updated plan when necessary to ensure adequate environmental safeguards are in place, are designed to protect Plaintiffs' members'

9

interests in a healthy ocean and coastal environment; thriving populations of sea otters, fur seals, whales, and other wildlife; and clean air. BOEM's failure to comply with these mandates constitutes a procedural injury. *See Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) (recognizing that an agency's failure to adequately consult under the Endangered Species Act constitutes a procedural injury); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167–68 (5th Cir. 2012) (recognizing that BOEM's approval of exploration plans under OCSLA without properly accounting for their environmental impacts as required by OCSLA constitutes a procedural injury). BOEM's management and authorization of offshore drilling activities at the Santa Ynez Unit without evaluating all new information relevant to the DPP governing such operations means Defendants cannot make a reasonable determination whether that DPP must be revised. It also means BOEM is not requiring an updated DPP that better protects California's ocean and already imperiled wildlife, exposing wildlife and the coastal environment to increased risk of harm. Such risks include, but are not limited to, increased risk of death and injury to humpback whales, fin whales, and other animals from ship strikes; increased noise pollution; and increased risk of oil spills, which could have devastating environmental and economic consequences on a variety of marine life.

35.    The above-described aesthetic, recreational, professional, spiritual, health, and other interests have been, are being, and will continue to be adversely affected and irreparably injured by BOEM's decision that Sable need not revise the DPP for the Santa Ynez Unit. If BOEM examined the relevant information and required an updated DPP, additional environmental safeguards could be required. In other words, the requested relief could result in an updated plan that provides for additional mitigation and oversight of offshore drilling activities at the Santa Ynez Unit that would better protect the ocean and imperiled wildlife and help alleviate the recreational, aesthetic, spiritual, and other injuries of Plaintiffs' members. *See*

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service*, 807 F.3d 1031, 1044 (9th Cir. 2015) (recognizing that to demonstrate redressability for "a procedural injury," a plaintiff "must only show that it has a procedural right, that if exercised, *could* protect its concrete interests" and finding claim redressable where the federal defendant's compliance with the procedure at issue could affect its decision (citation modified)); *Gulf Restoration Network*, 638 F.3d at 168 (recognizing that OCSLA's procedural requirements are "designed to protect" environmental interests).[1]

36.     BOEM's failure to require an update of the DPP for the Santa Ynez Unit also deprives Plaintiffs' members of a right to participate in BOEM's decisionmaking and to information which they are legally entitled. The requirements in OCSLA described in Paragraphs 47–61 below, are designed to promote public participation and information. By failing to evaluate all available information and not requiring revisions to the Santa Ynez Unit DPP, BOEM is depriving Plaintiffs' members of opportunities for public comment on those revisions, including whether the proposed updated plan includes sufficient

---

[1] "[T]he elements of Article III standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Jones v. L.A. Cent. Plaza Ltd. Liab. Co.*, 74 F.4th 1053, 1057 (9th Cir. 2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "[A]t the pleadings stage, the plaintiff must allege sufficient facts that, taken as true, demonstrate each element of Article III standing." *Id.* (citation modified). At the summary judgment stage, "a plaintiff must offer evidence and specific facts demonstrating each element of Article III standing." *Id.* at 1058 (citation modified). However, "standing declarations are not required to 'connect the dots' regarding causation and redressability, but they need only to provide the factual basis necessary to demonstrate injury-in-fact." *Ctr. for Biological Diversity v. NOAA Fisheries*, 644 F. Supp. 3d 574, 587 (N.D. Cal. 2022) (citation omitted); *see also NRDC v. Zinke*, 347 F. Supp. 3d 465, 511 (E.D. Cal. 2018) ("The Court can identify no authority that suggests causation and redress must be proved by member declarations."). Moreover, in evaluating a plaintiff's standing, including redressability, courts "must assume" that plaintiffs are "correct on the merits." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

environmental safeguards. The requested relief could result in additional information and procedures that would allow Plaintiffs' members to actively participate in decisionmaking regarding the management and oversight of offshore drilling at the Santa Ynez Unit that would alleviate the informational and procedural injuries of Plaintiffs' members.

37. Plaintiffs' members have no adequate remedy at law and the requested relief is proper. Relief in this case would ensure BOEM's authorization and management of offshore drilling activity at the Santa Ynez Unit complies with relevant law, including OCSLA's requirements that BOEM evaluate all available information and ensure sufficient environmental safeguards are in place and offshore drilling does not cause undue harm and involve the public in its decisionmaking. An order declaring BOEM in violation of the law, an order vacating its decision not to require revision of the DPP and remanding the matter to the agency, or an order requiring BOEM to comply with OCSLA and its implementing regulations by requiring a revision or supplement of the DPP, would redress the injuries of Plaintiffs' members.

## II.     Defendants

38. Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is sued in his official capacity. The Interior Department is responsible for managing and overseeing the development of oil and gas resources on the outer continental shelf in accordance with OCSLA. Secretary Burgum is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Interior Department and its Bureaus comply with all applicable laws and regulations, including OCSLA and the APA.

39. Defendant Bureau of Ocean Energy Management is a federal agency within the U.S. Department of the Interior. BOEM is charged with managing the development of offshore resources, including oil exploration, development, and production in federal waters.

40.    Defendant Douglas Boren is the Pacific Regional Director of BOEM and is sued in his official capacity. Mr. Boren has responsibility for implementing and fulfilling BOEM's duties under OCSLA and the APA.

**STATUTORY BACKGROUND**

**I.    Outer Continental Shelf Lands Act**

      **A.    Offshore oil production may only proceed under an approved development and production plan.**

41.    OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for purposes of exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356b. The outer continental shelf generally begins three miles from shore—the outer boundary of state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

42.    The Secretary has delegated its authority under OCSLA to two bureaus within the Department of the Interior: BOEM and the Bureau of Safety and Environmental Enforcement (BSEE). BOEM is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf, including approving and managing development plans. BSEE is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as approving applications for permits to drill a well and permits to modify.

