UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-02840-MWC-MAA Date: August 31, 2026

Title: Center for Biological Diversity, *et al*. v. Doug Burgum, *et al*.

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
| --- | --- |
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| --- | --- |
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER GRANTING FEDERAL DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION (DKTS. [76], [77]); DENYING PLAINTIFFS LEAVE TO FILE AMENDED COMPLAINT; AND CLOSING CASE [JS-6]**

Before the Court are two Motions to Dismiss Plaintiffs' Second Amended Complaint, filed by Federal Defendants Doug Burgum, Secretary of the U.S. Department of the Interior, the Bureau of Ocean Energy Management ("BOEM"), and Douglas Boren, Pacific Regional Director of BOEM (collectively, "Federal Defendants") and by Intervenor-Defendant Sable Offshore Corp.'s ("Intervenor" or "Sable"). *See* Dkt. # 76 ("*Defs.' MTD*"); Dkt. # 77 ("*Sable MTD*"). Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (collectively, "Plaintiffs") opposed, Dkt. # 80 ("*Opp'n*."), and Federal Defendants and Sable both replied. Dkt. # 81 ("*Defs.' Reply*"); Dkt. # 82 ("*Sable Reply*"). On August 21, 2026, the Court held oral argument, with all parties present. After considering both the papers and the parties' oral arguments, the Court **GRANTS** both Motions to Dismiss (Dkts. # 76 & 77) and **DENIES** Plaintiffs leave to file an amended Complaint. The Clerk of Court is **ORDERED** to **CLOSE** this case **(JS-6)**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-02840-MWC-MAA Date: August 31, 2026

Title: Center for Biological Diversity, *et al*. v. Doug Burgum, *et al*.

I. Factual Background

The Court derives the following background information from Plaintiffs' Second Amended Complaint ("SAC"). Dkt. # 73 ("*SAC*").

A. Brief History of Santa Ynez Unit & Refugio Oil Spill

There are currently thirty (30) active oil and gas leases on the Pacific outer continental shelf from which oil and gas drilling extractions activities occur or have occurred. *Id.* ¶ 74. Most of these leases are organized into units. *Id.* The Santa Ynez Unit ("the SYU" or "the Unit") is in the Santa Barbara Channel and consists of sixteen (16) leases. *Id.* There are three offshore production platforms at the SYU: (1) Platform Harmony; (2) Platform Heritage; and (3) Platform Hondo. *Id.* Platform Hondo was installed in June 1976, Platform Harmony was installed in June 1989, and Platform Heritage was installed in October 1989. *Id.*

Oil and gas development and production activities in the Pacific, including at the SYU, have numerous harmful effects on coastal and marine species in California. *Id.* ¶ 75. Such harms include: the exacerbation of climate change, *id.* ¶ 76; the discharge of drilling muds and cuttings, producing wastewater, and well treatment and workover fluids, which can contain toxic chemicals, heavy metals, and radioactive materials, *id.* ¶ 77; worsening impacts to the environment and public health, including the discharge of toxic wastewater, emissions of hazardous air pollutants, and increased risks of earthquakes and oil spills, *id.* ¶ 78; the release of harmful air pollutants like fine particulate matter and volatile organic compounds ("VOCs"), such as benzene, toluene, ethyl benzene, and xylene ("BTEX compounds"), all of which can harm respiratory, nervous, and circulatory systems, create ground-level ozone or smog, and can contribute to asthma, premature death, stroke, heart attack, low birth weight, and increase cancer risks, *id.* ¶¶ 46, 80; the creation of noise pollution from vessel and air traffic, conductor installation and pile driving, and production operations on platforms, *id.* ¶ 81; the possibility of vessel strikes of large whales and other marine mammals, *id.* ¶ 82; and finally, the increased risk of oil spills, which "can have devastating impacts on a wide variety of wildlife," pose "an array of lethal and sublethal impacts on marine species, both immediate and long-term," and harm to "public health, commercial fisheries, tourism, and recreation." *See id.* ¶¶ 83–94 (providing history of oil spills and detailing affects to marine wildlife and the public).

In 1974, BOEM's predecessor agency approved Exxon's development and production plan ("DPP") for drilling at the SYU from Platform Hondo based on a plan submitted in 1971. *Id.* ¶ 110. BOEM subsequently approved an updated plan for drilling from Platforms Harmony and Heritage in 1985 based on a plan originally submitted in 1982, and again in 1988 based on an updated plan submitted in 1987. *Id.* ¶ 111. Between April 1981 and December 1993, production began from the SYU's platforms. *Id.* ¶ 97. In 1992, BOEM approved a supplemental plan to allow the installation of topsides (*i.e.*, the surface deck of a platform), and in 2014, BOEM approved another DPP amendment to allow the replacement of two existing power cables from the onshore Las Flores Canyon processing facilities to Platform Harmony and the installation of a power cable from Platform Harmony to Platform Heritage to support electrical and communication equipment on both platforms. *Id.* ¶ 113.

In May 2015, the SYU shut down oil and gas production after an onshore pipeline used to transport oil from the Unit ruptured at Refugio State Beach Park, releasing hundreds of thousands of gallons of heavy crude oil into the surrounding environment ("the 2015 Refugio oil spill"). *Id.* ¶ 2. Investigators determined the pipeline ruptured due to external corrosion of the pipeline wall, and further concluded that the pipelines' cathodic protection system, which is designed to prevent corrosion, was ineffective. *Id.* The oil spill destroyed thousands of acres of shoreline and near-shore ocean habitat and killed hundreds of birds and marine mammals. *Id.* ¶ 3. It also forced the closure of fisheries and beaches, jeopardizing local beaches, decreasing recreational use, and disrupting the lifeways and cultural practices of Plaintiffs' members. *Id.*

Until 2024, ExxonMobil Corporation ("Exxon") owned and operated all three platforms and produced oil from the SYU for decades. *Id.* ¶ 98. On February 14, 2024, Exxon sold the SYU and all associated assets to Sable. *Id.* ¶ 99. Exxon loaned Sable $622 million of the $625 million purchase price of the SYU, and in return, Sable agreed that the SYU may revert to Exxon if it failed to restart the SYU within two (2) years. *Id.* ¶ 100. Upon purchasing the Unit, Sable immediately began efforts to restart oil production, including use of the same onshore pipeline system that ruptured in 2015; Sable decided not to replace the original pipelines, but instead, to repair the existing pipeline. *Id.* ¶ 101. "Sable's restart efforts have been fraught with legal problems." *See id.* ¶¶ 102–06 (listing penalties, criminal charges, and lawsuits against Sable for restarting pipeline).