43.    There are four separate stages to developing an offshore oil project:

> (1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS.

*Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984), *superseded by statute on other grounds*, Coastal Zone Act Reauthorization Amendments of 1990, Pub. L. No. 101-508, 104 Stat. 1388-307.

13

44.    At the fourth stage, prior to the development of a project, OCSLA requires lessees to submit a proposed development and production plan to BOEM. 43 U.S.C. § 1351(a); *Sec'y of the Interior*, 464 U.S. at 340.

45.    The plan must include a description of:

> (1) the specific work to be performed; (2) . . . all facilities and operations located on the [OCS] which are proposed by the lessee or known by him . . . to be directly related to the proposed development . . . ; (3) the environmental safeguards to be implemented . . . and how such safeguards are to be implemented; (4) all safety standards to be met and how such standards are to be met; (5) an expected rate of development and production and a time schedule for performance; and (6) such other relevant information as the Secretary may by regulation require.

43 U.S.C. § 1351(c).

46.    OCSLA's implementing regulations further define the information that must be included in or accompany the DPP. In particular, the plan must include detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities; how such wastes will be disposed of; the frequency, duration and amount of emissions of volatile organic compounds (VOCs) and other pollutants that will be generated by development and production activities; and mitigation measures designed to avoid or minimize the take of protected species if there is reason to believe that protected species may be incidentally taken by planned development and production activities, among other information. 30 C.F.R. §§ 550.241–.262.

**B.    Development plans govern all drilling and production activities on a lease.**

47.    Before conducting activities under an approved development and production plan, an oil company must obtain additional approvals and permits. 30 C.F.R. § 550.281(a). "The activities proposed in these applications and permits must conform to the activities described in detail in [the] approved [plan]." *Id.*

14

§ 550.281(b). For example, prior to drilling, sidetracking, bypassing, or deepening a well, the well must be included in the existing plan. *Id.* § 250.410(b).

48.     OCSLA's DPP requirement "is intended to provide the mechanism for review and evaluation of, and decision on, development and production in a leased area, after consultation and coordination with all affected parties." H.R. Rep. No. 95-595, at 164 (1977). Thus, OCSLA and its implementing regulations provide for significant public process before BOEM decides whether to approve, disapprove, or require modifications of the proposed plan. *See* 43 U.S.C. § 1351(d)–(h); 30 C.F.R. § 550.267.

49.     For example, BOEM must make a proposed plans "available for review to . . . the public," and "[a]ny interested . . . person may submit comments and recommendations to the Regional Supervisor." 30 C.F.R. § 550.267(b); 43 U.S.C. § 1351(a)(3). The Regional Supervisor may accept the public's recommendations and must make all comments and recommendations available to the public on request. 30 C.F.R. § 550.268(b)–(c).

50.     BOEM will also evaluate the environmental impacts proposed in a development and production plan under the National Environmental Policy Act, *id* § 550.269, which provides additional opportunity for the public to comment, 516 Department Manual § 2.1 (2026).

51.     Additionally, BOEM must send the proposed plan to the governor and certain officials of the affected state, who will determine whether the plan is consistent with the state's coastal management plan under the Coastal Zone Management Act. 43 U.S.C. § 1351(d); 30 C.F.R. § 550.268(a). The consistency review process triggers public notice, comment, and a public hearing at the state level. *See, e.g.,* 15 C.F.R. §§ 930.41(a), 930.42; *see also id.* § 930.2 ("State management programs shall provide an opportunity for public participation in the State agency's review of a Federal agency's consistency determination or an applicant's or person's consistency certification."); Cal. Pub. Res. Code § 30006

15

(stating that "the public has a right to fully participate in decisions affecting coastal planning, conservation, and development"); Cal. Code Reg., tit. 14, § 13660.4(b) (requirement that the California Coastal Commission hold a public hearing on a consistency certification).

52.    BOEM will review the activities proposed in the development and production plan to determine whether the lessee has "demonstrate[d] that [it has] planned and [is] prepared to conduct the proposed activities in a manner that," *inter alia*: conforms to OCSLA, its implementing regulations, and other federal laws; is safe; "[c]onforms to sound conservation practices and protects the rights of the lessor"; and "[d]oes not cause undue or serious harm or damage to the human, marine, or coastal environment." 30 C.F.R. §§ 550.267(c), 550.202.

53.    Once these processes conclude, BOEM may either approve, require modification of, or disapprove the plan. 43 U.S.C. § 1351(h)(1); 30 C.F.R. § 550.270(b).

54.    BOEM must require modification of the proposed development and production plan if "the lessee has failed to make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment," 43 U.S.C. § 1351(h)(1), or if the plan  "otherwise does not comply with the lease, [OCSLA], the regulations prescribed under [OCSLA], or other Federal laws." 30 C.F.R. § 550.270(b)(2).

55.    BOEM must disapprove a development and production plan if, *inter alia*:

> the lessee fails to demonstrate that he can comply with the requirements of [OCSLA] or other applicable Federal law . . . ; [or] if the Secretary determines, because of . . . exceptional resource values in the marine or coastal environment, or other exceptional circumstances, that (i) implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal or human environments, (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a

reasonable period of time, and (iii) the advantages of disapproving the plan outweigh the advantages of development and production.

43 U.S.C. § 1351(h)(1)(A)–(D); *see also* 30 C.F.R. § 550.271.

### C.  Significant revisions to development and production plans involve meaningful public process.

56.  OCSLA mandates that BOEM periodically review approved development and production plans. 43 U.S.C. § 1351(h)(3). The reviews "shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production." *Id.* To facilitate its review, BOEM "may require [the lessee] to submit updated information on [its] activities." 30 C.F.R. § 550.284(a). If such review "indicates that the plan should be revised to meet the requirements of" section 1351(h), BOEM "shall require such revision." 43 U.S.C. § 1351(h)(3).