B. Restarting the SYU

In December 2024, BOEM issued a memorandum indicating that it was requiring all oil companies operating on the Pacific outer continental shelf to update their DPPs to account for terms and conditions of a National Marine Fisheries Service February 2024 biological opinion issued under the Endangered Species Act. *Id.* ¶ 114. The terms require BOEM to ensure that oil and gas vessel operators on the Pacific outer continental shelf report any collisions with marine mammals and sea turtles to the National Marine Fisheries Service. *Id.* On April 29, 2025, BOEM issued a decision memorializing its completion of a periodic review of the SYU DPP for Platform Harmony, indicating that the purpose of the review was Sable's planned "phased return-to-production of the SYU properties beginning with Platform Harmony" ("April 2025 decision"). *Id.* ¶ 115. The decision also states that BOEM will complete the review of the DPPs for two other platforms in the SYU, Heritage and Hondo, after the Bureau of Safety and Environmental Enforcement ("BSEE") completes pre-production safety inspections. *Id.*

BOEM's April 2025 decision states that its review resulted in a finding that "[n]o additional revisions of the DPP for Platform Harmony are needed at this time." *Id.* ¶ 116. The decision also states that BOEM reviewed various documents, including:

> [S]everal [documents] related to the 2015 Refugio oil spill; regulatory requirements for blowout prevention and financial responsibility for offshore facilities; the annual plan of operations for the [SYU] from 2010 through 2015; the Clean Water Act permit for oil and gas platforms in federal waters off California; historical flaring and venting data for the Unit, a worst case oil spill discharge analysis from 2016; and others.

*Id.* ¶ 117.

In September 2025, Sable submitted a pipeline "Restart Plan" to the State Fire Marshal for approval. *Id.* ¶ 107. On October 22, 2025, the State Fire Marshal notified Sable that it had failed to meet certain repair conditions of the State Waivers and could not restart the pipelines until Sable had performed the repairs and obtained approval of the restart plan. *Id.* Rather than comply with the State Fire Marshal's repair conditions, on November 26, 2025, Sable notified the Pipeline and Hazardous Materials Safety

Administration that Sable had determined that the SYU's onshore pipelines were interstate facilities and that the State Fire Marshal lacked jurisdiction. *Id.* ¶ 108. On December 17, 2025, the Pipeline and Hazardous Materials Safety Administration granted Sable's request and issued an order redesignating the pipelines as interstate, purporting to strip the State Fire Marshal of its authority to regulate the pipelines. *Id.* On December 22, 2025, the Pipeline and Hazardous Materials Safety Administration approved Sable's Restart Plan and authorized restart of the onshore pipelines. *Id.* In March 2026, Sable restarted production at the SYU from Platform Harmony. *Id.*

C. SAC Claims

The SAC alleges that BOEM's review "failed to consider any information about Sable's actual plans for restarting and operating the Unit, even though Sable's corporate filings contain specific details—such as estimates of reserves, a map of over 100 new drilling opportunities, and a post-restart production timeline." *Id.* ¶ 118. The SAC also alleges that BOEM failed to "consider how restarting oil and gas production [at] the [SYU] will result in a higher volume of production over a longer period of time than the existing DPP contemplates." *Id.* BOEM's review also allegedly "failed to consider whether resuming operations at the [SYU] will significantly increase air or water pollution, or whether it will result in air emissions and waste discharges in excess of permitted levels." *Id.* BOEM also allegedly "failed to consider how operating the Unit's aging, corrosion-prone infrastructure . . . will heighten the risk of oil spills." *Id.* The SAC further alleges that "restarting drilling activity would significantly increase the degree and composition of air emissions, the amount and composition of wastewater, and the volume of production," and that the SYU has already exceeded the level of production contemplated in the DPP and associated environmental analyses. *Id.* ¶¶ 119–20; *see also id.* ¶¶ 121–30.

Plaintiffs' SAC brings two claims. First, the SAC brings a claim under the citizen-suit provision of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1351(h)(1), (3) for BOEM's failure to consider changes in available information and failure to require an update to the SYU DPP. *See id.* at 37–39. Second, the SAC pleads that, in the alternative, BOEM's decision that the SYU need not be revised constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A), (D). *Id.* at 39–40.

II. Procedural History

On April 2, 2025, Plaintiffs initiated this action against BOEM, filing their original Complaint. Dkt. # 1. On May 12, 2025, Plaintiffs filed their First Amended Complaint ("FAC"). Dkt. # 12. On June 10, 2025, Sable intervened in this case, Dkt. # 28, and then moved to dismiss the FAC shortly thereafter, Dkt. # 31. On September 10, 2025, the Court denied Sable's motion to dismiss. *See generally* Dkt. # 39 ("*Sept. 10, 2025 Order*"). In resolving Sable's motion, the Court addressed the parties' dispute regarding which statute controls the present action: the APA or OCSLA. *See Sept. 10, 2025 Order* at 7–9 (addressing the "Statute Controlling Plaintiffs' Cause of Action") (emphasis omitted). The Court held, in pertinent part, that OCSLA controls this matter, explaining:

> Beginning with the question as to whether the APA provides an avenue for relief separate from OCSLA, making the 60-day notice requirement inapplicable, the Court finds that OCSLA controls. Plaintiffs' FAC indeed refers to BOEM's violation of or lack of compliance with OCSLA multiple times. . . . And since '[c]ourts must give effect, if possible, to every clause and word of a statute,' . . . the Court cannot overlook the plain language of OCSLA that 'all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of, the provisions of [OCSLA], or any regulation promulgated under this subchapter . . ., shall be undertaken in accordance with the procedures described in' OCSLA's citizen suit provision. 43 U.S.C. § 1349(a)(6). The same is true of the text of the APA, which counsels that judicial review is available 'for final agency action for which there is no other adequate remedy in a court.' 5 U.S.C. § 704. To adopt Plaintiffs' interpretation would require the Court to act as if there were no remedy available under the citizen suit provision of OCSLA, or as if Plaintiffs were not seeking to correct 'violations' of OCSLA, contrary to the plain language of the FAC. . . .
>
> . . . Plaintiffs provide no authority where a court interpreted a provision referring to 'all suits' challenging violations of or

> seeking enforcement of a statute as simultaneously allowing judicial review of the APA. . . .
>
> . . . With respect to Plaintiffs' argument that they are not bringing a suit under § 1349(a)(1) because they are not seeking a mandamus action, the Court likewise finds this reasoning unpersuasive. As detailed above, the Court has little doubt that Plaintiffs' lawsuit challenges BOEM's decision and alleges violations of OCSLA. . . .