57.  OCSLA specifies that any significant revision of an approved plan shall be reviewed in accordance with the procedures for approving the plans in the first instance. 43 U.S.C. § 1351(i).

58.  BOEM's regulations specify that a plan may be "revised" or "supplemented." 30 C.F.R. § 550.283.

59.  A company must revise an approved DPP when it proposes to, *inter alia*, "significantly increase the volume of production or storage capacity;" increase the emissions of certain air pollutants "to an amount that exceeds the amount specified" in the approved DPP; or "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged." 30 C.F.R. § 550.283(a).[2]

---

[2] BOEM's regulations are written in a question-and-answer format directed to "[y]ou" (the oil and gas company). This aligns with federal plain language guidance. *See* Off. of Fed. Reg., *Making Regulations Readable*, https://www.archives.gov/federal-register/write/plain-language/readable-regulations.html (last visited June 4, 2026). These guidelines instruct agencies to "[l]ook for opportunities to write directly to 'you,' whoever must comply," but caution that "'[y]ou' is easiest to use in simple procedures and hardest when

BOEM's decision whether to require DPP revision is not limited to these triggers. As BOEM's predecessor agency explained in adopting the rule, the agency "cannot anticipate, with complete certainty, the factors that would require a revision, and therefore must retain a certain degree of flexibility." 70 Fed. Reg. 51,478, 51,493 (Aug. 30, 2005). Revised plans that are "likely to result in a significant change in the impacts previously identified and evaluated[] are subject to all of the procedures" for approving a plan in the first instance, 30 C.F.R. § 550.285(c), including the requirements that BOEM solicit and consider public comment, *id.* §§ 550.266–.273.

60.     A company must supplement an approved DPP when it proposes to conduct activities "that require approval of a license or permit which is not described in [the] approved [plan]." *Id.* § 550.283(b). All supplemental development and production plans "are subject to all of the procedures" for approving a plan in the first instance, 30 C.F.R. § 550.285(c), including the requirements that BOEM solicit and consider public comment, *id.* §§ 550.266–.273.

61.     For example, another oil company operating platforms in the Santa Barbara Channel is required to update its approved development and production plan so that it can use hydraulic fracturing (fracking) on its wells. BOEM has provided the same public process required for approving a development and production plan in the first instance. This includes providing public notice of the

different readers share overlapping duties." *Id.* Here, BOEM has pre-determined that certain changes in operations should affirmatively trigger revision of a development and production plan and writes directly to "you" (the companies) to inform them of this obligation. It follows that if any of these triggers are present during BOEM's review of an approved plan, it must also "require revision" under 43 U.S.C. § 1351(h)(3).

application on its website and accepting public comment.[3] BOEM has also prepared an environmental impact statement under the National Environmental Policy Act on the updated plan, and a public comment period on what that analysis should address. 91 Fed. Reg. 13,063–64 (Mar. 18, 2026). BOEM has also sent the updated plan to California officials to begin consistency review under the Coastal Zone Management Act.

62.     Each of these requirements help to ensure Congress's goal in OCSLA that, *inter alia*, "environmental safeguards" are in place and helps "to balance orderly energy resource development with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2)(B).

**D.     OCSLA's citizen-suit provision provides expansive standing and does not supplant remedies available under other laws.**

63.     OCSLA contains a citizen-suit provision that allows suits "to compel compliance with [OCSLA] against any person, including the United States, and any other government instrumentality or agency . . . for any alleged violation of any provision of [OCSLA,]" its implementing regulations "or of the terms of any permit or lease issued by the Secretary." 43 U.S.C. § 1349(a)(1).

64.     The statute states that, "no action may be commenced" to compel compliance with OCSLA "prior to sixty days after the plaintiff has given notice of the alleged violation, in writing under oath, to the Secretary and any other appropriate Federal official, to the State in which the violation allegedly occurred or is occurring, and to any alleged violator[.]" *Id.* § 1349(a)(2)(A).

65.     OCLSA's legislative history indicates that Congress intended for the citizen-suit provision to provide broad standing to sue to "those who may have a definable aesthetic or environmental interest," including "persons who meet the

---

[3] *See* BOEM, *Updated Development and Production Plan for the Santa Clara Unit*, https://www.boem.gov/regions/pacific-ocs-region/oil-gas/revised-development-and-production-plans-pacific (last visited June 4, 2026).

requirement for standing to sue set out by the Supreme Court in *Sierra Club v. Morton*, 405 U.S. 727 (1972)." H.R. Rep. 95-590, at 161.

66.     The legislative history also demonstrates Congress's intent that "[l]egal remedies or relief under any other act or the common law would not be affected" by OCSLA's citizen-suit provision, such that "any statutory procedure or remedy provided in other Federal statutes . . . are not precluded." *Id.*; *see also* 43 U.S.C. § 1349(a)(6) ("Nothing in this section shall restrict any right which any person or class of persons may have under any other Act or common law to seek appropriate relief."). Recognizing that an action could be challenged "either under [OCSLA] or [another] appropriate statute or both," Congress thus created OCSLA's citizen-suit provision, "patterned on provisions in most other related statutes," to provide "a unitary court action—where all challenges are raised, under one or more statutes." *Id.* at 162.

67.     OCSLA's citizen-suit provision imposes certain procedural requirements on "all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of" OCSLA or its implementing regulations, such as the requirement that a plaintiff provide notice prior to filing suit. *See* 43 U.S.C. § 1349(a)(2)–(6). But by its express terms, the citizen suit provision does not foreclose any claims or remedies available to litigants under other laws. *Id.* § 1349(a)(6). This includes claims seeking review and vacatur of arbitrary agency decisionmaking under the APA. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997) (considering whether a statute's citizen-suit provision "expressly precludes review under the APA" or the "statutory scheme suggests a purpose to do so.").