*Id.* at 8–9 (internal citations omitted).

On November 20, 2025, Federal Defendants lodged the Administrative Record for this case, Dkt. # 49, and on December 8, 2025, Federal Defendants lodged a Supplemental Administrative Record. Dkt. # 50. Thereafter, the parties filed and fully briefed, among other things, cross-motions for summary judgment. Dkts. # 51, 57, 59. On May 14, 2026, the Court *sua sponte* dismissed the FAC for lack of Article III Standing ("Dismissal Order") and denied as moot the cross-motions for summary judgment. *See* Dkt. # 71 ("*Dismissal Order*"). The Dismissal Order contained three principal holdings. First, the Court held that "Plaintiffs have demonstrated a prospective, albeit, somewhat tenuous environmental injury in the possibility that Platform Harmony may result in a future oil spill." *Id.* at 15. Nonetheless, the Court held that, second, Plaintiffs failed to "demonstrate that OCSLA or its implementing regulations afford Plaintiffs a procedural right to the process of revising a DPP" under Section 1351(g) of OCSLA. *See id.* at 15–18. Finally, the Court held that Plaintiffs' environmental injuries were not redressable because the plain text of OCSLA's citizen-suit provision provides only that a person may commence a civil action to "compel compliance" with the terms of OCSLA, yet "[c]ompelling 'compliance' does nothing to likely redress Plaintiffs' declared injuries, as this would essentially revert to the deference of the Secretary [of Interior]." *See id.* at 18–24. Because the "Court is powerless to compel the Secretary to conduct another review, as Congress has afforded discretion about *when* to do so to the Secretary of Interior," the Court dismissed Plaintiffs' FAC with leave to amend. *See id.* at 21 (emphasis in original), 24.

On June 4, 2026, Plaintiffs filed their SAC. Dkt. # 72. Thereafter, Federal Defendants and Sable filed the instant motions to dismiss the SAC for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Defs.' Mot.*; *Sable Mot.* After completion of briefing

on the motions, *see Opp'n*; *Defs.' Reply*; *Sable Reply*, the Court held oral argument on August 21, 2026. Dkt. # 85.

## III. Legal Standards: Motion to Dismiss

### A. Rule 12(b)(1): Article III Standing

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *Exxon Mobil Corp v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). As such, "[i]t is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Gila River. Indian Cmty. v. Schoubroek*, 145 F.4th 1058, 1070 (9th Cir. 2025) (same). Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).

Article III of the Constitution limits the Court's authority to resolving "Cases" or "Controversies." U.S. Const., art. III, § 2. "The doctrine of standing, among others, implements this limit on [the Court's] authority." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (internal quotation marks and citation omitted). The Supreme Court "has established that the irreducible constitutional minimum of standing contains three elements that a plaintiff must plead and—ultimately—prove." *Id.* (internal quotation marks and citation omitted). "First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted). "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing the [three] elements of standing, and each element must be supported in the same way as any other

manner on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege factors demonstrating each element." *Spokeo*, 578 U.S. at 338 (cleaned up) (internal ellipses omitted); *Jones v. L.A. Cent. Plaza*, 74 F.4th 1053, 1056 (9th Cir. 2023). In a facial challenge to Article III standing, the Court must "accept the truth of the plaintiff's allegations," assess the sufficiency of the allegations "as it would a motion to dismiss under Rule 12(b)(6)," and apply "*Iqbal*'s pleading standards[.]" *Jones*, 74 F.4th at 1056 & n.1.

"If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citation omitted). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (parenthetical in original) (citations omitted). The three elements of standing "do[] not change in either the declaratory judgment or permanent injunction context." *Chandler v. Cal. Dep't of Corr. and Rehab.*, No. 1:21-cv-01657-JLT-HBK, 2024 WL 2153890, at *10 (E.D. Cal. May 14, 2024) (citations omitted); *see also Haaland v. Brackeen*, 599 U.S. 255, 292–92 (2023) (analyzing standing for plaintiffs' requests for declaratory and injunctive relief); *California v. Texas*, 593 U.S. 659, 671–72 (2021) (analyzing standing where the plaintiffs sought injunctive relief and a declaratory judgment); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 407–10 (2013) (analyzing standing for plaintiffs' requests for a declaratory judgment and permanent injunction); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1022 (9th Cir. 2023) (Article III standing requirement "is not relaxed in the declaratory judgment context.") (internal quotation marks and citation omitted). Indeed, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California*, 593 U.S. at 672 (citation omitted).

B. Rule 12(b)(6)

A defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "At the pleading stage, all allegations of material fact are taken as true and

construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell At. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the non-moving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.* at 773–74 (internal citation and quotation marks omitted) (cleaned up). However, "[c]onclusory allegations and unreasonable inferences do not provide [ ] a basis" for determining a plaintiff is entitled to relief. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("The court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (cleaned up). Nor may the Court accept legal conclusions and threadbare recitals of the elements of a cause of action. *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 723 (9th Cir. 2026) ("Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief.") (citation omitted); *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 893 (9th Cir. 2025); *Doe I v. Cysco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023) ("Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (cleaned up).