## II.     Administrative Procedure Act

68.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706. Litigants may use the APA to seek judicial review of agency action "pursuant to specific authorization in the substantive statute," or they may use the APA's general review provisions to seek review of "final agency action" for which

there is no other adequate remedy. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704); *Bennett*, 520 U.S. at 175 ("The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)).

69.    The APA "applies . . . except to the extent that . . . statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has long emphasized that the APA's judicial review provision is "generous" and its "purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes." *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955). As such, "judicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). BOEM has admitted that its decision that the Santa Ynez Unit DPP need not be revised is judicially reviewable.

70.    To the extent that OCSLA does not provide an adequate remedy at law, the APA provides the cause of action. *Cf. Bennett*, 520 U.S. at 172–75.

71.    Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

72.    Agency actions are arbitrary and capricious if the agency "relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must provide "a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

73.    "Under the APA, the normal remedy for an unlawful agency action is to set aside the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007), *rev'd on other grounds sub nom. Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009) (citation modified).

## FACTUAL BACKGROUND

### I.    The Harms of Offshore Oil and Gas Drilling

74.    There are currently 30 active oil and gas leases on the Pacific outer continental shelf from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel and consists of 16 leases. There are three offshore production platforms at the Santa Ynez Unit: Platform Harmony, Platform Heritage, and Platform Hondo. Platform Hondo was installed in June 1976, Platform Harmony was installed in June 1989, and Platform Heritage was installed in October 1989.

75.    Oil and gas development and production activities in the Pacific, including at the Santa Ynez Unit, have numerous harmful effects on coastal and marine species in California.

76.    For example, oil and gas drilling exacerbates climate change, which is already threatening many species with extinction and causing more intense storms, droughts, and wildfires, among other harms.

77.    Oil and gas drilling also includes the discharge of drilling muds and cuttings, produced wastewater, and well treatment and workover fluids. The federal government permits platforms Harmony, Heritage, and Hondo to discharge more than 33.76 million gallons of produced wastewater into the ocean each year. These

discharges can contain toxic chemicals like benzene (a known carcinogen), heavy metals, and radioactive materials.

78.    Oil and gas activity off California has also entailed the use of well stimulation treatments such as fracking and acidizing. These practices cause significantly worse impacts to the environment and public health than conventional offshore oil and gas production. The harmful impacts from well stimulation treatments include the discharge of toxic wastewater, emissions of hazardous air pollutants, and increased risks of earthquakes and oil spills, among other harms.

79.    Exxon previously used well stimulation treatments at the Santa Ynez Unit and has stated it would likely need to use well stimulation treatments to restart the platforms in the Santa Ynez Unit. Sable has informed investors that it intends to do workovers of existing wells. Fracking is a type of well workover.

80.    Oil and gas drilling activities also release harmful air pollutants like fine particulate matter and VOCs. VOCs emitted during drilling activities can include the "BTEX compounds"—benzene, toluene, ethyl benzene, and xylene— which are designated as hazardous air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term and long-term effects to the respiratory, nervous, and circulatory systems. Additionally, VOCs create ground-level ozone, or smog, which can contribute to asthma, premature death, stroke, heart attack, and low birth weight. Benzene is also a known carcinogen and has been detected in people living within a 10-mile radius of oil wells where fracking has occurred.

81.    The impacts also include noise pollution from vessel and air traffic, conductor installation and pile driving, and production operations on platforms. Noise pollution can interfere with important biological functions of marine mammals like feeding, mating, and rearing young.

82.    Vessel traffic from offshore oil and gas activity can also lead to vessel strikes of large whales and other marine animals. Vessel strikes can kill or injure

large whales and other animals by causing blunt force trauma, resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or amputations.

83.    Oil spills are another impact of offshore drilling. Drilling off California has been accompanied by spills and other accidents since its early days, including a spill of more than 2,000 gallons from Platform Hogan in 1968 and the infamous 1969 spill from Platform A in the Santa Barbara Channel that spewed upwards of 4.2 million gallons of oil into the ocean.

84.    Other spills have occurred since. For example, in addition to the 2015 Refugio oil spill, in October 2021, an offshore pipeline connected to Platform Elly in federal waters off California spilled 25,000 gallons of oil into the ocean.

85.    Oil spills can have devastating impacts on a wide variety of wildlife. Oil spills have an array of lethal and sublethal impacts on marine species, both immediate and long-term. Direct impacts to wildlife from exposure to oil include behavioral alteration, suppressed growth, induced or inhibited enzyme systems, reduced immunity to disease and parasites, lesions, tainted flesh, and chronic mortality. Oil can also exert indirect effects on wildlife by reducing key prey species. Oil destroys the waterproofing and insulating properties of feathers and fur of birds and mammals, respectively, thereby compromising their buoyancy and ability to thermoregulate.

86.    Marine mammals can be exposed to oil externally by swimming in oil and internally by inhaling volatile compounds at the surface, swallowing oil, and consuming oil-contaminated prey. Exposure to toxic fumes from petroleum hydrocarbons during oil spills has been recently linked to mortality in cetaceans, even years after such incidents occur.

87.    Exposure to crude oil also adversely affects fish at all stages. Early-life stages of fish are particularly sensitive to the effects of toxic oil components such as polycyclic aromatic hydrocarbons, which can cause larval deformation and

death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver, changes in heart and respiration rates, fin erosion, and reproductive impairment. Additionally, fish and sharks are at risk from lethal coating of their gills with oil and declines in and contamination of their food sources. Exposure to crude oil has also been linked to long-term population effects in fish. A study based on 25 years of research demonstrated that embryonic salmon and herring exposed to very low levels of crude oil can develop heart defects that impede their later survival.