IV. Discussion

A. Whether the APA or OCSLA Controls

At the outset, the Court addresses the parties' preliminary arguments as to whether the APA or OCSLA controls this case. The SAC alleges an alternative theory under the APA that BOEM's April 2025 decision "constitutes a final agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" *SAC* ¶ 115. Sable moves to dismiss this claim, in part, maintaining that "[t]he law of the case is settled: the APA does not provide an independent basis for Plaintiffs to assert their OCSLA claims." *Sable MTD* at 28. Plaintiffs respond that they "are free to plead alternative claims and requests for relief in accordance with Federal Rule of Civil Procedure 8(a)(3) and (d)." *Opp'n* at 17. Plaintiffs further contend that because the Court previously found that OCSLA's "compel compliance" language constrains its authority to order relief, "then OCSLA does not provide an adequate remedy at law" and the APA cannot control. *See id.* at 19. Finally, Plaintiffs assert that the law-of-the-case doctrine does not apply to an amended Complaint, relying on the Ninth Circuit's decision in *Askins v. United States Department of Homeland Security*, 899 F.3d 1035, 1042 (9th Cir. 2018). *Id.* at 20. Even so, Sable's Reply brief reiterates that the Court's prior "decision was correct and it should reject Plaintiffs' attempt to relitigate these issues" because the Court has already "made the legal determination that the APA does not apply." *Sable Reply* at 17.

*i. Law-of-the-Case-Doctrine*

"The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Askins*, 899 F.3d at 1042 (quotation marks and citation omitted). The doctrine does not, however, "preclude a court from reassessing its own legal rulings in the same case." *Id.* Plaintiffs are correct that, in *Askins*, the Ninth Circuit squarely held that the law-of-the-case-doctrine does not apply when a district court dismisses a complaint with leave to amend, because it invites the plaintiff(s) to "include[] facts and claims that were different from those in the initial complaint." *Id.* at 1043. "Thus, when an original complaint is dismissed without prejudice, the filing of an amended complaint does not ask the court to reconsider its analysis of the initial complaint"—the amended complaint "is a new complaint, entitling the plaintiff to judgment on the complaint's own merits[.]" *Id.* ("[W]e do not ask whether the plaintiff is 'precluded' or 'barred' by the prior ruling.").

At the same time, if a district court "determines the amended complaint is substantially the same as the initial complaint, the district court is free to follow the same reasoning and hold that the amended claims suffer from the same legal insufficiencies." *Id.* "The district court may [then] decide the second motion to dismiss in the same way it decided the first, but permitting the filing of an amended complaint requires a new determination" so that the Court may "correct any errors or misunderstandings without having to find that its prior decision was 'clearly erroneous.'" *Id.*

Accordingly, in light of *Askins*, the Court declines to invoke the law-of-the-case-doctrine in this instance and rest on its prior ruling. However, at the same time, the Court cannot ignore the logic undergirding the *Askins* decision—that the law-of-the-case-doctrine should not apply to an amended complaint because the amended complaint supersedes the original, and in theory, adds new facts and claims that were different from the original. *Cf. Askins*, 899 F.3d at 1043. On September 10, 2025, the Court determined that though Plaintiffs' original Complaint raised an APA challenge, the citizen-suit provision of OCSLA controls because under the APA, "judicial review is available for 'final agency action for which there is no other adequate remedy in a court.'" *Sept. 10, 2025 Order* at 8 (quoting 5 U.S.C. § 704).

Upon review of Plaintiffs' original Complaint, Dkt. # 1, and the SAC, the Court cannot find any new claims or facts that would materially alter its September 10, 2025 analysis. Indeed, the only difference between the two Complaints is that Plaintiff's original Complaint preceded BOEM's April 2025 decision. *See* Dkt. # 1 (filed on April 2, 2025). This is a distinction without a difference, however, as the initial Complaint alleged that BOEM's "failure to require revisions of the DPPs for the Santa Ynez Unit . . . constitutes 'agency action unlawfully withheld or unreasonably delayed' within the meaning of the APA, 5 U.S.C § 706(1)." Dkt. # 1 ¶ 109. The initial Complaint alleged that, in the alternative, BOEM's determination "constitutes an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," just as the SAC alleges. *See id.* Given these allegations present in the original Complaint, the Court is not persuaded that the SAC has alleged new facts or legal theories that would require altering its September 10, 2025 analysis, and indeed, Plaintiffs' Opposition brief fails to point to any material changes. *See generally Opp'n*. Plaintiffs' initial Complaint and SAC bring the same legal theories. *See id.* The Court is thus not convinced that its prior analysis warrants a different outcome.

*ii. OCSLA Controls*

Nevertheless, out of an abundance of caution, the Court conducts a "new determination" of Plaintiffs' SAC. *Askins*, 899 F.3d at 1043.

Section 704 of the APA states that only "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy* in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added). If Congress "has enacted a special statutory review process for administrative action, that process applies to the exclusion of the APA." *Wilson v. Comm'r of Internal Revenue*, 705 F.3d 980, 990 (9th Cir. 2013). "The APA's preclusion of judicial review when there is another adequate remedy reflects Congress' judgment that the general grant of review in the APA ought not duplicate existing procedures for review of agency action or provide additional judicial remedies in situations where Congress has provided special and adequate review procedures." *Zhang v. Internal Revenue Serv.*, No. 26-cv-00525-VKD, 2026 WL 2210000, at *3 (N.D. Cal. July 30, 2026) (internal quotation marks and citation omitted).

Section 1349 of the OCSLA provides an avenue for citizen-suits, stating, in relevant part:

> Except as provided in this section, any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency . . . **for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter**, or of the terms of any permit or lease issued by the Secretary under this subchapter.

43 U.S.C. § 1349(a)(1) (emphasis added).

Here, Plaintiffs' SAC asserts that BOEM failed to examine available information and require an update to the SYU DPP, as it was required to do pursuant to Section 1351(h) of OCSLA. *See, e.g.*, *SAC* at 37. For instance, the SAC cites Section 1351(h)(1) of OCSLA to allege that the statute "mandates modification of a plan if . . . the lessee has failed to

make adequate provision in such plan for safe operations on the lease area or for protection of the human, marine, or coastal environment." *Id.* ¶ 142 (internal quotation marks omitted). The SAC further points to Sections 1351(h)(1)(A) and (D) to allege that OCSLA's own terms required BOEM to "disprove a plan if the lessee fails to demonstrate that he can comply with the requirements of [OCSLA] or . . . if implementation of the plan would probably cause serious harm or damage to life . . . or to the marine, coastal or human environments." *SAC* ¶ 143. Accordingly, the SAC alleges that because BOEM determined that Sable need not revise the DPP for Platform Harmony in the SYU despite relevant evidence pointing otherwise, BOEM's decision violated OCSLA. *See id.* ¶¶ 145–47.