88.    Official reports document that the 2015 Refugio oil spill killed at least 558 birds and 232 mammals, including 19 dolphins and more than 94 sea lions. A wide variety of nearshore fish species were impacted by the spill, including surfperch and grunion, which were spawning at the time of the spill. The actual number of birds killed is likely to be four times the number of birds recovered. The spill also impacted a variety of coastal habitats, including kelp wrack, feather boa kelp, surfgrass, and eelgrass. Humpback whales were seen swimming in the spilled oil. Scientists predict the ecological impacts of these spills will be felt for years to come.

89.    Oil spills not only harm wildlife, but public health, commercial fisheries, tourism, and recreation. For example, following the 2015 Refugio oil spill, the California Department of Fish and Wildlife closed 138 square miles of marine waters to fishing and shellfish harvesting, two State Parks were closed, and the Governor declared a state of emergency in Santa Barbara County.

90.    While oil spills occur wherever offshore drilling activities occur, the risk of spills is especially acute off California because of the age of the oil and gas infrastructure.

91.    For example, the pipeline that ruptured in 2015, causing the 2015 Refugio oil spill, was built in 1987. The 1985 environmental impact statement that the U.S. Bureau of Land Management and California State Lands Commission prepared for the construction and operation of the pipeline acknowledged that

spills happen and determined that the risk of a spill would more than double as the pipeline aged from 20 to 40 years. Many of the offshore pipeline segments in the Santa Ynez Unit have reached 40 years of age.

92.    According to scientists, aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines. These impacts accelerate over time and can act synergistically to increase the rate of crack propagation. Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent. One offshore pipeline study found that the annual probability of pipeline failure increases rapidly after 20 years, equating to a probability of failure of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found that accident incident rates, including spills, increased significantly with the age of infrastructure.

93.    A recent analysis of federal records found that from 1986 to July 2021, nearly 1400 oil and gas pipeline leaks, spills, and other significant incidents in California caused at least $1.2 billion in damages, as well as 230 injuries and 53 deaths.

94.    Older wells can also lead to oil spills or other accidents. For example, one study found that 30 percent of the offshore oil wells in the Gulf of Mexico experienced well casing damage in the first five years after drilling, and damage increased over time to 50 percent after 20 years.

95.    Federal records show that the Santa Ynez Unit has already experienced problems. Before it shut down, federal inspectors on May 1, 2015, found "numerous corrosion issues" and components out of compliance on Platform Hondo. Inspectors also found corrosion at Platform Hondo on April 30, 2015, and, the week prior, found five failed gas detectors and "leakage rates higher than the maximum allowable" on that platform's Well H-12U. All three Santa Ynez Unit platforms had early-2015 gas leaks that required their crews to gather for safety

26

reasons, including an incident on Platform Harmony on March 29, Platform Hondo on April 27, and Platform Heritage on May 19.

96.    More recent problems have also occurred. For example, during maintenance activities on October 24, 2024, there was a leak of hydraulic fluid from an equipment line at Platform Harmony; and an electrical incident at Platform Hondo on November 19, 2024, resulted in an arch flash.

## II.    Oil and Gas Production from the Santa Ynez Unit

97.    Production began from the Santa Ynez Unit's platforms between April 1981 and December 1993.

98.    Until 2024, ExxonMobil Corporation (Exxon) owned and operated all three platforms and produced oil from the Santa Ynez Unit for decades. Exxon sold the Santa Ynez Unit after it was shut down for nearly ten years due to the 2015 oil spill from an onshore pipeline (now owned by Sable), which ruptured and spilled what is now believed to be up to 450,000 gallons of oil on the Santa Barbara Coast.

99.    On February 14, 2024, Exxon sold the Santa Ynez Unit and all associated assets to Sable.

100.    Exxon loaned Sable $622 million of the $625 million purchase price of the Santa Ynez Unit. In return, Sable agreed that the Santa Ynez Unit may revert to Exxon if it failed to restart the SYU within two years.

101.    After purchasing the Unit, Sable immediately began efforts to restart oil production, including use of the same onshore pipeline system that ruptured in 2015. Sable decided not to replace the original pipelines, but instead to repair the existing pipeline.

102.    Sable's restart efforts have been fraught with legal problems. For example, in April 2025, the California Coastal Commission voted unanimously to assess a historic $18 million penalty against Sable for unpermitted pipeline work in the Coastal Zone. A court upheld the fine.

103. On May 19, 2025—the tenth anniversary of the Refugio Beach Oil Spill—Sable informed investors that it had restarted operations at the Santa Ynez Unit.

104. In September 2025, the Santa Barbara District Attorney filed criminal charges against Sable for alleged environmental violations stemming from Sable's pipeline work.

105. In October 2025, the Central Coast Regional Water Quality Control Board sued Sable, alleging violations of the California Water Code for failure to comply with an investigative order, failure to report waste discharges, and unpermitted discharge of waste into waters of the state.

106. In December 2024, California's Office of State Fire Marshal (State Fire Marshal) issued waivers of certain pipeline safety requirements for the Santa Ynez Unit's onshore pipelines due to the limited effectiveness of the cathodic protection system on the pipelines.

107. In September 2025, Sable submitted a pipeline Restart Plan to the State Fire Marshal for approval. On October 22, 2025, the State Fire Marshal notified Sable that it had failed to meet certain repair conditions of the State Waivers and could not restart the pipelines until Sable had performed the repairs and obtained approval of the restart plan.

108. Rather than comply with the State Fire Marshal's repair conditions, on November 26, 2025, Sable notified the Pipeline and Hazardous Materials Safety Administration that Sable had determined that the Santa Ynez Unit's onshore pipelines were interstate facilities over which the State Fire Marshal lacked jurisdiction, despite the fact these pipelines are located wholly within the state of California. On December 17, 2025, the Pipeline and Hazardous Materials Safety Administration granted Sable's request and issued an order redesignating the pipelines as interstate, purporting to strip the State Fire Marshal of its authority to regulate the pipelines. On December 22, 2025, less than a week after asserting

28

jurisdiction, the Pipeline and Hazardous Materials Safety Administration approved Sable's Restart Plan and authorized restart of the onshore pipelines. In March 2026, Sable restarted production at the Santa Ynez Unit from Platform Harmony.