Because the APA provides that a "reviewing court shall . . . *compel* agency action unlawfully withheld," 5 U.S.C. § 706(1) (emphasis added), while the citizen-suit provision of OCSLA allows select persons to "*compel* compliance" with its terms, 43 U.S.C. § 1349(a)(1) (emphasis added), the Court cannot determine that the alternative remedy provided under OCSLA is inadequate. *See, e.g.*, *Zhang*, 2026 WL 2210000, at *3 ("To be considered 'adequate,' an alternative remedy need not provide relief *identical* to relief under the APA, but it must provide relief of the same genre.") (internal quotation marks omitted) (citing *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1245 (D.C. Cir. 2017)); *see also Ctr. for Bio. Diversity v. Haaland*, No. 2:22-cv-06996-CAS-KSx, 2023 WL 3007920, at *5 (C.D. Cal. Apr. 17, 2023) ("As plaintiffs note, the plain text of the citizen-suit provision [of OCSLA] . . . appears to contemplate mandamus-type actions.") (citing 43 U.S.C. § 1349(a)(1)). Further, as another court in this District explained, "the plain text, statutory scheme, and legislative history of OCSLA all support plaintiffs' ability to sue seeking defendants' compliance with their statutory duty to review" DPPs, or, in this case, their failure to consider changes in available information and to require revisions of a DPP. *See Ctr. for Bio Diversity*, 2023 WL 3007920, at *5.

Moreover, OCSLA's citizen-suit provision provides that "any person" with a "valid legal interest" may commence a civil action "to compel compliance" against any government agency "for any alleged violation of any provision" of OCSLA. 43 U.S.C. § 1349(a)(1). Based on a plain reading of the SAC, this is the very relief that Plaintiffs seek—to compel BOEM's compliance with the terms of Section 1351(h) of OCSLA. *See SAC* at 37–39. Though Plaintiffs contest that there is no other adequate remedy under OCSLA based on the Court's Dismissal Order, this is not dispositive. *See Opp'n* at 19. Congress and the Ninth Circuit do not require that an alternative remedy be meritorious, or that the Plaintiffs demonstrate Article III standing to pursue an alternative remedy; instead,

the test is whether Congress enacted a "special statutory review process for administrative action," *Wilson*, 705 F.3d at 990, and whether such a review process provides for "relief of the same genre" as the APA. *Zhang*, 2026 WL 2210000, at *3. Here, the Court finds that such relief is found in OCSLA's citizen-suit enforcement provision. Accordingly, the Court rejects Plaintiffs' alternative theory that this is an APA case. The Court next turns to Federal Defendants' and Sable's Article III standing challenges.

B. Article III Standing

Plaintiffs are two nonprofit organizations. *See SAC* ¶¶ 20–25. "To have associational standing, each organization must show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." *Nat'l Fam. Farm Coal. v. U.S. Env'tl Prot. Agency*, 966 F.3d 893, 908 (9th Cir. 2020). Federal Defendants and Sable do not appear to challenge the latter two elements. Instead, each motion appears to only challenge the members' standing to sue in their own right.

*i. Injury-in-Fact*

First, Federal Defendants and Sable both maintain that Plaintiffs' environmental injuries are speculative and hypothetical. *See Defs.' MTD* at 3–5; *Sable MTD* at 20–21. Sable further argues that Plaintiffs failed to adequately allege a procedural injury under OCSLA. *Sable MTD* at 14–19. The Court separately addresses each theory.

a. Environmental Injuries

Federal Defendants and Sable first contend that the SAC raises only allegations of possible future injury in that BOEM's failure to require further revision to Platform Harmony's existing DPP may result in "increased risks of oil spills, vessel strikes, air pollution, underwater noise, and other environmental harms[.]" *Defs.' MTD* at 14; *see also Sable MTD* at 20 ("Plaintiffs' alleged injuries rest on a similarly speculative chain of future possibilities. . . . Plaintiffs discuss at length the potential recreational, cultural and aesthetic harms that they allege *may* result from an oil spill.") (internal quotation marks and citation omitted) (emphasis in original). The Court disagrees on at least two grounds.

First, the SAC does not allege any hypothetical or conjectural harm. Instead, the SAC alleges, in part, that "because the [SYU] platforms have been offline for nearly a decade, restarting drilling activity would significantly increase the degree and composition of air emissions, the amount of and composition of wastewater, and the volume of production." *SAC* ¶ 119. The SAC further alleges that "drilling activities at the [SYU] *will* emit air pollution in a quantity that exceeds the amount specified in the approved plans," and that "fugitive emissions have consistently occurred at [the SYU] facilities." *Id.* ¶¶ 123–24 (emphasis added). Finally, the SAC alleges that "[o]ffshore oil and gas drilling at the [SYU] degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of Santa Barbara beaches, shorelines, and the surrounding waters where offshore drilling occurs at the [SYU]." *SAC* ¶ 31. "In environmental cases, Article III standing requires injury to the plaintiff, not the environment." *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1007 (9th Cir. 2025) (citation omitted). The allegations in the SAC therefore appear certain and definite, as opposed to conjectural or hypothetical, and directly affect the Plaintiffs' members. Plaintiffs have adequately alleged an Article III environmental injury.

Moreover, to the extent that the SAC alleges a hypothetical in the possibility of an oil spill—for instance, in the allegation that "new information indicates an oil spill *could be* substantially larger than described in the DPP," this does not affect the standing analysis. *See SAC* ¶ 128 (emphasis added); *see also id.* ¶¶ 6 (alleging that the old age of the DPP "significantly increases the risk of oil spills"), 10 ("[A]n oil spill from production activities at the [SYU] *could be* substantially larger than that considered in the Unit's DPP.") (emphasis added). As the Court discussed in its previous Dismissal Order, "[t]hreatened environmental injury is by nature probabilistic" and Plaintiffs "need not prove to a scientific certainty" that restarting Platform Harmony will result in environmental damage. *Ecological Rights*, 230 F.3d at 1151–52 (internal quotation marks and citation omitted); *see also Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002). In any event, Plaintiffs have already demonstrated actual and concrete environmental injuries in their SAC. This theory lacks merit.

b. Procedural Injury

Federal Defendants and Sable next maintain that Plaintiffs' SAC still fails to "adequately plead a procedural injury connection with their OCSLA claim and requested

relief," and that "there is no 'procedure' that BOEM violated in its determination that no revision to the Platform Harmony DPP was required." *See Sable MTD* at 14–19; *Defs.' MTD* at 7–9. Plaintiffs respond that they have a "right to a procedurally sound DPP review process under section 1351(h)(3)," and explicitly note that their "procedural injuries are not tethered to 43 U.S.C. § 1351(g), as Sable suggests." *Opp'n* at 26 (internal quotation marks and citation omitted) & 27 n.5. Plaintiffs proffer that "an agency's failure to adequately evaluate information in the context of an impact review is a procedural injury, where compliance with the statute's mandates protect plaintiff's concrete interests." *Id.* at 27.