109.   In April 2026, Sable announced to investors that it was producing from 40 wells on Platform Harmony and Platform Heritage, at an average of 750 gross barrels of oil per day per well, which totals 30,000 gross barrels per day. Sable expects average production to be approximately 700 gross barrels of oil per day once all 74 production wells on these two platforms are online, totaling 51,800 gross barrels per day. *Id.*

## III.    The Santa Ynez Unit DPP and BOEM's Determination It Need Not Be Revised

110.   BOEM's predecessor agency approved Exxon's DPP for drilling at the Santa Ynez Unit from Platform Hondo in 1974 based on a plan submitted in 1971.

111.   The agency subsequently approved an updated plan for drilling from Platforms Harmony and Heritage in 1985 based on a plan originally submitted in 1982, and again in 1988 based on an updated plan submitted in 1987.

112.   In 1992, it approved a supplemental plan to allow the installation of topsides (i.e., the surface deck of a platform, which includes all drilling equipment) onto the previously installed Platforms Harmony and Heritage.

113.   In 2014, BOEM approved another DPP amendment to allow the replacement of two existing power cables from the onshore Las Flores Canyon processing facilities to Platform Harmony and the installation of a power cable from Platform Harmony to Platform Heritage to support electrical and communication equipment on both platforms.

114.   In December 2024, BOEM issued a memorandum indicating that it was requiring all oil companies operating on the Pacific outer continental shelf to update their development and production plans to account for terms and conditions of a February 2024 biological opinion issued by the National Marine Fisheries

29

Service under the Endangered Species Act. Those terms and conditions require BOEM to ensure that oil and gas vessel operators on the Pacific outer continental shelf report any collisions with marine mammals and sea turtles to the National Marine Fisheries Service.

115. On April 29, 2025, BOEM issued a decision memorializing its completion of a periodic review of the SYU DPP for Platform Harmony, indicating that the purpose of the review was Sable's planned "phased return-to-production of the SYU properties beginning with Platform Harmony." The decision also states that "BOEM will complete the review of the DPPs for two other platforms in the SYU, Heritage and Hondo, after BSEE pre-production safety inspections are completed."

116. BOEM's decision states that its review resulted in a finding that "[n]o additional revisions of the DPP for Platform Harmony are needed at this time."

117. It also states that BOEM reviewed various documents, including several related to the 2015 Refugio oil spill; regulatory requirements for blowout prevention and financial responsibility for offshore facilities; the annual plan of operations for the Santa Ynez Unit from 2010 through 2015; the Clean Water Act permit for oil and gas platforms in federal waters off California; historical flaring and venting data for the Unit, a worst case oil spill discharge analysis from 2016; and others.

118. BOEM's review failed to consider any information about Sable's actual plans for restarting and operating the Unit, even though Sable's corporate filings contain specific details—such as estimates of reserves, a map of over 100 new drilling opportunities, and a post-restart production timeline. Nor did BOEM consider how restarting oil and gas production the Santa Ynez Unit will result in a higher volume of production over a longer period of time than the existing DPP contemplates. BOEM's review also failed to consider whether resuming operations at the Santa Ynez Unit will significantly increase air or water pollution, or whether

it will result in air emissions and waste discharges in excess of permitted levels. BOEM also failed to consider how operating the Unit's aging, corrosion-prone infrastructure, which has already exceeded its anticipated lifespan, will heighten the risk of oil spills. Sable itself has notified investors that the risks of offshore oil and gas production at the Santa Ynez Unit are heightened because most of the equipment has been shut down since 2015.

119.    Several factors triggering the requirement to revise the DPP under BOEM's regulations are present. For example, because the Santa Ynez Unit platforms have been offline for nearly a decade, restarting drilling activity would significantly increase the degree and composition of air emissions, the amount and composition of wastewater, and the volume of production.

120.    The Santa Ynez Unit has already exceeded the level of production contemplated in the DPP and associated environmental analyses. The DPP estimated extraction of the oil and gas reserves in the Santa Ynez Unit to "take place over a period of approximately 25 to 35 years," through 2020.

121.    Moreover, the DPP stated that Exxon "estimates that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels . . . of crude oil and 600 to 700 billion standard cubic feet . . . of natural gas." However, BSEE reports that Exxon already produced over 507.4 million barrels of oil and over 963.1 billion cubic feet of gas from the three platforms in the Santa Ynez Unit—well beyond what is considered in the DPP. Moreover, BOEM estimates that the Santa Ynez Unit has 190 million barrels of oil in remaining reserves. Sable's estimates are drastically higher. It estimates that 646 million barrels to over 1 billion barrels of oil are still recoverable from the Santa Ynez Unit.

122.    The fact that the Santa Ynez Unit has outlived its expected production timeline, that it has already produced more oil than contemplated under the DPP, and Sable plans to produce significantly more oil for years to come—including by

drilling more wells and doing well workovers—means that Sable plans to "significantly increase in the volume of production" at the Santa Ynez Unit. *See* 30 C.F.R. § 550.283(3).

123. Additionally, drilling activities at the Santa Ynez Unit will emit air pollution in a quantity that exceeds the amount specified in the approved plans. The 1982 DPP for the Unit states, for example, that vapor recovery systems on all crude oil storage tanks and crude processing vessels would "essentially eliminate [VOC] emissions." However, when it was operational, the processing facilities for the Santa Ynez Unit were Santa Barbara County's largest source of VOC emissions.

124. The DPP also states that the Santa Ynez Unit facilities will include design features to minimize fugitive emissions. But fugitive emissions have consistently occurred at Santa Ynez Unit facilities. These leaks are a significant source of the Unit's VOC emissions. Exxon previously stated that it was unable to determine the cause of the leaks but that they are likely "due to the high vibration, operating pressures and thermal expansion/contraction that occurs during start-ups & shutdowns of the equipment," and, as such, "it is relatively *next to impossible* to totally to prevent a recurrence" of these leaks.