Where plaintiffs assert a procedural injury for standing purposes, "they must allege that (1) the agency committed a procedural violation, (2) the procedures in question 'protect a plaintiff's concrete interests,' and (3) 'it is reasonably probable that the challenged action will threaten their concrete interests." *City of Culver City v. Fed. Aviation Admin.*, 167 F.4th 1260, 1265 (9th Cir. 2026) (quoting *San Luis & Delta-Mondota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017), *as corrected* (Mar. 23, 2017)). "A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." *Id.* (quotation marks and citation omitted). In their Opposition brief, and again at oral argument, Plaintiffs suggest that "[a] procedural injury lies where an agency reached a substantive decision through a flawed decision-making process, not just where the statute provides a plaintiff the right to participate in that process." *See* Aug. 21, 2026 Hr'g Tr., Dkt. # 86 ("*Hr'g Tr.*") at 15:25–16:3. This assertion is incorrect. There must first be a source of law that confers a procedural right to a plaintiff. *See Save Bull Trout v. Williams*, 51 F.4th 1101, 1106 (9th Cir. 2022) (a procedural injury "requires [plaintiffs] to show that the procedures in question are designed to protect some threatened concrete interest of theirs that is the ultimate basis of their standing."); *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017) (plaintiffs must show that the "agency violated certain procedural rules") (cleaned up).

For example, a plaintiff may demonstrate a procedural injury in the procedures afforded by the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Sterling v. Feek*, 150 F.4th 1235, 1246 (9th Cir. 2025); *K.J. by and through Johnson v. Jackson*, 127 F.4th 1239, 1252 (9th Cir. 2025). Or, more apt to the instant scenario, it is well-established that environmental plaintiffs may demonstrate procedural injuries for alleged violations of Section 7(a)(2) of the Endangered Species Act, the text of which requires federal agencies

to "consult with the [United States Fish and Wildlife Services] or the [National Oceanic and Atmospheric Administration's National Marine Fisheries Service] before engaging" in action that may jeopardize the continued existence of endangered or threatened species. *See, e.g.*, *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779–80 (9th Cir. 2014); *see also Ctr. for Bio. Diversity v. U.S. Env'tl Prot. Agency*, 168 F.4th 1164, 1174 (9th Cir. 2026).

Here, the SAC alleges that OCSLA's "mandate that BOEM review previously approved [DPPs] based on new information and that the agency require an updated plan when necessary to ensure adequate environmental safeguards are in place . . . constitutes a procedural injury." *SAC* ¶ 34 (citations omitted); *see also Opp'n* at 26–27 & n.5 (specifying that theory of procedural injury is "not tethered to 43 U.S.C. § 1351(g), but instead, to Section 1351(h)(3)). Section 1351(h)(3) of OCSLA provides:

> The Secretary shall, from time to time, review each plan approved under this section. Such review shall be based upon changes in available information and other onshore or offshore conditions affecting or impacted by development and production pursuant to such plan. If the review indicates that the plan should be revised to meet the requirements of this subsection, the Secretary shall require such revision.

43 U.S.C. § 1351(h)(3).

As the Court's Dismissal Order noted, this provision accords great deference to the Secretary of Interior ("Secretary"). The issue, however, is this Section fails to mention *any* procedural requirements whatsoever—either external procedures afforded to the public, or internal procedures that must occur within the Department of Interior. Plaintiffs' Opposition brief points to the fact that in *City of Sausalito v. O'Neill*, the Ninth Circuit held that "a cognizable procedural injury exists when a plaintiff alleges that a proper [Environmental Impact Statement] has not been prepared under the National Environmental Policy Act[.]" 386 F.3d 1186, 1197 (9th Cir. 2024); *Opp'n* at 28. But, this procedural requirement was grounded in the plain terms of the Act, which "requires that an environmental impact statement be prepared for major Federal actions significantly affecting the quality of the human environment[.]" *City of Sausalito*, 386 F.3d at 12206 (quoting 42 U.S.C. § 4332(2)(C)). The same cannot be said in this case, where OCSLA has no such EIS requirement. *See, e.g.*, *id.* at 1197 ("[F]or Article III purposes, we may

recognize a 'procedural injury' **when a procedural requirement has not been met**, . . .") (emphasis added). Even in *National Family Farm Coalition v. United States Environmental Protection Agency*, 966 F.3d 893 (9th Cir. 2020)—which Plaintiffs rely on both in their Opposition brief and at oral argument, *see Opp'n* at 21–22, 25; *Hr'g Tr.* at 16:4–8, 17:6–11—the Court found a procedural injury grounded in the plain terms of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). *See* 966 F.3d at 909 ("Indeed, the registration standards at issue are the safeguards put in place by Congress to ensure that approved pesticides do not cause adverse effects on the environment.") (citing 7 U.S.C. § 136a.); *see also* 7 U.S.C. § 136a.(c) ("*Procedure* for registration") (emphasis added).

Though, as the Court noted in its Dismissal Order, OCSLA provides certain procedural requirements "[i]f approval of a [DPP] is not found to be a major Federal action, as defined under Sections 1351(e) and (f)," *Dismissal Order* at 16 (citing 43 U.S.C. § 1351(g)), Plaintiffs' SAC and briefing makes clear that they expressly do not rely on Section 1351(g) to assert a procedural injury. Nor have Plaintiffs attempted to demonstrate that this is not a major Federal action. Accordingly, because Plaintiffs wholly rely on Section 1351(h)(3) to accord a procedural injury, and because the plain terms of Section 1351(h)(3) do not provide for any procedural rights, the SAC fails to adequately assert any procedural injuries. The Court therefore declines to "relax[]" the "requirements of causation and redressability[.]" *Williams*, 51 F.4th at 1106.