125. The DPP is silent on the issue of greenhouse gas emissions. Before it shut down in 2015, the onshore processing facilities for the Santa Ynez Unit were Santa Barbara County's largest facility source of greenhouse gas emissions, contributing 55 percent of the County's total emissions. And greenhouse gas emissions come not only from processing the oil and gas and earlier stages of the drilling process, but from consumption of the produced oil itself.

126. In other words, the amount of air pollution from oil and gas production at the Santa Ynez Unit is greater than that considered in the approved DPP.

127.   Yet BOEM's review of air emissions considered only two things: that the Santa Ynez Unit's gas flaring rates peaked in the 1990s, and that the Unit is covered by air permits. It did not consider whether new operations would "[i]ncrease the emissions of [a] criteria air pollutant, VOC, or [total suspended particulates] to an amount that exceeds the amount specified" in the DPP. 30 C.F.R. §§ 550.283(a)(4), 550.249(a)(2).

128.   Furthermore, new information indicates an oil spill could be substantially larger than described in the DPP. For example, the 1982 DPP for the Unit claimed that containment measures for the onshore facilities associated with the Santa Ynez Unit "will be extremely effective in dealing with most spills" and that such spills "are typically small (less than 5 barrels)" or 210 gallons. However, the 2015 spill spilled significantly more oil. Santa Barbara County described the spill as roughly 123,228 gallons, but an expert report indicates that it could have been as high as 451,500 gallons. Santa Barbara County has also acknowledged that the onshore pipeline serving the Santa Ynez Unit platforms could spill once a year and rupture once every four years. The old age and degraded state of the Santa Ynez Unit infrastructure compounds the risk of an oil spill.

129.   Despite Exxon's stated intent to use well stimulation treatments to restart and continue production from the Unit and Sable's stated intent to workover existing wells, as well as the available information indicating the extent of water pollution from well stimulation treatments, BOEM's review of the DPP did nothing more than verify that the Santa Ynez Unit is covered by a Clean Water Act permit. It did not consider whether or how resuscitating and prolonging operations at the Unit would "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged." 30 C.F.R. § 550.283(a)(5).

130.   Nor did BOEM consider whether any of Sable's activities require a supplemental DPP because it intends to conduct activities that require approval of a license or permit not already described in the approved DPP. 30 C.F.R. §

33

550.283(b). For example, nothing in the existing DPP contemplates that Sable would obtain a State Waiver from the State Fire Marshal, (or a special permit from the Pipeline and Hazardous Materials Safety Administration) waiving certain pipeline safety regulations so that it could operate a post-failure pipeline with limited corrosion protections.

**IV.    Procedural History of the Present Suit**

131.   On September 26, 2024, in accordance with 43 U.S.C. § 1349(a)(2)(A), Plaintiffs provided BOEM with their notice of intent to sue to compel compliance with its duty under OCSLA to review the Santa Ynez Unit DPP based on new information and require revisions to ensure the plan meets the requirements of the statute.

132.   On April 2, 2025, Plaintiffs filed this lawsuit, asserting that BOEM's "failure to require revisions of the DPPs for the Santa Ynez Unit violates OCSLA, 43 U.S.C. § 1351, its implementing regulations, 30 C.F.R. §§ 550.283, 550.284, and/or constitutes 'agency action unlawfully withheld or unreasonably delayed' within the meaning of the APA, 5 U.S.C. § 706(1)." Compl. ¶ 109, Dkt. No. 1. In the alternative, the complaint asserted that BOEM's "determination that the DPPs for the Santa Ynez Unit need not be revised for any reason other than to include the terms and conditions in a 2024 biological opinion (regarding reporting vessel collisions with marine mammals and sea turtles) constitutes an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' and made 'without observance of procedure required by law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A), (D)). The Complaint sought an order declaring "that Defendants' failure to require revisions of the DPPs for the Santa Ynez Unit violates OCSLA, its implementing regulations, and/or the APA" and an order that Defendants "require revisions of the DPPs for the Santa Ynez Unit." *Id.* at 27.

133.   Later in April 2025, just weeks after Plaintiffs filed this lawsuit, BOEM issued its decision memorializing its review of the development plan for the Santa Ynez Unit and its determination that the plan need not be revised.

134.   On May 12, 2025, after learning of BOEM's review and determination, Plaintiffs amended their complaint to narrow their claim for relief to challenge BOEM's decision as arbitrary and capricious and not in accordance with OCSLA under section 706(2) of the APA. *See* First Amended Compl. ¶¶ 107–11, Dkt. No. 12.

135.   On September 10, 2025, this Court denied intervenor Sable's motion to dismiss Plaintiffs' First Amended Complaint. The Court held that OCSLA's citizen suit governs Plaintiffs' claims and that Plaintiffs' September 2024 notice of intent to sue satisfied OCSLA's procedural requirements.

136.   On May 14, 2026, following the close of the parties' briefing of cross-motions for summary judgment, this Court issued a *sua sponte* order dismissing Plaintiffs' complaint for lack of subject matter jurisdiction, after concluding Plaintiffs lacked standing. The Court held that Plaintiffs had demonstrated an environmental injury from BOEM's decision, but that Plaintiffs had not demonstrated a redressable procedural injury. The Court held that because "the APA does not apply[,] the Court cannot provide for vacatur and remand," while simultaneously holding that OCSLA does not supply Plaintiffs with an adequate remedy because "compelling 'compliance' does nothing to likely redress Plaintiffs' declared injuries, as this would essentially revert to the deference of the Secretary." *Id.* at 20–23; *but see* 5 U.S.C. § 704 ("agency action for which there is no other adequate remedy in a court" is subject to judicial review under the APA). The Court granted Plaintiffs leave to amend their complaint within 21 days.