*ii. Traceability*

Federal Defendants and Sable next contend that Plaintiffs' injuries fail to establish Article III's causation requirements. *Defs.' MTD* at 6; *Sable MTD* at 22–23. Federal Defendants maintain that Plaintiffs' alleged prospective injuries are too attenuated because they "depend, if they exist at all, upon Sable's future operational decisions and the occurrence of future environmental events that are unpredictable and independent of BOEM's challenged determination." *Defs.' MTD* at 6. Meanwhile, Sable contends that BOEM's April 2025 decision "was not necessary for Sable to resume operations at the SYU which have long been authorized." *Sable MTD* at 22 ("[C]ontrary to Plaintiffs' implications, any authorization of offshore drilling activities, . . . such as applications for permits to drill, would require additional approval through distinct regulatory processes, independent of the periodic review at issue here."). Sable further argues that Plaintiffs' causation theory rests on an attenuated chain of conjecture. *Id.* at 23. Plaintiffs' response,

in part, relies on the fact that because Plaintiffs asserted procedural injuries, the Court should relax their causation requirements. *See Opp'n* at 31 (arguing that "a plaintiff asserting a procedural injury need only establish a reasonable probability of the challenged action's threat to his concrete interest") (emphasis omitted) (cleaned up) (internal quotation marks and citation omitted).

"The second and third standing elements—causation and redressability—are often flip sides of the same coin." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (internal quotation marks and citation omitted). For instance, "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Id.* "To survive a motion to dismiss for lack of constitutional standing,[] plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citation omitted). A causation theory does not fail "simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain plausible." *Id.* (cleaned up) (citation omitted). "In cases where a chain of causation involved numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, the Supreme Court and [the Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." *Id.* (internal quotation marks and citations omitted); *see also Murthy v. Missouri*, 603 U.S. 43, 68 n.8 (2024) ("The whole purpose of the traceability requirement is to ensure that in fact, the asserted injury was the consequence of the defendants' actions, rather than of the independent action of a third party.") (internal quotation marks and citation omitted).

"[E]nvironmental plaintiffs must make some showing of how the agency's failure to account for environmental consequences affects them, even if environmental effects might not be realized for many years." *Ctr. for Bio Diversity*, 141 F.4th at 1008 (internal quotation marks and citation omitted); *see also Food & Drug Admin.*, 602 U.S. at 383 ("The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."). "For example, when the government regulates (or under-regulates) a business," as is alleged here, "the regulation (or lack thereof) may cause downstream or upstream" injuries to others in the chain, including "individual users." *Food & Drug Admin.*, 602 U.S. at 384–85. Even so, "to establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury[.]" *Id.* at 385.

The asserted injuries in this case are the Plaintiffs' members "recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities" along the Santa Barbara and Goleta coastline. *See SAC* ¶ 22. "Plaintiffs' members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future." *Id.* Yet, as the SAC alleges, "[o]ffshore oil and gas drilling at the [SYU] degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of Santa Barbara beaches, shorelines, and the surrounding waters where offshore drilling occurs at the [SYU]." *Id.* ¶ 31. "It harms their health and the water quality and wildlife that they study, fish for, and observe and decreases their ability to view species that are impacted by offshore drilling activities or abandon the area because of these activities." *Id.*; *see, e.g.*, ¶ 31 (alleging that one Center member who regularly surfs off the coast of Santa Barbara is impacted "from oil and gas drilling activities at the [SYU] due to [n]oise pollution, water pollution, vessel strikes, oil spills, and other impacts").

Here, Plaintiffs' causation theory fails for two separate reasons. First, Plaintiffs' causation chain is far too attenuated. As alleged in the SAC, Plaintiffs maintain that had BOEM considered additional information about Sable's plans to restart the Unit, including, among other things, "estimates of reserves, a map of over 100 new drilling opportunities, and a post-restart production timeline,"; the "aging, corrosion-prone infrastructure" of the DPP; that restarting the Unit would result in a "higher volume of production" of oil than originally contemplated by the existing DPP; and that restarting the DPP will significantly increase air and water pollution, then BOEM would have required an updated plan of the DPP. *See SAC* ¶ 35, 118. By considering this updated plan, BOEM may have required Sable to provide for additional mitigation and oversight of offshore drilling activities, and this potential additional mitigation efforts would possibly "alleviate" the Plaintiffs' alleged injuries. *See id.* ¶ 35. But this theory is far too hypothetical and attenuated, and wholly relies on the Secretary's discretion. *See* 43 U.S.C. § 1351(h)(3). Nor does it provide a predictable or plausible chain of events.

Second, staying confined to the allegations contained in the Complaint—as the Court must do at this stage—Plaintiffs' injuries appear to result as a byproduct of *any* kind of offshore oil and gas activities. *See SAC* ¶¶ 31–33. The SAC makes no distinction as to what levels or degree of offshore activities are acceptable to Plaintiffs, nor does the SAC provide a level of offshore drilling that would alleviate Plaintiff's alleged harms. Instead, the SAC is clear that *any* type of offshore oil and gas drilling at SYU "degrades Plaintiffs' members" recreational, spiritual, aesthetic enjoyment of the beaches and waters. *See id.*

¶ 31. Because Plaintiffs' injuries stem from offshore oil and gas drilling, it is also unclear that BOEM and Sable are responsible for Plaintiffs' injuries. Indeed, as the SAC provides, on December 22, 2025, "the Pipeline and Hazardous Materials Safety Administration approved Sable's Restart Plan and authorized restart of the onshore pipelines." *Id.* ¶ 108. Only after earning such approval did Sable restart production at the SYU from Platform Harmony. *Id.*

Thus, Plaintiffs' injuries are both hypothetical and attenuated, and not fairly traceable to BOEM and Sable, but instead, it seems, to the Pipeline and Hazardous Materials Safety Administration which approved of restarting the DPP in the first instance. Plaintiffs' causation theory thus fails to satisfy Article III's commands.

*iii. Redressability*

Finally, Federal Defendants and Sable assert that Plaintiffs' injuries are not redressable because even if BOEM reconsidered its April 2025 decision, Plaintiffs' theory assumes the agency would require revision of Platform Harmony's DPP and impose additional mitigation measures that would reduce their environmental harms. *See Defs.' MTD* at 7; *Sable MTD* at 23–27. Plaintiffs respond that their injuries are redressable because "a full evaluation of impacts as required by OCSLA could lead to a revision of the DPP that includes additional environmental safeguards." *Opp'n* at 34. "In other words, the requested relief—a full evaluation of relevant information—could result in an updated plan that provides for additional mitigation and oversight of offshore drilling activities at the [SYU] that would better protect the ocean and alleviate the injuries of Plaintiffs' members." *Id.* But, Plaintiffs again presume that the Court will relax the redressability requirement because they alleged procedural injuries. The Court declines to relax this requirement.

"To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020); *Day v. Henry*, 152 F.4th 961, 968 (9th Cir. 2025) ("Redressability is meant only to be a constitutional minimum, depending on the relief that federal courts are *capable* of granting.") (emphasis in original). "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021); *Diamond Alt. Energy, LLC v. Env'tl Prot.*

*Agency*, 606 U.S. 100, 120 (2025) ("Article III's redressability requirement serves to align injuries and remedies."). "The primary goals of [the redressability] requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions." *Diamond Alt.*, 606 U.S. at 120. Further, "to show redressability, the plaintiff must simply show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." *Id.* at 121; *G.B. by and through G.P. v. U.S. Env'tl Prot. Agency*, 172 F.4th 1042, 1064 (9th Cir. 2026). "The redressability inquiry" cannot "amount to a guess over whether a favorable decision will in fact ultimately bring about the plaintiff's broadest objective." *G.B.*, 172 F.4th at 1064 (quoting *Gutierrez v. Saenz*, 606 U.S. 305, 318 (2025)); *Juliana*, 947 F.3d at 1170 ("Redress need not be guaranteed, but it must be more than merely speculative."). Instead, "[r]edressability is satisfied so long as the requested remedy would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mecinas v. Hobbes*, 30 F.4th 890, 900 (9th Cir. 2022) (citation omitted). In analyzing redressability, the Court "assume[s]" that Plaintiffs have a "meritorious legal claim[][.]" *Juliana*, 947 F.3d at 1170.

Plaintiffs' SAC requests: (i) that the Court declare that BOEM's April 2025 decision is arbitrary, capricious, and not in accordance with OCSLA; and (ii) compel BOEM to comply with OCSLA by ordering it to review changes in available information or to require a revision to or supplementation of the DPP by a date certain. *SAC* at 40. Yet, as discussed above, the SAC alleges that Plaintiffs are injured by any and all types of offshore oil drilling and activities. Even if the Court issued a declaration and compelled BOEM to review additional material or revise the DPP, this will not stop Sable's offshore drilling activities. Moreover, for the reasons provided in the Court's Dismissal Order:

> OCSLA confers discretion on the Secretary of Interior to "require modification of a plan" only if "he determines" that the lessee failed to account for safe operations or the protection of the human, marine, or coastal environment. 43 U.S.C. § 1351(h)(1). Compelling "compliance" does nothing to likely redress Plaintiffs' declared injuries, as this would essentially revert to the deference of the Secretary. *Contra Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-

> causing party to reconsider the decision that allegedly harmed the litigant.") (emphasis added). Similarly, Section 1351(h)(3) cannot afford relief either. As the *Haaland* court explained, the only "non-discretionary obligation" required is that the Secretary "shall, from time to time" conduct reviews of "each plan approved under" OCSLA. 43 U.S.C. § 1351(h)(3). There is no dispute that BOEM conducted such a review in its April 2025 Decision. The Court is powerless to compel the Secretary to conduct another review, as Congress has afforded discretion about *when* to do so to the Secretary of Interior. *See id.*; *Waterkeeper*, 140 F.4th at 1215. Further, the statute only requires revision if the review indicates "that the plan should be revised to meet the requirements" of OCSLA. 43 U.S.C. § 1351(h)(3). Revision is then left up to the Secretary's read of the plan, and what he believes should happen next. *See id.*; *see also Handel v. Edlow*, No. 1:25-cv-00584-HBK, 2026 WL 84339, at *4 (E.D. Cal. Jan. 12, 2026) ("[T]he statute's use of 'sense' and 'should' signals precatory legislative intent but does not compel a compulsory duty. Black's Law Dictionary defines 'should' as 'no more than an obligation of propriety or expediency, a moral obligation . . . It does not ordinarily express certainty as 'will' sometimes does.'") (citing *Black's Law Dictionary* 1379 (6th ed. 1990)). Indeed, "[c]ourts define 'should' as permissive not a mandatory term." *Handel*, 2026 WL 84339, at *4 (citations omitted). Thus, compelling compliance of OCSLA does not compel revision to the Plan.

*Dismissal Order* at 21–22.

The Court finds that Plaintiffs' injuries are not redressable. In light of the foregoing, Plaintiffs have failed to plausibly allege Article III standing for their OCSLA claims. Because the Court determines that Plaintiffs lack Article III standing, the Court declines to consider Sable's arguments that Plaintiffs failed to provide an adequate 60-day notice under OCSLA. *See Sable MTD* at 31.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-02840-MWC-MAA Date: August 31, 2026

Title: Center for Biological Diversity, *et al*. v. Doug Burgum, *et al*.

The Court therefore **GRANTS** Federal Defendants' Motion to Dismiss (Dkt. # 76) and Sable's Motion to Dismiss (Dkt. # 77). Because Plaintiffs amended their Complaint, yet still failed to adequately demonstrate Article III standing for their claims, the Court finds that any further leave to amend is futile. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) ("[T]he district court's discretion to deny leave to amend is particularly broad where [the] plaintiff has previously amended the complaint."); *see also Becker v. Wells Fargo Bank*, 672 F. App'x 660, 663 (9th Cir. 2016). The Court therefore **DENIES** Plaintiffs leave to file an amended Complaint.

V. Conclusion

For the foregoing reasons, the Court **ORDERS** that:

1. Defendants' Motion to Dismiss and Sable's Motion to Dismiss (Dkts. # 76 & 77) are both **GRANTED**. The Court **DENIES** Plaintiffs leave to file an amended Complaint.

2. The Clerk of Court is instructed to **CLOSE** this case **[JS-6]**.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