## CLAIMS FOR RELIEF

**Count 1 (OCSLA): Failure to Examine Available Information and Require an Update to the Santa Ynez Unit DPP**

137. Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 136 of this Complaint.

138. OCSLA mandates that BOEM "shall, from time to time, review each plan approved under this section." 43 U.S.C. § 1351(h)(3).

139. "Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan." *Id.* The "frequency and extent" of BOEM's review will be based on the "significance of any changes in available information and onshore or offshore conditions affecting, or affected by, the activities in" an approved development plan. 30 C.F.R. § 550.284(a).

140. During its periodic review, BOEM "may require [the lessee] to submit updated information on [its] activities." *Id.* § 550.284(a).

141. OCSLA mandates that "[i]f the review indicates that the plan should be revised to meet the requirements of this subsection, [BOEM] shall require such revision." 43 U.S.C. § 1351(h)(3).

142. In requiring a plan to be revised "to meet the requirements of this subsection," the statute refers to section 1351, subsection (h). Subsection (h) mandates "modification of a plan if . . . the lessee has failed to make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment." *Id.* § 1351(h)(1).

143. Subsection (h) further requires BOEM to disprove a plan if "the lessee fails to demonstrate that he can comply with the requirements of this subchapter or other applicable Federal law," or if "implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life) . . . or to the marine, coastal or human environments." *Id.* § 1351(h)(1)(A), (D).

36

144. BOEM's regulations state that development and production plans must be revised in certain circumstances, including when an operator "propose[s] to: . . . significantly increase the volume of production;" "[i]ncrease the emissions of [certain] air pollutant[s] . . . to an amount that exceeds the amount specified in [the] approved [plan];" "[s]ignificantly increase the amount of solid or liquid wastes to be handled or discharged;" or "[c]hange the location of your onshore support base either from one State to another or to a new base or a base requiring expansion;" among other situations. 30 C.F.R. § 550.283(a).

145. BOEM determined that Sable need not revise the DPP for Platform Harmony in the Santa Ynez Unit despite the fact that (1) the Unit has outlived its expected production timeline; (2) more oil and gas has been and will be produced at the Unit than contemplated under the DPP; (3) oil and gas production at the Unit has and will emit more air pollution than specified in the DPP; (4) oil and gas production at the Unit will discharge significantly more water pollution than considered in the DPP; (5) the infrastructure has outlived its intended lifespan; and (6) the risk of another oil spill from production at the Unit is heightened.

146. BOEM's decision failed to consider highly relevant "changes in available information or offshore conditions" related to the resumption of operations at the Santa Ynez Unit, including: the fact that that Exxon already produced more oil from the Unit than contemplated in the DPP; Sable's actual plans for resuming production from decades-old infrastructure for years into the future; that the infrastructure has outlived its expected lifespan; that the risk of oil spill is heightened; the extent of greenhouse gas emissions and other air pollution from oil and gas production at the Santa Ynez Unit; that Exxon previously said that fugitive emissions from operations at the Unit are next to impossible to control; and that Exxon previously said it would likely need to use well stimulation treatments to restart and continue production at the Santa Ynez Unit.

147.   BOEM's failure to consider changes in available information and to require revisions of the DPP for the Santa Ynez Unit violates OCSLA, 43 U.S.C. § 1351(h)(3), and its implementing regulations, 30 C.F.R. §§ 550.283, 550.284.

**Count 2 (APA): Arbitrary Determination that the DPP for Platform Harmony in the Santa Ynez Unit Need Not Be Revised**

**(Alternative Pleading)**

148.   Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 136 of this Complaint.

149.   Alternatively, BOEM's action is reviewable under the APA to the extent that OCSLA does not provide an adequate remedy at law. *See* 5 U.S.C. § 704.

150.   When considering whether agency decisionmaking is arbitrary and capricious, "[i]t is fundamental that the agency must have 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022) (citation omitted). BOEM's decision fails to consider important aspects of the problem.

151.   BOEM's decision ignored critical new information about Sable's actual plans to resurrect this long-dormant, post-failure oil project, including the potential impacts of those plans. BOEM's decision failed to consider the fact that that Exxon already produced more oil from the Unit than contemplated in the DPP, Sable's plans to produce more oil and gas for years into the future, that the infrastructure has outlived its expected lifespan, that the risk of oil spills is heightened, the extent of greenhouse gas emissions and other air pollution from oil and gas production at the Santa Ynez Unit, that Exxon previously said that fugitive emissions from operations at the Unit are next to impossible to control, and that Exxon previously said it would likely need to use well stimulation treatments to

38

restart and continue production at the Santa Ynez Unit. BOEM's determination that the DPP for Platform Harmony in the Santa Ynez Unit need not be revised constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## REQUESTS FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief for their First Claim for Relief:

1. Declare that BOEM's April 29, 2025, decision that the DPP for Platform Harmony in the Santa Ynez Unit need not be revised is arbitrary, capricious, and not in accordance with OCSLA or its implementing regulations;

2. Compel BOEM to comply with OCSLA by ordering it to review changes in available information and other onshore or offshore conditions affecting or impacted by development and production at the Santa Ynez Unit or to require a revision to or supplementation of the DPP by a date certain;

3. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

4. Grant such other relief as the Court deems just and proper.

Plaintiffs respectfully request that this Court grant the following relief for their Second Claim for Relief:

1. Declare that BOEM's April 29, 2025, decision that the DPP for Platform Harmony in the Santa Ynez Unit need not be revised is arbitrary and capricious and not in accordance with OCSLA and its implementing regulations, in violation of the APA;

2. Vacate BOEM's decision;

3. Remand BOEM's decision to the agency for further analysis of all the relevant factors and order BOEM to issue a new decision by a date certain;

4. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

5. Grant such other relief as the Court deems just and proper.

Respectfully submitted this 4th day of June 2026.

 s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*
